**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CAUSE NO. 5:25-mj-03354-GJF** |
| | § | |
| **MAXWELL JENSEN** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S APPEAL OF ORDER OF DETENTION PENDING TRIAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now the Defendant, MAXWELL JENSEN, by and through his attorney, BROCK BENJAMIN and pursuant to 18 USC Sec. 3145 appeals the Order of Detention Pending Trial filed in this matter and as grounds hereby states:

**I. Background.**

On August 21, 2025, a criminal complaint was filed in the District of New Mexico charging the defendant 18: Sec. 2314-Transportation of Stolen Goods.

On June 18, 2025, an FBI Special Agent of the Midland, Texas Resident Agency Office was notified by a confidential source of information (CS) that Maxwell Jensen was seeking to orchestrate a scheme in which he would pay off employees of oil production companies for crude oil. The CS explained to FBI that Jensen would be storing the stolen crude oil at 4154 7 Rivers Highway, Carlsbad, New Mexico (Target Location), and that Jensen was seeking a vacuum truck driver to pick up oil from third party locations, and the Target Location was used to receive

approximately 600 barrels of oil every day. At current crude oil prices 600 barrels is valued at $39,000. A tracker was requested and approved by the Court.

The tracker data revealed that from August 15, 2025, to August 18,2025, the Target Vehicle made four trips to Plains All American Pipeline sites. A total of 23 trips were recorded on the tracking device going to the Plains All American pipeline sites from July 22, 2025, to August 18, 2025. Agent Boone believes each of these trips involved the theft of crude oil.

ln recorded phone conversations between and the CS and Maxwell Jensen, Jensen discussed his associate, "Tom," (Rees) who ran Jensen's yard in Carlsbad, New Mexico under the business "Hound Dog." Over the course of the recordings, Jensen explained that Hound Dog received 25% of the illicit profits for oil sold from Target Location in Carlsbad, and, as of July 29, 2025, Rees had produced more than 100 load tickets.

The above facts are a snippet of the facts alleged in the five criminal complaints.

**II. Additional Information.**

Discovery has been produced which does not comport with any of the above. Simply there are no links as described above. The audio recordings describe actions with the cooperator in a different location in a different district- Western District of Texas- Odessa Texas.

**III. Detention-**

On August 22, 2025, the defendant was arrested in the District of Utah. On August 22, 2025, the defendant was initialed before the Honorable Dustin B. Pead, United States Magistrate Judge, in the District of Utah for Rule 5 Proceedings. On August 27, 2025, it appears the defendant waived his Identity and Detention hearings, and the defendant was remanded to the custody of the United States Marshals Service. A detention order has not been produced.

On September 25, 2025, the defendant appeared for his Initial Appearance hearing before Your Honor. The defendant was ordered to remain in custody pending further hearings. On September 30, 2025, the defendant appeared for a Preliminary/Detention Hearing before Your Honor.

**IV. Argument and Authorities-**

Under the Bail Reform Act of 1984, the presumption of detention under 18 U.S.C. 3142 is that an individual is bondable, and the government bears the ultimate burden of proving that no conditions of release can reasonably assure the defendants appearance in court and the safety of the community. *United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003), *United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003). The facts presented in the motion to revoke the detention order demonstrate that the presumption of release stands for Mr. Maxwell Jensen. Mr. Jensen therefore files this motion seeking the Court's review and release.

***1. Lack of Evidence of Danger to the Community:***

The government has not presented clear and convincing evidence that Jensen poses a danger to the community. The NACDL article attached as "Exhibit A" emphasizes that the presumption of detention cannot substitute for an individualized determination of dangerousness. Courts must consider whether the defendant poses an identified and articulable threat to a specific individual or the community. Here, the government has relied solely on the nature of the charged offense without presenting evidence of any specific threat posed by Jensen. The 10th Circuit has made clear that the nature of the offense alone is insufficient to justify detention.

***2. Reasonable Assurance of Appearance in Court:***

The government has also failed to prove by a preponderance of the evidence that no conditions of release can reasonably assure Jensen appearance in court. *United States v. Ford*, No. 89-20049-01, 1989 U.S. Dist. LEXIS 8525 (D. Kan. July 19, 1989), *United States v. Tyson*, No. 12-20083-15-KHV, 2012 U.S. Dist. LEXIS 106165 (D. Kan. July 31, 2012). Jensen's lifelong residence in Utah, property ownership demonstrate that he is not a flight risk. This case is truly an example of the United States fabricating an offense to detain an individual.

*4.* ***Improper Weight Given to the Presumption of Detention:***

The NACDL article underscores that the presumption of detention is often improperly treated as a mandate for detention rather than a rebuttable presumption. This practice contravenes the 10th Circuits requirement that courts must consider all factors under 3142(g) and make an individualized determination. In this case, the court appears to have given undue weight to the presumption without adequately considering the evidence rebutting it.

**VI. Request.**

The facts presented in the motion to revoke the detention order clearly rebut the presumption of detention. Jensen's strong community ties, familial obligations, and the lack of evidence of danger to the community demonstrate that conditions of release can reasonably assure her appearance in court and the safety of the community. *United States v. McCray*, CIVIL ACTION Case No. 96-40057-02-DES, 1996 U.S. Dist. LEXIS 17167 (D. Kan. Oct. 1, 1996), The government has failed to meet its burden of proof, and detention is not warranted under the Bail

Reform Act. This Court should grant the motion to revoke the detention order and release Jensen on the conditions recommended by Pretrial Services.

Respectfully submitted,

*/s/ Brock Benjamin*
BROCK BENJAMIN
Attorney for Defendant
New Mexico Bar No. 141535
1013 E. San Antonio Ave.
El Paso, Texas 79901
Tel: 915-412-5858
Fax: 915-503-2224
E-Mail: brock@brockmorganbenjamin.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this the 27th day of October, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

*/s/ Brock Benjamin*
BROCK BENJAMIN



# FREEDOM DENIED

## How the Culture of Detention Created a Federal Jailing Crisis

THE UNIVERSITY OF CHICAGO
THE LAW SCHOOL
Federal Criminal Justice Clinic

Alison Siegler, Lead Author | October 2022

EXHIBIT "A"

# FREEDOM DENIED

# Table of Contents


**AUTHORS & ACKNOWLEDGMENTS** P.5

**EXECUTIVE SUMMARY** P.15

**CONTEXTUALIZING THE CULTURE OF DETENTION** P.53

1. Publicly Available Data Provide Little Insight into the Causes and Contours of the Federal Bail Crisis.
2. The COVID-19 Pandemic Did Not Change the Federal System's Culture of Detention.
3. A Judge's Decision to Jail Someone Pretrial Has Damaging and Enduring Effects.
4. Legal Standards at Federal Bond Hearings

## FINDINGS & RECOMMENDATIONS P.81

1 Judges Must Follow the Correct Legal Standard at the Initial Appearance Hearing and Stop Jailing People Unlawfully. P.82

TAKEAWAYS P.84
THE LAW P.87
THE PRACTICE P.93
THE SOLUTION P.107

2 Judges Must Stop Unlawfully Jailing Poor People Without Lawyers at the Initial Appearance Hearing. P.110

TAKEAWAYS P.116
THE LAW P.118
THE PRACTICE P.128
THE SOLUTION P.141

3 Judges Must Follow the Correct Legal Standard in Presumption-of-Detention Cases to Reduce Racial Disparities and High Federal Jailing Rates.

| | |
|---|---|
| TAKEAWAYS | P.148 |
| THE LAW | P.151 |
| THE PRACTICE | P.158 |
| THE SOLUTION | P.168 |

P.146

4 Judges Must Stop Unlawfully Jailing People for Poverty Through Excessive Financial Conditions.

| | |
|---|---|
| TAKEAWAYS | P.172 |
| THE LAW | P.174 |
| THE PRACTICE | P.180 |
| THE SOLUTION | P.190 |

P.170

| | |
|---|---|
| CONCLUSION | P.193 |
| APPENDIX A: BACKGROUND & METHODOLOGY | P.199 |
| APPENDIX B: DISTRICT-SPECIFIC DATA COMPARISONS | P.217 |
| ENDNOTES | P.241 |

# AUTHORS & ACKNOWLEDGMENTS

# Authors

**Lead Author:** Professor Alison Siegler, Founding Director of the Federal Criminal Justice Clinic and Clinical Professor of Law, University of Chicago Law School, alisonsiegler@uchicago.edu.

**Federal Criminal Justice Clinic Student Authors:**

**Report Team Leaders and Primary Authors:**

- FCJC students (2021–2022): Clare Downing, Stephen Ferro, Angela Chang, and Jaden Lessnick
- Project Manager (2021–2022): Jacqueline Lewittes
- FCJC students (2020–2021): Sam Bonafede and Kate Harris
- Project Manager (2021): Noadia Steinmetz-Silber

**Additional Authors:**

- FCJC students (2021–2022): Alessandro Clark-Ansani, Krysta Kilinski, Mikaila Smith, and Paige Petrashko
- FCJC students (Summer 2022): Emma Stapleton and Sebastian Torrero
- FCJC students (2020–2021): Michael Belko and Adam (Psi) Simon

**About the Authors:** The Federal Criminal Justice Clinic (FCJC) is the nation's first legal clinic devoted to representing indigent clients charged with federal felonies, pursuing impact litigation in federal court, and engaging in systemic reform of the federal criminal system to combat racial and socioeconomic inequities.

**Additional Collaborators in the Federal Bailwatching Project**

This Report grew out of a data-gathering effort called the Federal Bailwatching Project, which was led by Professor Siegler and her students and supported by the collaboration of many others. More details on the project and the roles of the specific collaborators listed below can be found in Appendix A: Background & Methodology.

- Technical Advisor: Professor Sonja Starr, Julius Kreeger Professor of Law & Criminology, University of Chicago Law School

- Primary Advisor: Professor Erica Zunkel, Associate Director of the Federal Criminal Justice Clinic and Clinical Professor of Law, University of Chicago Law School
- Advisor: Professor Judith Miller, Faculty Member in the Federal Criminal Justice Clinic and Clinical Professor of Law, University of Chicago Law School
- Data Managers:
  - FCJC student (2021–2022): Angela Chang
  - Coase-Sandor Institute for Law and Economics (2021–2022): Research Specialist Dylan Baker and Research Professional Morgen Miller
  - Jacqueline Lewittes (2022)
- Project Managers:
  - FCJC intern (Summer 2022): Jacqueline Lewittes
  - FCJC student (Summer/Fall 2021): Krysta Kilinski
  - FCJC intern (Summer 2021): Michael Jeung
  - FCJC intern (Spring 2021): Noadia Steinmetz-Silber
- Law Faculty:
  - Courtwatching Site Managers:

    Baltimore Site Manager: Professor Maneka Sinha, Director of the University of Maryland Carey School of Law's Criminal Defense Clinic

    Boston Site Manager: Aliza Bloom, former Visiting Scholar, Boston University School of Law's Criminal Law Clinical Programs (now Faculty Fellow, Criminal Law and Procedure, New England Law School)

    Salt Lake City Site Managers: Professor Jon Powell, Director of Campbell Law School's Restorative Justice Clinic; and Assistant Monica Veno
  - Additional Faculty Collaborators:

    Harvard Law School's Criminal Justice Institute Clinic: Professor Dehlia Umunna, Faculty Deputy Director; Senior Clinical Instructor Lia Monahon, Managing Attorney; and former Clinical Instructor Sadiq Reza (now Visiting Professor of Law, Boston University School of Law)

    Boston University School of Law's Criminal Law Clinical Programs: Professor David Rossman, Director; and Professor Wendy Kaplan
- Student Courtwatching Site Managers, Miami: FCJC students Sam Bonafede, Kate Harris, and Stephen Ferro
- Interview Team Leaders: FCJC students Krysta Kilinski and Alessandro Clark-Ansani
  - Interview Team: Jennifer Chang and Sarah Tanner

- Technical Research Assistants: Jacob Jameson and Dhruv Sinha
- Chief Federal Public Defenders:

  Baltimore: Chief Federal Public Defender James Wyda

  Boston: Chief Federal Public Defender Miriam Conrad (ret.), Assistant Federal Public Defender Jane Peachy, and CJA Attorney Jessica Hedges

  Miami: Chief Federal Public Defender Michael Caruso

  Salt Lake City: Chief Federal Public Defender Scott Wilson and Assistant Federal Public Defender Robert Steele
- Qualtrics Experts (2020–2021): FCJC student Desiree Mitchell and Kaushal Addanki, Research Application Developer with the Center for Decision Research, University of Chicago Booth School of Business
- Fundraising Assistance: FCJC alum Kristin Greer Love
- Courtwatching Teams:
  - Baltimore Site, University of Maryland Carey School of Law students: Summer Akhtar, Katie Aumiller, Rose Cowan, Cynthia Faris, Rachel Greenwald, Elizabeth Harris, Meghan Howie, Kathryn Meader, Veronica Mina, Daniel Mooney, Emilia Lucy Petrillo, Avery Potts, Rachel Rabinowitz, and Kelsey Robinson
  - Boston Site:

    Boston University School of Law's Criminal Law Clinical Program students: Sophia Caprio, Michelle Daker, Nicole Dill, Andrew Gourley, Christina Morris, Alexander Phillips, Zachary Reid, Curtis St. Pierre, and Jacob Tarjick

    Harvard Law School's CJI students: Taylor Dodson, Maddy Gates, Maggie McGovern, Julia More, Erin Wetzel, and Gordon (Riley) Worrell
  - Miami Site, FCJC students: Michael Belko, Sam Bonafede, Clare Downing, Stephen Ferro, Kate Harris, Kathleen Larkin, Mikaila Smith, and Adam (Psi) Simon; Project Manager: Noadia Steinmetz-Silber; Interns: Alessandro Clark-Ansani and Molly Norris
  - Salt Lake City Site, Campbell Law School's Restorative Justice Clinic students: Aryana Ainolhayat, Ryan Cooke, John Davis, Haley Haynes, Ashley Holton, and Grace Massarelli
- Counsel at Initial Appearance Team: Haim (Ariel) Aiash, Jonathan Concepcion, E.J. Morera, Adam (Psi) Simon, and Luz (Or) Tur-Sinai Gozal
- FCJC Summer Interns:
  - 2022: Ricky Holder, Mabel Lewis, and Ethan Ostrow
  - 2021: Jacqueline Lewittes, Miles Ogihara, Esi Koomson, Gabriela Meschino, Molly Norris, and Shiv Puri

# Acknowledgments

This Report is the culmination of the tireless commitment, inspiring passion, zealous advocacy, and unwavering generosity of many over the last two years. Words are insufficient to communicate the depth of our gratitude, but we endeavor to acknowledge the support of those who made this Report possible.

We received a number of philanthropic contributions from individuals and organizations across the country. Their generosity fueled all aspects of our work, from quantitative analysis to data visualizations to the entire visual composition of this Report. This support and encouragement is extremely meaningful and impactful, and this Report would not exist without their engagement. We would like to recognize the Astor Street Foundation, as well as its President/Treasurer Sarah Olson Zimmerman, Vice President Lynde B. Uihlein, and Secretary John U. Olson; Pegah Sadr; the Yagan Family Foundation; Leah Harp; Paul Mandell; Michelle Williams; and Mitch Paradise.

We could not have conducted this project without the pivotal work done by the authors and collaborators named herein. Every contributor was essential, and many selflessly devoted hundreds—if not thousands—of hours of their precious time to this complex and multifaceted project.

We are deeply indebted to our Technical Advisor, Professor Sonja Starr, and our Primary Advisor, Professor Erica Zunkel. Their contributions and insights cannot be overstated. Professor Starr and Professor Zunkel provided an irreplaceable foundation for the data-gathering structure of the Federal Bailwatching Project that underlies this Report. They were integral in creating and conceptualizing this project, participating in countless early meetings and co-creating initial versions of the project's forms, protocols, online surveys, and trainings. This project would not have gotten off the ground without their involvement and effort. Professor Starr and Professor Zunkel remained invaluable thought-partners throughout the project, providing ongoing editorial commentary as we honed our procedures and materials. They also contributed meaningfully to early fundraising efforts.

Professor Starr oversaw many of the empirical and technical aspects of the Federal Bailwatching Project. Her quantitative deftness was essential: she spent myriad hours cleaning the data and conducting statistical analyses and provided indispensable support with the interpretation of our results. In addition, she hired and supervised the Technical Research Assistants and was extraordinarily generous in devoting her own faculty resources to compensate them.

Professor Zunkel had the brilliant idea of using courtwatching—an efficacious tool in state-level bail reform—to conduct an in-depth examination of the federal bail system and co-directed the Chicago Pilot Study (2018–2019) that served as the model for this broader project. Professor Zunkel also played a central role in the FCJC's legislative advocacy around the Bail Reform Act, was instrumental in setting up this project's first courtwatching site, and provided outstanding feedback on this Report throughout its concept and drafting phases. In addition, Professor Zunkel's personal support was indispensable to completing this enormous project.

We benefited tremendously from our Advisor, Professor Judith Miller. We are deeply indebted for her guidance and support throughout this project. This Report is informed by her in-depth research into numerous legal issues, including the presumption of detention and the right to counsel at Initial Appearance. The insights and feedback that she provided throughout the concept and drafting phases improved this Report immeasurably.

The FCJC students who worked on this project are the unmistakable embodiment of this Andy Warhol observation: "They always say time changes things, but you actually have to change them yourself." Words cannot begin to express our gratitude to the FCJC Report Team Leaders and Primary Authors (Clare Downing, Stephen Ferro, Jaden Lessnick, Sam Bonafede, and Kate Harris), Project Managers (Jacqueline Lewittes, Noadia Steinmetz-Silber, Krysta Kilinski, and Michael Jeung), Courtwatching Site Managers (Sam Bonafede, Kate Harris, and Stephen Ferro), Interview Team Leaders (Krysta Kilinski and Alessandro Clark-Ansani), and to Angela Chang for serving as both a Data Manager and as an FCJC Report Team Leader & Primary Author. The whole is greater than the sum of its individual parts; together, they were the backbone of this prodigious project and devoted themselves to it entirely. While still students, they exemplified the most impressive and commendable traits of the very best lawyers. They went above and beyond at every turn, working nights, weekends, and vacations to ensure the project's success. Their selflessness is unmatched: several continued to contribute to this project after their graduation while studying for the bar. We are forever indebted to them for their unwavering devotion to our collective mission, their tireless work ethic, and their remarkable commitment to bringing the vision for this Report to fruition.

This project also benefited tremendously from the colossal contributions made by the Law Faculty Site Managers—Professor Maneka Sinha, then-Visiting Scholar Aliza Bloom, Professor Jon Powell, and Assistant Monica Veno; Law Faculty Collaborators—Professor Dehlia Umunna, Senior Clinical Instructor Lia Monahon, then-Clinical Instructor Sadiq Reza, Professor David Rossman, and Professor Wendy Kaplan; Chief Federal Public Defenders James Wyda, Miriam Conrad, Michael Caruso, Scott Wilson; First Assistant Federal Public Defender Robert Steele; and their staff. Their active and enthusiastic partnership enabled us to expand the courtwatching component of our study to 4 federal courthouses. This Report centers around the quantitative data their support enabled us to collect. The Chief Federal Public Defenders committed themselves wholeheartedly to getting the courtwatching off the ground, sustaining the project, and troubleshooting issues as they arose. Our faculty partners pivoted from their own work to dedicate themselves and their students to this joint project. We are deeply appreciative of their willingness to venture into new territory, supervise their students throughout the complex and intensive courtwatching phase, and devote their staff's energy and resources as well.

Special appreciation goes to Boston Site Manager Aliza Bloom, who was a true partner in creating and executing the entire courtwatching project—she wrote, edited, and contributed to countless iterations of every form and protocol, conducted multiple trainings of students in her clinic and beyond, and advised students across the project on courtwatching and coding techniques to ensure the accuracy of our data.

Many thanks as well to the courts whose public access policies enabled us to observe bond hearings via Zoom in their districts: U.S. Chief District Court Judge James Bredar of the District of Maryland, that district's federal magistrate bench, and court staff; the federal magistrate judges in the District of Massachusetts; the federal magistrate judges in the Southern District of Florida; and the federal magistrate judges in the District of Utah. We are also grateful to the many current and former judges who consulted with us at various points in our study, including Judge Gabriel Fuentes, Judge Nancy Gertner, Judge Jonathan Hawley, and Judge Evelyn Furse.

We greatly appreciate the 48 federal magistrate judges, Chief Federal Defenders, and Assistant Federal Defenders who participated in an interview with our team. To ensure candor, we promised interviewees that we would de-identify them, would not list their names in this Report, and would not attribute quotes to them directly. We therefore thank them here, collectively and individually, for giving so generously of their time, insight, and wisdom. Despite their different backgrounds, experiences, and perspectives, the interviewees were united by their commitment to the fairness and transparency of the federal criminal system. We are especially humbled by the frankness every stakeholder brought to

these interviews. Their interviews were essential to our ability to provide a truly national perspective on the federal bail process.

A special acknowledgment for the Coase-Sandor Institute and our Data Managers Morgen Miller and Dylan Baker, who graciously dedicated their data expertise to this project for over a year. Thanks, too, to Technical Research Assistants Jacob Jameson and Dhruv Sinha, who worked with Professor Starr and alongside Coase-Sandor. Together, the data team spent countless hours writing code to clean, merge, and analyze our massive data set, often working late into the night to ensure the validity of our results. Their boundless patience in addressing our around-the-clock requests is commendable.

We also express our sincerest thanks to the many law students from a diverse array of legal clinics who willingly gave their time and brainpower to court-watching, observing hearing after hearing, and meticulously coding their results into complex online forms. Their work lies at the heart of this Report, which would not have been possible without them.

Thanks to the entire team at Voilà:—Francis Gagnon, Timour Screve, Celia Albano, and Jonathan R. Miranda—for creatively and industriously crafting a visual identity for this Report and shepherding it from concept to reality.

We greatly appreciate the commitment of the Law School's Communications office, Associate Dean for Communications Marsha Nagorsky, Manager of Digital Communications Quinn Baron, and Director of Information Technology David Gulbransen. Many thanks for their phenomenal website design and production support.

The FCJC would not be able to push for systemic change without the institutional support of the University of Chicago Law School, Dean Thomas Miles, and Professor Jeff Leslie, the Director of Clinical and Experiential Learning. Their generous support enabled us to print and bind our Executive Summary.

Professor Siegler personally thanks Professor Zunkel and Professor Miller for being zealous advocates, inspirational professors, dedicated change-makers, and exceptional partners in the FCJC.

Professor Siegler also thanks the following for their unsparing support, help, and encouragement throughout this project: Patricia Richman, David Patton, Milagros Cisneros, Eric Vos, and the federal defender community; Premal Dharia; Judge Ben Hernandez-Stern; FCJC alums Andrew Grindrod, Amanda Penabad, Matthew Deates, and Professor Stephanie Holmes Didwania; Brandon Buskey, Andrea Woods, Jennesa Calvo-Friedman, and the ACLU Criminal Law Reform Project; Frank Draper, Craig Crawford, and the Training Division of the Defender Services Office of the Administrative Office of the U.S. Courts; Mark Sherman,

Jim Chance, Cassandra Snyder, Jefri Wood, and The Federal Judicial Center; the bail reform community, including Kanya Bennett, Twyla Carter, Sharlyn Grace, Robin Steinberg, Alec Karakatsanis, Rachel Foran, and Dr. Rachael Bedard; Kyle O'Dowd and the members of the Pretrial Release Working Group; Rachel Rossi; Bill Hicks; Diane Testa; Steve Marenberg and Alison Whalen; Ali Flaum; Robin Walker Sterling; Heather Lewis Donnell; Alaina Harkness; Damon Hemmerdinger; and Kara Hailey. I am also grateful to my children, Zetta and Mira, and my parents, Anna and Mark Siegler.

And finally, Professor Siegler thanks her PD mentors: Carol Brook, John Murphy, Abbe Smith, John Copacino, Jonathan (Rap) Rapping, Steve Bright, and Glenn Falk. Your brilliance and dedication have guided me for decades. You inspired me to speak out in the face of injustice and to believe that system-change is possible.

Design and visualizations by Voilà: | chezVoila.com



# EXECUTIVE SUMMARY

**Over thirty years ago, the Supreme Court held that people charged with federal crimes should only rarely be locked in jail while awaiting trial: "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[1] Given that everyone charged with a crime is presumed innocent under the law, federal judges should endeavor to uphold the Court's commitment to pretrial liberty.**

**This Report reveals a fractured and freewheeling federal pretrial detention system that has strayed far from the norm of pretrial liberty.**[2] This Report is the first broad national investigation of federal pretrial detention, an often overlooked, yet highly consequential, stage of the federal criminal process. Our Clinic undertook an in-depth study of federal bond practices, in which courtwatchers gathered data from hundreds of pretrial hearings. Based on our empirical courtwatching data and interviews with nearly 50 stakeholders,[3] we conclude that a "culture of detention" pervades the federal courts, with habit and courtroom custom overriding the written law.[4] As one federal judge told us, "nobody's . . . looking at what's happening [in these pretrial hearings], where the Constitution is playing out day to day for people."

**Our Report aims to identify why the federal system has abandoned the norm of liberty, to illuminate the resulting federal jailing crisis, and to address how the federal judiciary can rectify that crisis.** This Report also fills a gaping hole in the available public data about the federal pretrial detention process and identifies troubling racial disparities in both pretrial detention practices and outcomes.

Federal pretrial jailing rates have been skyrocketing for decades. Jailing is now the norm rather than the exception, despite data demonstrating that releasing more people pretrial does not endanger society or undermine the administration of justice. Federal bond practices should be unitary and consistent, since the federal bail statute—the Bail Reform Act of 1984 (the BRA)—is the law of the land and governs nationwide.[5] Yet this study exposes a very different reality than that envisioned by the Supreme Court, one in which federal judges regularly deviate from and even violate the law, and on-the-ground practices vary widely from district to district.

This Report was researched and written by Professor Alison Siegler and students and interns in the Federal Criminal Justice Clinic at the University of Chicago Law School (FCJC).[6] Over the course of two years, our team conducted an extensive courtwatching study in which we observed over 600 bail hearings across 4 federal district courts: The District of Massachusetts in the First Circuit, the District of Maryland in the Fourth Circuit, the District of Utah in the Tenth Circuit, and the Southern District of Florida in the Eleventh Circuit. With the help of faculty and clinic students from 4 other law schools, we gathered, coded, and analyzed data about federal pretrial detention, and mined the docketing system for additional information. We also generated qualitative data by interviewing 48 federal magistrate judges and federal public defenders from 36 federal district courts across 11 federal circuits.[7]

In this Report, we document the federal bail crisis on a national scale.[8] Professor Siegler previously testified before Congress: "The federal pretrial detention system is in crisis . . . but its problems have been largely overlooked."[9] We use both quantitative and qualitative data to bring attention to this disturbing reality. Our Report highlights a troubling divergence between the written bail law and on-the-ground practices across the country, as well as racial disparities in pretrial detention practices.[10] The legal violations that we identify in this Report are surely unintentional. Federal judges respect the law and do their best to follow it. But based on our research, we conclude that federal courts have allowed misguided and entrenched practice norms to overshadow the law.

To rectify the situation, judges must adhere more closely to the laws governing the pretrial process and take decisive steps to shift the culture from one that prioritizes detention to one that prioritizes release. This Report seeks to encourage that culture shift by:

- Describing our courtwatching data, which reveal the myriad ways in which judges detain federal arrestees in contravention of the legal standards in the BRA, and clarifying those legal standards;
- Furnishing qualitative evidence that our findings are replicated beyond the 4 districts where we engaged in courtwatching;
- Highlighting the racial disparities that result from judges' detention and release decisions and prosecutors' requests for pretrial detention;

- Illuminating the individual and societal harms of jailing; and
- Providing a set of concrete recommendations and best practices for judges to rectify the crisis.

**Although the existing evidence shows that the federal bail system is in crisis, it does not show why or how that crisis is occurring.** Our data provide insight into federal pretrial detention practices that cannot be evaluated via publicly available information published by the Administrative Office of the United States Courts (AO) or the Bureau of Justice Statistics (BJS). **The AO and BJS provide zero data about basic and fundamental aspects of the federal pretrial detention system.** The AO's national public data often effaces information about racial disparities and provides little insight into the drivers of mass pretrial jailing. Although the AO retains vast quantities of data,[11] it sharply curbs public access to information pertaining to race,[12] the length of pretrial detention,[13] and the miniscule rate at which people released on bond reoffend or flee.[14] The AO also fails to disaggregate data into the two distinct stages of the federal pretrial process—the Initial Appearance and the Detention Hearing—frustrating researchers' abilities to understand how pretrial detention plays out in practice.[15] And neither the AO nor BJS publicly tracks the rate at which indigent individuals go unrepresented by counsel during the Initial Appearance hearing, let alone the race and citizenship status of people locked in jail without lawyers at that hearing.

# Our Report aims to identify why the federal system has abandoned the norm of liberty, to illuminate the resulting federal jailing crisis, and to address how the federal judiciary can rectify that crisis.

1

# Pretrial Detention Is Now the Norm, Not the Exception.

**The BRA prioritizes pretrial release, placing the burden on prosecutors to establish that a person who is presumed innocent should be locked in jail pending trial rather than released into the community. Under the statute, there is a *presumption of release* for most arrestees.[16] The BRA's preference for pretrial release is further evinced in § 3142(j), which mandates: "Nothing in this section shall be construed as modifying or limiting the presumption of innocence."[17]**

In *United States v. Salerno*,[18] the Supreme Court deemed the BRA constitutional based on provisions that—on paper—protect the rights of the accused. Because the statute contained procedural and substantive "safeguards" for arrestees, the Court found that "the provisions for pretrial detention in the BRA" protect pretrial liberty and render pretrial detention "[the] carefully limited exception."[19] Appellate courts agree that "[t]he default position of the law . . . is that a defendant should be released pending trial."[20]

This Report illustrates that many of the safeguards implemented by Congress and trumpeted by *Salerno* are not honored in practice. Since the BRA was enacted in 1984, the rate at which people charged with federal crimes are locked in jail pending trial has been on the rise. In 1983, less than 24% of people charged with federal crimes were detained pending trial.[21] The year after the BRA was enacted, the federal system's pretrial detention rate increased to 29% (with 19% of arrestees held without bail and an additional 10% held on

# This Report illustrates that many of the safeguards implemented by Congress and trumpeted by *Salerno* are not honored in practice.

financial conditions they could not meet).[22] Pretrial detention rates proceeded to soar; by 2019, people charged with federal crimes were detained at a rate of 75%.[23] *See* Figure 1. Even during the COVID-19 pandemic, pretrial jailing rates have remained extremely high.[24] In addition to demonstrating how far federal practice has strayed from the presumption of innocence and the statutory presumption of release, these exorbitant rates of pretrial detention have staggering consequences. Every person "detained" pending trial is removed from the community and locked in a jail cell, while every person released returns home.[25]

**Figure 1: Federal Pretrial Detention Rates Have Skyrocketed Since the BRA Was Enacted (1983–2019).**




These rising jailing rates cannot be explained by prosecutors charging individuals with more serious offenses. A recent study by the federal courts found that, over the past ten years, the federal detention rate has increased across all offense types, "even [after] adjusting for the changing composition of the federal defendant population."[26] Differences in charging practices between state and federal systems likewise do not explain the ballooning federal detention rates. The states see a markedly higher rate of violent crime than the federal system.[27] Yet the states detain just 38% of people in felony cases and 45% of people charged with violent felonies, both a far cry from the 75% pre-pandemic federal detention rate.[28]

Not only have pretrial detention rates risen in recent decades, but over the past 40 years, the length of time people spend in federal jail awaiting trial has increased nearly sevenfold.[29] *See* Figure 2. Today, an individual who is detained pretrial spends, on average, nearly a year in jail.[30] Contrast this with the less than 2 months that the average person who was detained pretrial spent in a federal jail cell in 1985, the year after the BRA was enacted.[31]

**Figure 2: The Average Length of Federal Pretrial Detention Has Ballooned Since the BRA Was Enacted (1983–2021).**




High detention rates and lengthy jail terms impose exorbitant and unnecessary costs on taxpayers. In 2021, it cost $35,758 to put a single person in jail for a year, a figure more than 8 times higher than the $4,340 it cost to supervise that same person on bond in the community.[32] Based on the number of people detained pretrial each year and the average length of their detention, we estimate that taxpayers spend more than one billion dollars per year to pay for federal pretrial jailing.[33] The total cost of mass detention is a substantial portion of annual allocations for all federal carceral facilities,[34] yet such high expenditures are not necessary to ensure appearance at trial and community safety.

The fiscal cost of federal pretrial detention pales in comparison to the human costs. The burden of federal pretrial detention overwhelmingly falls on poor people of color. Nationally, 81% of those charged with federal crimes are non-white.[35] In our study, 87% of the arrestees whose cases we observed were people of color. *See* Figure 3. The federal bail crisis thus exacerbates racial disparities in the system writ large.[36] On the economic front, 90% of people charged with a federal crime do not have the money to hire their own lawyer,[37] a clear indicator that most people facing pretrial detention are poor.

**Figure 3: People of Color Are Disproportionately Charged with Crimes in the Federal System.**




**Data prove that locking away so many human beings is not necessary to promote the two goals at the heart of the BRA: ensuring that people released on bond appear in court and do not commit additional crimes.**[38] Releasing more people does not lead to increased rates of flight or crime. In fact, the rates at which people on federal pretrial release either fail to appear for court or are rearrested for new crimes are extraordinarily low across the board, with both sitting at approximately 1–2%.[39] *See* Figure 4. Those rates have remained vanishingly low over time, from the 1980s through today, regardless of any changes in the federal criminal population or the types of crimes charged.[40]

**Figure 4:** **Even When Release Rates Increase, Arrestees Almost Never Flee or Recidivate.**




Strikingly, rates of nonappearance and rearrest are just as low in the federal courts with the *highest* pretrial release rates as they are in the districts with the *lowest* release rates.[41] *See* Figure 4. And those rates remained similarly low even as judges released slightly more people during the pandemic.[42] Moreover, these low rearrest rates certainly overestimate recidivism, because they capture those people who were *arrested* for any type of offense while on pretrial release (even a misdemeanor or driving violation).[43] There is no public information about *conviction* rates on pretrial release, but they are necessarily even lower than rearrest rates.[44]

This evidence proves that federal judges could release far more people pending trial without making their communities any less safe or risking non-appearance. In fact, the federal rates are far lower than the approximately 10% failure-to-appear and rearrest rates in what

are considered to be "high-performing" state-level courts, such as the District of Columbia (D.C.) system.[45] For example, the D.C. Pretrial Services Agency reported that, over the past 5 years, D.C.'s failure-to-appear rate was 10%[46] and its rearrest rate was 12%,[47] and the agency set a "strategic goal"[48] of maintaining these rates. A recent study of bail reform in Harris County, Texas, similarly found an approximately 10% failure rate for both measures and concluded that this "did not substantially impede the resolution of cases."[49] That same study further "obtain[ed] unambiguous results that clearly show that the increase in release rates [after reform] . . . was not associated with an increase in future crime."[50]

Given the lack of publicity around federal bail practices, it is entirely possible that judges who jail people pretrial are neither aware of these low failure rates nor relying on them in their detention decisions. Instead, judges respond to institutional pressures and misplaced fears that contribute to the culture of detention. Some federal magistrate judges over-detain in response to the classic "Willie Horton problem"—the fear that a released arrestee may commit a new crime[51]—despite data showing that this is a statistical improbability in the federal system. Other federal magistrate judges may over-detain out of the more personal fear of losing their jobs, since they serve limited terms at the discretion of the district court.[52]

High pretrial detention rates also fly in the face of overwhelming evidence demonstrating that pretrial jailing does not advance its stated purpose of ensuring appearance and community safety. **Although federal judges may believe that detaining more arrestees will ensure community safety, evidence shows that pretrial detention is instead criminogenic, harming individuals and imposing additional costs on society.** A series of studies has proven that even short-term detention increases the likelihood of reoffending by more than 25%.[53] These data cast significant doubt on the notion that pretrial detention curbs criminal activity and benefits society. Rather, as one United States District Court judge has observed, "Mass detention creates mass incarceration."[54]

Our system of pretrial detention places significant burdens on individuals, families, and society while providing little provable benefit. When jailed pending trial, people can face physical threats, such as violence or difficulties in accessing necessary healthcare. Detained people also suffer personal costs, such as employment instability, housing instability, and the lost custody of children—all at a higher rate than those who are released before trial.[55] In addition to the

criminogenic effects of pretrial detention itself, jailing an individual pending trial increases the likelihood that they will be convicted,[56] sentenced to longer terms of incarceration, and face mandatory minimums,[57] which in turn impede their reentry into society.[58]

This Report seeks to understand why some federal courts detain people at higher rates than are necessary to ensure community safety. The BRA itself is partly to blame, as many of its provisions are vague, confusing, or overbroad, and have therefore failed to provide adequate guidance to the federal courts. The statute's murkiness helps explain why courts have developed pretrial detention practices that violate the spirit or the letter of the law, as well as practices that diverge across districts, undermining the unitary nature of the federal system. But judges are frequently tasked with applying convoluted laws. The complexity of the statute does not justify allowing courthouse custom to effectively override the language and intent of the BRA.

Our primary explanation for the legal violations documented in this Report is the phenomenon we have labeled the culture of detention. When the BRA offers ambiguous guidance, judges and prosecutors interpret its provisions in ways that favor detention, either through inadvertence, risk aversion, or both. Even when the BRA contains clear instructions, judges and prosecutors frequently ignore those instructions in favor of longstanding district practices, substituting courtroom habits for the plain text of the statute and overincarcerating people in the process. For example, one judge we interviewed justified those deviations by saying: "Oh, that's just the way we do it." Chief Federal Defenders repeatedly told us that when they object that the courthouse culture does not align with the law, the response they are met with is usually some variation of: "Well, we've always done it that way." One Defender even coined a phrase: "We're up against the 'this is the way we've always done it' attitude."

The federal judiciary can rectify the federal bail crisis by scrupulously enforcing the BRA's substantive and procedural protections. As Justice John Paul Stevens famously said: "It is confidence in the men and women who administer the judicial system that is the true backbone of the rule of law."[59]

# 2 Findings

**Our courtwatching study of 4 federal district courts focuses on 343 cases in which we observed the entire pretrial detention and release process.[60] To supplement our quantitative data, we interviewed judges and federal public defenders in the same 4 districts,[61] as well as in 32 additional federal districts. A detailed explanation of the project's origins, contours, and methodology can be found in Appendix A: Background & Methodology.**

Based on these data, our Report reveals serious defects at each stage of the federal pretrial process.

We present 4 findings about the federal pretrial detention system, illustrating in each instance that courtroom practices deviate sharply from the written law and fuel a culture of detention.

# A Finding 1: At the Initial Appearance Hearing, Federal Judges Jail People Unlawfully.

Our data expose a severe misalignment between the BRA's prescribed Initial Appearance process and the practice that unfolds in federal courthouses around the country. We observed a problematic feedback loop play out during Initial Appearances: the prosecutor requests pretrial detention for reasons not authorized by the law, the defense attorney does not object, and the judge neither questions the prosecutor nor adheres to the statutory requirements, sometimes jailing people unlawfully. *See* Figure 5. When judges rubber stamp prosecutorial detention requests that deviate from the legal standard, prosecutors continue disregarding the law and judges continue jailing people improperly in a subset of cases—in an endless cycle. The illegal detentions that result from this mutually-reinforcing process ultimately lead to higher jailing rates at the Initial Appearance and beyond, and fall disproportionately on people of color. For more detail, see Findings & Recommendations—Federal Judges Must Follow the Correct Legal Standard at the Initial Appearance Hearing and Stop Jailing People Unlawfully.

**Figure 5:** **Problematic Feedback Loop at Initial Appearance**



## The Law

Congress and the Supreme Court envisioned the BRA as having a narrow "detention eligibility net" that authorizes pretrial jailing for a small subset of those charged with federal crimes.[62] The parameters of that net are explicitly set forth in 18 U.S.C. § 3142(f). Section 3142(f) was intended to serve as a gatekeeper for federal pretrial detention during the Initial Appearance hearing, which is the first of two potential bond hearings authorized by the BRA. At the Initial Appearance, a prosecutor must establish that one of the factors listed under § 3142(f) is met in order for the judge to even hold the second bond hearing—the Detention Hearing—where the judge determines whether the arrestee should be detained pending trial.[63] However, if none of the § 3142(f) factors is met, the judge must immediately release the accused at the Initial Appearance, and is forbidden from holding a Detention Hearing at all.

If a case involves a charge listed under § 3142(f)(1) and the prosecutor requests detention during the Initial Appearance, the judge must hold a Detention Hearing and may order the arrestee detained pending that hearing.[64] But for cases that do not involve such enumerated charges—which we call "non-(f)(1) cases"—the judge may hold a Detention Hearing and detain the arrestee pending that hearing *only* if there is a serious risk that the arrestee will flee, obstruct justice, or threaten, injure, or intimidate a prospective witness or juror.[65]

# Although federal judges may believe that detaining more arrestees will ensure community safety, evidence shows that **pretrial detention is instead criminogenic, harming individuals** and imposing additional costs on society.

# Initial Appearance Standard

***Federal Bailwatching Findings***

- **In 81% of Initial Appearances in our study where the prosecutor requested detention, the prosecutor asked the judge to hold a Detention Hearing without citing any legal basis under § 3142(f).** In some of these cases, prosecutors cited invalid bases for requesting a Detention Hearing, such as danger to the community or non-serious risk of flight. *See* Figure 9.




- In over 99% of Initial Appearances where the prosecutor requested detention without citing a valid basis under § 3142(f), judges detained people without questioning prosecutors' grounds for detention. *See* Figure 9. **This created a problematic feedback loop in which a prosecutor's request for detention at the Initial Appearance almost always resulted in a judicial order of detention, even when based on improper grounds.** *See* Figure 5.




- **In 12% of Initial Appearances where the prosecutor was seeking detention, judges entered a detention order even though no statutory basis for detention existed under § 3142(f).** These detention orders, therefore, were flatly illegal under the BRA. *See* Figure 9.




99%




*Racial Disparities*
at the Initial Appearance

- **Prosecutors sought detention in cases that did not qualify for a Detention Hearing under § 3142(f)(1) more than twice as frequently for non-white arrestees.** *See* Figure 10.

- Prosecutors similarly cited improper grounds for detention more frequently against Black and Latino arrestees. *See* Figure 11.




*Citizenship Status Disparities*
at the Initial Appearance

- **Prosecutors requested detention nearly 20% more frequently if the arrestee was identified as a noncitizen.** At 79% of these hearings, prosecutors failed to cite a valid basis for detention under § 3142(f). *See* Figure 15.

- **In noncitizen cases, no judge questioned the prosecutor's grounds for detention** when they failed to cite a valid basis for detention at the Initial Appearance, leading judges to detain arrestees in 78% of these cases.

B

# Finding 2: At the Initial Appearance Hearing, Federal Judges Unlawfully Jail Poor People Without Lawyers.

Our study uncovered an egregious access-to-counsel problem in the federal system: judges in more than one-quarter of federal district courts do not provide every arrestee with a lawyer to represent them during the Initial Appearance. *See* Figure 6. In fact, 72% of the 36 districts where we interviewed or surveyed stakeholders deprive at least some individuals of counsel at this first bail hearing.[66] This finding is particularly concerning given that 90% of those charged with a federal crime cannot afford a lawyer.[67] Jailing people without lawyers definitively violates federal law and may violate the Constitution. These deprivations of counsel also contribute to high pretrial detention rates and exacerbate racial disparities. In our study, every arrestee who was deprived of a lawyer at the Initial Appearance was jailed, and nearly all were Black or Latino. For more detail, see Findings & Recommendations—Federal Judges Must Stop Unlawfully Jailing Poor People Without Lawyers at the Initial Appearance Hearing.

**Figure 6: There is a Nationwide Access-to-Counsel Crisis in the Federal System.**



## The Law

Federal law requires judges to ensure that anyone who cannot afford a lawyer is represented by court-appointed counsel during their Initial Appearance hearing. Under the law, every individual accused of a federal crime must be represented by counsel "at every stage of the proceedings *from his initial appearance*,"[68] rendering it unlawful for a judge to fail to appoint lawyers to represent indigent arrestees at the Initial Appearance. The right to counsel at the Initial Appearance is further supported by the principles underlying the Fifth and Sixth Amendments and public policy.

# Access to Counsel at Initial Appearance

*Federal Bailwatching Findings*

- Our interviews and survey data revealed that **more than one-quarter of federal district courts fail to appoint a lawyer for every arrestee at the Initial Appearance**, with at least 26 of the 94 federal districts exhibiting this problem. *See* Figure 6.

- In one district where we courtwatched, **11% of arrestees went unrepresented for the entirety of their Initial Appearances**, with no lawyer by their side to advocate for their liberty interests. *See* Figure 16.

- In that district, **every single individual who faced their Initial Appearance without a lawyer was jailed after the hearing, a 100% detention rate.** *See* Figure 17.

- In all 4 districts in our courtwatching study, when arrestees were forced to proceed without counsel for some part of their Initial Appearance, there was a notable increase in pretrial detention: **across court-watched districts, partially represented individuals were detained 89% of the time, while fully represented individuals were detained 67% of the time.** *See* Figure 18.




100%

### *Racial Disparities*

in the failure to provide counsel before deprivations of liberty




- **92% of the arrestees who were unrepresented at their Initial Appearances were people of color.** *See* Figure 17.

- Judges *unlawfully* detained unrepresented individuals in violation of § 3142(f) in some of the Initial Appearances we observed, compounding the harm of not providing a lawyer.

- We also observed Initial Appearances where **arrestees made incriminating statements while judges questioned them without a lawyer**, jeopardizing the person's Fifth Amendment right against self-incrimination and their ability to fight the case in the future.

C

# Finding 3: Federal Judges Misapply the Presumption of Detention.

Judges have the power and responsibility to limit the impact of the statutory "presumption of detention" that sometimes applies during the Detention Hearing, but our study finds that they routinely apply the presumption incorrectly, giving it more weight than the law allows and failing to assess whether the presumption has been rebutted.

At the Detention Hearing—the second pretrial hearing in the federal system—a rebuttable presumption of detention applies in certain types of cases.[69] The presumption *does not mandate* detention. Instead, courts of appeals have set an easy-to-meet rebuttal standard.

Our study found that judges overwhelmingly fail to find the presumption rebutted, a clear indication that they are not adhering to the legal standard in presumption cases. This misuse of the presumption of detention causes many more people to be detained pending trial than necessary, and it results in more burdensome conditions of release in the rare cases in which judges grant release. Additionally, since people of color face charges triggering the presumption more often than white arrestees, the misapplication of the presumption exacerbates racial disparities in the federal criminal system. Judges' treatment of the presumption of detention is particularly important given the prevalence of presumption-triggering charges; nationally, the presumption of detention applies to 93% of all federal drug offenses.[70] For more detail, see Findings & Recommendations—Federal Judges Must Follow the Correct Legal Standard in Presumption-of-Detention Cases to Reduce Racial Disparities and High Federal Jailing Rates.

## The Law

The BRA creates a rebuttable presumption of detention for certain offenses. Because the presumption imposes such a heavy cost on individual liberty, courts have set a standard that should make it easy for an arrestee to rebut the presumption.[71] This low rebuttal standard matches Congress's original intent for the presumption, which was to lock up only "the worst of the worst" offenders.[72] In every Detention Hearing in a presumption case, the law requires a judge to: (1) determine whether the presumption has been rebutted under the legal standard articulated in case law; and (2) weigh the presumption against all of the other pretrial release factors listed in § 3142(g),[73] keeping the burden of proving that detention is warranted on the prosecution at all times.

# Presumption of Detention

*Federal Bailwatching Findings*

- In our study, **arrestees facing a presumption of detention were detained at a rate of 72%, which exceeded the rate of detention among arrestees to whom a presumption did not apply by nearly 20%.** *See* Figure 19.




- Judges detained arrestees facing a presumption of detention in 87% of the cases in which the prosecutor explicitly invoked the presumption during the Detention Hearing, compared to 76% of the time when the prosecutor did not invoke the presumption.




- In 95% of the contested Detention Hearings we observed where the presumption of detention applied, judges either failed to mention whether the presumption of detention was rebutted or concluded that the presumption was not rebutted. *See* Figure 20.




- **In 100% of Detention Hearings where the judge found that the presumption had not been rebutted, the judge detained the arrestee.**



## *Racial Disparities*
in presumption-of-detention cases




- In the cases where a presumption of detention applied, 89% of the arrestees were people of color.
- Among the Detention Hearings where prosecutors invoked the presumption of detention, 97% of the arrestees were people of color. *See* Figure 21.
- **Prosecutors erroneously invoked the presumption of detention exclusively against Black or Latino arrestees.**
- **Judges detained people of color at higher rates than white individuals**: the detention rate in presumption-of-detention cases involving people of color was 73%, while the detention rate in presumption-of-detention cases involving white arrestees was just 68%. *See* Figure 22.

100%

D

# Finding 4: Federal Judges Impose Excessive Financial Conditions that Violate the Law and Jail People for Poverty.

Our study shows that judges consistently impose inequitable and burdensome financial conditions of release. Some courts jail arrestees simply because they are too poor to pay for their release, thereby violating the BRA. These practices contribute to high pretrial detention rates and have a disproportionate racial impact, further aggravating racial disparities in the federal system. For more detail, see Findings & Recommendations—Federal Judges Must Stop Unlawfully Jailing People for Poverty Through Excessive Financial Conditions.

## The Law

The BRA unequivocally states that judges "may not impose a financial condition that results in the pretrial detention of the person."[74] Congress intended this provision to end the practice of imposing "pretrial detention through the arbitrary use of high money bail."[75] Congress hoped the statute would end one of the primary evils of cash bail systems: caging poor individuals by conditioning their release on their ability to pay. Although the statute authorizes judges to condition release on financial requirements,[76] such conditions are prohibited if they result in the accused being jailed for poverty.

# Because many people charged with federal crimes are indigent, financial conditions of release run a serious risk of serving as de facto detention orders, an indisputable violation of the BRA.

# Financial Conditions

## *Federal Bailwatching Findings*

- **In 37% of cases in our study, judges imposed financial conditions, such as personal surety bonds, corporate surety bonds, and the upfront posting of collateral.** *See* Figure 23.

- **In 34% of all cases and 91% of cases where financial conditions were imposed, judges required arrestees to post a secured bond**, reintroducing the evils of cash bail systems that the BRA sought to avoid. *See* Figure 23.

- In one district where we courtwatched, arrestees were *detained* in 40% of cases involving financial conditions solely because they did not have the money to pay for their release. *See* Figure 25. Judges in that district regularly imposed federal bail bonds known as corporate surety bonds (CSBs). **In 92% of cases where a CSB was imposed, the accused was locked in jail because they were unable to obtain a bail bond. Every single individual subjected to a CSB was a person of color.** *See* Figure 24.

- Across all 4 districts, **arrestees did not have the money to meet financial conditions in 36% of cases where such conditions were imposed.** *See* Figure 23. In fact, 21% of all arrestees detained at the Initial Appearance remained in jail after the Detention Hearing because they could not meet financial conditions of release. For these individuals, the financial conditions acted as de facto detention orders, in violation of the law.



95%

## *Racial Disparities*

in the imposition of financial conditions of release

- Black and Latino arrestees were much more likely to face financial conditions of release than white arrestees; among arrestees on whom secured bonds were imposed, 95% were people of color. *See* Figure 26.

95%

# 3 Recommendations

In *Salerno*, the Supreme Court described the accused's "strong interest in liberty" as "importan[t] and fundamental."[77] Our study shows courtroom custom overriding the legal standards that were supposed to preserve that fundamental right. To comply with the law, federal judges must start from the statutory premise that pretrial release is the default and that pretrial detention can be justified only if no conditions of release will reasonably assure the accused's appearance in court and community safety. Judges can mitigate the culture of detention by abiding by the BRA and other federal laws. Adhering to the rule of law, as we describe in the below recommendations, would also mitigate racial and socioeconomic disparities in the federal criminal system. To align the on-the-ground practices with the law, we recommend that judges do the following.

A

# Recommendation 1: At the Initial Appearance, judges must prevent unlawful detentions by following the § 3142(f) legal standard.

Judges violate federal law during Initial Appearance hearings when they set or hold Detention Hearings without any legitimate basis for detention under § 3142(f). Judges must understand the legal standard that applies at the Initial Appearance and enforce the strict limitations on pretrial detention provided in the written law.

First, judges must break the problematic feedback loop by requiring prosecutors seeking detention at the Initial Appearance to cite a specific § 3142(f) factor listed in the BRA. If a prosecutor presents improper grounds for holding a Detention Hearing, such as "danger to the community" or non-serious "risk of flight," the judge must deny the prosecutor's request and promptly release the arrestee (unless § 3142(f)(1) independently authorizes a Detention Hearing). Second, in cases that do not fall under § 3142(f)(1), judges must hold prosecutors to their burden of proof under § 3142(f)(2). In such cases, a judge must release the arrestee at the Initial Appearance unless the prosecutor justifies their request for a Detention Hearing by presenting *individualized facts and evidence* establishing a "serious risk" of flight or obstruction of justice. In all cases, judges should vigilantly adhere to the statute and ensure that no arrestee is unlawfully jailed at the Initial Appearance.

Our recommendations relating to the Initial Appearance are discussed in Findings & Recommendations—The Solution: At the Initial Appearance, Judges Must Prevent Unlawful Detentions by Following the § 3142(f) Legal Standard.

# Recommendation 2: At the Initial Appearance, judges must follow the law and appoint lawyers to actively represent every indigent arrestee.

Judges violate federal law, the Federal Rules of Criminal Procedure, and potentially the Sixth Amendment when they jail poor people without lawyers or force someone to appear *pro se* opposite a federal prosecutor during the Initial Appearance. To comport with the law and safeguard the accused's liberty interest and constitutional rights, judges must provide every indigent arrestee with an appointed lawyer to actively represent them throughout their entire Initial Appearance hearing. It is not sufficient to have a defense lawyer on standby. Rather, the law entitles every arrestee to a lawyer who is functioning in an adversarial capacity and can vindicate their client's rights under the legal standard in § 3142(f). Judges should follow best practices by appointing counsel *before* questioning people, therefore protecting arrestees' Fifth Amendment right against self-incrimination.

Our recommendations relating to the appointment of counsel at the Initial Appearance are discussed in Findings & Recommendations—The Solution: At the Initial Appearance, Judges Must Follow the Law and Appoint Lawyers to Actively Represent Every Indigent Arrestee.

C

# Recommendation 3: At the Detention Hearing, judges must adhere to the low standard for rebutting the presumption of detention and never treat the presumption as a mandate for detention.

Judges give the presumption of detention more weight than the law authorizes, treating it as a heavy thumb on the scale in favor of pretrial jailing. Courts must instead treat the presumption as genuinely rebuttable and give it the low weight to which it is entitled. To adhere to the law, during every Detention Hearing in a presumption case, a judge should apply a two-step analysis.

First, the judge must determine whether the presumption is rebutted, a question that turns not only on the defense presentation but also on all of the evidence in the record (including the Pretrial Services Report). In this rebuttal analysis, the judge should follow case law and hold that an arrestee has rebutted the presumption as long as there is "*some* evidence" that the arrestee will not flee or endanger the community if released.[78] The judge's finding as to whether the presumption of detention has been rebutted should be stated on the record.

Second, regardless of whether the presumption has been rebutted, the judge must weigh all of the factors listed in § 3142(g) to reach the ultimate release or detention decision.[79] That ultimate determination must adhere to the legal standard in § 3142(e): as in any case, the judge must release an arrestee in a presumption case if the prosecutor has not proven by clear and convincing evidence that there are no conditions that would "reasonably assure" that person's appearance in court and the safety of the community. Throughout the analysis, the judge should never shift the burden of proof to the defense or treat the presumption as a mandate for detention.

Our recommendations relating to the presumption of detention are discussed in Findings & Recommendations—The Solution: At the Detention Hearing, Judges Must Adhere to the Low Standard for Rebutting the Presumption of Detention and Never Treat the Presumption as a Mandate for Detention.

D

# Recommendation 4: At both pretrial hearings, judges must stop imposing financial conditions that result in detention and tailor release to each arrestee's individual economic circumstances.

Judges violate federal law when they impose inequitable and burdensome financial requirements for release, especially when they jail people who are too poor to pay for their freedom. In such cases, financial conditions of release function as de facto detention orders, contravening the plain language and spirit of the BRA. Instead, judges must recommit to making individualized release decisions and thoroughly consider whether financial conditions—including bail bonds, cash bonds, and "solvent surety" requirements—are truly the least restrictive conditions available. Such individualized determinations are critical to aligning the practice with the law as written, since the vast majority of people charged with federal crimes are poor.

Our recommendations relating to financial conditions of release are discussed in Findings & Recommendations—The Solution: At Both Pretrial Hearings, Judges Must Stop Imposing Financial Conditions that Result in Detention and Tailor Release Conditions to Each Arrestee's Individual Economic Circumstances.

# CONTEXTUALIZING THE CULTURE OF DETENTION

**Although a robust bail reform movement has been combatting cash bail in state courts for years, skyrocketing federal pretrial detention rates have gone largely unnoticed. This Report reveals a widespread culture of detention in the federal system, with courtroom practices around the country deviating markedly from the law.**

Contrary to the purpose of the Bail Reform Act of 1984 (BRA) and the Supreme Court's holding in *United States v. Salerno*,[80] pretrial *jailing* is now the rule, and pretrial *release* is the rare exception. Publicly available data establish that federal judges detain people pretrial at much higher rates than are necessary to achieve the twin purposes of the BRA—ensuring community safety and appearance in court. The pervasive consequences of these high jailing rates extend far beyond the term of detention itself, ultimately harming not only the accused, but also their families, communities, and society. In short, the costs of mass detention outweigh any societal benefit.

**One of the key obstacles to ascertaining the full scope of the federal bail crisis is the lack of national public data on federal pretrial detention practices.** The available data do not provide any insight into why federal detention rates have been rising for decades, despite evidence showing no corollary increase in community safety. The existing data likewise provide no information about how the pretrial detention process plays out in day-to-day practices, nor do they discuss racial disparities in specific federal pretrial detention practices. Without more granular data, it is impossible to identify the causes of the federal bail crisis and pinpoint necessary reforms.

This Report fills that gap. Through courtwatching—observing federal pretrial hearings—and interviewing stakeholders, we gathered an abundance of information about the interplay between judges, prosecutors, defense lawyers, and arrestees in courts across the country. Our courtwatching centered on federal courts in Baltimore, Boston, Miami, and Salt Lake City. We expanded the scope of our study to the national level by conducting interviews that illuminate pretrial detention practices in many other federal courts. Our quantitative and qualitative research shows that the substantive limitations on pretrial detention established by Congress and the Supreme Court are not respected in practice.

This section provides context for the Findings & Recommendations that follow. This section first describes the lack of information about federal bail practices. It then establishes that the COVID-19 pandemic did not alleviate or exacerbate the federal bail crisis in a way that would limit the import of this Report's findings. The many interviews we conducted made clear that the systemic problems identified within this Report are extensive and long-term obstacles that existed well before the pandemic. The weight of our findings is thus not in any way minimized by the fact that we gathered our data during the pandemic. This section next discusses the devastating consequences of pretrial jailing, including its detrimental impact on people's physical and mental wellbeing, its adverse effects on an arrestee's ultimate case outcome, and the enduring harm pretrial jailing wreaks on arrestees and their families. Finally, this section clarifies the statutorily defined standards that govern federal pretrial detention to provide the legal backdrop for our groundbreaking findings and urgent recommendations.

**We hope that this Report leads federal judges and other stakeholders to adhere to the letter of the law and resist the institutional pressures and implicit biases that created and sustain the culture of detention. By following the law, judges can safeguard the liberty interests of people accused of federal crimes and mitigate the dire consequences of federal jailing detailed below.**

## *Key to read the charts*



# 1 Publicly Available Data Provide Little Insight into the Causes and Contours of the Federal Bail Crisis.

**This Report provides a new and far more detailed picture of the federal bail system than the very limited publicly available data. With existing data, it is impossible to study key questions like whether judges are following the law and whether race impacts detention decisions. The limited extant public information does not hint at the reality our data reveals: federal judges regularly deviate from the law when jailing people prior to trial.**

While the Administrative Office of the U.S. Courts (AO) possesses vast quantities of data, it strictly limits public access to that information.[81] As noted in the Executive Summary, the AO does not provide public access to its federal data about race, length of pretrial detention, and low rates of recidivism and flight. In addition, the AO inexplicably denies taxpayers information about the annual cost of federal pretrial detention.[82] Data tables relating to these and many other matters are housed on the "J-Net," the federal judiciary's intranet website, but are kept secret from anyone without access to that system.

Meanwhile, the limited data the AO *does* publicize lumps important and independent data points together in overly broad categories. Although the AO provides some information about the rate at which prosecutors seek detention and the subsequent rate of detention

ordered by judges, that information is not disaggregated to allow an understanding of how those issues play out at each stage of the pretrial process: the Initial Appearance hearing, the Detention Hearing, and post-Detention-Hearing proceedings.[83] Nor does the AO data provide any information about prosecutors' bases for seeking detention or judges' bases for detaining people.

Although the Bureau of Justice Statistics (BJS) publishes some reports about federal pretrial detention, its publications suffer from their own host of problems. For example, while BJS tracks the type of crime charged, it often uses general categories, like "violent" offenses or "property" offenses, and never links offense types to the BRA's provisions. This makes it impossible to accurately discern basic facts about federal pretrial detention, including: the percentage of people charged with offenses that render them statutorily eligible for a Detention Hearing[84] versus the percentage of people charged with offenses that do not qualify for a Detention Hearing,[85] as well as the detention rate for each of these groups; the rate at which people are charged with offenses that carry a statutory presumption of detention;[86] detention rates in presumption-of-detention cases; and detention rates in non-presumption cases. Moreover, some BJS reports combine many years' worth of data into one statistic, making it impossible to identify annual trends.[87] And BJS publishes reports infrequently, sometimes waiting nearly a decade between reports.[88]

**AO and BJS data fail to shed light on numerous aspects of the federal pretrial detention process.** For many pretrial detention measures, BJS does not disclose race or citizenship data, which obscures racial disparities. For example, BJS provides no data about the race and citizenship status of people subjected to financial conditions of release, much less a racial breakdown of those detained because they are too poor to meet a monetary condition. Moreover, many BJS reports make it impossible to understand the link between race or citizenship data and pretrial detention outcomes for specific federal offenses.[89] While BJS's most recent federal pretrial detention report links race with pretrial detention outcomes by offense,[90] it does not disaggregate Latino arrestees from white arrestees, further obscuring potential racial disparities.[91]

As Professors Siegler and Zunkel wrote in 2019, "[w]hile there is disturbingly little published data about the race effects of federal pretrial detention, the few studies that exist show consistent racial disparities over time, with people of color being detained at higher rates than [w]hite people."[92] For example, a 2018 study found that

in the federal system, Latino and Black individuals are detained at rates of 88% and 60%, respectively, while white individuals are detained at a rate of 45%.[93] Although these data are helpful to understanding the racial disparities exacerbated by the federal pretrial system, the particularity and frequency of such publicly available research remains insufficient. In fact, "the first nationwide analysis of race- and gender-based disparity in federal pretrial detention" was not published until 2021.[94]

Our Report provides a comprehensive picture of the federal pretrial detention system that fills in many of these gaps. It further shows that it is possible for entities like the AO and BJS to give the public far more information than they currently make available. To address the lack of publicly available data about race and federal pretrial detention, we gathered information about the observable race of every person whose hearing we watched.[95] This revealed racial disparities in many aspects of the process. Additionally, by recording whether or not an arrestee was identified as a U.S. citizen, we discerned the variations in pretrial detention processes and outcomes experienced by citizens and noncitizens.[96]

We hope that the AO and BJS will revise their data dissemination practices to ensure that the public has access to the most comprehensive data possible. Without this information, stakeholders and members of the public are unable to evaluate the necessity and efficacy of proposed reforms, thereby allowing the culture of detention to continue unabated.

2

# The COVID-19 Pandemic Did Not Change the Federal System's Culture of Detention.

**Although we conducted our courtwatching study during the COVID-19 pandemic, our findings are broadly generalizable. The pandemic took an unprecedented and deadly toll on people in jail and prison. It also led many federal courts to provide remote access to Initial Appearances and Detention Hearings, a development that enabled us to courtwatch in 4 geographically distinct districts. Despite the remote format and the ever-present threat of infection, empirical and qualitative evidence show that the federal culture of detention is not unique to the pandemic.**

The pandemic neither exacerbated nor mitigated the gulf between law and practice that exists in the federal system. The 4 central problems highlighted in our Findings & Recommendations appeared long before the pandemic and will persist long after, unless and until federal judges take action. When we shared our courtwatching findings with judges and federal defenders in 36 federal courts, they uniformly confirmed that the divergence between the statutory text and courtroom custom is a longstanding dilemma in the pretrial arena that predated the pandemic. That observation corresponds with the FCJC faculty's own experience in two decades of federal court practice.

**National data and our quantitative and qualitative research show that the pandemic also did not meaningfully mitigate the federal system's overuse of pretrial detention.**[97] During the early years of the pandemic, the average length of time people spent in federal jail *increased* markedly, from 253 days in 2019 to 346 days in 2021.[98] Nevertheless, the potentially deadly effects of the pandemic were rarely discussed at pretrial hearings or during judges' detention and release determinations. Our courtwatching data reveal that defense counsel mentioned the pandemic in only one Initial Appearance out of the 343 in our study,[99] defense counsel mentioned the pandemic in just 11% of Detention Hearings, and arrestees were detained in 76% of those cases. As for the health risks posed by pretrial detention during the pandemic, defense counsel argued that an arrestee was particularly vulnerable to COVID-19 in only 6% of the handful of Detention Hearings where the defense mentioned the pandemic, and 73% of those arrestees were detained.

During our interviews, judges and Federal Defenders across the country reported that, in their experience, COVID-19 did not make judges any less likely to jail someone.[100] One judge candidly declared that very few judges "considered the pandemic as a reason not to detain somebody if they deserve[d] to be detained." One Defender described how remote hearings posed an additional barrier to release: "[B]ecause [being in person] really gives much more nuance to who the individual is . . . [it] make[s] it a little harder to say no [to release] in someone's face." That Defender reported no increase in leniency during the pandemic. While there was an initial push for release in the early days of the pandemic, one Chief Federal Defender observed that "[a]s the year [2020] went on . . . [prosecutors] started ratcheting up in terms of their detention requests. . . . [B]y July [2020], they were asking for detention for everybody."

# 3 A Judge's Decision to Jail Someone Pretrial Has Damaging and Enduring Effects.

> *I had a woman yesterday who was ordered detained, and you know, there was 37 pounds of meth. But this is a woman who had been a prostitute at least twice, she had a property crime about four years ago, these are all clustered together, at the same time she was divorcing her husband who sexually abused one of her kids—now he's in prison for a long time—and she was not a well-educated lady. I think she had some other stuff maybe about 15, 16 years earlier, and she had some traffic warrants, but my point to the judge was, I can clear these warrants, this is a woman [whose] . . . crimes are crimes of poverty and desperation. . . . These people's lives are abysmal, I mean you don't do that [prostitute yourself] because you've got power. You do it because you're desperate, and you know, you're willing to basically let someone use you. So anyway, the judge, . . . he just detained, and I don't . . . I realize 37 pounds of meth, that's a lot of meth, but they tried to sort of characterize her as this sophisticated kind of person. I think she was sort of put up to what she did by somebody else. This woman lives in a trailer with her mother. . . . [S]he was supervis[able], and you can see that.*

This account by one Defender typifies the stories we heard about the human beings who are jailed in the federal system—their lives, their heartbreaks, and their ability to come to court and comply with the law, if only a judge would let them return home to their families.

Pretrial detention has myriad pernicious consequences, harming individuals, as well as their loved ones and communities.[101] First, it prevents people from accessing necessary healthcare, subjects them to dangerously overcrowded living conditions, exposes them to physical violence, and increases their vulnerability to infectious diseases. Second, people who are jailed pending trial in the federal system are more likely to be convicted, sentenced to longer terms of incarceration, and sentenced pursuant to a mandatory minimum than their released peers. Finally, pretrial detainees experience employment and housing instability at a higher rate than their released peers, and they can lose custody of their children after even a few days in jail.

**The harmful effects of pretrial detention cannot be justified as permissible consequences of protecting the community**, since research shows that pretrial detention—for any amount of time—is correlated with an *increase* in recidivism.[102] In fact, "researchers found that pretrial detention is associated with a 'consistent and statistically significant increase' in the likelihood of new arrest pending trial," although "people who are never detained pretrial are no less likely to appear for court."[103] Another study found that "defendants who are detained before trial are over ten percentage points more likely to be rearrested for a new crime up to two years after the initial arrest."[104] Far from mitigating crime, "detaining a person pretrial can do more harm than good and have cascading negative consequences on a community's safety."[105] Although these studies focus on state systems, their results are generalizable to the federal context—especially considering the state system's significantly higher proportion of overall violent offenders.[106]

By contrast, pretrial *release* has been shown to improve case outcomes and mitigate the deleterious effects of facing federal criminal charges. Research demonstrates that pretrial release reduces future crime in two ways. First, it avoids the criminogenic effects of pretrial detention (including harsh prison conditions and negative peer effects). Second, release increases the likelihood of current and future employment, which in turn supports economic stability and discourages further criminal activity.[107]

# A Federal Pretrial Detention Exposes Presumptively Innocent People to Dangerous Conditions.

The presumption of innocence that applies to anyone facing trial prohibits punishment prior to conviction. Nevertheless, courts have ruled that jailing someone prior to trial does not constitute "punishment."[108] However, when conditions are so harsh that "jail officials place detainees in situations that pose specific threats to their life or health," some circuits have deemed pretrial detention to be punishment—and thus constitutionally impermissible.[109] Recent evidence shows that the federal system has come dangerously close that line, and probably even crossed it.

**The brutal reality is that people detained pretrial in federal jails are deprived of necessary medical care, live in dangerously overcrowded conditions, are subjected to violence, and suffer high rates of COVID-19 infection.**

First, individuals detained pending trial have trouble accessing basic healthcare. One study found that approximately one-fifth of all people suffering from medical conditions were unable to see a doctor while in federal or state jail.[110] Relatedly, pretrial detainees are often unable to acquire essential prescription medication.[111] This same study found that one-third of people with chronic conditions were not taking their prescription medication in jail, most commonly because the jail's doctor did not find the medication necessary or the facility would not provide it.[112]

Second, rampant overcrowding in federal jails exacerbates medical neglect while introducing incarcerated people to a litany of other risks. Nearly half of all federal jails have experienced overcrowding in the last decade.[113] Some, like the Metropolitan Correctional Center in downtown Manhattan (MCC Manhattan), have held twice their stated maximum number of detainees.[114] There, jail staff take up to two months to respond to a sick call request.[115] Overcrowding and understaffing at MCC Manhattan and the Metropolitan Detention Center in Brooklyn (MDC Brooklyn) has led to the two jails sharing "a single psychiatrist and . . . a handful of psychologists" to "treat the

nearly 500 inmates suffering from significant psychiatric illnesses."[116] Overcrowding poses special risks for individuals who are detained in older federal jails. For example, in the brutally hot months of July and August, people detained in the United States Penitentiary in Atlanta (USP Atlanta)—which opened in 1902[117]—were "held in an overcrowded pod (unit) with approximately 100 other people," often without "air conditioning or airflow."[118]

Mass detention has also led to hazardous understaffing issues in federal jails, which exacerbate the effects of overcrowding and further impede adequate access to medical care. For example, in the Miami Federal Detention Center, understaffing led to detainees who were "diabetics, hypertensives, [and suffered from] cardiomyopathy and HIV . . . not being provided their medication. It was reported that over 750 prescriptions [went] unfilled."[119]

A recent investigation of abuse, corruption, and misconduct at the USP Atlanta federal jail reveals that **people jailed before trial in the federal system are often subjected to horrific living conditions.**[120] In testimony before the Senate, Assistant Federal Public Defender Rebecca Shepard described an environment where pretrial detainees are deprived of clean bathing and drinking water, go months without hot meals, suffer emaciation from poor nutrition, go weeks without clean clothes, experience months-long lock downs, and are denied access to medication and mental health professionals.[121] Conditions like these are replicated at BOP pretrial detention facilities across the country.[122]

These appalling conditions also deprive people of their constitutional right to the effective assistance of counsel. Attorneys at USP Atlanta and other poorly managed federal jails struggle to speak to or exchange mail with their clients.[123] Lack of access to counsel in turn causes court dates to be continued, drives up the time that each person spends behind bars, and increases the cost to taxpayers.[124] In the brief periods when people awaiting trial are released from their cells during lock downs at USP Atlanta, they must make the "cruel but routine" choice of "whether to shower, speak to a loved one or lawyer, or study their legal case, before returning to a cramped, infested, and often too-hot cell."[125]

Third, people incarcerated in federal and state jails pretrial are often exposed to violence and physical threats. In 2018, approximately 28,000 individuals locked in federal and state jails and prisons reported sexual victimization while in custody.[126] For every

1,000 individuals held in jails and prisons, nearly 13 alleged an act of sexual victimization.[127] The actual number of assaults is likely much higher, as *staff* members perpetrated 56% of these reported assaults.[128] These numbers represent an increase of more than 300% from 2011[129] and an increase of more than 200% in sexual violence at the hands of correctional staff.[130] Aside from the threats an individual may encounter directly, witnessed violence can also result in significant harm, including post-traumatic stress, anxiety, depression, avoidance, hypersensitivity, hypervigilance, suicidal thoughts, flashbacks, and challenges with emotional regulation.[131]

The effects of experienced and witnessed violence exacerbate preexisting mental health conditions, which are more common among those in prisons and jails than among the general public.[132] One former prisoner—who spent 13 years in a federal prison—described the jail where he was held *before* trial as "by far the worst place" to face incarceration.[133]

Fourth, the ongoing COVID-19 pandemic compounds the health and safety crisis in federal jails. Mass incarceration—and mass pretrial detention—have created the "perfect breeding ground" for the virus.[134] The virus transmits most easily in confined spaces; "perhaps no space contains a fixed population less capable of dispersing than a detention facility."[135]

In 2020, the COVID-19 infection rate was over 5 times higher for the incarcerated population than for the general U.S. population.[136] Early in the pandemic, federal jails quickly became hotspots for the virus. In May 2020, cases exploded at the Metropolitan Correctional Center in Chicago's federal jail (MCC Chicago), with over one-sixth of the people detained there contracting the coronavirus.[137] Just downstate from MCC Chicago, hospitals were overwhelmed by infected individuals needing emergency treatment.[138] In other federal jails, COVID-19 spread even more rapidly. At the San Diego Metropolitan Correctional Center (MCC San Diego), for example, over 70% of the 550 detainees were infected in a single month.[139]

As the pandemic progressed, each new variant renewed concerns about the health and safety of people jailed before trial. By August 2022, the BOP acknowledged that more than one-third of those in BOP-managed institutions or community care facilities had been infected by COVID-19 since the start of the pandemic (49,316 of 141,252 people in federal jails and prisons combined).[140] Research and congressional testimony by Professor Alison Guernsey has raised

concerns that such BOP data seriously underestimate the number of infections and deaths.[141] For example, the BOP reported that, as of January 31, 2022, COVID-19 was responsible for 284 deaths in BOP facilities, but Freedom of Information Act requests revealed numerous additional unreported deaths.[142]

BOP mismanagement during the COVID-19 pandemic extended beyond outbreaks and underreporting. For example, at the Seattle-Tacoma Federal Detention Center (FDC SeaTac), detainees reported a complete month-long lockdown because of a policy of FDC SeaTac's which imposed an automatic two-week lockdown for the entire jail anytime a staff member or incarcerated person caught COVID-19.[143] For an entire month, detained individuals were "restricted to their cells for 22 to 24 hours a day, without access to education, recreation, or communication with family."[144]

Amid a new outbreak of the monkeypox virus across the country, medical professionals have continued to raise concerns that federal jails are hotspots for the transmission of dangerous diseases. The monkeypox virus spreads "through close, personal, often skin-to-skin contact," including "[c]ontact with respiratory secretions."[145] As the former medical chief of the New York City jail system writes, "jails, prisons and detention centers are sites of common close physical contact that also remain purposefully removed from our community health systems and oversight."[146] Noting the BOP's mismanagement of the COVID-19 pandemic, medical professionals have cautioned "with people in tight spaces like a jail, a lot has to change in order for people to not give one another monkeypox."[147]

**The COVID-19 pandemic revealed additional inadequacies plaguing our federal pretrial detention centers, but it did not create them.** As pretrial detention rates have soared in recent decades, federal jails have become more crowded, more understaffed, and more dangerous. The people living in these egregious conditions are presumed innocent under the law, yet these conditions threaten their health and impede their ability to succeed at trial, prolonging the ill effects of their pretrial detention.

# B Federal Pretrial Detention Leads to Longer Sentences.

Jailing a person pending trial has major consequences for the outcome of their case. As United States District Court Judge Jed Rakoff has written:

> *In the majority of criminal cases, a defense lawyer meets her client only when or shortly after the client is arrested so that, at the outset, she is at a considerable informational disadvantage to the prosecutor. If, as is very often the case (despite the constitutional prohibition of 'excessive bail' and so-called 'bail reform' in a few localities), bail is set so high that the client is detained, the defense lawyer has only modest opportunities, within the limited visiting hours and other arduous restrictions imposed by most jails, to interview her client and find out his version of the facts.*[148]

This restricted access hampers the attorney's ability to provide a robust defense and inhibits the development of a strong client-attorney relationship. In interviews, defenders and judges alike consistently echoed the idea that the pretrial detention determination "[is] a really, really significant, pivotal moment in any given case."

**The consequences of pretrial jailing extend far beyond the initial period of detention and permeate each subsequent aspect of an individual's case**, including the ultimate determination of guilt and any attendant sentence. In regard to case outcome, a judge we interviewed observed that pretrial detention "creates a tremendous amount of pressure to plead [guilty] . . . [and] accept a disposition that will result in a more prompt release because now, as a defendant, I've experienced custody. I don't like it. It also gives the government a lever." Another judge we spoke to recalled instances in which an arrestee's only hope of avoiding decades-long mandatory minimum sentences was to cooperate with prosecutors: "[F]rom time to time, an AUSA would brazenly say something like, 'we have no interest in cooperation [with the arrestee] if you release them [pending trial].'"

Data corroborate these observations. Strikingly, one study of federal and state arrestees found that "[p]retrial detention increases a defendant's likelihood of conviction by 55%,"[149] even when controlling for confounding factors.[150] Relatedly, a study in state court found that

individuals who are released pretrial are substantially less likely to be found guilty, to plead guilty, and to be incarcerated at all.[151]

Should an arrestee be convicted, the pretrial detention decision directly and adversely affects the length of their sentence, according to a 2020 study.[152] Additionally, the study found a causal relationship between pretrial release and receiving a below-guidelines sentence or avoiding a mandatory minimum.[153] Pretrial release also increases the likelihood that an arrestee will receive a sentence reduction for providing assistance to prosecutors.[154]

As one Federal Defender we interviewed said:

> *[When someone] is on bond and doing well . . . it's likely for them to get a lower sentence when it comes time to sentence. Because you at least have set them up where . . . they're with family members, they're not getting into trouble . . . and so, when it comes time to make those mitigation arguments, you have some concrete things—in addition to . . . . putting their lives in context—also showing what they've done while they've been on bond.*

Another Defender observed that, at the sentencing stage, "it's very hard for a judge to put somebody in [prison] who has been doing so well on the outside," as the arrestee has shown that they can be successful at home. Pretrial release also provides a judge with humanizing context about the arrestee. In these instances, a judge can "see the [arrestee's] family, [and] they get to see [the defense attorney] interacting with the [arrestee] without any sort of handcuffs or anything."

In contrast, when someone who has been detained pending trial appears for sentencing, the judge has only ever seen them in a jail uniform and has never witnessed the person living successfully at home. Pretrial detention deprives a person of the opportunity to show the sentencing judge "that they can (and more likely will) live by society's rules."[155] At the sentencing hearing, one Defender noted that an arrestee who has been jailed pretrial can only make "arguments about what they will do when they get out, this is the job you hope they'll have, and things like that, versus actually being able to show and demonstrate what they're actively doing" if they instead had been released.

In short, the decision whether to put an arrestee in jail pretrial not only influences the entire trajectory of that person's case, but also determines whether they will spend many more years behind bars after their case is over.

# The decision whether to put an arrestee in jail pretrial not only influences the entire trajectory of that person's case, but also determines whether they will spend many more years behind bars after their case is over.

C

# Even Short Periods of Pretrial Detention Have Long-Term Negative Personal Consequences.

Beyond leading to lengthier sentences, pretrial detention negatively impacts the lives and well-being of detained individuals, their families, and their communities in many long-lasting ways.

People locked in jail pretrial are more likely to lose their jobs and incomes, even if they are detained for just a few days before ultimately being released. Because federal pretrial detention disproportionally affects poor people of color,[156] the collateral consequences of detention further aggravate this disparity along socioeconomic and racial lines. One state study found that 3 to 4 years after pretrial bond hearings, individuals who had been released were 25% more likely to be employed than their detained counterparts.[157]

Even when people experience only brief periods of pretrial detention, their long-term earnings are significantly lower than those of people who are never detained.[158] As one state study explains, "[T]ypically, those who are working when given even a short jail sentence are in low-wage positions and are easily replaceable."[159] Individuals detained for 3 or fewer days reported employment disruption 17% of the time, yet nearly 60% of those detained for more than 3 days reported such disruption.[160] In addition to the risk of short-term job loss, a person jailed pending trial could be at risk of experiencing long-term unemployment, particularly if they are "in their peak wage-earning years (20–40)" or face "disruption of education and job training."[161]

This finding about the impact of short-term jailing is especially salient for the federal system, where our study finds that the vast majority of arrestees (77%) are detained at the Initial Appearance and jailed for several days until a Detention Hearing.[162]

Moreover, the effects of time spent in jail and subsequent periods of lost earnings compound over the course of an individual's lifetime, fueling intergenerational poverty. As one study reports, "formerly imprisoned people earn nearly half a million dollars less over their careers than they might have otherwise."[163] This study further found that such economic losses are more acute among Black and Latino individuals, worsening economic disparities across racial lines.[164]

Employment instability, compounded by other factors, can also cause housing instability when detained individuals are later released. People who are detained pretrial often have housing instability to begin with, and any time spent in jail can worsen the situation.[165] "[A]n arrest record and time in jail can result in denial from a landlord or the inability to stay with family members who live in public housing where living with a person with a criminal record is banned."[166] Moreover, individuals who have experienced pretrial detention are less likely to "hold a lease or mortgage after release compared to their pre-incarceration status and are more likely to experience homelessness after release from jail, *even when charges were dismissed*."[167]

**Pretrial jailing fuels a pernicious cycle of intergenerational incarceration.**[168] Pretrial detention has devastating and lasting effects on the lives of detainees' children. When a parent is detained for even a short time, they can lose custody and their child can be placed in the foster care system.[169] Once a child is in foster care, a detained parent is less likely to regain custody than their released counterparts.[170] These harmful consequences become more acute if a person is convicted and faces incarceration post-conviction—an outcome that is statistically more probable if the arrestee is detained pending trial rather than released. A study of the effects of federal prisons found "children of incarcerated parent[s] . . . exhibit more negative behavioral, academic, and emotional outcomes, and are more likely than their peers to end up in prison."[171]

**Today's system of mass pretrial detention places significant burdens on individuals, families, and communities, yet the data show that these costs provide little societal benefit.** Bail reform efforts undertaken by a number of cities—including New York, Houston, and Los Angeles—provide ample evidence that reducing pretrial detention does not increase rearrest rates, including for serious or violent crimes, and saves taxpayers millions of dollars. In New York, for example, crime rates for various categories of offenses *decreased* after bail reform—including rates of grand larceny, robbery, and rape[172]—and the state is projected to save an estimated $638 million on incarceration costs.[173] One study analyzing New York's bail reform concluded that "80,000 people may have avoided jail incarceration due to cash bail because of the 2019–20 reforms and went on to pose no documented threat to public safety."[174] Studies in other places, such as Harris County, Texas, found comparable results: bail reform reduced pretrial detention "without adversely impacting public safety," and "did not fuel a spike in crime."[175]

**To begin to remedy the many harms of mass pretrial detention and support the positive outcomes of pretrial release, federal judges must shift the culture from one prioritizing pretrial detention to one prioritizing pretrial release.**

# 4 Legal Standards at Federal Bond Hearings

**The high federal pretrial detention rate is not what Congress intended. The BRA reflects Congress's desire to detain a "small but identifiable group of particularly dangerous defendants."[176] It was only for this "limited group of offenders that the courts [needed the] . . . power to deny release pending trial."[177] Congress considered at length arrestees' pretrial liberty interests, and concluded that the constitutional concerns with pretrial detention required a narrowly tailored statute to secure community safety and appearance in court.[178] The BRA, then, codified Congress's desire to detain just a fraction of the people charged with federal crimes. In upholding the Act as constitutional, the Supreme Court confirmed that the law was intended to "operate[] only on individuals arrested for a specific category of extremely serious offenses."[179] The Act therefore "carefully limits the circumstances under which detention may be sought to the most serious of crimes."[180]**

To balance a person's pretrial liberty interest with the prosecution's interests in preventing danger and flight, the BRA sets substantive limits on pretrial jailing in addition to its "exacting . . . procedural protections."[181] These substantive limitations apply at the two sequential bond hearings that take place in federal court: the Initial Appearance hearing and the Detention Hearing.

At a person's Initial Appearance—the first court appearance in a federal criminal case—the law provides a *presumption of release*.[182] If, and only if, specific enumerated criteria are met at the Initial Appearance, a judge may proceed to a Detention Hearing and detain the arrestee in the interim.[183]

At the Detention Hearing, a presumption of release continues to apply for most arrestees; a judge may jail a person only if they find that no conditions of release will "reasonably assure" the person's appearance in court and the safety of the community.[184] At both hearings, the BRA imposes yet another substantive limitation, prohibiting judges from imposing any financial requirement that the arrestee is too poor to satisfy.[185] Other statutes provide an additional procedural protection for indigent individuals: the right to be represented by appointed counsel for the entirety of the Initial Appearance hearing.

# A | The Initial Appearance Hearing

The first substantive limit imposed by the BRA applies at the Initial Appearance hearing and is contained in § 3142(f). That provision defines the narrow category of offenses that are eligible for pretrial detention, instructing: "The [judge] shall hold a [detention] hearing" only "in a case that involves" one of 7 factors. Under this law, a judge may jail an arrestee at the Initial Appearance only if one of seven preconditions to jailing in § 3142(f) is satisfied—we call these the "(f) factors."[186] These 7 (f) factors serve as gatekeepers to detention; if a judge detains someone without an applicable (f) factor, the resulting detention is flatly illegal.[187] If no (f) factor applies, a judge is not even allowed to hold a Detention Hearing. Instead, they must release the arrestee at the Initial Appearance.[188]

The factors in § 3142(f) create a federal "detention eligibility net"—the set of offenses and factors for which Congress has authorized pretrial detention.[189] Section 3142(f)(1) defines the scope of the BRA's *offense-specific factors*, circumscribing the offense-specific bases for holding a Detention Hearing. Section (f)(1) authorizes a judge to hold a Detention Hearing, upon the prosecutor's request, for crimes of violence; most drug offenses; offenses involving guns, a minor victim, or terrorism; offenses with a maximum penalty of life in prison or death; and certain instances of recidivism.[190] Section 3142(f)(2) adds two additional bases for detention that we categorize as non-offense-specific risk factors: a judge is authorized to hold a Detention Hearing if there is a "serious risk that [the] person will flee,"[191] or a "serious risk" that the person will obstruct justice.[192]

Many judges and practitioners mistakenly refer to the types of offenses within the § 3142(f)(1) eligibility net as "presumption cases." This is a dangerous misnomer that fuels the culture of detention. *The BRA does not prescribe any presumption of detention at the Initial Appearance*. The lone offense-specific presumption of detention in the entire statute applies only during the Detention Hearing, not the Initial Appearance.[193] In fact, a number of the offenses listed in § 3142(f)(1) do not qualify for a presumption of detention during the Detention Hearing, including crimes of violence and gun possession offenses.[194] It is therefore patently wrong to bundle together all of the § 3142(f)(1) offenses under the umbrella term "presumption cases."

B

# Right to Counsel at the Initial Appearance Hearing

Federal law requires judges to ensure that every arrestee is represented by counsel during the Initial Appearance, and to appoint counsel to represent poor arrestees during that hearing. Specifically, 18 U.S.C. § 3006A requires that "[a] person for whom counsel is appointed *shall* be represented at every stage of the proceedings *from his initial appearance* before the United States magistrate judge or the court through appeal."[195] Federal Rule of Criminal Procedure 44 requires the same: "A defendant who is unable to obtain counsel is entitled to have counsel appointed to represent the defendant at every stage of the proceeding from the initial appearance through appeal."

To comply with these laws, courts must ensure that, at every single Initial Appearance, a lawyer is present and actively representing the arrestee throughout that hearing. It is not enough to appoint a lawyer who is not present at the hearing or to have a lawyer in the courtroom who is not representing the arrestee. The legislative history of § 3006A plainly states that the law "requires . . . appointment of counsel for any person under arrest," and that this representation "necessarily *precedes* the stage of formal appointment of counsel" at the Initial Appearance.[196] This early and meaningful appointment of counsel is the only way to "assure that everyone, rich or poor, will have the opportunity to utilize the services of an attorney as early in the proceedings as is possible."[197] In addition, every arrestee must be represented by counsel during the Initial Appearance to ensure that they are not detained in violation of the substantive requirements of § 3142(f).

# C The Detention Hearing

At the Detention Hearing, additional substantive and procedural protections apply. When an arrestee is detained at the Initial Appearance, the statute states that "[t]he [detention] hearing shall be held immediately upon the person's first appearance . . . unless that person, or the attorney for the Government, seeks a continuance."[198] A judge may not order a continuance of their own accord. When the prosecution seeks a continuance, that continuance is limited to 3 days, barring good cause.[199] When the individual seeks a continuance, however, the limit is 5 days, again barring good cause.[200]

As at the Initial Appearance, there is a presumption of release at the Detention Hearing, except in cases covered by § 3142(e)(2)–(3), where a rebuttable presumption of detention applies.[201] However, the presumption of detention does not mandate detention. Instead, at all Detention Hearings—even when the presumption of detention applies—the court is prohibited from detaining the accused pretrial unless it finds that no conditions of release will reasonably assure the person's appearance in court and community safety.[202]

The most common rebuttable presumption of detention is contained in § 3142(e)(3). Under this provision, an arrestee faces a presumption of detention at the Detention Hearing in most cases involving drug offenses, § 924(c) gun violations, offenses against minor victims, and terrorism.[203]

An additional rebuttable presumption of detention applies under the following exceedingly rare circumstances: the accused is (1) charged with a crime of violence, drugs, guns, an offense against a minor victim, or terrorism, (2) the accused was previously convicted of any one of those offenses while on pretrial release, and (3) fewer than 5 years have passed since the date of conviction or release from prison for that prior offense.[204]

Because the presumption of detention is rebuttable, the court is required at every Detention Hearing where it applies to determine whether the evidence the defense has presented is sufficient to "rebut" that presumption—even if the defense never mentions the word "rebuttal." The bar for rebuttal is low: the law requires courts to find the presumption rebutted as long as the defense presents "some evidence" relating to the factors listed in § 3142(g).[205] Some courts have allowed judges to consider even a *rebutted* presumption as a factor favoring detention.[206] However, that approach has no basis in the statute and may be constitutionally problematic, as it impermissibly relieves prosecutors of their burden of persuasion.[207] And even if the presumption of detention has not been rebutted, courts may not automatically order detention, but must instead consider the presumption "together with the factors listed in § 3142(g)."[208]

# D Conditions of Release

When a judge releases an arrestee, the BRA establishes a presumption that the person will be released on personal recognizance or subject to an unsecured bond.[209] However, if a judge determines that such conditions will not reasonably assure appearance and community safety, the judge may impose additional conditions of release to mitigate those concerns.[210] In that case, the judge must impose the "least restrictive" condition(s) that will reasonably assure appearance and safety.[211]

Section 3142(c)(1) contains a list of conditions that a judge is required to consider before detaining an arrestee pretrial. The first condition is commonly referred to as a "third-party custodian"—a judge can order the arrestee to "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court."[212] Other conditions include restrictions on travel, employment requirements, and drug treatment. The statute also allows judges to impose additional conditions not listed in § 3142(c)(1).[213]

Although the statute lists certain financial conditions of release, it has an overarching command: "The judicial officer *may not impose a financial condition that results in the pretrial detention of the person.*"[214] This prohibition is intended to restrict the use of financial conditions and to prevent indigent arrestees from being locked in jail because they do not have the money or the means to pay for their own release.

# FINDINGS & RECOMMENDATIONS

# 1 Judges Must Follow the Correct Legal Standard at the Initial Appearance Hearing and Stop Jailing People Unlawfully.

**Our study found that there is a severe misalignment between the legal standard that applies during Initial Appearance hearings and the practice that unfolds in courthouses around the country. Judges routinely ignore the legal standard in § 3142(f) and sometimes jail people unlawfully.**

While courtwatching, we observed a problematic feedback loop that results in illegal detention. Prosecutors frequently make improper detention requests that do not comply with the statute, judges neither question those requests nor adhere to the statutory requirements, and some arrestees are jailed unlawfully.[215] *See* Figure 5. The results of our 2019 Chicago pilot study were strikingly similar, further illustrating the nationwide scope of this problem.[216] Our qualitative interviews confirmed that judges across the country mistakenly assume that prosecutors are entitled to a Detention Hearing in every case, ignoring explicit statutory language to the contrary. The unlawful detentions we uncovered contribute to rising detention rates and disproportionately fall on people of color.

To address these misapplications of the law, federal judges can—and must—bring federal bail practices back in line with the original intent of the BRA.[217]

# Our study found that there is a **severe misalignment** between the legal standard that applies during Initial Appearance hearings and the practice that unfolds in courthouses around the country.

# A | Takeaways

- **In 81% of Initial Appearances in our study where the prosecutor requested detention, the prosecutor asked the judge to hold a Detention Hearing without citing any legal basis under § 3142(f).** In some of these cases, prosecutors cited invalid bases for requesting a Detention Hearing, such as danger to the community or non-serious risk of flight. *See* Figure 9.




- In over 99% of Initial Appearances where the prosecutor requested detention without citing a valid basis under § 3142(f), judges detained people without questioning prosecutors' grounds for detention. *See* Figure 9. **This created a problematic feedback loop in which a prosecutor's request for detention at the Initial Appearance almost always resulted in a judicial order of detention, even when based on improper grounds.** *See* Figure 5.




- **In 12% of Initial Appearances where the prosecutor was seeking detention, judges entered a detention order even though no statutory basis for detention existed under § 3142(f).** These detention orders, therefore, were flatly illegal under the BRA. *See* Figure 9.




99%

## *Racial Disparities*
at the Initial Appearance




- **Prosecutors sought detention in cases that did not qualify for a Detention Hearing under § 3142(f)(1) more than twice as frequently for non-white arrestees.** *See* Figure 10.

- Prosecutors similarly cited improper grounds for detention more frequently against Black and Latino arrestees. *See* Figure 11.

## *Citizenship Status Disparities*
at the Initial Appearance




- **Prosecutors requested detention nearly 20% more frequently if the arrestee was identified as a noncitizen.** At 79% of these hearings, prosecutors failed to cite a valid basis for detention under § 3142(f). *See* Figure 15.

- **In noncitizen cases, no judge questioned the prosecutor's grounds for detention** when they failed to cite a valid basis for detention at the Initial Appearance, leading judges to detain arrestees in 78% of these cases.

# THE STATUTE: 18 U.S.C. § 3142(f)

(f) Detention Hearing.—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—

(1) upon motion of the attorney for the Government, in a case that involves—

(A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

(D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code; or

(2) upon motion of the attorney for the Government or upon the judicial officer's own motion in a case, that involves—

(A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

# B The Law: The Bail Reform Act Carefully Limits the Cases Eligible for Detention.

The BRA divides the bail process into two stages, an Initial Appearance hearing and a Detention Hearing, each of which is governed by a separate legal standard. In all cases, the statute contains "a presumption in favor of pretrial release" at the Initial Appearance.[218] It states that a judge "shall order the pretrial release of [an arrestee] on personal recognizance" at the Initial Appearance subject to the least restrictive conditions of release that will "reasonably assure" that person's appearance in court and the safety of the community.[219] To detain an arrestee at the Initial Appearance and proceed to a Detention Hearing, a judge must find certain predicates satisfied at the Initial Appearance itself.

Although the Initial Appearance is the first court hearing in a federal criminal case, it does not come first in the statute. Instead, the legal standard for Initial Appearances is buried in the middle of the statute, in § 3142(f).

There is a widespread misperception that prosecutors are entitled to a Detention Hearing every time they request one. However, under the BRA, the prosecutor may move for detention at the Initial Appearance *only* if authorized by one of the factors in § 3142(f) (the "(f) factors"). The BRA says that "the judicial officer shall hold a [detention] hearing" only "in a case that involves" one of the 7 (f) factors.[220] "If none of the § 3142(f) factors are satisfied, however, the [judge] is prohibited from holding a detention hearing or detaining the defendant pending trial."[221] If no (f) factor applies, the arrestee *must*, as a matter of law, be released at the Initial Appearance. In this sense, § 3142(f) "serve[s] as a gatekeeper to [pretrial] detention."[222]

The Supreme Court reaffirmed this limitation in *Salerno*, saying, "detention hearings [are only] available if [the] case involves crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenders, or certain repeat offenders."[223] A central reason the Supreme Court upheld the BRA as constitutional in *Salerno* was the gatekeeping function of the (f) factors.[224] The Court opined in pertinent part, "the Bail Reform Act *carefully limits the circumstances under which detention may be sought* to the most serious of crimes."[225]

Every federal court of appeals that has examined this issue agrees that one of the § 3142(f) factors must be proven at the Initial Appearance in order to hold a Detention Hearing.[226] As the Second Circuit recently held, before a federal judge can detain an arrestee at the Initial Appearance, "the Government must establish by a preponderance of the evidence that it is entitled to a detention hearing" by presenting a valid (f) factor.[227] The First Circuit agrees: "Congress did not intend to authorize preventative detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists."[228] The U.S. Attorney's Manual that guided federal prosecutors for decades concurred: "Section 3142(f) does not authorize a detention hearing in the absence of one of the six situations set forth [in the statute]."[229]

There are two broad categories of (f) factors: the 5 offense-specific factors in § 3142(f)(1) and the two non-offense-specific risk factors in § 3142(f)(2).[230]

## Offense-Specific Factors

In § 3142(f)(1), the BRA identifies 5 categories of offenses that authorize a judge to hold a Detention Hearing, if and only if the prosecutor requests one: crimes of violence; most drug offenses; offenses involving guns, a minor victim, or terrorism; offenses with a maximum penalty of life in prison or death; and certain instances of recidivism.[231] The statute does not authorize the judge to detain an arrestee or hold a Detention Hearing without the prosecutor moving for one.[232] If an (f)(1) factor applies and a prosecutor requests pretrial detention, the judge is required to hold a Detention Hearing. The statute further requires the judge to detain the arrestee between the Initial Appearance and Detention Hearing if a party's request for continuance is granted.[233]

Consequently, the prosecutor's decision to charge a § 3142(f)(1) offense and seek detention ties the judge's hands at this stage, effectively mandating detention during any continuance between the Initial Appearance and the Detention Hearing.[234] In an analogous context, a growing body of research in the federal system shows that prosecutorial charging decisions create disparities—including racial disparities—at sentencing.[235]

Automatic detention under § 3142(f)(1) arose during the 1980s War on Drugs, motivated by concerns about rising crime rates.[236] Despite significant evidence to the contrary, key decision-makers attributed this uptick to individuals on pretrial release.[237] Since Congress passed the BRA, people of color have most felt the effects of automatic jailing at the Initial Appearance under § 3142(f). For example, in 2019, over 75% of people who qualified for automatic detention at the Initial Appearance in cases where the (f)(1) factors applied were people of color.[238] *See* Figure 7.

**Figure 7: People of Color Disproportionately Face Charges that Expose them to Jailing at the Initial Appearance Under § 3142(f).**




Additionally, evidence shows that offense type is not a good proxy for a person's risk of recidivism or risk of flight.[239] One government study concluded that § 3142(f) "was a poorly defined attempt to identify high risk defendants based primarily on their charge, relying on the belief that a defendant's charge was a good proxy for that defendant's risk."[240] Another study found that although "[a]ssuming that offense seriousness correlates to flight risk has intuitive appeal, . . . decades of bail studies challenge that claim."[241] In fact, "defendants charged with more serious offenses . . . do not, in fact, fail to appear at higher rates."[242]

## Non-Offense-Specific Risk Factors

The second category of (f) factors requires a judge to make a subjective determination about whether an arrestee poses a serious risk. If no offense-specific § 3142(f)(1) factor is present, the prosecutor may move

# Since Congress passed the BRA, people of color have most felt the effects of automatic jailing at the Initial Appearance under § 3142(f).

for a Detention Hearing only on one of the grounds in § 3142(f)(2). The prosecutor must establish by at least a preponderance of the evidence[243] that the arrestee is either a *serious* risk of flight or poses a *serious* risk of obstructing justice.[244]

It is critical to understand that neither these non-offense-specific risk factors nor the offense-specific factors allow a judge to proceed to a Detention Hearing based on (1) danger to the community, or (2) a non-serious risk of flight.

First, although at the Initial Appearance the prosecutor frequently asks the judge to detain the arrestee as a "danger to the community," the courts of appeals have stated unambiguously that when none of the (f) factors are met, "pretrial detention solely on the ground of dangerousness to another person or to the community is not authorized."[245] As the Ninth Circuit has held, "We are not persuaded that the [BRA] authorizes pretrial detention without bail based solely on a finding of dangerousness. This interpretation of the Act would render meaningless 18 U.S.C. § 3142(f)(1) and (2)."[246] "[I]f none of the offense-specific § 3142(f)(1) factors apply, a judge is prohibited from relying on "danger to the community—including financial danger—as a basis for detaining a defendant at the Initial Appearance or holding a detention hearing."[247] Release on conditions is *mandatory*.[248]

Second, although prosecutors often improperly seek detention at the Initial Appearance on the bare assertion that the arrestee poses a "risk of flight," *ordinary* risk of flight is similarly an impermissible basis on which to order detention at the Initial Appearance or schedule a Detention Hearing.[249] Instead, the statute requires prosecutors to establish by at least a preponderance of the evidence that the arrestee poses a *serious* risk of flight.[250] This means that "the prosecutor must proffer some evidence to demonstrate that the case actually 'involves' a risk of flight that is serious rather than the baseline risk posed in any federal criminal case."[251] As one court has stated, an arrestee may be jailed "only if the *record* supports a finding that he presents a serious risk of flight."[252] The BRA's legislative history makes clear that detention for serious risk of flight should occur only in "extreme and unusual circumstances."[253]

A Detention Hearing is authorized only in a narrow subset of "non-(f)(1) cases"—those cases that do not involve an offense-specific factor in § 3142(f)(1). In non-(f)(1) cases, the court may detain the arrestee at the Initial Appearance and hold a Detention Hearing only if one of the § 3142(f)(2) risk factors is present. Non-(f)(1) cases include

all fraud and financial crimes, money laundering, postal theft, bank theft, alien smuggling, illegal reentry, and straw purchaser offenses,[254] as well as offenses that a court of appeals has declassified from the category of crimes of violence.[255] Non-(f)(1) cases comprise nearly 60% of all federal pretrial cases.[256] *See* Figure 8. Accordingly, **in the majority of cases nationwide, there is a real question of whether the law allows a judge to hold a Detention Hearing at all.**

**Figure 8: Non-(f)(1) Cases Where Judges Are Not Automatically Authorized to Hold a Detention Hearing Comprise Nearly 60% of All Federal Pretrial Cases.**




In non-(f)(1) cases alleging a financial crime, the law prohibits the court from detaining someone at the Initial Appearance or holding a Detention Hearing on the basis of "financial danger."[257] Yet despite this prohibition, judges detain 37% of those charged with fraud offenses at the Initial Appearance.[258] One judge we interviewed candidly admitted to holding a Detention Hearing in a fraud case on this impermissible basis: "In fact, I did make that mistake, and [the defense] filed a motion after I detained someone in a fraud case based in part on dangerousness. They moved to reconsider, and ultimately the individual was released."

C

# The Practice: At the Initial Appearance Hearing, Federal Judges Jail People Unlawfully.

**Our study revealed a nationwide problem in the federal courts: judges do not understand the legal standard that applies at the Initial Appearance and at times detain people unlawfully.** In practice, the application of the § 3142(f) factors departs from the statutory strictures and from appellate courts' guidance, frequently resulting in unlawful detention.

**Our interviews demonstrated that judges throughout the country mistakenly believe that prosecutors are entitled to a Detention Hearing whenever they request one—a position that disregards both the statute and well-established appellate case law.** Most of the judges we interviewed either admitted to not knowing the legal rules that apply at the Initial Appearance or evinced a misunderstanding of the legal standards. More than half of the Chief Federal Defenders we interviewed likewise expressed confusion about the legal standard that applies at the Initial Appearance. Over and over, judges and attorneys alike were mystified when we began asking questions about the § 3142(f) requirements, and some expressed surprise at the basic idea that there is, in fact, a legal standard that applies during the Initial Appearance.

We watched many Initial Appearances in which judges promptly granted prosecutors' requests for detention, jailed the arrestee, and scheduled a Detention Hearing for a later date, all without first determining whether the statute authorized a Detention Hearing. We saw judges, prosecutors, and even defense attorneys proceed through Initial Appearances in an extremely cursory, rote fashion:

**JUDGE:** *Government, what is your position on bond?*

**PROSECUTOR:** *We request pretrial detention based on risk of flight and danger to the community.*

**JUDGE:** *Okay sounds good to me. The Detention Hearing is scheduled for next Wednesday, February 2. Anything further?*

**PROSECUTOR:** *No.*

**DEFENSE COUNSEL:** *No, your honor.*[259]

Unfortunately, the above exchange typifies many of the Initial Appearance colloquies we witnessed. Often, there was no meaningful consideration of the legal standards that apply at the Initial Appearance, no recognition of the statutory presumption of release, and no effort to safeguard arrestees' pretrial liberty interests. Instead, as in this colloquy, prosecutors requested detention for reasons not authorized by the statute and judges automatically detained people at the Initial Appearance whenever the prosecutor requested it. As in this example, judges detained in a knee-jerk fashion without first ascertaining whether there was a statutory basis for (1) holding a Detention Hearing at all, and (2) detaining the arrestee for several days until that Detention Hearing.

Nationwide, there is a 78% detention rate at the Initial Appearance stage.[260] In our study, 77% of arrestees were detained at that initial stage.

## Prosecutors Regularly Request Detention at the Initial Appearance on Improper Grounds.

Our study revealed a pattern of prosecutors and judges ignoring and misapplying the legal standard at the Initial Appearance—a pattern that sometimes resulted in unlawful detentions.

In 81% of the Initial Appearances where the prosecutor sought detention, they failed to cite a valid statutory basis for detention. *See* Figure 9. In 38% of cases, the prosecutor cited statutorily invalid

bases, including "danger to the community," non-serious "risk of flight," and an arrestee's status as a non-citizen.[261] *See id*. Our data showed that there was, in fact, a legitimate, offense-specific basis for detention under § 3142(f)(1) in many of these cases.

**Figure 9:** **At the Initial Appearance, Prosecutors Regularly Request Detention on Improper Grounds and Judges Detain People Unlawfully.**



However, in our courtwatching, we observed that problematic feedback loop: when the prosecutor cites improper grounds for detention, judges rarely question whether there is a proper statutory basis for holding a Detention Hearing or detaining the arrestee, and at times they jail people unlawfully. *See* Figure 5. Our interviews confirmed the nationwide scope of this problem, with many of the judges we interviewed admitting that they did not ask prosecutors to cite a § 3142(f) factor to justify holding a Detention Hearing. Some judges even acknowledged that it is their practice to schedule a Detention Hearing whenever the prosecutor requests one.

This feedback loop is both a consequence and a driver of the culture of detention, with in-court practices diverging from the legal requirements. One judge, speaking of their experience as a prosecutor, told us: "I don't recall the subject of Detention Hearing eligibility ever really coming up. Instead, it seemed as though the prosecutors, the defense bar, and the [judges] assumed that if the prosecutor was moving for detention, it was permitted a continuance of up to three days for the Detention Hearing to take place, and the Detention Hearings were scheduled." One Defender we interviewed characterized this trend as "sloppiness," noting that "folks [have] gotten into bad habits." Another Defender, concurring in this evaluation, labelled the issue as "complacency culture."

One judge we interviewed expressed frustration with the idea that prosecutors must clearly state the basis for detention when seeking to detain someone at the Initial Appearance. The judge noted that "it's kind of superfluous to have to repeat [the basis for detention]" because the judges know the statute (a perspective belied by our findings). Another judge told us, more circumspectly, that after decades on the bench, they felt that "everybody kind of understands when you say 'danger,' 'risk of flight,' . . . everybody can understand what you're talking about, and it's just a little—it's shorthand." To their credit, this judge acknowledged that "it's not right" to use a shorthand that is inconsistent with the statute.

Prosecutors are more likely to request detention at the Initial Appearance for arrestees of color. In the non-(f)(1) cases we observed, the prosecution sought detention 43% of the time for people of color, but only 21% of the time for white arrestees. *See* Figure 10. Alarmingly, looking across all Initial Appearances, prosecutors cited an improper basis for detention 35% of the time for arrestees of color as compared to 23% of the time for white arrestees. *See* Figure 11. Arrestees of color are more likely to be illegally jailed at the Initial Appearance than their white counterparts.

**Figure 10: Prosecutors Sought Detention in Non-(f)(1) Cases More Than Twice as Frequently Against People of Color Than Against White Arrestees.**




**Figure 11: Prosecutors Are More Likely to Request Detention at the Initial Appearance on Improper Grounds for People of Color.**



# Our most troubling finding was that, in 12% of Initial Appearances where the prosecutor was seeking detention, judges detained people illegally.

# 12%

## Judges Misapply the Law and Illegally Detain Arrestees.

Our most troubling finding was that, in 12% of Initial Appearances where the prosecutor was seeking detention, judges detained people illegally. *See* Figure 9. These were non-(f)(1) cases where, as a matter of law, there was no offense-specific ground for detention under § 3142(f)(1). In these non-(f)(1) cases, prosecutors did not cite or present evidence of any § 3142(f)(2) factor to support their detention request (the only possible statutory basis for detention). Instead, 97% of the time the prosecution cited improper grounds, like danger to the community or ordinary risk of flight.

Despite the prosecution providing no legitimate basis for detention in the non-(f)(1) cases in our study, *every single one* of the arrestees in those cases was detained at the Initial Appearance and subjected to an improper Detention Hearing. *See* Figure 12. These detentions at Initial Appearances—and the Detention Hearings that followed—were flatly unlawful, in that they were not supported by any showing, *or even an assertion*, that the arrestee posed a serious risk of flight or obstruction of justice.

**Figure 12: At the Initial Appearance, Prosecutors' Improper Detention Requests in Non-(f)(1) Cases Lead Judges to Detain People Unlawfully.**




Such unlawful detentions are the inevitable consequence of the Initial Appearance feedback loop we identify, in which prosecutors seek a Detention Hearing on improper grounds and judges automatically grant that request without checking the statute.

Moreover, these unlawful detentions were carried out in a racially disparate way. Among non-(f)(1) cases, 56% of Black arrestees and 45% of Latino arrestees were jailed on improper grounds at the Initial Appearance in non-(f)(1) cases, compared to just 21% of white arrestees. *See* Figure 13.

**Figure 13: Unlawful Detentions Are Carried Out in a Racially Disparate Way.**




The unlawful detentions we observed are just the tip of the iceberg. Nationwide, 76% of arrestees in non-(f)(1) cases are detained at the Initial Appearance[262]—a strikingly high rate considering that the only valid ground for detention in such cases requires the prosecutor to prove that the arrestee poses a "serious risk" of flight or obstruction. *See* Figure 14. Setting this high national detention rate alongside our observation that judges detained *every single non-(f)(1) arrestee* for whom prosecutors sought detention, it is very likely that judges elsewhere in the country are likewise jailing people unlawfully in such cases. Especially considering our qualitative finding that many judges automatically acquiesce to prosecutors' requests to jail people at the Initial Appearance, the non-(f)(1) cases in our study are truly the canaries in the coal mine.

Given that more than 1 in 10 arrestees in our study were unlawfully jailed when the prosecutor requested detention at the Initial Appearance, it is clear that judges are ignoring or misapplying the law. *See* Figure 9. This is not just an isolated situation in which a few judges or attorneys slightly misunderstand the law; rather, there is a pervasive, systemic deprivation of liberty that is not authorized by statute or case law.

**Figure 14:** **Nationwide, 76% of Arrestees in Non-(f)(1) Cases Are Detained at the Initial Appearance.**




**During our courtwatching, we consistently observed judges violating the law at Initial Appearances in non-(f)(1) cases.** For example, during an Initial Appearance in a mail fraud case involving an indigent Black arrestee, the prosecutor cited legally erroneous bases for detention: "We seek pretrial detention based on risk of flight and danger to the community."[263] The judge detained the individual and scheduled a Detention Hearing for 5 days later without objection by the defense.[264] Since this offense is not covered by § 3142(f)(1) and no § 3142(f)(2) factors were cited, it was unlawful to detain this arrestee at the Initial Appearance and unlawful to hold a Detention Hearing in his case. Yet at the Detention Hearing, the judge jailed the person for the duration of their case—a dire consequence when no Detention Hearing was legally authorized.[265]

In a far less typical example, a judge improperly jailed an arrestee at the Initial Appearance for possessing stolen mail, based that detention on the invalid grounds of "risk of flight" and "danger to the community," but subsequently rectified that error.[266] At the Detention Hearing itself, the judge acknowledged that holding a Detention Hearing would be statutorily authorized only if the prosecutor had shown that the arrestee posed a serious risk of flight or specific threat to a victim or witness, and concluded that the prosecution had "failed to do so."[267] The judge consequently ordered release.[268] But this man—who was employed in the construction business and had two children at home[269]—should never have been jailed in the first place. Unfortunately, this was the *only* case involving unlawful detention at the Initial Appearance where the judge realized and corrected the error at the Detention Hearing.

We observed numerous other instances of illegal detention in non-(f)(1) cases, including situations in which judges detained people without prosecutors requesting detention or making any effort to meet the legal standard for holding a Detention Hearing. We repeatedly heard judges tell arrestees, "You are entitled to a Detention Hearing"—a blatant misstatement of the law that erroneously relieves the prosecution of its burden of establishing a § 3142(f)(2) risk factor that warrants a Detention Hearing.

Here are additional examples of the unlawful detentions we watched:

- During the Initial Appearance in one non-(f)(1) case in which the arrestee was solely charged with immigration offenses, the prosecutor and defense counsel stipulated to, and the judge imposed, a $250,000 corporate surety bond that the arrestee was unable to meet, resulting in detention for the duration of the case.[270]

- In a non-(f)(1) money laundering case, everyone in the courtroom appeared to be operating on the unspoken assumption that a Detention Hearing would be held, and the defense stipulated to detention without the prosecutor making any request at all.[271]

- In a non-(f)(1) case alleging identity theft and conspiracy to commit bank fraud, the prosecutor requested, and the judge imposed, a $100,000 personal surety bond.[272] Although no one was seeking detention, the arrestee was jailed until the Detention Hearing because the arrestee's lawyer was not present, and the probation officer was not able to reach his mother.[273]

- In a fourth non-(f)(1) case—which involved charges of credit card fraud and identity theft—the judge conducted the Initial Appearance without defense counsel present and misstated the law, saying: "You are entitled to a bond or Detention Hearing. . . . [I] f the government is requesting that you be held without a bond."[274] The judge then scheduled a Detention Hearing, despite the prosecutor never requesting one or establishing any legal basis for detention.

In all 4 of these cases, there was no offense-specific basis for holding a Detention Hearing under § 3142(f)(1), and the prosecutor failed to cite to or present the requisite evidence for detention under § 3142(f)(2). Thus, each of these 4 cases represents an alarming instance of a judge jailing someone illegally.

Such unlawful detentions occur because judges are not questioning the prosecutors' grounds for detention. Despite the flagrant violations of the BRA discussed above, in over 99% of the cases in which prosecutors failed to mention § 3142(f), judges failed to challenge prosecutors' bases for detention. That is, among all cases in which the prosecution requested detention at the Initial Appearance, over 99% of arrestees were detained, even when the prosecution had presented no valid basis for locking the person in jail or holding a Detention Hearing. *See* Figure 9. That is a far cry from the Supreme Court's admonition that the BRA's (f) factors "carefully limit[] the circumstances under which detention may be sought to the most serious of crimes."[275]

Some of these unlawful detentions may be motivated by judges' fear that someone they release will reoffend, coupled with an unquestioning reliance on Pretrial Services. When asked what explains these unlawful detentions, one judge we interviewed said, "I think judges who don't want to make either the right or the hard decision to find release conditions consistent with the Bail Reform Act rely on Pretrial [Services'] recommendations as a basis to detain." The judge continued:

> *I think it's laziness. I think it's that everyone thinks you're going to get a Detention Hearing and the basis for it doesn't much matter [be]cause the government asks for a Detention Hearing, and there is one—even if it's not properly cited—and we're going to get one within three days. But, you know, could we do better? Absolutely. Should we follow the law? Yes, I think so. I just need to be instructed.*

**Our courtwatching data and stakeholder interviews show that lack of adherence to § 3142(f) is not an isolated problem in a few districts but is instead a nearly universal problem that spans federal courts throughout the country.** A shockingly high number of the judges we interviewed indicated that they considered "danger to the community" to be a legitimate basis for holding a Detention Hearing, even though every court of appeals to have considered the issue has said otherwise. To their credit, one judge called their district's failure to question prosecutors' bases for detention in non-(f)(1) cases "a weak spot in our analysis," which had likely led to many unnecessary and potentially illegal detentions. The judge went on to explain that, rather than proffering evidence as § 3142(f) requires, "[prosecutors] would say [they are seeking detention for] 'serious risk of flight' and then boom, the person gets detained until their [detention] hearing."

The defense bar is also implicated in, and influenced by, the culture of detention. Strikingly, the defense did not object to detention in any of the cases where arrestees were jailed illegally at the Initial Appearance. One Chief Defender candidly admitted, "I don't think we've ever raised that argument [at the Initial Appearance] that you don't get to the Detention Hearing at all. I don't know that we've ever raised that point here [in my district]."

However, our interviews indicate that some defense counsel who don't raise § 3142(f) arguments at the Initial Appearance are responding to pressure from judges. One Defender explained that when the defense bar objects to detention at the Initial Appearance, judges say "save that for the Detention Hearing, counsel." Another Defender told us that judges typically view any argument at the Initial Appearance regarding whether an arrestee is a *serious* risk of flight "as something for them [to] determine [at] the Detention Hearing"—a position that disregards the requirements of § 3142(f)(2). That Defender explained that, while lawyers in their office have tried to argue that judges "shouldn't even be having the Detention Hearing in this circumstance," judges are "very uninterested in that argument."

Defense counsel waives release in 40% of cases nationally, according to AO data.[276] In our courtwatching study, defense attorneys agreed to detention[277] in 42% of the cases we observed (across Initial Appearance and Detention Hearings). The rate at which defense attorneys waived release at any point in the pretrial process varied among the 4 districts, ranging from 25% to 48%.

While one reason for these high waiver rates is that a certain percentage of cases involve some kind of detainer (often from a prior state case or a case in which the arrestee is on probation/parole), these high waiver rates are also driven by the problematic feedback loop we have described. When prosecutors request detention at extremely high rates at the Initial Appearance and judges nearly universally respond by detaining arrestees during that hearing—even without a valid basis—it is little wonder that Defenders describe feeling a sense of hopelessness in the face of the culture of detention. If judges break that feedback loop by following the statutory rules, defense counsel may well begin requesting release at higher rates.

## Judges Regularly Detain Noncitizens at the Initial Appearance on Improper Grounds.

In the Initial Appearances we watched, judges often detained noncitizens and individuals with Immigration and Customs Enforcement (ICE) detainers on improper grounds.[278]

While the BRA authorizes temporary detention of people with no legal status,[279] pretrial detention of noncitizens during the Initial Appearance and Detention Hearing must meet the same legal standards as any other case. Notably, illegal reentry and immigration offenses are not covered by § 3142(f)(1), meaning that prosecutors must provide evidence of a *serious* risk of flight or obstruction to jail noncitizens at the Initial Appearance. The law is clear that an ICE detainer, standing alone, is not evidence of a serious risk of flight—flight must be voluntary.[280]

In practice however, one Defender described how an ICE detainer can lead to "automatic detention. . . . [T]he judges' view is that [an ICE detainer] is sufficient to detain." This Defender then told us: "I've brought those [motions] and appealed those to the district court before, and I've never seen anyone get out with an ICE detainer."

DOJ data show that noncitizens do not pose a higher risk of flight or violation of release conditions than citizens. Undocumented individuals have the exact same low rate of non-appearance as U.S. citizens; they fail to appear just 1% of the time.[281] Compared to U.S. citizens, undocumented arrestees are *more* likely to comply with other conditions of release and significantly *less* likely to have their bond revoked.[282]

Despite these realities, in the cases where we courtwatched, prosecutors requested detention for 85% of identified noncitizens at the Initial Appearance, as compared with just 68% of all arrestees. In 79% of noncitizen cases in which the prosecutor requested detention, they either cited an improper basis in seeking a Detention Hearing or did not provide *any* grounds for holding a Detention Hearing. Regardless, when prosecutors failed to cite a valid statutory basis for detention in these cases, the noncitizen was jailed 78% of the time. *See* Figure 15. Moreover, prosecutors' invalid detention requests resulted in judges *unlawfully* detaining 20% of noncitizens at their Initial Appearances.

**Figure 15:** **Prosecutors More Frequently Request Detention for Noncitizen Arrestees, Leading Judges to Regularly Detain Noncitizens on Improper Grounds.**




One Defender we interviewed corroborated these findings, noting that prosecutors request detention more often for people who are noncitizens, even in non-immigration cases. Similarly, a judge told us that prosecutors often fail to demonstrate any "level of analysis" when requesting detention in cases involving noncitizens. Instead, the judge characterized prosecutors' thinking as: "there's a detainer, we're requesting detention."

D

# The Solution: At the Initial Appearance, Judges Must Prevent Unlawful Detentions by Following the § 3142(f) Legal Standard.

**Judges must take action to ensure that the law is followed and end the destructive feedback loop that results in unlawful jailing at the Initial Appearance.** One judge told us that, until we began raising consciousness about the legal standard at the Initial Appearance, "the (f) factors were not really foremost in most [judges'] minds." This needs to change.

**First, judges must understand the legal standard that applies during Initial Appearances and must recognize the strict limitations the BRA places on the types of cases in which a judge may hold a Detention Hearing or detain an arrestee at all.** In a case that involves an offense-specific factor in § 3142(f)(1), it violates the law for a judge to detain an arrestee at the Initial Appearance or proceed to a Detention Hearing without an explicit request from the prosecution.

**Adherence to the legal standard is equally important in districts where the Initial Appearance and the Detention Hearing are held during a single court proceeding—a practice common in high-volume urban districts like New York and Los Angeles.** In such districts, judges must be especially wary about the fact that two very different legal standards apply at the Initial Appearance and the Detention Hearing. When a prosecutor requests detention during a unitary proceeding, judges should scrupulously consider whether there is any valid legal basis under § 3142(f) for holding a Detention Hearing before conducting a Detention Hearing.

**Second, judges must be highly vigilant in ensuring that federal prosecutors comport with each element of the BRA's legal standard at the Initial Appearance.** When a prosecutor requests detention and a Detention Hearing for reasons that Congress has deemed inappropriate or otherwise impermissible—like danger or ordinary flight risk—they are asking the judge to violate the law. Rather than rubber-stamping this improper invitation to detain, judges must be on guard, stand as the bulwark against illegal detention, and deny such requests.

# Rather than rubber-stamping this improper invitation to detain, judges must be on guard, stand as the bulwark against illegal detention, and deny such requests.

Judges should ask prosecutors to state on the record what § 3142(f) factor authorizes a Detention Hearing. If a prosecutor moves for pretrial detention at the Initial Appearance on the allegation that an arrestee is a danger to the community and/or an ordinary risk of flight, the judge must explain that there is no statutory basis for that request under § 3142(f). Dangerousness and ordinary risk of flight are not § 3142(f) factors, and it is incumbent on judges to remind prosecutors of that basic statutory fact.

**Third, judges must be especially careful in the types of cases where we documented illegal detentions.** These are non-(f)(1) cases where there is no offense-specific factor that authorizes a judge to hold a Detention Hearing, and where the only possible basis for detention is "serious risk" of flight or obstruction of justice under § 3142(f)(2). To determine whether an arrestee is a serious risk of flight, judges may need to hold a more extensive hearing than usual during the Initial Appearance. Because the law demands a showing that any risk of flight is "serious," the prosecution should present some evidence to meet its burden, such as evidence about the particular arrestee's history and characteristics (e.g., past failures to appear in court) or to the circumstances of the offense (e.g., the person led the police in a high-speed chase).[283] The defense should be given an opportunity to present its own evidence to establish that the arrestee does not pose a serious risk of flight or obstruction. And the judge must not move forward to a Detention Hearing unless, at the Initial Appearance, "the record supports a finding that [the arrestee] presents a serious risk of flight" or obstruction.[284]

**Fourth, judges can use their influence to mitigate the culture of detention.** "Judges should closely scrutinize prosecutors' requests for detention" and "ask them to explain *why* they are moving for temporary detention, particularly if available information suggests that the person poses a low risk of flight or danger."[285] This watchdog function is especially important in cases where the arrestee played a small role in the overall crime or has little to no criminal history.[286] In such cases, judges can ensure that release is the norm and jailing is the "carefully-limited exception."[287]

**By following these recommendations, judges can uphold the law, interrupt the culture of detention, and protect the liberty interests of the people who appear before them.**

# 2 Judges Must Stop Unlawfully Jailing Poor People Without Lawyers at the Initial Appearance Hearing.

**In many federal courts, judges lock poor people in jail without a lawyer during their Initial Appearance, in violation of federal law. Our study uncovered a national access-to-counsel crisis: judges in more than one-quarter of the 94 federal district courts do not provide every arrestee with a lawyer to represent them during the Initial Appearance. *See* Figure 6. In fact, 72% of the districts where we interviewed or surveyed stake-holders deprive at least some individuals of counsel at this first bail hearing.[288] While the scope of the problem varies across districts and divisions, in every court that exemplifies this particular crisis, arrestees are jailed without counsel. These widespread deprivations of counsel contribute to the culture of detention and drive high jailing rates at Initial Appearances nationwide.[289]**

State courts' failures to provide counsel at first appearance are well documented,[290] but our study is the first to report and catalogue parallel failures in the federal system. In one district where we courtwatched, we found that 11% of arrestees did not have a lawyer during their Initial Appearance. *See* Figure 16.

# In many federal courts, judges lock poor people in jail without a lawyer during their Initial Appearance, in violation of federal law.

**Figure 16:** **In Miami, Indigent Arrestees Were Not Represented by Counsel in 11% of Initial Appearances.**



Additionally, in interviews with and surveys of stakeholders, we learned that in at least 26 federal districts, judges fail to ensure that arrestees are represented by counsel at the Initial Appearance in some—and often many—cases. **In certain courts, 100% of arrestees are deprived of counsel during their Initial Appearance.** Our findings surely understate the scope of this particular crisis, as we were unable to interview stakeholders in 58 federal districts (62% of the total districts).

Locking people in jail without counsel violates the U.S. Code and the Federal Rules of Criminal Procedure, may be unconstitutional, and is not sound public policy. It is therefore imperative that federal judges throughout the country stop holding uncounseled Initial Appearance hearings.

Our data show that these legal failures come with serious consequences. Every uncounseled Initial Appearance we observed ended in pretrial detention—a far higher detention rate than at the Initial Appearances where arrestees were represented by counsel. *See* Figure 17. And nearly every single arrestee we observed who faced an Initial Appearance without a lawyer was either Black or Latino, exacerbating the already pronounced racial disparities in the criminal system. *See id*. These findings are particularly troubling given that most people charged with a federal crime do not have the money to hire their own lawyer and therefore rely wholly upon judges to appoint counsel at their Initial Appearances.[291]

**Figure 17:** At the Initial Appearance, Arrestees Deprived of Lawyers Are Jailed at Far Higher Rates than Those With Lawyers.



Federal judges have a duty to follow the law and uphold constitutional rights. Therefore, it is imperative that judges appoint a lawyer to actively represent every indigent arrestee at every Initial Appearance, and throughout that entire hearing.[292] Whenever any discussion related to pretrial detention takes place—including potentially incriminating financial questioning—the arrestee must be represented by counsel. This is the only way to fully uphold the law and protect the liberty interests of the indigent accused.

## THE STATUTE: 18 U.S.C. § 3006A(c)(1)

A person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings.

# A | Takeaways

- Our interviews and survey data revealed that **more than one-quarter of federal district courts fail to appoint a lawyer for every arrestee at the Initial Appearance**, with at least 26 of the 94 federal districts exhibiting this problem. *See* Figure 6.




- In one district where we courtwatched, **11% of arrestees went unrepresented for the entirety of their Initial Appearances**, with no lawyer by their side to advocate for their liberty interests. *See* Figure 16.




- In that district, **every single individual who faced their Initial Appearance without a lawyer was jailed after the hearing, a 100% detention rate.** *See* Figure 17.




- In all 4 districts in our courtwatching study, when arrestees were forced to proceed without counsel for some part of their Initial Appearance, there was a notable increase in pretrial detention: **across court-watched districts, partially represented individuals were detained 89% of the time, while fully represented individuals were detained 67% of the time.** *See* Figure 18.




100%

*Racial Disparities*
in the failure to provide counsel before deprivations of liberty




- **92% of the arrestees who were unrepresented at their Initial Appearances were people of color.** *See* Figure 17.

- Judges *unlawfully* detained unrepresented individuals in violation of § 3142(f) in some of the Initial Appearances we observed, compounding the harm of not providing a lawyer.

- We also observed Initial Appearances where **arrestees made incriminating statements while judges questioned them without a lawyer**, jeopardizing the person's Fifth Amendment right against self-incrimination and their ability to fight the case in the future.

# B The Law: Arrestees Have a Legal Right to Be Represented by Counsel at the Initial Appearance.

## Federal Law Entitles Indigent Arrestees to Representation by Counsel at the Initial Appearance.

Every time a judge fails to provide an indigent individual with a lawyer to represent them throughout the entirety of their Initial Appearance hearing, she violates federal law. There are at least two laws that explicitly direct courts to appoint counsel to stand up on behalf of indigent arrestees during the Initial Appearance: 18 U.S.C. § 3006A and Rule 44 of the Federal Rules of Criminal Procedure. Each provision requires judges to provide appointed counsel "at every stage of the proceeding from initial appearance through appeal."[293] These laws are explicitly directed at the judges responsible for appointing counsel, not at the federal public defender.[294]

Section 3006A states in mandatory terms that every indigent arrestee "shall be represented . . . from initial appearance." The plain text of this law requires several things. First, it mandates "represent[ation]"—meaning a lawyer must actively appear on behalf of every arrestee and represent them as counsel, not just passively standby in an advisory capacity. Second, the plain language of the statute requires that each person be represented *during* their Initial Appearance.[295] Dictionary definitions and case law define the word "from" inclusively, as a "starting-point" for a series.[296] It follows that requiring representation "from initial appearance" does not mean a judge can provide counsel toward the end of that hearing, let alone after that hearing concludes. Rather, the law requires judges to provide each arrestee with a lawyer to stand up on their behalf and represent them for the entire duration of the Initial Appearance hearing.[297]

The purpose and legislative history of § 3006A further demonstrate that it requires judges to ensure that all individuals are represented by counsel during the Initial Appearance. When Congress enacted § 3006A through the Criminal Justice Act of 1964 (the CJA), it made clear that the statute was meant to guarantee "counsel at

# Every time a judge fails to provide an indigent individual with a lawyer to represent them throughout the entirety of their Initial Appearance hearing, she violates federal law.

every stage of the proceedings," the first of which is "the initial appearance."[298] Congress emphasized this point when it amended the CJA in 1970, noting that the law "requires . . . appointment of counsel for any person under arrest," and that this representation "necessarily precedes the stage of formal appointment of counsel" at the Initial Appearance.[299] These reports further the purpose of § 3006A: "assur[ing] that everyone, rich or poor, will have the opportunity to utilize the services of an attorney as early in the proceedings as is possible."[300]

**In short, the text, interpretation, and stated purpose of § 3006A show that all arrestees are entitled to have a lawyer actively representing them—not passively advising—during their Initial Appearance hearing.**

While we use the term "indigent arrestee" as a shorthand for someone who cannot afford to pay for a lawyer, it is clear from the CJA's legislative history that judges are required to appoint counsel for *anyone* who cannot afford quality representation. As then-Attorney General Robert F. Kennedy said in his testimony in support of the CJA: "[This bill] seeks to guarantee competent legal representation and services to every accused person whose lack of funds prevents him from providing for his own defense."[301] He continued: "[This bill] studiously avoids the term 'indigent.' Instead, it adopts the test of financial inability to secure a necessary part of adequate representation."[302]

This broad mandate for appointment of counsel squares with the CJA's goal of ensuring representation for arrestees at every stage of criminal proceedings. Attorney's fees in federal criminal cases can easily exceed tens or hundreds of thousands of dollars—a cost many above the poverty line are unable to afford. As a result, judges cannot deny representation to those who cannot afford it, irrespective of their socioeconomic status.

The Model Plan that implements the CJA also clearly requires representation by counsel *during* the Initial Appearance hearing. In a section pointedly called "Timely Appointment of Counsel," the Plan specifies:

> *Counsel must be provided to eligible persons as soon as feasible in the following circumstances, whichever occurs earliest: (1) after they are taken into custody; (2) when they appear before a magistrate or district court judge; (3) when they are formally charged or notified of charges . . . ; or (4) when a . . . judge otherwise considers appointment of counsel appropriate under the CJA and related statutes.*[303]

The "whichever occurs earliest" command means that the moment an indigent arrestee first "appear[s]" before a magistrate judge during the Initial Appearance hearing (circumstance (2)), the judge must "provide[]" that person with counsel—even *before* the point in that hearing when the arrestee is formally notified of the charges (circumstance (3)).

The Federal Rules of Criminal Procedure likewise require judges to provide counsel to represent every arrestee during the Initial Appearance. The text of Rule 44, which governs appointment of counsel, states that any arrestee unable to retain counsel shall have an attorney appointed to "represent the defendant at every stage of the proceeding *from initial appearance* through appeal."[304] In its notes on the 1966 amendment to Rule 44, the Advisory Committee explained, "The phrase 'from his initial appearance before the commissioner or court' is intended to require the assignment of counsel as promptly as possible after it appears that the defendant is unable to obtain counsel."[305] Rule 5, which discusses Initial Appearances specifically, also states that "[t]he judge must allow the defendant reasonable opportunity to consult with counsel" during the Initial Appearance hearing itself.[306] Much like the CJA, these rules establish that every arrestee has the right to be actively represented by a lawyer for the entire duration of the Initial Appearance.

## Arrestees Must Be Represented by Counsel During the Initial Appearance Because the Bond Determination Implicates Important Legal Standards that Laypeople Cannot Apply on Their Own.

Beyond the laws requiring representation by counsel, every arrestee needs a lawyer to enforce the complex legal standard that applies at the Initial Appearance, ensure that the judge does not hold an unwarranted Detention Hearing, and prevent the person from being locked in jail in violation of the BRA. Every federal Initial Appearance involves a determination of detention or release governed by the BRA. When the prosecution moves for detention at the Initial Appearance, § 3142(f) sets forth the only lawful bases for detention and the holding of a Detention Hearing; courts are required to release the arrestee when no § 3142(f) factor is present.[307] Unrepresented arrestees cannot effectively enforce their own rights under that statute, make their own bond arguments, or hold prosecutors and judges to the law's strictures.

Yet our interviews suggest that many judges and practitioners are operating under the misconception that the Initial Appearance is a perfunctory administrative proceeding, rather than a court hearing governed by a panoply of statutory rules.[308] A core tenet of our legal system is its adversarial nature—there must be an attorney representing each side's interests.[309] Without a lawyer, someone charged with a crime has little chance of opposing a prosecutor's request that they be locked in jail. And without counsel, there is an even higher risk that an arrestee will be detained *unlawfully*, in violation of the BRA's rules.[310] In short, an unrepresented individual cannot be expected to understand the complex legal standards that have long eluded highly educated judges and lawyers.

## The Sixth Amendment Right to Counsel Attaches at the Initial Appearance.

In addition to the federal rules and statutes that require representation by counsel during the Initial Appearance, indigent arrestees likely have a Sixth Amendment right to counsel during that hearing.

The Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life *or liberty*, wherein the prosecution is presented by experienced and learned counsel."[311] In *Gideon v. Wainwright*,[312] the Supreme Court held that the Sixth and Fourteenth Amendments entitle indigent people charged with serious crimes to court-appointed counsel.[313]

In *Rothgery v. Gillespie County*,[314] the Supreme Court unequivocally held that the Sixth Amendment right to counsel *attaches* at the Initial Appearance: "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."[315] A federal arrestee has a constitutional right to appointed counsel at any "critical stage" of the proceedings after the right to counsel has "attached."[316] The Court has never settled the question of whether the federal Initial Appearance qualifies as a "critical stage" and is therefore a procedure during which a person has a Sixth Amendment right to be represented by counsel.[317]

The federal Initial Appearance is a critical stage. All available evidence illustrates that the outcome of the Initial Appearance may adversely affect an arrestee's rights, and that counsel is necessary to protect those rights under the BRA and navigate the pretrial labyrinth. The attachment rule is supposed to ensure that a person has a right to counsel at the point when "the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law'"—such as the intricacies of the legal standard that applies during the federal Initial Appearance.[318]

Case law is clear that a proceeding qualifies as a critical stage if it meets two criteria: the outcome could substantially prejudice an individual's rights, and an attorney could remedy that potential prejudice. "Critical stages" are those that hold "significant consequences for the accused"[319] where there is "a need for counsel's presence."[320] At a critical stage, counsel is needed to assist in "coping with legal problems or . . . meeting [the defendant's] adversary."[321] It does not matter whether the hearing is "formal or informal."[322] Rather, what matters to the critical stage analysis is "whether potential substantial prejudice to a defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice."[323]

First, the outcome of an Initial Appearance has the potential to significantly prejudice the rights of the accused—most prominently, the right to liberty. Courts recognize that the potential loss of one's liberty is sufficiently significant to trigger the Sixth Amendment right to counsel.[324] Federal and state courts alike have acknowledged that, given the potential loss of liberty involved, a state bail hearing is a critical stage requiring appointed counsel.[325]

That the Initial Appearance may prejudice a person's liberty is aggravated by the fact that pretrial detention adversely affects the disposition of one's entire case, making conviction at trial more likely. When a person is detained pretrial, they are more likely to be convicted because they have a diminished ability to confer with their lawyer and gather evidence.[326] Additionally, individuals who are detained pretrial are more likely to receive a higher sentence, a within-Guideline sentence, and a mandatory minimum sentence than those who are released.[327] Pretrial detention may also impede access to counsel at later stages of the case.[328]

The risk of prejudice to an arrestee at the Initial Appearance extends far beyond the deprivation of liberty. Even a few days in pretrial

detention can cause people to lose their jobs, their homes, and custody of their children.[329] These consequences accrue regardless of whether counsel is ultimately appointed at a later critical stage. The Initial Appearance therefore can substantially prejudice an arrestee's rights.

Second, the Initial Appearance is a critical stage because a lawyer can remedy the inherent potential for prejudice by ensuring that the judge adheres to the proper legal standard and does not detain the arrestee unlawfully in violation of § 3142(f). Arrestees cannot be expected to be familiar with this legal standard, to understand that the law authorizes a judge to hold a Detention Hearing only in certain types of cases, or to hold prosecutors to their burden under § 3142(f).[330] This Report shows that even judges and prosecutors often misunderstand the legal nuance of the BRA's provisions. Arrestees are simply not intimately familiar with the legal intricacies of the pretrial detention process. Because "the function of counsel as a guide through the complex legal technicalities"[331] of the BRA is essential to remedy the potential for prejudice that arises during the Initial Appearance, the second prong of the critical stage test is met.

Two circuit cases—both of which predate *Rothgery*—erroneously suggest that the Sixth Amendment does not require representation at the Initial Appearance. Their reasoning, however, supports the position that the Sixth Amendment *does* require counsel at the Initial Appearance.

In *United States v. Perez*,[332] the Ninth Circuit considered whether an arrestee has a right to counsel at the Initial Appearance before the court asks the arrestee their name. "Significantly, counsel was appointed when the proceedings may have affected his rights following the initial determination of the defendant's name."[333] The court concluded that Perez did not have a right to counsel before being asked his name because "[n]othing at this stage of the proceedings . . . impairs the defense of the accused."[334] That understanding may have been plausible in 1985 when *Perez* was issued, but as described above, more recent evidence shows that the deprivations of liberty that commonly occur during Initial Appearances are causally related to an increased risk of conviction.[335] In *United States v. Mendoza-Cecilia*,[336] the Eleventh Circuit similarly disregarded the importance of the Initial Appearance, calling it "largely administrative" and noting that the bail hearing is "not a trial on the merits."[337] *Perez* and *Mendoza-Cecilia* unfairly and incorrectly minimize the role that an attorney can play in safeguarding an arrestee's liberty, and other courts have not followed these cases

when evaluating the equivalent of the federal Initial Appearance in state systems.[338]

As this Report has shown, the Initial Appearance is anything but administrative. Instead, it is a critical stage at which arrestees can and do suffer unlawful deprivations of liberty if not represented by counsel. Without counsel present to insist that judges and prosecutors follow the oft-ignored legal standard in § 3142(f), arrestees are jailed unlawfully and are subjected to unauthorized Detention Hearings.

Some judges nevertheless perpetuate the view that the Initial Appearance is a benign administrative procedure rather than a critical stage. One judge we interviewed echoed these misconceptions, musing, "Maybe I shouldn't even be giving people lawyers [at the Initial Appearance]. But I think [the practitioners] would be amenable to [universal representation by counsel], because honestly having a lawyer helps; it just helps everything go faster." It should go without saying that a lawyer's job at the Initial Appearance is not to make things "go faster," but instead to protect the accused's presumption of innocence and profound interest in liberty.

The Due Process Clause of the Fifth Amendment also protects an arrestee's right to be represented by a lawyer during the Initial Appearance. Due process requires "constitutionally sufficient" procedures to prevent against unnecessary or erroneous deprivations of liberty.[339] At the Initial Appearance, an arrestee has a clear liberty interest against being detained pretrial. And, as explained above, the arrestee cannot hope to vindicate that liberty interest without a lawyer present. The legal technicalities of § 3142(f) are beyond the grasp of people without legal training. Accordingly, several courts have held that the Due Process Clause requires representation by a lawyer at the state equivalent of an Initial Appearance.[340]

## Conflict-of-Interest Concerns Do Not Prevent Courts from Providing All Arrestees with Representation at the Initial Appearance.

**The plain legal requirements of § 3006A, Rule 44, and the Constitution override any practical or ethical concerns with ensuring that every arrestee is represented by counsel during the Initial Appearance.**

In the course of our interviews, some judges claimed that they did not have enough lawyers on hand to provide representation to every

arrestee during the Initial Appearance. One judge described the problem this way: "What happens logistically here in the courtroom is that the CJA lawyers are not there. And so, the PD [federal public defender] is there, so anytime you can appoint the PD, you appoint the PD. But, if the PD is not there, I have no way [to provide counsel], unless I tell the CJA lawyers." When asked why the judges in that particular district allow arrestees to be jailed without counsel during the Initial Appearance, the judge blamed the culture, saying that it is "certainly an issue of the practice in the district."

Beyond this logistical objection, practitioners in many districts told us about a second major barrier to ensuring universal representation at Initial Appearances: judges refuse to allow an appointed lawyer to represent multiple co-defendants during the Initial Appearance, for fear of creating an ethical conflict of interest. As one Chief Defender exclaimed when describing this issue: "[The judges are] more concerned about the conflict [of interest] than they are about the Sixth Amendment!"

Our interviews with stakeholders from other districts show that any logistical or ethical obstacles can be overcome with a bit of planning and coordination. Every federal district in the country can easily follow the example of the many districts that ensure that all arrestees are represented by counsel during the Initial Appearance, such as the Northern District of Illinois, the Southern District of California, and the Eastern and Western Districts of Wisconsin. These districts and more allow the federal defender duty attorney to represent arrestees in conflict cases, and even to represent multiple co-defendants in the same case—with the explicit, on-the-record caveat that such representation is for the purposes of the Initial Appearance only.[341]

In districts where the duty defender represents multiple arrestees during the Initial Appearance, the attorney does not discuss the details of the offense with anyone, focusing instead on matters relevant to the legal standard at the Initial Appearance. In some districts, the attorney also obtains a verbal waiver of any conflict of interest from all arrestees. As soon as practicable—and well in advance of any Detention Hearing—CJA counsel are appointed to represent all but the one co-defendant who continues to be represented by the federal defender's office. This approach is supported by the 1979 amendment notes to Rule 44, which clarify that "[t]he defendant should be fully advised by the trial court of the facts underlying the potential conflict [of interest] and be given the opportunity to express his views."[342]

Allowing a duty defender to provide temporary representation of multiple clients with the informed consent of each is markedly preferable to forcing arrestees to face their Initial Appearances alone. One Chief Defender described the process as follows: The federal defender duty attorney "is prepared to represent multiple people at an Initial Appearance . . . with the court's permission, and the court almost always permits it." The duty defender avoids conflict of interest concerns by telling "all the clients that [they are] meeting with at the time, 'I'm not going to talk to you about the facts of the case. . . . I don't know which of you, yet, I will be representing. I want you to get your court appearance today, so . . . with your permission, I'm going to represent you and the others, but because of that, I can't get into the facts. . . .' [A]nd they'll agree because they want it—they'll want their court appearance."

While interviewing a judge in a district where arrestees often go unrepresented at the Initial Appearance, we asked if the judges there would be amenable to the federal defender duty attorney simply representing every arrestee during that hearing. The judge considered this solution and responded, "I'm not sure why they couldn't do that." **It became clear during our interviews that stakeholders in that district did not consider the absence of counsel at the Initial Appearance to be a problem, and therefore had made no effort to craft a solution.**

Another Chief Defender described an even better method for ensuring representation and avoiding conflicts of interest: at Initial Appearances in multi-defendant cases, the duty defender represents one person, and the judge or defender's office secures CJA panel attorneys to represent the remaining co-defendants.

This Defender noted that her district would "have [a federal defender] duty attorney and a CJA duty attorney assigned [to Initial Appearances] for each day and ready to roll." The Defender said the court had also set up a "fairly complicated computer system" to ensure that CJA attorneys could always be reached for Initial Appearances.[343] Finally, the Defender explained that it was possible to secure extra attorneys for multi-defendant cases with a bit of prior warning: "[E]ven in some of our smaller offices . . . they [would reach] out to me and [say], 'Hey, we have a big case coming in, we don't have enough people on the [CJA] panel. Can you tell us some people [from another district/division] who would be available?' . . . [T]here's no reason to be scrambling." Though the Defender recalled some initial pushback from judges when this practice began, "it turned out, they loved it."

# C The Practice: At the Initial Appearance Hearing, Federal Judges Unlawfully Jail Poor People Without Lawyers.

**Our study uncovered a nationwide access-to-counsel crisis in the federal system.** During our courtwatching, we observed judges violating federal law by holding uncounseled Initial Appearances where indigent individuals appeared *pro se* across from federal prosecutors, and by jailing indigent individuals without first appointing them a lawyer. We also observed Initial Appearances where indigent arrestees were represented during only part of the hearing and made incriminating statements before being given a lawyer.

During interviews and conversations with defenders and judges, we learned that this problem extends far beyond the districts where we watched deprivations of counsel unfold before our eyes. In fact, more than one-quarter of the 94 federal districts nationwide, and possibly more, do not ensure that every single arrestee is represented by a lawyer at the Initial Appearance. *See* Figure 6. **These widespread deprivations of counsel violate the law, increase an arrestee's chances of being detained or incriminating themselves, and exacerbate existing racial disparities in the federal system.**

## Judges in Many Federal Courts Lock Poor People in Jail Without Lawyers at the Initial Appearance.

### *a. Our Courtwatching Data Illustrate the Access-to-Counsel Crisis.*

Among the 4 federal districts where we courtwatched, we found a concerning access-to-counsel problem. Arrestees were fully represented by counsel in only 60% of Initial Appearances across the 4 districts. In 30% of cases, arrestees were not provided counsel until partway through the hearing.[344] Most troubling, we found that in 7% of cases, arrestees were entirely deprived of counsel and were forced to appear *pro se* during the Initial Appearance.[345]

# During our courtwatching, we observed judges violating federal law by holding uncounseled Initial Appearances where indigent individuals appeared *pro se* across from federal prosecutors, and by jailing indigent individuals without first appointing them a lawyer.

# In fact, more than one-quarter of the 94 federal districts nationwide, and possibly more, do not ensure that every single arrestee is represented by a lawyer at the Initial Appearance.

In some districts, however, the problem is far worse. Of the 4 districts in our study, the Southern District of Florida was the only court where we observed judges holding Initial Appearances and locking people in jail with no defense lawyer present. *See* Figure 16. In that district, indigent arrestees were not represented by counsel in 11% of Initial Appearances, and they received only partial representation about 40% of the time. *See id*. That is, in fewer than half of the Initial Appearances we observed in the Southern District of Florida, judges ensured that arrestees were represented by counsel during the entire hearing.

Remarkably, our conversations with stakeholders from the Southern District of Florida suggest that these statistics actually *underestimate* the problem. One Defender told us that the pandemic actually improved this situation, and that the portion of arrestees who went unrepresented in that district was "much lower than it would be in normal times." Likewise, one judge estimated that, before the COVID-19 pandemic, around 30% of Initial Appearances occurred without a defense lawyer representing the accused at any point of the hearing.

The following example typifies the many Initial Appearances we witnessed where judges locked poor people in jail without a lawyer. In this case, there was no defense lawyer present during the hearing. The prosecutor requested a Detention Hearing on invalid grounds, and the judge unquestioningly detained the arrestee for 3 days:

**JUDGE:** *Ok, I find at this time that you qualify for the appointment of an attorney. So what we will do since your co-defendant is already being represented by the [Federal Public Defender], we will have to appoint you a . . . CJA attorney . . . . [T]he court will contact him, let him know of his appointment so he can contact you. The next matter we discuss . . . is the right to a bond hearing. In this matter, I'm going to hear from the government.*

**PROSECUTOR:** *The government is requesting pretrial detention based on risk of flight and danger to the community, but if we have a couple of days I can speak with [appointed counsel] and I'm sure we can figure it out.*

**JUDGE:** *That's a matter that your attorney will be handling on your behalf. I'm going to set that [Detention] Hearing for three days from today, that would be February 25th in the afternoon, so your attorney will be in contact with you regarding that hearing. And that will be the next hearing in your case. It may be that he will be discussing that with the government ahead of time.*

**ARRESTEE:** *Ok.*[346]

The failure to provide counsel during the Initial Appearance in this case and others not only violated multiple laws, but also ran afoul of the timing requirements for appointment in Southern District of Florida's CJA Plan, which are identical to those in the Model Plan.[347] Rather than automatically setting Detention Hearings and jailing unrepresented people until those hearings, judges must adhere to the law and ensure that each arrestee is represented for the entirety of their Initial Appearance.

### *b. Stakeholder Interviews with Defenders Across the Country Demonstrate the National Scope of this Access-to-Counsel Problem.*

**The deprivation of lawyers during the Initial Appearance is a national problem. Our qualitative research confirms that in more than one-quarter of the 94 federal districts in this country, judges fail to provide a lawyer to all arrestees at the Initial Appearance.**[348] This access-to-counsel problem spans at least 26 federal district courts and 9 federal circuits.[349] *See* Figure 5. It is likely this under-estimates the problem, as our interviews covered less than half of the federal districts.

We confirmed through our research that in at least 16 districts, judges do not provide every indigent individual with an appointed attorney to represent them during the Initial Appearance: the Southern District of Florida, the Western District of Texas, the Southern District of Texas, the Northern District of Mississippi, the Western District of Missouri, the Middle District of North Carolina, the Southern District of Ohio, the District of Delaware, the Central District of Illinois, the Eastern District of North Carolina, the District of South Carolina, the Eastern District of Virginia, the District of Arizona, the Northern District of California, the District of New Mexico, and the District of the Virgin Islands.[350] In addition to these 16 named districts, in 10 more districts, we heard from at least one Defender or CJA attorney that people are not always represented by counsel for the entirety of the Initial Appearance, bringing the total number of districts to 26—which is 28% of all of the federal district courts in this country.[351]

Courts in these 26 districts not only violate the federal laws discussed above and risk unconstitutional deprivations of counsel, but also contravene the timing requirements for appointment of counsel in their own CJA Plans.[352]

In at least two of the districts named above, 100% of arrestees are *not* represented during the Initial Appearance. One Defender told us that, in nearly a decade with the office, he had never heard of anyone representing an arrestee at the Initial Appearance; all indigent arrestees in his district are forced to appear *pro se* during that first hearing. In a third listed district, over 50% of people are not represented. In a fourth named district, a Defender estimated that 40% of arrestees currently go without counsel at the Initial Appearance, but explained that this was an improvement over the past, when zero arrestees were represented during that proceeding. A judge in that same district told us that even when federal defenders were present in the courtroom in one of the divisions in the district, "they would sit there, and unless the question [of whether counsel would be appointed] came up, the person [would] always go through the Initial Appearance unrepresented."

That vignette describes a common scenario in a number of the 16 districts listed by name in this Report—a federal defender duty attorney is physically present in the courtroom, but serves "primarily in an advisory capacity" or "standby" capacity, according to interviewees. Notably, that attorney *does not actively represent* arrestees during the Initial Appearance or present legal arguments on their behalf.

Instead, the duty attorney speaks with the arrestee before the hearing, informs them of their rights, perhaps fills out the financial affidavit with them, and then sits back and does not otherwise participate in the hearing. One Defender described the defense lawyer as being simply "a warm body." This practice must also change, as it is simply another variation on the denial of counsel. An attorney standing by as a warm body is not playing their requisite adversarial role.

In other named districts—including the District of South Carolina, the Eastern District of Virginia, the District of Arizona, the Northern District of California, the District of New Mexico, and the District of the Virgin Islands—arrestees are often represented by appointed counsel during the Initial Appearance. However, in each of these 6 districts, there are certain types of cases in which arrestees are *not* represented by appointed counsel. For instance, in some districts, the practice in multi-defendant cases is for the federal defender's office to represent one arrestee during the Initial Appearance while the others go unrepresented. In other districts, people without legal status in the United States are not consistently represented during the Initial Appearance. In still other districts, the practice recently changed in an effort to provide counsel, but people continue to go without lawyers during the Initial Appearance in a subset of cases.[353]

We also learned that several additional districts beyond these 26 historically did not provide all indigent arrestees with counsel during the Initial Appearance. However, those districts changed their practices fairly recently to provide lawyers for all arrestees during the Initial Appearance. The districts where the practice has changed include the District of Puerto Rico, the Eastern District of Louisiana, the District of Colorado, the District of Wyoming, and the Northern District of Indiana.[354] In all 5 of these districts, there was previously a blanket practice of *never* appointing counsel to represent arrestees during the Initial Appearance. Accordingly, until fairly recently, *one-third* of federal districts locked indigent individuals in jail without counsel.[355]

A major driver of this access-to-counsel problem is that most of the judges and many of the Chief Federal Defenders we interviewed admitted to not knowing the legal rules that apply at the Initial Appearance under § 3142(f).[356] In fact, some were surprised to learn that there is, indeed, a legal standard that governs during that hearing. These misapprehensions help explain why judges, and even some defenders, do not see a problem with people being jailed

without lawyers. During our interviews, we heard many variations on the question asked by one Chief Defender: "What are the kinds of legal arguments that are typically made at the Initial Appearance?" In districts where the judges and defense bar are not aware of the legal standard, they also may not understand why a lawyer is necessary to guarantee that standard is followed.

In the many districts that allow poor people to be jailed without lawyers, Defenders nearly universally reported that federal prosecutors "move to detain everyone" at the Initial Appearance. And why wouldn't they, when there is no lawyer on the other side to raise a legal objection to jailing?

## Arrestees Without Lawyers at the Initial Appearance Are Detained at Far Higher Rates than Those with Counsel.

**Unsurprisingly, our data show that detention rates at the Initial Appearance increase as representation decreases.** Arrestees who received full representation at the Initial Appearance were detained in 67% of cases. Arrestees who received partial representation, in contrast, were detained in 89% of cases[357]—a 23-percentage-point increase. Finally, when the accused had no lawyer at all, *every single Initial Appearance* ended with the arrestee going to jail. *See* Figure 18.

**Figure 18:** **When Arrestees Were Forced to Proceed Without Counsel at Their Initial Appearance, There Was a Dramatic Increase in Pretrial Detention.**



# A failure to provide counsel at the Initial Appearance acts as a de facto detention order.

# 100%

This finding suggests that a failure to provide counsel at the Initial Appearance acts as a de facto detention order. When courts deny the accused the assistance of a lawyer, they not only violate the accused's statutory and constitutional rights, but they effectively condemn that person to jail time—and all the adverse consequences that come with it.

To make matters worse, *unrepresented* individuals are frequently prevented from advocating on their own behalf during the Initial Appearance, with judges and prosecutors alike expressing reservations about speaking directly with the accused. A judge we interviewed candidly said: "[I]f I see a defendant is going to do anything at that Initial Appearance [when] they didn't have an attorney . . . I'm just not going to let them talk, you know, I'm going to stop them. . . . I think that most magistrate judges I know are like that, no matter where they fall on that law-and-order spectrum." This approach shuts down self-advocacy, an accused's only possible avenue to release when the judge fails to appoint a lawyer.

At the outset of one Initial Appearance hearing we watched, the prosecutor appeared ready to agree to the arrestee's release on a personal surety bond. But after the arrestee mentioned that she was homeless during questioning by the judge, the prosecutor changed his mind and requested detention. Because the arrestee did not have counsel to assist her, she tried to speak up on her own behalf:

**JUDGE:** *The detention hearing on Wednesday at 10 a.m., and I will set the arraignment—*

**ARRESTEE:** *Can I speak?*

**JUDGE:** *—also. Yes, ma'am.*

**ARRESTEE:** *I am at this time at a friend's house. And I swear that I am not going to flee. I am not going to do anything bad. My dog is staying with them as well.*

**JUDGE:** *All right, ma'am. Mr. [Prosecutor], does that change the government's position?*

**PROSECUTOR:** *Your Honor, quite frankly I would like to have a conversation with appointed defense counsel about this as opposed to the defendant.*[358]

Of course, since there was no lawyer representing the woman during her Initial Appearance, there was no one for the prosecutor to have that conversation with, and the woman was ultimately detained.

In other cases, judges detained unrepresented arrestees unlawfully, without any valid basis for detention under the BRA. A judge should take extra pains to ensure that an unrepresented arrestee is, in fact, eligible for detention under § 3142(f) at the Initial Appearance, since the accused is not protected by adversarial safeguards. Nonetheless, we observed two cases where the court both failed to provide counsel and failed to observe the law, which did not authorize pretrial detention. **Cases like these are especially egregious, as judges violate the law twice over: they violate the accused's legal right to be represented by counsel and detain the accused unlawfully in counsel's absence.**

## Unlawful Detention Squared: Judges Detain Arrestees Illegally and Without Lawyers

**In a fraud case in which there was no offense-specific basis for detention at the Initial Appearance, a judge ordered the arrestee detained, even though the prosecutor *did not request detention*, let alone meet the legal standard.** The prosecutor did not say a single word outside of his introduction, but the judge entered an illegal detention order without a second thought. In fact, when detaining this individual, the judge even acknowledged that the arrestee did not have a lawyer:

> **JUDGE:** *Okay. So I'll appoint [name of lawyer] on this case. He's not present, but he will be in contact with you regarding your case.*
>
> **COURTROOM DEPUTY**: *You want to set it for—*
>
> **JUDGE:** *So I'm going to set your case for arraignment for a detention hearing and for arraignment. So your next court hearing will be November 19th, and before that your attorney will be in contact with you to discuss your case with you.*[359]

## Lack of Counsel at the Initial Appearance Exacerbates Racial Disparities.

**In our study, the vast majority of people whom judges unlawfully deprived of counsel at the Initial Appearance were Black and brown individuals.** In 92% of the Initial Appearances we witnessed where the court failed to appoint a lawyer, the arrestee was either Black or Latino. In fact, the proportion of people of color who faced *pro se* Initial Appearances exceeded the representation of people of color in our sample writ large.[360] Only two white arrestees in our sample had to face the Initial Appearance without counsel, compared to 23 people of color. *See* Figure 17.

Black and Latino individuals were also more likely than white individuals to face the Initial Appearance without the full assistance of counsel. While just 13% of white arrestees were only partially represented at their Initial Appearance, over 30% of Black and Latino individuals faced the same problem—more than twice as many.[361] Moreover, white arrestees received full representation in 80% of their Initial Appearances, while Black and Latino arrestees received full representation in 60% and 53% of their Initial Appearances, respectively.

Even being deprived of a lawyer for part of the Initial Appearance can seriously prejudice the accused. A person can inadvertently incriminate themselves while responding to a judge's questions about their financial circumstances, even after the judge advises them of their rights under the Fifth Amendment. Language barriers can further complicate the fraught nature of facing federal criminal charges without a lawyer. In one case, for example, the court questioned a Venezuelan man without counsel. He was charged with a drug crime while aboard a vessel subject to U.S. jurisdiction and answered the judge's questions through an interpreter:

**JUDGE:** *Other than that property, do you have any other personal property or bank account, financial account greater than 5,000 US dollars?*

**ARRESTEE:** *The properties I don't have, vehicles I don't have those either. Bank account I do have.*

**JUDGE:** *What is the balance in your bank account?*

**ARRESTEE:** *Currently, it's probably zero. That was the reason why I accepted that job.*

**JUDGE:** *Don't say anything about anything that happened to you. So let me find that you qualify for appointment of counsel, and I will therefore appoint the—well, for now the Federal Public Defender is to represent you in connection with this proceeding.*[362]

By the time this man was given a lawyer, he had already incriminated himself. As long as courts fail to provide representation to everyone from the start of their Initial Appearance onward, people accused of serious crimes will continue to make incriminating statements. And as long as Black and Latino are given lawyers less often than white arrestees—as was the case in our study—these incriminating statements will disproportionally harm people of color.

D

# The Solution: At the Initial Appearance, Judges Must Follow the Law and Appoint Lawyers to Actively Represent Every Indigent Arrestee.

**The responsibility for this access-to-counsel crisis falls squarely on the judges' shoulders.** Federal law and district CJA Plans task judges with appointing counsel to represent indigent individuals during Initial Appearance hearings. The text and purpose of Rule 44 and § 3006A(c) clearly establish that every arrestee must have a lawyer to represent their interests during their Initial Appearance. Every time a federal judge fails to provide a lawyer for an arrestee during the Initial Appearance and forces that person to appear *pro se* across from a prosecutor, they violate the law. Locking people in jail without lawyers is a perversion of the adversarial system.

Courts must ensure that every person accused of a federal crime is actively represented by a lawyer from the start of their Initial Appearance, and at least before any detention or release determination is made. Providing universal representation at federal Initial Appearances will stem high detention rates and avoid jailings that are simultaneously unlawful and uncounseled.

The best practice is to have a duty federal defender or CJA lawyer actively represent arrestees at every Initial Appearance, and for judges to secure additional CJA lawyers whenever the federal defender's office is conflicted out. This has been the practice in the District of Massachusetts for decades; the Western District of Virginia also uses this model, and the District of Colorado recently began endeavoring to follow it as well.

Many courts already provide counsel for every indigent arrestee from the very start of the Initial Appearance, even before a judge reviews the financial affidavit. Other courts, however, stand on ceremony by refusing to allow counsel to represent an arrestee at the Initial Appearance until pursuing a lengthy colloquy regarding the indigency determination. This latter practice must cease, as it jeopardizes an arrestee's liberty interest and Fifth Amendment right against self-incrimination.

It also disregards the fundamental purpose of the CJA, which was to provide an appointed attorney for every arrestee "whose lack of funds prevents him from providing for his own defense," not just for those who fall below the poverty line.[363]

Stakeholders we interviewed in districts that adhere to best practices described various ways courts determine whether a person is entitled to appointed counsel without questioning an unrepresented arrestee. One judge described how he appoints counsel *before* the Initial Appearance to facilitate that determination: "[W]hat I started doing was, I didn't care if they qualified or not, I was just appointing CJA to help facilitate them getting an attorney. . . . [T]he staff determines, after Pretrial Services interviews them, whether they're going to qualify, and whether the public defender has a conflict. And if the public defender has a conflict, my case manager will ask me, and we'll appoint a CJA attorney before the initial conference." A Chief Defender discussed similar practices in his district: "[I]n terms of the indigency determination, the clients fill out a financial affidavit, and it's submitted to Pretrial Services, who then submit it to the Court." He continued: "And I don't—honestly in my seven years, six years here, I've never seen—I don't care how much the client makes—I've never seen a judge deny a client court appointed counsel, because, you know, it costs $90,000 just to fight a federal case, you know. So, that's how they do [it], and then in terms of the questioning, usually the only question that is posed is: do you want counseling? That's really it."

Among the districts that fail to provide counsel to each arrestee at the Initial Appearance, many Defenders told us that their offices had campaigned for years to convince judges to allow them to represent arrestees during these hearings, but to no avail. When we asked Defenders why judges were so resistant to following the law and allowing them to provide representation at the Initial Appearance, this statement of one interviewee was echoed by many others: "They think we're a fly in the ointment. They think having lawyers there will slow down their process." Another Chief Defender concurred: "It's very efficient this way. The judges say it's too much trouble to have lawyers there [representing people during the Initial Appearance]."

However, others told us that efficiency concerns cut in the opposite direction, in favor of providing lawyers. One Chief Defender said that the culture in their district began to change during the pandemic: "They let us participate [in Initial Appearances] because they suddenly realized how helpful we are." Another Chief Defender told us that judges in their district appoint counsel in every case because

# Locking people in jail without lawyers is a perversion of the adversarial system.

# Courts must ensure that every person accused of a federal crime is actively represented by a lawyer from the start of their Initial Appearance, and at least before any detention or release determination is made.

it makes things run more smoothly: "Judges want experienced counsel there [at the Initial Appearance] for efficiency."

**Our courtwatching data and qualitative interview findings show that this access-to-counsel crisis also stems from judges prioritizing district culture above the law.** "[The judges] don't want anything to change," said one Chief Defender. "They've always done it this way," said another. This sentiment was echoed in our interviews with judges. When we asked a judge in a district where judges regularly fail to provide poor people with lawyers why that practice had persisted for so long, they candidly responded, "Sometimes we do things around here just because—[and] I imagine this is the truth everywhere . . . —'Oh that's just the way we do it.'" This statement provides an explanation, but it is not an excuse for violating people's legal rights.

The Department of Justice is also to blame for allowing this unconscionable situation to continue. Our research establishes that, in over one-quarter of federal courts, Assistant United States Attorneys regularly ask judges to deprive unrepresented individuals of their liberty. Under the ethical rules, the prosecutor serving as the lawyer for the United States government "has the responsibility of a minister of justice and not simply that of an advocate," and "this responsibility carries with it specific obligations to see that the defendant is accorded procedural justice."[364] In a criminal case, there can be no procedural justice without defense counsel.

Federal prosecutors should never participate in any hearing in a criminal case when there is no advocate on the other side. Instead, there should be a blanket DOJ policy requiring prosecutors to insist on the appointment of counsel at the Initial Appearance before any hearing is held—especially any hearing where they seek to jail the accused. If DOJ adopts such a policy, it is imperative that judges and other stakeholders hammer out the logistics so that counsel is provided promptly and the Initial Appearance is not delayed to procure counsel.

The obstacles to providing representation at the Initial Appearance are bureaucratic, but the right to a lawyer is ensconced in well-settled law, and the liberty interest protected by defense lawyers at such hearings is fundamental. **Federal courts must prioritize the law over the culture of detention and guarantee that every person charged with a federal crime in this country is represented by a defense lawyer—playing their proper adversarial role—from the beginning to the end of their Initial Appearance.**

3

# Judges Must Follow the Correct Legal Standard in Presumption-of-Detention Cases to Reduce Racial Disparities and High Federal Jailing Rates.

**The statutory presumption of detention that applies to many federal offenses during the Detention Hearing is a primary driver of sky-high pretrial detention rates. The practice surrounding the presumption—and the presumption itself—contradict the sacred promise of "innocent until proven guilty"[365] and reverse the BRA's "clear preference for pretrial release."[366] Courts misunderstand and misapply the presumption of detention, further contributing to the culture of detention.**

The most common presumption of detention in the BRA reads: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" most federal drug offenses, gun offenses charged under § 924(c), minor victim offenses, and several other crimes.[367]

Congress intended this presumption of detention to capture only the "worst of the worst" offenders.[368] "[L]egislators wanted the drug presumption to prevent rich people suspected of high-level drug trafficking from fleeing."[369] But in practice, the presumption now applies in a high percentage of federal cases—including 93% of federal drug cases[370]—very few of which pose any special risks of flight or recidivism. In our Chicago pilot study, nearly 90% of the presumption cases we observed were drug cases.[371] Given the prevalence of presumption-triggering charges, it is especially important that judges hew carefully to the limitations the statute and case law place on the presumption.

**Our study finds that judges routinely misapply the presumption of detention, giving it more weight than the law allows.** As a legal matter, the presumption is rebuttable, but judges fail to treat it as such. This appears to be a nationwide problem, as our courtwatching data are supported by interviews with stakeholders from around the country. In fact, many of the judges we interviewed made statements indicating that they either misunderstand the presumption of detention or do not apply it correctly.

Our findings corroborate a recent government study's observation that the presumption of detention has become "a built-in bias for incarceration that feeds the federal system's colossal detention rates and stark racial disparities," and "deprives nearly every person awaiting trial in a federal drug case of their liberty."[372]

To ensure that the presumption of detention does not swallow the presumption of release, courts must follow the letter of the law by treating the presumption as rebuttable, giving the presumption the low weight to which it is assigned by case law, and holding the prosecution to its burden of proving that detention is genuinely necessary.

# A | Takeaways

- In our study, **arrestees facing a presumption of detention were detained at a rate of 72%, which exceeded the rate of detention among arrestees to whom a presumption did not apply by nearly 20%.** *See* Figure 19.

- Judges detained arrestees facing a presumption of detention in 87% of the cases in which the prosecutor explicitly invoked the presumption during the Detention Hearing, compared to 76% of the time when the prosecutor did not invoke the presumption.

- In 95% of the contested Detention Hearings we observed where the presumption of detention applied, judges either failed to mention whether the presumption of detention was rebutted or concluded that the presumption was not rebutted. *See* Figure 20.

- **In 100% of Detention Hearings where the judge found that the presumption had not been rebutted, the judge detained the arrestee.**



## *Racial Disparities*
in presumption-of-detention cases




- In the cases where a presumption of detention applied, 89% of the arrestees were people of color.
- Among the Detention Hearings where prosecutors invoked the presumption of detention, 97% of the arrestees were people of color. *See* Figure 21.
- **Prosecutors erroneously invoked the presumption of detention exclusively against Black or Latino arrestees.**
- **Judges detained people of color at higher rates than white individuals**: the detention rate in presumption-of-detention cases involving people of color was 73%, while the detention rate in presumption-of-detention cases involving white arrestees was just 68%. *See* Figure 22.

100%

## THE STATUTE: 18 U.S.C. § 3142(e)(3)

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed—

(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

(B) an offense under section 924(c), 956(a), or 2332b of this title;

(C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed;

(D) an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or

(E) an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.

# B The Law: The Presumption of Detention Was Intended to Apply Narrowly and to Be Easily Rebutted by the Defense.

While the Supreme Court has expressly recognized that "freedom should be the [norm] for people awaiting trial," the statutory presumption of detention leads "judges to assume people charged with certain crimes . . . will flee and endanger the community if released."[373] At the Detention Hearing, the presumption of detention applies to most cases involving drugs, gun charges under § 924(c), minor victims, or terrorism.[374] Although the presumption was supposed to apply to only the most serious of cases, it now applies to nearly half of all federal cases.[375] To temper this reality, case law emphasizes two checks that the BRA and the Constitution impose on the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution always bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors.

## Congress Intended the Presumption of Detention to Apply Narrowly, But It Has Become Expansive in Modern Practice.

The legislative history of the BRA makes clear that Congress intended the presumption of detention to apply to only a narrow set of cases—a group they thought of as the "worst of the worst" offenders.[376] The Senate Judiciary Committee, for example, argued that there should be a presumption of detention for the "most serious" drug offenses because it is "well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity" who "have both the resources and foreign contacts to escape to other countries with relative ease."[377]

However, the BRA was also drafted amidst the so-called "War on Drugs."[378] This policy outlook, which has disproportionately impacted people of color,[379] exaggerates the risks posed by those arrested on drug charges. The statements of the senators drafting the BRA reflect this bias. Senator Orrin Hatch, for example, "without citing

any evidence, contended that bail reform in drug cases was needed because drug offenders 'historically abused bail proceedings more than most criminal offenders.'"[380] Senator Lawton Chiles echoed this point, explaining that "a presumption of detention would establish 'special considerations' for bail in drug cases that would 'go a long way toward closing that revolving door and would help assure that drug dealers who are arrested are brought to justice.'"[381]

Deputy Attorney General James Knapp raised alarm bells at the time, foreshadowing that the drug presumption would apply even to those "without any prior record or evidence of criminal history."[382] But Congress failed to heed his warning.[383]

Forty years later, DOJ's prescient concerns have been borne out in practice, especially as drug-related prosecutions increased as a percentage of the overall federal docket. Drug crimes are now the most common federal offenses. They make up the largest share of the federal criminal caseload,[384] and their share of that docket has increased by 50% since the enactment of the BRA in 1984.[385] This escalation in drug cases means an increase in presumption cases, as the presumption applies in most drug cases. A recent study by Professor Stephanie Holmes Didwania found that "the presumption was responsible for a 19 percentage-point increase in the probability of detention" after controlling for other variables.[386]

Today, not only does the presumption of detention apply more broadly and inflexibly than intended, but it creates racial disparities as well. Didwania finds that "Black and Hispanic men are more likely to be subject to presumptive detention than similarly situated white men."[387] The presumption falls disproportionately on people of color, as they are more likely to face charges that fall under the presumption's domain.[388]

Understandably, the Judicial Conference of the United States has expressed concern that the rise in presumption cases is "unnecessarily increasing the detention rates of low-risk defendants, particularly in drug trafficking cases."[389] The Judicial Conference relied on a study finding that the presumption increased detention orders by 26% for people in the lowest Pretrial Risk Assessment (PTRA) category.[390] The same study found that detention rates in gun presumption cases climbed from 66% in 1995 to 86% in 2010.[391] These findings strongly suggest that judges place undue weight on the presumption of detention.

Although Congress intended the presumption of detention to apply to only the most serious of cases, there is no evidence that people in presumption cases pose any greater risk than those in non-presumption cases of either being rearrested for *any* offense, rearrested for *violent* offenses, failing to appear, or revocation of pretrial release.[392] In many cases, in fact, individuals charged in presumption cases are actually at a *lower* risk of absconding than those in non-presumption cases.[393]

Thus, the presumption of detention has largely outgrown its intended purpose, and judges should do their best to lessen its impact.

## The Constitution, BRA, and Case Law Provide Several Checks on the Presumption.

The law furnishes safeguards that can prevent the presumption from having an outsized effect on pretrial detention. In particular, the presumption is subject to two checks that should guard against the over-incarceration of low-risk individuals: (1) the presumption is rebuttable and places a minimal burden of production on the arrestee, and (2) an unrebutted presumption alone is insufficient to order detention.[394]

Serious constitutional issues arise when judges disregard these checks and treat the presumption like a de facto order of detention. To comport with due process, judges must recognize that the presumption is rebuttable and must give arrestees a meaningful opportunity to rebut the presumption in practice.[395]

Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause,"[396] the Supreme Court has held that infringements on liberty must be "narrowly tailored to serve a compelling state interest."[397] Applying this heightened scrutiny to the bail context, *Salerno* "upheld the constitutionality of a bail system where pretrial defendants could be detained only if the need to detain them was demonstrated on an individualized basis."[398] But when judges treat the BRA's presumption as "irrebuttable," they deprive arrestees of their due process right to an "individualized evaluation," which inevitably "results in the deprivation of liberty even when not necessary."[399] If a judge fails to treat the presumption as rebuttable, individuals "are categorically denied bail based solely on their status"—not based on an individualized determination of their risk of flight or dangerousness.[400] This runs afoul of the Constitution.

# The presumption of detention has largely **outgrown its intended purpose**, and judges should do their best to lessen its impact.

Fortunately, the two checks on the presumption help judges avoid these constitutional concerns. The first check is that the presumption is rebuttable and the defense bears only a "light burden of production" to rebut the presumption.[401] As the Seventh Circuit explained in *United States v. Dominguez*, the presumption is "'rebutted' when the defendant meets a 'burden of production' by coming forward with *some evidence* that he will not flee or endanger the community."[402] "Any evidence" at all that comes within the broad scope of § 3142(g) meets the low bar for rebuttal, "including evidence of [the arrestee's] marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)."[403] Courts recognize that this standard for rebutting the presumption "is not a heavy [burden] to meet."[404] The Fifth Circuit has held that the arrestee's ties to the community, standing alone, definitively rebut the presumption: "Where the defendant has presented considerable evidence of his longstanding ties to the locality in which he faces trial, as did [this defendant], the presumption contained in § 3142(e) *has been rebutted*."[405]

Therefore, in every presumption-of-detention case, it is incumbent upon the *judge* to assess whether evidence has been introduced that rebuts the presumption. The defense need only *produce* evidence or facts; the law does not require the defense attorney to argue specifically that those facts "rebut" the presumption as a matter of law. Once "some evidence" has been produced, the judge must make a legal determination about whether the evidence in the record is sufficient to "rebut" the presumption. The Seventh Circuit has reversed a lower court's pretrial detention determination because "the judge did not hew to [this] statutory framework."[406] Since any "evidence of economic or social stability" meets the defense's burden and rebuts the presumption,[407] in most presumption cases the judge should conclude that the presumption has been rebutted.

The second important legal check on the presumption is that "an unrebutted presumption is not, by itself, an adequate reason to order detention."[408] Both the Fifth and Seventh Circuits have held that the presumption of detention, standing alone, cannot support a detention order.[409] If the presumption alone could justify detention, "there would be no need for Congress to have specified 'the weight of the evidence against the person' as a separate factor for the court to consider."[410] Instead, courts must consider the presumption "together with the factors listed in § 3142(g)," even if the presumption has not been rebutted.[411]

In reaching the ultimate release or detention determination, the judge must remember that, even in a presumption case, "the burden of persuasion always rests with the government."[412] That is, the defense never has to persuade the judge that there exist conditions of release that will reasonably assure the accused's appearance and the safety of the community, let alone guarantee their client's compliance.[413] Instead, it is always the prosecutor's burden to show, by "clear and convincing evidence," that no such conditions exist.[414] When the prosecution requests detention on the basis of dangerousness, it is the prosecutor's burden to "prove[] by clear and convincing evidence [both] that [the] arrestee presents *an identified and articulable threat* to an individual or the community"[415] and that no conditions of release would mitigate that particularized threat. Notably, the judge must never expect the defense to "'rebut' the government's showing of probable cause to believe that [the accused] is guilty of the crimes charged," nor "demonstrate that [the type of crime charged] is not dangerous to the community."[416]

As a practical matter, these two checks come into play at a Detention Hearing in a presumption case because § 3142(f)(1) authorizes temporary detention at the Initial Appearance and the holding of a Detention Hearing in every presumption case. Adherence to these procedural checks would prevent the presumption from promoting unnecessary pretrial detention.

## The Law Requires Judges to Follow Two Steps in Presumption-of-Detention Cases.

In connection with these two checks on the presumption, case law sets forth two legal steps that a judge must follow in every presumption case.

At Step 1, the judge should determine whether the presumption has been rebutted, ideally stating their finding on the record. Under the law, as long as the defense presents "some evidence" that weighs in favor of release—including any evidence of ties to the community—the judge should conclude that the presumption has been rebutted.[417] While the law requires the defense to produce facts, it does not require the defense to make the legal argument that those facts "rebut" the presumption. Rather, in every presumption case, the

judge must evaluate the record as a whole to determine whether the presumption is rebutted as a matter of law. In reaching that determination, the judge should ideally examine the Pretrial Services Report for evidence that rebuts the presumption.

At Step 2, after a judge has decided whether the presumption has been "rebutted," they must then determine whether detention is warranted after considering the other pretrial release factors listed in § 3142(g).[418] The ultimate question is whether the prosecution has carried its burden of proving that there are no release conditions that would reasonably assure both (1) this particular arrestee's appearance in court, and (2) by clear and convincing evidence, that this particular arrestee does not pose "an identified and articulable threat" to a specific individual or the community.[419] Importantly, the judge must consider all of the § 3142(g) factors *whether or not* they found the presumption rebutted at the first step.[420]

# C The Practice: Federal Judges Misapply the Presumption of Detention.

Even though judges have the power and legal responsibility to limit the impact of the presumption of detention, they seldom do. Instead, our research shows that judges routinely ignore the legal checks that the BRA provides and give the presumption of detention more weight than the law allows. This appears to be a nationwide problem, as our courtwatching data were supported by interviews with stakeholders in many additional districts. This misuse of the presumption causes many more people to be incarcerated pending trial than necessary and results in stricter conditions of release in the rare cases where people obtain release. These impacts also contribute to racial disparities in the federal criminal system, since people of color face presumption charges more often than white arrestees.

## Judges Give the Presumption of Detention More Weight Than the Law Allows.

**Our study revealed that, too often, judges base their detention decisions on the presumption instead of the person.** In deciding whether pretrial detention is appropriate, the law requires judges to engage in an individualized assessment of whether there are any conditions of release that will reasonably assure the person's appearance in court and the safety of the community, even when the presumption of detention applies. In practice, however, judges rarely look past the relevant offense to decide whether the individual in fact poses a flight risk or danger to the community. Instead, they treat the presumption as a de facto detention order.

Our courtwatching data show that arrestees were detained at much higher rates in presumption-of-detention cases than non-presumption cases. The presumption of detention applied in 58% of the cases we observed. Within those presumption cases, arrestees faced a 72% detention rate. This detention rate exceeded the detention rate for non-presumption cases by nearly 20%. *See* Figure 19. This is consistent with the disparity Didwania found in her study.[421]

# Our study revealed that, too often, judges base their detention decisions on the presumption instead of the person.

Detention rates grew even higher when we confined our analysis to Detention Hearings. Arrestees facing a presumption were detained 87% of the time when the prosecutor explicitly invoked the presumption during the Detention Hearing, compared to 76% of the time when they did not.

**Figure 19: Arrestees Are Detained More Frequently in Presumption Cases Than in Non-Presumption Cases.**




Our supplemental legal research revealed that this presumption problem is potentially even more pronounced in other districts. A team of FCJC researchers led by Professor Judith Miller obtained every district court judicial opinion written in a presumption case in the First Circuit from the enactment of the BRA in 1984 through late 2021.[422] The team found that 92% of the 250 written opinions in presumption cases in that circuit ordered the arrestee detained. Two districts within the circuit had even higher proportions of detention orders. In one district, judges detained arrestees in 97% of their written opinions in presumption-of-detention cases; in the other district, judges ordered detention in *every single written opinion*, not granting release to a single arrestee in a presumption case.[423]

When judges allow their detention pronouncements to be driven primarily by the presumption, jailing decisions are not limited to the cases in which pretrial detention is truly warranted by the law and the facts. Allowing the presumption alone to control detention determinations means that judges are not adhering to their obligation to consider the particular individual's flight risk or danger level, as well

as the availability of conditions that would mitigate those concerns in a way that might "reasonably assure" compliance. Systematically overvaluing the *type* of crime charged, at the expense of giving individualized consideration to a person's particular characteristics, promotes mass incarceration.

There are many reasons why a judge might mistakenly treat the presumption as a mandate for pretrial detention. Perhaps judges misunderstand the presumption and how it should impact their analysis. Several Defenders we spoke with expressed this view. One Defender said judges "definitely don't apply" the proper legal standard in presumption cases. "They definitely nod their heads and don't say you're wrong," the Defender continued, "and then they don't [apply the law]. So I don't know, maybe they get it and they don't care, but they sure as heck are not applying it correctly." Another Defender lamented that it is "sort of a waste of time to do all the prep [for the Detention Hearing in a presumption case] because you know it's a fait accompli." In judges' defense, some scholars also misunderstand the presumption and improperly place a burden of persuasion on the defense.[424]

Other Defenders expressed specific complaints with how judges apply the rebuttal standard (Step 1 of the legal test). One explained that judges do not understand that the burden of persuasion always rests with the prosecutor, and routinely shift it to the defense, in violation of the law. Another noted that judges conflate the rebuttal standard with the burden of persuasion: "[T]hey're not going to say that it got rebutted, and then not release." Yet another Defender summarized their experience as follows: "I think you're just so far behind the eight ball when you start in a presumption case that it's really, really hard. The odds of you getting someone out if you got a presumption case are vastly lower."

**Our courtwatching data confirm that judges are not following the law in presumption cases.** Consider, for example, the requirement at Step 1 that the presumption need only be rebutted by "some evidence."[425] As explained above, this standard for rebuttal is meant to be easy to satisfy.[426] Yet in 95% of presumption cases that held a Detention Hearing in our study, judges either concluded that the arrestee had failed to rebut the presumption or did not mention whether the presumption was rebutted.[427] *See* Figure 20.

Our data also suggest that judges often disregard Step 2 of the legal test, where they are supposed to weigh the rebutted or unrebutted

presumption along with all of the other pretrial release factors in reaching the ultimate release or detention determination. Of the cases where judges did not affirmatively find the presumption rebutted, 81% resulted in detention. And at every single Detention Hearing where a judge definitively found that the presumption had *not* been rebutted, the judge detained the arrestee. *See* Figure 20. These numbers are surprising given that almost any evidence can rebut the presumption, and an unrebutted presumption

**Figure 20: Judges Are Not Following the Law in Presumption Cases.**




does not mandate detention.

When we asked a judge from a district where we had court-watched why it is so rare for courts to find the presumption of detention rebutted, the judge explained: "I don't understand [the presumption]. . . . I really don't think judges, including this judge, even though I did some research into trying to understand what it means—what does it mean? What do you need to provide to rebut it? I don't think that's litigated enough. I think that it needs to be brought to the court's attention more often to know what standard applies." This sentiment was echoed in a Detention Hearing we observed, in which the presiding judge remarked: "Candidly, I don't know whether the presumption is rebutted or not. Case law is murky as to what level of evidence is required to rebut . . . . I don't know if that is met here. So, I'll just base this [detention order] on preponderance of evidence that there is no condition that would prevent flight."[428]

**These statements elucidate why only 5% of judges found that the presumption of detention was rebutted at the Detention Hearing: judges don't understand the legal standard for rebutting the presumption, and some unfairly put the onus on the defense to explain it.**

In fairness to judges, defense counsel argued that the presumption was rebutted or rebuttable in less than 20% of presumption cases where the prosecutor or judge mentioned the presumption. Additionally, the defense waived the Detention Hearing, stipulated to detention, or otherwise did not contest detention in 55% of the presumption cases we observed, as compared with 26% of non-presumption cases.

However, at *contested* Detention Hearings where judges did not affirmatively find the presumption of detention rebutted,[429] judges detained arrestees at a rate of 78%. Therefore, the exorbitant pretrial detention rates we observed in presumption cases are primarily driven by judges misapplying the law. Judges ultimately are required to make a finding about whether the presumption has been rebutted at every contested Detention Hearing, regardless of the defense presentation. Yet nearly every contested Detention Hearing in our sample lacked this finding.

Another example of the misapplication of the presumption of detention occurs at the Initial Appearance. Although there is some overlap between the § 3142(f) factors and the types of cases that qualify for the presumption of detention under § 3142(e), the presumption itself applies only at the Detention Hearing stage. But the presumption was improperly mentioned by a judge in 5% of Initial Appearances in our study; we also witnessed several cases in which the presumption was invoked where it did not apply as a matter of law. Five percent may seem a relatively small number, but given that the law unambiguously cabins the presumption to the Detention Hearing, 5% of Initial Appearances is 5% too many. We also observed 4 cases in which a prosecutor or a judge invoked a presumption at the Detention Hearing where, as a matter of law, no presumption applied.[430]

Judges may also give the presumption of detention too much weight because they are risk averse and fear adverse consequences.[431] Judges "retain [an] incentive to be too cautious releasing people pretrial,"[432] and that incentive can loom especially large in presumption cases. A Chief Federal Defender in one district where we courtwatched

expressed this view. "I think sometimes the presumptions are used to get to a place that [judges] think they want to get to, and I think there's a risk averse-ness, sort of," the Defender noted. "It's safer, it's easier for them to detain. And I don't think they totally understand the magnitude of the impact that they're having—or maybe they don't care—but I think they very much worry if they release and if something bad happens—I think that is triggering. . . . [J]udges are more worried about taking a risk and the fear that they might get burned." A judge we spoke with discussed these types of misgivings: "[I]t's always in the back of my mind in a case like that. That, you know, this is a presumption case, and am I doing the right thing if I am deciding that all of the other information in front of me is suggesting the person should be released?"

Finally, judges may feel compelled to overweigh the presumption of detention because, in presumption cases, the statute ties detention to the type of offense, rather than to individual characteristics. For example, the drug presumption applies to any drug offense that carries a maximum term of imprisonment of ten years or more.[433] This means that "[v]irtually all federal drug offenses subject individuals to these heightened detention standards . . . without regard to a person's role, culpability in the offense, or lack of prior convictions."[434]

A Chief Federal Defender we interviewed discussed the unfair challenges the generalized nature of the presumption poses. "It's not an absolute that [presumption case arrestees are] going to be detained, but it's much harder and really in sort of an unfair way," he remarked. "It's just . . . the cases aren't worse than so many other cases that are non-[presumption], and you've got this uphill battle that you have to fight with it. So, it's a lot harder. It's a problem." One judge put the point even more explicitly: "I just don't think [the presumption] is worth anything. Especially [since] there's such a wide variety of drug and gun cases, etc., from that list, and the fact that everyone's presumed detained just seems absurd. Why would you do that to people? . . . I can't even really wrap my mind around that reasoning."

## When Judges Do Release Presumption Arrestees, They Impose Harsher Conditions than in Non-Presumption Cases.

Even in the rare case when an arrestee facing a presumption of detention was released in our study, they faced more stringent conditions of release than their counterparts. For example, the median bond amount in presumption cases was much higher than the median bond for non-presumption cases; in presumption cases, it was $250,000 at the Detention Hearing, which is double the non-presumption median of $125,000.[435] Thus, the presumption appears to result in harsher conditions of release as well as higher detention rates.

Practitioners from districts beyond the ones where we court-watched confirmed that judges impose harsher release conditions in presumption cases. One Chief Federal Defender we spoke with noted that, "[o]n drug cases, if you have someone to vouch for the client, . . . we've got [a] pretty good shot at getting people out." But she continued by noting that the arrestees "might be [placed] on GPS [monitoring], which can be a real hassle. [The judges] *love* GPS—that's like the new thing that makes them feel good about what they're doing." Another Defender described a similar experience. "If we win [release in a presumption case]," she remarked, "what we will win is a high bond with [financial] conditions, you know, requiring co-sureties." The Defender characterized this change as "[t]he difference between a flat-out detention, and . . . a detention because they can't meet the conditions." In this way, the presumption continues to promote the culture of detention even when the arrestee apparently overcomes it.

## The Presumption of Detention May Contribute to Racial Disparities in the Federal System.

The burden of the presumption of detention is not borne equally by all arrestees. Using sentencing data as a proxy, we estimate that most arrestees facing a presumption are people of color, since they make up 75% of those convicted of qualifying drug offenses nationwide.[436] In this study, the proportion of people of color was even higher: 89% of presumption cases involved people of color, while only 11% involved white arrestees.[437] And in our Chicago pilot study, 94% of presumption cases involved people of color.[438]

The presumption is especially pernicious for people of color because the offenses to which it is tied can dovetail with racial disparities and stereotypes. One judge spoke candidly about this problem. "[A]nother type of case we get in our district a lot are . . . so-called 'gang cases,'" the judge remarked, "and I think there's a lot of racism involved in calling someone a gang member and then arguing about their dangerousness. Because as soon as you label someone that way, the thought that comes into . . . a judge's mind is, 'Oh, this person is violent. They're living the kind of lifestyle of violence and committing crimes and that type of thing.' . . . [O]ne of the things I think is really important to do is not to have things devolve into these types of meaningless labels."

Our data support the idea that the presumption may fall even more heavily on arrestees of color. People of color received different treatment from prosecutors when facing a presumption charge. Of the cases in which prosecutors invoked the presumption during the Detention Hearing, 97% of the arrestees were people of color, and 3% were white. *See* Figure 21.

**Figure 21: People of Color Receive Different Treatment When Facing a Presumption Charge.**

Of the cases in which prosecutors invoked the presumption during the Detention Hearing, 97% of the arrestees were people of color, and 3% were white.



In addition, judges detained people of color at higher rates than white individuals: the detention rate in presumption cases involving people of color was 73%, while the detention rate in presumption cases involving white arrestees was just 68%. *See* Figure 22. In our Chicago pilot study, *every* arrestee detained in a presumption case was a person of color.[439]

**Figure 22: The Presumption of Detention May Contribute to Racial Disparities in the Federal System.**




Finally, when we observed judges and prosecutors making serious legal mistakes regarding the presumption, the arrestee was always a person of color. As mentioned above, we observed two cases in which a prosecutor invoked a presumption at the Detention Hearing, despite a presumption not applying as a matter of law—and in both cases, the arrestee was Black. (In one of those cases, the judge erroneously affirmed the prosecutor's claim that a presumption of detention existed.) Relatedly, we observed two other cases in which the judge invoked a presumption where none applied by law. In both of those cases, the arrestee was Black.

D

# The Solution: At the Detention Hearing, Judges Must Adhere to the Low Standard for Rebutting the Presumption of Detention and Never Treat the Presumption as a Mandate for Detention.

**Judges can mitigate the presumption of detention's ill effects by adhering to the letter of the law.** Both the scholarship and the data show that the presumption has largely outgrown its intended purpose and its usefulness. Congress may take action to rein in the presumption at some point.[440] Courts may even be forced to confront the presumption's constitutionality. Until then, judges must "hew to the statutory framework" in presumption cases, an approach that will also insulate their decisions from reversal.[441]

In every presumption case, judges should follow this two-step process:

At Step 1, the judge should make a finding about rebuttal. As a matter of law, if the defense has presented "some evidence" of the arrestee's history and characteristics (such as ties to the community, family ties, or employment) or some evidence that mitigates the circumstances of the offense, the judge should find the presumption rebutted.[442] If the defense has not presented any evidence, the judge should examine the Pretrial Services Report to determine if there is any evidence that "rebuts" the presumption. Following this first step in every presumption case will limit the damage the presumption causes, minimizing its weight from the outset—as Congress intended.

At Step 2, the judge should consider all of the § 3142(g) factors together, viewing the presumption as, at most, just one factor in the mix—and never treating the presumption as the determinative factor.[443] The judge should recognize that the existence of a rebutted—or even an unrebutted—presumption does not limit their discretion to release. The rebuttable presumption must never operate like a mandatory minimum or a mandate for detention.

By following these simple legal rules, judges can prevent unnecessary detention and shift the culture of detention.

# Our courtwatching data confirm that judges are not following the law in presumption cases.

4

# Judges Must Stop Unlawfully Jailing People for Poverty Through Excessive Financial Conditions.

**Our courtwatching study shows that federal judges consistently impose financial conditions of release that result in pretrial detention. This practice violates the explicit statutory language of the Bail Reform Act, perpetuates a system where wealth buys release and people are jailed for poverty, and has a disproportionate racial impact. These detentions, which violate the law, contribute to rising detention rates as well as racial and socioeconomic disparities in the federal system.**

Judges must bring the practice back in line with the law by ceasing to impose financial conditions that arrestees cannot meet.

## THE STATUTE: 18 U.S.C. § 3142(c)(2)

The judicial officer may not impose a financial condition that results in the pretrial detention of the person.

# Our study found that federal courts regularly impose inequitable and burdensome financial conditions, perpetuating a system in which money buys freedom and poverty ensures incarceration.

# A | Takeaways

- **In 37% of cases in our study, judges imposed financial conditions, such as personal surety bonds, corporate surety bonds, and the upfront posting of collateral.** *See* Figure 23.

- **In 34% of all cases and 91% of cases where financial conditions were imposed, judges required arrestees to post a secured bond**, reintroducing the evils of cash bail systems that the BRA sought to avoid. *See* Figure 23.

- In one district where we courtwatched, arrestees were *detained* in 40% of cases involving financial conditions solely because they did not have the money to pay for their release. *See* Figure 25. Judges in that district regularly imposed federal bail bonds known as corporate surety bonds (CSBs). **In 92% of cases where a CSB was imposed, the accused was locked in jail because they were unable to obtain a bail bond. Every single individual subjected to a CSB was a person of color.** *See* Figure 24.

- Across all 4 districts, **arrestees did not have the money to meet financial conditions in 36% of cases where such conditions were imposed.** *See* Figure 23. In fact, 21% of all arrestees detained at the Initial Appearance remained in jail after the Detention Hearing because they could not meet financial conditions of release. For these individuals, the financial conditions acted as de facto detention orders, in violation of the law.



95%

## *Racial Disparities*

in the imposition of financial conditions of release

- Black and Latino arrestees were much more likely to face financial conditions of release than white arrestees; among arrestees on whom secured bonds were imposed, 95% were people of color. *See* Figure 26.

95%

B

# The Law: The Bail Reform Act Prohibits Financial Conditions of Release that Result in Detention.

The BRA unambiguously prohibits judges from imposing financial conditions of release that people are unable to meet. The statute states concisely: "The judicial officer may not impose a financial condition that results in the pretrial detention of the person."[444] The BRA contemplates no exceptions or loopholes to this requirement. And yet, courts regularly evade, pervert, and ignore this unambiguous provision.

Judges are allowed to require conditions of release only when an unsecured bond will not reasonably assure an arrestee's appearance and community safety.[445] In addition, a judge may not impose *financial* conditions of release to address safety concerns; such conditions may only be used to secure someone's appearance in court.[446] Judges are therefore prohibited from issuing "a detention order without a proper finding of risk of flight or danger to the community" and from "granting bail but setting an exorbitant financial condition that the defendant [cannot] meet."[447]

The BRA thus strictly cabins the use of financial conditions, authorizing them only when necessary to assure appearance—not safety—and limiting them to arrestees who are solvent enough to meet the financial obligation imposed. The BRA allows judges to require arrestees to "execute a bail bond with solvent sureties" only when such a condition is reasonably necessary to ensure appearance.[448] Courts have interpreted this statutory provision to authorize two different types of financial conditions: (1) federal bail bonds known as corporate surety bonds (CSBs), and (2) personal surety bonds commonly referred to as "solvent surety" bonds. Congress intended that judges would reserve both *bail bonds* and *solvent surety* bonds for the rare case,[449] to avoid detaining people simply because they are poor.[450]

The legislative history of the BRA shows that the prohibition on financial conditions that result in detention was of central concern to the drafters.[451]

# The BRA unambiguously prohibits judges from imposing financial conditions of release that people are unable to meet.

# The BRA strictly cabins the use of financial conditions, authorizing them only when necessary to assure appearance—not safety—and limiting them to arrestees who are solvent enough to meet the financial obligation imposed.

As the main Senate report notes, the "primary purpose of the [1966 BRA] was to deemphasize the use of money bonds in the federal courts, a practice which was perceived as resulting in disproportionate and unnecessary pretrial incarceration of poor defendants."[452] The Senate report emphasizes that one "concern [animating the enactment of the BRA] . . . was the argument that stringent financial conditions of release . . . would be used to avoid the limitations and procedural requirements" for pretrial detention.[453] The committee noted that "bail procedures often result in pretrial detention through the arbitrary use of high money bail," requiring "restrictions on the use of financial conditions."[454]

In fact, one of the reasons the 1984 Act authorized preventive detention on dangerousness grounds was to stop judges from "strain[ing] the law, and impos[ing] a high money bond ostensibly for the purpose of assuring appearance, but actually to protect the public."[455] The Senate committee explained, "[T]he pretrial detention provisions of Section 3142 are to replace any existing practice of detaining dangerous defendants through the imposition of excessively high money bond."[456]

Accordingly, the BRA was supposed to "preclud[e] pretrial detention through the use of high money bond."[457] Federal courts recognized this prohibition almost immediately after the BRA's passage, with the Eighth Circuit stating that one of the "major differences" from previous federal bail laws was "the [BRA's] prohibition against using inordinately steep financial conditions to detain defendants."[458] Other circuits followed suit.[459]

As a practical matter, the BRA's prohibition means that "[i]f the judicial officer determines that some amount of money will assure the appearance of the defendant, then he must select an amount that is attainable."[460] Critics of state-level cash bail systems have long touted the BRA's limitations on financial conditions as a salutary and egalitarian aspect of the federal bond regime.[461]

Supreme Court jurisprudence also states that excessive financial conditions are antithetical to the BRA and the Constitution. In *Stack v. Boyle*,[462] the Court held that judges violate the Eighth Amendment when they impose bail "at a figure higher than an amount reasonably calculated [to ensure the arrestee's appearance at trial]."[463] In *Salerno*, the Court corroborated *Stack*'s holding, stating that "when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more."[464]

Accordingly, financial conditions of release that result in an arrestee's detention are *always* excessive: either there are no conditions of release that will reasonably assure the person's appearance, in which case a court can order confinement outright, or there exist conditions that will assure appearance, in which case the arrestee must be released.[465] A judge who detains someone at the Initial Appearance by setting financial conditions that the arrestee cannot meet blocks that person from availing themselves of the procedural protections of a Detention Hearing.[466]

If an arrestee does not qualify for detention, the BRA commands that the judge "shall order the pretrial release of the person on personal recognizance" unless doing so "will not reasonably assure the appearance of the person as required or will endanger the safety of . . . the community."[467] If the judge determines that conditions are needed to ensure these goals, the statute requires the "least restrictive . . . condition"[468]—including the least restrictive financial condition(s).[469] Most importantly, while a judge may choose from a menu of least restrictive conditions that will reasonably assure appearance, a financial condition that the person cannot meet is never an option. Judges have a variety of tools at their disposal to reasonably assure appearance without using financial conditions,[470] which inherently "privilege the wealthy over the poor."[471]

To ensure that financial conditions of release are not excessive, and therefore do not result in unlawful detention, judges must consider the individualized circumstances of each arrestee. The BRA's legislative history illuminates this point, as the Judiciary Committee "emphasized that all conditions are not appropriate to every defendant," and instructed "the judicial officer [to] weigh each of the discretionary conditions separately with reference to the characteristics and circumstances of the defendant before him and to the offense charged, and with specific reference to the factors set forth in [§ 3142](g)."[472] Federal courts concur, with the Eighth Circuit reversing a release order that applied the same condition of release to all individuals in a multi-defendant case.[473] Individualized determinations also mitigate against "over-conditioning," or imposing conditions of release that are more burdensome than what is required to satisfy the purpose of the BRA.[474]

# Financial conditions of release that result in an arrestee's detention are always excessive: either there are no conditions of release that will reasonably assure the person's appearance, in which case a court can order confinement outright, or there exist conditions that will assure appearance, in which case the arrestee must be released.

C

# The Practice: Federal Judges Impose Excessive Financial Conditions that Violate the Law and Jail People for Poverty.

**Our study found that federal courts regularly impose inequitable and burdensome financial conditions, perpetuating a system in which money buys freedom and poverty ensures incarceration.**[475] In practice, judges frequently disregard the BRA's bright-line rule against predicating release on someone's ability to pay.

Judges rely too heavily on secured bonds. In some courts, judges purport to release indigent arrestees by imposing high corporate surety bonds, knowing full well that the person will never be able to obtain the bond and will therefore remain in jail. This undue emphasis on financial conditions of release exacerbates racial disparities within the federal pretrial system. Additionally, our data show that financial conditions result in detentions that violate the BRA, as some arrestees are too poor to meet the conditions imposed. We assessed financial conditions imposed at the Initial Appearance, at the Detention Hearing, and overall across both hearings.

## Judges Are Overly Reliant on Secured Bonds.

We found that judges rely heavily on financial conditions.[476] Across our entire dataset, judges imposed financial conditions in 37% of cases. *See* Figure 23. Cases involving financial conditions comprised 68% of the subset of released cases and 21% of the subset of detained cases. Judges imposed *secured* bonds with alarming frequency, using them in 91% of cases involving financial conditions across the Initial Appearance and Detention Hearing stages. *See* Figure 23. In 11% of cases involving financial conditions, judges imposed *cash bail* requirements (secured bonds requiring the upfront posting of cash).

Secured bonds come in many different forms—they include cash bail, the upfront posting of collateral, the upfront posting of property, personal "solvent surety" bonds, and corporate surety bonds obtained from a bail bond company.

A personal *solvent surety* bond requires the arrestee to find a relative or friend with financial resources willing to bind themselves legally to paying the bond if the arrestee flees.[477] In many cases, imposing a solvent surety bond violates the BRA, in that it is a financial condition that results in detention. But defense attorneys often agree to this condition in an effort to secure their clients' release. When this happens, it is incumbent on judges to uphold their statutory responsibility to impose the *least* restrictive conditions—even if that means disagreeing with both defense counsel and the prosecution and imposing an unsecured bond instead.

**Figure 23: Judges Impose Burdensome Financial Requirements and Jail People for Poverty.**



One especially troubling type of secured bond in the federal system is the corporate surety bond (CSB). When a CSB is purchased, the bail bond company signs a contract with family members or friends and charges a nonrefundable fee—which in federal court is typically between 10% and 15% of the full bail amount.[478] The co-signers are often required to post property or other assets as collateral, sometimes in amounts totaling 150% of the bail amount.[479] If the arrestee violates the terms of release or fails to appear in court, the person who signed the contract is responsible for paying the full bail amount and forfeits the collateral.[480]

According to a review done by Color of Change and the ACLU, many bail bond contracts include additional fees and conditions that are difficult for the arrestee and their co-signers to meet.[481] Many people are left with loan installments and fees well after a case is resolved.[482] Bail bond companies are often predatory and charge extremely high interest rates.[483] Indigent people must then choose between staying in jail or taking on significant debt to secure their freedom.[484]

Most federal CSBs involve *Nebbia* conditions, another restrictive condition of release.[485] When a court orders *Nebbia* conditions, the arrestee or the relative/friend posting bond is required to prove that the funds for both the premium and the collateral come from legitimate, legal means. Although a judge has determined that the arrestee is otherwise entitled to release, the individual will remain in jail until the arrestee has met their burden of proof at a *Nebbia* hearing.

**The use of CSBs results in higher rates of pretrial detention because indigent people are unable to obtain such bonds.** In our study, CSBs were used in 14% of all cases (and only in one district, the Southern District of Florida (Miami)). In 92% of the cases where a CSB was imposed, the arrestee was ultimately detained pretrial (after both the Initial Appearance and the Detention Hearing). *See* Figure 24. At the Initial Appearance, 100% of cases involving a CSB ultimately resulted in pretrial detention; at the Detention Hearing, 70% of cases involving a CSB resulted in the detention of the arrestee. In contrast, when an unsecured bond was imposed, only 10% of people were detained at the Initial Appearance, and no one was detained at the Detention Hearing.

**Figure 24: The Use of Corporate Surety Bonds Results in Higher Rates of Pretrial Detention and Exacerbates Racial Disparities.**




We observed the pervasive use of CSBs in Miami, and detention outcomes in that district demonstrate conclusively the problems with CSBs. Fully 40% of cases in Miami involving financial conditions result in pretrial detention solely because the arrestee is unable to meet financial conditions of release. *See* Figure 25. CSBs are so common in Miami that the court has an official stamp that reads: "Both sides stipulate to a $250,000 CSB with *Nebbia*, reserving the right to a PTD hearing at a later date."

**Figure 25: Judges Jail Arrestees Who Are Too Poor To Pay For Their Release.**



**In our interviews with judges and Defenders, we confirmed that federal judges across the country rely upon CSBs and cash bonds, in derogation of the statute.** One Defender from a large western district where we did not courtwatch told us: "[T]he biggest obstacle [to getting our clients released] is our magistrate court not setting [financial] bonds that are a reasonable expectation for the clients to meet."[486] As this Defender explained, in such cases "[the condition of release] is either detention or a cash or corporate surety bond. And then, who's going to post that bond—that cash?" In that district, the posting of funds must be done by the arrestee themselves or a relative. Similarly, in a large district in the southwest where we did not courtwatch, Defenders told us that judges often require the upfront posting of cash, which prevents release in many cases. Contrary to the legal standard under § 3142(c)(2), these conditions of release often result in jailing on the basis of an arrestee's poverty.

Through interviews with Defenders in districts where we did not courtwatch, we also uncovered the pervasive use of the so-called "solvent surety" condition. An arrestee must find a family or friend to serve as a personal surety, meaning that person agrees to pay the monetary amount of the bond if the arrestee absconds.

Requiring an indigent individual to locate a personal solvent surety who is willing to post or co-sign a money bond often forecloses the possibility of release for indigent arrestees—in violation of the BRA. In districts where this practice is common, Defenders told us that solvent sureties are required to provide numerous forms of personal and financial information, establish their net worth, and show proof of employment and recent paystubs.[487] Contrary to the legal standard, judges in these districts require signatories "to show actual assets, that need[] to meet [the bond] amount." As one Defender in a large western district remarked, this requirement frequently "put[s] poor people in jail."

Even if an arrestee can secure a solvent surety, this condition often prolongs the amount of time an arrestee spends in jail. The process of verifying the proposed surety is both burdensome and time-consuming. Additionally, one Defender from a large district in the southwest where we did not courtwatch told us that prosecutors will at times rescind their release recommendation while verification is pending. The verification process is so prolonged in that particular district that the Defender recalled cases in which their clients were ordered released and yet locked in jail for 45 days as they awaited the verification of their solvent surety.

**It is little wonder that Defenders from across the country told us that if they could change one thing about their district's pretrial processes, they would eliminate the solvent surety requirement.**

While conditions like electronic monitoring and GPS monitoring may seem like alternatives to financial conditions of release, they may still carry a high pecuniary burden for arrestees. When a judge orders electronic monitoring, a device is attached to the releasee's ankle and connected to their phone. If the person leaves their home without authorization, an alarm will alert Pretrial Services/Probation. Arrestees are often required to pay a daily fee to the private companies that provide this technology. This cost may be prohibitive, forcing some people to stay in jail.[488]

In our study, judges ordered electronic monitoring in 42% of the cases where an arrestee was released. Several Defenders whom we interviewed labelled electronic monitoring as the most overused condition of release. One Defender explained that electronic monitoring was so commonly imposed in their district that they were constantly "running out of monitors" and having to delay release for arrestees until "when we think we'll have [a monitor] freed up." One judge we interviewed speculated that electronic monitoring is so frequently used because "it seems like something punitive you can do to the person while they're out."[489]

## Excessive Financial Conditions Have a Disproportionate Racial Impact.

**Saddling indigent arrestees with high bonds aggravates racial disparities in the federal system** given discrepancies in household wealth across racial groups.[490]

People of color are less likely to meet financial requirements, as institutionalized racism in the form of housing, tax, financial, and education policies has resulted in highly uneven distributions of wealth and property ownership.[491] Black Americans own just one-tenth of the wealth of white Americans, and this wealth gap "persists regardless of households' education, marital status, age, or income."[492] Although the average Black American household owes one-third of the debt owed by the average white American household, the interest rates for Black borrowers are noticeably higher.[493] Research conducted in the Second Circuit, for example, found that 33% of white arrestees in that federal court were homeowners, compared to just 7% of Black arrestees and 9% of Latino arrestees.[494]

Against this backdrop, it is striking that in 95% of cases in our study where a secured bond was imposed, the arrestee was a person of color.[495] See Figure 26. Moreover, in every single case in our study where a CSB was imposed, the arrestee was a person of color.[496] See Figure 24.

**Figure 26: Excessive Financial Conditions of Release Have a Disproportionate Racial Impact.**



95% of secured bonds were imposed against **people of color.**

## Financial Conditions Contribute to Unlawful Detention.

**Our findings reveal on-the-ground practices that make a mockery of the BRA's prohibition against financial conditions that result in detention.**

Shockingly, during our courtwatching, arrestees were detained because they could not meet financial conditions of release in 13% of all cases we observed, and in more than one-third—36%—of the cases where financial conditions were imposed. See Figure 23. Of the people who were detained in our study, 21% were detained for the duration of the case because they could not meet financial conditions of release.

Our study further revealed that federal judges are fully aware that indigent arrestees cannot pay exorbitant financial conditions such as CSBs. When setting a $250,000 CSB, one judge said to the probation officer, on the record:[497]

So you have expressed a concern that he should not be released on this bond, which it's my experience nobody ever meets this bond and they remain detained. But we will make it a matter of record that this Defendant may not be released on this tentative bond without further hearing.

During an interview, another judge confirmed that CSBs almost always result in detention, describing $250,000 CSBs as "a bond they're never going to make, obviously. Most people can't make that bond."

Imposing a financial bond that a person cannot make is, by definition, unlawful: a judge violates the BRA every time they "impose a financial condition that results in the pretrial detention" of an arrestee.[498] One judge we interviewed stated that when they impose a bond that an arrestee can't meet, "I don't feel bad about that necessarily if I think the bond was reasonable." But a bond that an arrestee cannot meet is, by its very nature, unreasonable and illegal.

**Because many people charged with federal crimes are indigent, financial conditions of release run a serious risk of serving as de facto detention orders, an indisputable violation of the BRA.**[499] Our interviews suggest that this is the case in many districts across the country. One Chief Federal Defender told us that financial conditions in their district are so unreasonable for arrestees that they are "tantamount to detention." A Chief Federal Defender from another district likewise stated that financial conditions "set[] people up for failure or keep[] them in jail."

In every case, judges must keep the BRA's prohibition on financial conditions that result in detention paramount, carefully considering necessity and reasonableness before imposing any type of financial condition. But many judges act on autopilot, without attention to whether a given condition would be overly burdensome for a particular individual. This may be a consequence of prosecutors or Pretrial Services frequently requesting financial conditions of release. Overall, prosecutors requested financial conditions of release in 29% of the cases we observed (22% of Initial Appearances and 12% of Detention Hearings). Regardless, judges must have the courage to follow the law and depart from requested conditions that would prove onerous or unreachable for the person standing in front of them.

Our interviews revealed a perception that judges do not carefully consider a person's financial ability before imposing financial conditions. One Defender we interviewed observed, "Pretrial [Services] will want to load your client down [with conditions] . . . . If the attorney doesn't speak up, the judge will just go with it." A Chief Federal Defender from another district recalled a case in which they argued that imposing the prosecutor's requested financial conditions would violate the BRA because the arrestee was too poor to make bond and would end up jailed for poverty. Rather than consider the arrestee's indigency, the judge "waited for the prosecutor to withdraw the [financial] request" before altering the conditions of release.

**During courtwatching, we witnessed the direct connection between burdensome financial conditions and pretrial detention.** We watched one case where 3 fishermen from Cuba—who did not speak English and were charged with nonviolent drug offenses—were ordered released on CSBs of $250,000 each, with *Nebbia* conditions. But none of the arrestees was able to afford the bond, so all remained detained pending trial.

Judges sometimes explicitly told arrestees that financial conditions served as de facto orders of detention. For example, when ordering a $250,000 corporate surety bond with a *Nebbia* condition, one Miami judge told the defense attorney:[500]

> The language just explicitly states what would actually happen if your client ever met the $250,000 corporate surety with a *Nebbia* condition bond, which the likelihood of that is in my educated guess zero.

These examples highlight how judges further the culture of detention by imposing onerous financial conditions, turning purported release orders into mandates for detention.

Our results further show that defense lawyers rarely advocate against financial conditions of release. In cases where financial conditions were imposed at the Initial Appearance, the defense argued against

those conditions just 2% of the time (2 cases total). In those 2 cases, both of the arrestees were white. At the Detention Hearing, the defense contested financial conditions of release in only 3% of the cases in which financial conditions were imposed. *See* Figure 27.

**Figure 27: The Defense Bar Rarely Contests Financial Conditions of Release.**




Our interviews indicate that the defense may shy away from contesting financial conditions because they are willing to agree to just about anything to keep their clients out of jail. As one Defender put it, "if he's getting out, I mean Jesus, let him out. I'll take what I can get. And if that's what you need to let him out, [then] let him out." Another Defender concurred, noting "You want to get somebody out, and your client's family owns a house, and they're . . . willing to put [the] house up, . . . you're not raising the issue." This Defender explained, "you just go to the Court and say, 'we've got property, judge, if you want to use this as collateral on a bond.' . . . [W]e're doing it because we're trying to get our clients out." However, this disempowered trend from the defense bar does not excuse the conduct of judges. The BRA requires judges to make an independent determination as to the appropriateness of a bond and a person's financial ability to meet the bond, and far too often judges impose a financial condition without such a determination.

D

# The Solution: At Both Pretrial Hearings, Judges Must Stop Imposing Financial Conditions that Result in Detention and Tailor Release Conditions to Each Arrestee's Individual Economic Circumstances.

**As frontline decisionmakers tasked with applying the law as written, judges must heed the BRA's instruction to impose the least restrictive conditions of release.** To comply with the statute, judges should also cease imposing financial conditions of release that people cannot meet. The only way to fully adhere to the statutory prohibition against financial conditions that result in detention is to entirely stop imposing financial conditions on indigent individuals.

Given that the vast majority of those charged with federal crimes are indigent,[501] many federal courts in this country need to dramatically reduce their reliance on financial conditions. Judges should reserve financial conditions of release for the rare case where the arrestee has the economic means to pay for their freedom.

As a practical matter, judges should pay close attention to each arrestee's personal financial circumstances and fashion individualized conditions of release that are reasonable for that specific person. Before imposing a financial condition, a judge should carefully examine whether the particular arrestee before them has the means and the wherewithal to meet that condition. The judge should also evaluate whether a financial condition might impermissibly result in the arrestee's detention. In making these individualized determinations, judges must be mindful of how financial conditions compound existing racial and socioeconomic disparities.

Unless judges are vigilant, they will continue violating the BRA by allowing the statute's narrow authorization of financial conditions to swallow its rule against detaining indigent individuals via financial conditions that they cannot meet. In federal districts where it has become commonplace to impose financial conditions of release, often without regard for the arrestee's economic means, judges will need to resist the entrenched culture and refuse to impose financial conditions proposed by the prosecution and Pretrial Services/ Probation. Judges should take a hard look at all of the financial conditions that make it difficult—and often impossible—for indigent arrestees to secure release.

Given the evils of cash bail, the federal system should unequivocally abjure corporate surety bonds, a truly retrograde vestige of the past. Federal judges should also think carefully before imposing *any* kind of secured bond, including requiring a relative to serve as a solvent surety.

By applying the BRA as written, judges can avoid detaining people for poverty and can mitigate racial and socioeconomic disparities within the federal system.



# CONCLUSION

**When our Clinic first embarked on this study, we were surprised to learn that many federal judges, prosecutors, and defense attorneys were completely unaware of the federal bail crisis unfolding in their midst. Stakeholders consistently told us that the federal pretrial process was working just fine. Some even questioned why we would choose to spend time and energy investigating a system that was functioning as it should. Those stakeholders were largely oblivious to skyrocketing federal jailing rates and were astonished to learn how rare it is for people to flee or be rearrested after being released pretrial—demonstrating that the federal system could release far more people pending trial without jeopardizing community safety or the efficient administration of justice.**

However, Federal Criminal Justice Clinic faculty and students knew from our own experiences litigating federal pretrial hearings that the system was in crisis. We also knew that the brunt of that systemic breakdown was being borne by people of color, poor people, and people who have no powerful lobby to challenge such injustices. We knew that, absent intervention, mass detention would continue unabated in the federal system. To begin to change this culture, a catalyst was needed.

We hope this Report serves as that catalyst by providing the first data-driven examination of the federal bail crisis. This Report describes a pervasive culture of detention within the federal system. **Through courtwatching and interviewing stakeholders around the country, we uncovered a freewheeling system in which judges have allowed misguided courtroom habit to supersede the law.** During Initial Appearance hearings, we watched federal judges lock poor people in jail without lawyers and detain others in violation of the statute. During Detention Hearings, we watched judges ignore the rebuttable nature of the presumption of detention. And we saw judges purporting to release indigent people while instead burdening them with unattainable financial conditions, thus violating the law and impermissibly blocking any hope of freedom.

This Report also shows how such deviations from the written law exacerbate racial and socioeconomic disparities in the criminal legal system. Prosecutors cited improper grounds for detention at Initial Appearances more frequently when the arrestee was a person of color than when they were white, and people of color were far more likely to be illegally detained at the Initial Appearance than white arrestees. People of color were also significantly more likely to be deprived of counsel at their Initial Appearance hearing than white arrestees. At Detention Hearings, prosecutors overwhelmingly invoked the presumption of detention against people of color—on several occasions doing so when no presumption existed as a matter of law. Consequently, people of color were detained at higher rates in presumption cases than white arrestees. Additionally, the vast majority of secured bonds were imposed against people of color, and only people of color were subject to bail bonds (corporate surety bonds). While each of these findings is independently concerning, taken as a whole, they provide a damning illustration of pretrial practices aggravating racial disparities in the system.

Our Clinic's research has already persuaded judges to reconsider their practices, making us optimistic that this Report will encourage further reforms.

After the FCJC's pilot study in Chicago, we observed promising changes in federal bail processes. One judge told us that, as a result of our study, judges and practitioners in Chicago had developed "a heightened sensitivity to the whole question of whether a Detention Hearing may take place at all under § 3142(f)." Prior to the FCJC's intervention, federal prosecutors in Chicago cited a valid basis for detention in just 5% of Initial Appearances. But after we intervened with the United States Attorney's Office and shared our findings with the court, federal prosecutors cited a valid statutory basis in 82% of Initial Appearances.[502] Additionally, after training the defense bar, we observed a nearly 40% decrease in the rate at which defense attorneys consented to pretrial detention.[503]

Our interventions have likewise catalyzed a culture shift in courtrooms across the country. One judge we interviewed observed that our efforts to educate stakeholders about the BRA are "having a huge impact across the country, and it's sort of chipping away at all this and winning people over." That judge continued by saying that, after attending one of our bail presentations via the Federal Judicial Center, all of the federal magistrate judges in their district

convened to discuss the legal standard that applies during the Initial Appearance, and concluded that it had been a "weak spot in [their] analysis." The entire court decided to rectify the problem by asking prosecutors "to give some factual basis" for their detention requests at the Initial Appearance, especially in non-(f)(1) cases, where the risk of unlawful detentions is greatest. Another judge told us: "Detention rates are coming down, and much of that is attributable to you and your efforts. You have made a real difference in how the federal judiciary sees release and detention." Our interventions are also changing the way federal public defenders approach bond issues. One Chief Defender told us that our research "is forcing [the defense] to be better lawyers . . . make better arguments," and "get courts to listen to those arguments."

By complying with the law and requiring federal prosecutors to follow suit, federal judges can ensure that every single person who comes before them is protected by the BRA's substantive and procedural safeguards. Our Report lays out 4 key recommendations to ensure adherence to the statute and the Constitution. First, to prevent unlawful detentions at the Initial Appearance, judges must adhere to the limitations in § 3142(f). Second, to prevent arrestees from being jailed without lawyers, judges must appoint counsel to represent every indigent arrestee for the entirety of their Initial Appearance hearing. Third, in presumption-of-detention cases, judges must recognize the low standard for rebutting the presumption and never treat the presumption as a mandate for detention. Finally, at both pretrial hearings, judges must strictly limit the use of financial conditions of release and account for each person's individual financial circumstances to prevent arrestees from being jailed for poverty.

Fear may inform many of the harms we identify in this Report. It is incumbent upon judges to act boldly and to be guided by data, not institutional pressures. As one judge we interviewed noted, "if people aren't violating your bond, then you're not letting enough people out. The statute says 'reasonably assure' safety and appearance. That phrase means there's an acceptable risk that's being assumed by the system. If I'm not feeling the impact of that risk, I've got to recalibrate and release more people."

We hope that our Report empowers federal judges to continue shifting the culture that has brought the federal system to this calamitous point. One judge we interviewed characterized federal bail hearings as "the intersection of our education crisis . . . , our mental health crisis, our drug crisis, and race in America." Especially given those interactions, judges must resist the institutional pressures and implicit biases that have led the system to prioritize detention and must return to the presumption of release enshrined in the BRA and affirmed in *Salerno*. Ultimately, federal judges have the power to uphold the rule of law, to make detention prior to trial the rare exception, and to be champions of liberty.



# APPENDIX A: BACKGROUND & METHODOLOGY

During the 2018–2019 academic year, the Federal Criminal Justice Clinic (FCJC) began investigating the cause of high federal pretrial detention rates and identified a "federal bail crisis."[504] Following the success of the FCJC's Chicago Pilot Study in 2018–2019, Professor Alison Siegler launched a national Federal Bailwatching Project (FBP) in fall 2020 to further investigate that crisis. This Report is the culmination of that project.

# 1 Chicago Pilot Study (2018–2019)

**In 2018, Professor Siegler, Professor Erica Zunkel, and their students in the FCJC embarked on the first court-watching project ever undertaken in federal court, observing bond hearings in the United States District Court for the Northern District of Illinois in Chicago.[505] Professors Siegler and Zunkel published the findings from this pilot project in the National Association of Criminal Defense Lawyers' *Champion* journal, in an article titled *Rethinking Federal Bail Advocacy to Change the Culture of Detention*.[506] The Chicago courtwatching project served as a pilot for the national study described in this Report.**

The Chicago pilot consisted of two primary phases.[507] During Phase 1, law students in the FCJC and volunteers from across the University of Chicago gathered and coded data from 173 bail-related hearings in federal court in Chicago.[508] The FCJC discovered that prosecutors frequently requested detention for unlawful reasons, and that in nearly 10% of cases, arrestees were detained in violation of the law.[509] The FCJC also uncovered troubling racial disparities. After completing the data-gathering portion of Phase 1, the FCJC shared its findings with the U.S. Attorney's Office and federal magistrate judges in Chicago.[510] In Phase 2, which began in mid-2019, the FCJC conducted additional courtwatching, which showed that prosecutors, judges, and defense attorneys were all adhering more closely to the BRA in the aftermath of the FCJC's interventions.[511] During interviews, stakeholders in Chicago said that our pilot project changed how judges, prosecutors, and the defense bar approach the federal pretrial detention process by highlighting how in-court practices had diverged from the legal standards.

# 2 The FCJC's Advocacy Efforts

**From 2018 to the present, the FCJC has engaged in a multi-pronged effort to combat the federal bail crisis, educate stakeholders and the public, and align on-the-ground practices with the written law. These interventions have brought the federal bail crisis into the national consciousness:**

- **Legislative Advocacy**: In November 2019, Professor Siegler testified before the House Judiciary Committee about the need for reform in the federal bail system.[512] Professor Siegler's oral testimony[513] and accompanying written testimony[514] highlighted the most troubling aspects of the federal bail crisis and proposed reforms to the BRA that would both clarify the legal standards and revivify the norm of liberty that had motivated the statute.[515] Professor Zunkel played a critical and central role in the Clinic's legislative advocacy work. Many of the reforms advocated in the testimony and in Professor Siegler and Zunkel's work were embodied in the Federal Bail Reform Act of 2020, introduced by Chairman Jerrold Nadler (D-NY) as a replacement for the Bail Reform Act of 1984.[516]

- **Policy Advocacy:** In November 2020, Professors Siegler and Zunkel contributed to the call for federal bail reform in a Justice Roundtable Report.[517]

- **Executive Branch Advocacy**: In December 2020, the FCJC submitted a memo to the Biden Administration discussing the need for federal bail reform and next steps for the Administration,[518] and Professor Siegler met with members of the Biden Transition Team.

- **Public Advocacy**: In February 2021, Professor Siegler and Kate Harris, a student in the FCJC, published an op-ed in the New York Times titled *How Did the "Worst of the Worst" Become Three Out of Four?*[519] This piece urged the Biden Administration and Attorney General Merrick Garland to "disrupt the culture of detention that pervades the ranks of federal prosecutors and, to some degree, the federal judiciary."[520]

- **Training federal judges and other stakeholders**: Since 2018, Professor Siegler has given speeches and trainings for hundreds of federal judges, hundreds of probation officers, and thousands of Federal Public Defenders and CJA lawyers.

# 3 Federal Bailwatching Project (2020–2022)

**In 2020, Professor Siegler launched the national Federal Bailwatching Project (FBP). The centerpiece of the FBP is the courtwatching study detailed in this Report. In that study, FCJC students and others gathered, coded, and analyzed data from 4 federal courts and mined the federal docketing system for additional data about the courtwatched cases. The 4 federal courts where we gathered courtwatching data were the Southern District of Florida (Miami), the District of Massachusetts (Boston), the District of Maryland (Baltimore), and the District of Utah (Salt Lake City).**

We also generated qualitative data from many more federal courts through interviews with stakeholders. These interviews were conducted in districts throughout the country. The interviews enabled us to confirm that the practices we witnessed while courtwatching were replicated in other courts and revealed additional problematic practices. Interviewing also helped our team identify best practices that might shift the culture from one prioritizing pretrial detention to one prioritizing release.

Professor Siegler created the overarching vision for the FBP, recruited all collaborators, and supervised and ran every phase of the project that culminated in this Report. At the time of this Report's publication, she and the FCJC continue to pursue legislative and policy advocacy, as well as stakeholder engagement and training.

# A Phase 1: Creation and Courtwatching

After the Chicago pilot, we decided to scale up our courtwatching model to conduct a broader investigation with a more national scope. In the fall of 2020, we began to plan the courtwatching phase of the FBP. Because of the ongoing COVID-19 pandemic, we were required to conduct our courtwatching entirely virtually, with courtwatchers "attending" video hearings via Zoom, rather than entering physical courthouses.

Professor Siegler recruited clinical law professors and students from 5 additional law schools who agreed to collaborate on the project during this first phase of the courtwatching study. The student court-watchers took verbatim notes during Initial Appearance hearings and Detention Hearings and coded their data into standardized online courtwatching forms.

Throughout the summer and fall of 2020, we engaged in exploratory conversations with Chief Federal Defenders to set up the 4 court-watching sites. Through these conversations, we identified a set of federal courts where it would be possible to access virtual bond hearings. To gain access to some courts, we or the Chief Defender communicated directly with the judges. During the summer of 2020, Professor Zunkel was instrumental in setting up the first court-watching site, in the District of Massachusetts.

The contributions and insights of Professor Zunkel and the project's Technical Advisor, Professor Sonja Starr, provided an essential and irreplaceable foundation for the entire data-gathering structure of this study. In the fall of 2020, Professors Siegler, Zunkel, and Starr created the early drafts of the courtwatching forms and online surveys that courtwatchers used to gather and record data. Together, they created "Verbatim Notes Forms" for courtwatchers to record information as they watched pretrial hearings, with separate forms for Initial Appearances and Detention Hearings. The 3 professors also developed an early template of the online surveys into which court-watchers ultimately coded data about the hearings. In addition, the professors worked together on early fundraising efforts. Professors Zunkel and Starr also served as advisors throughout the duration of the 2-year project, providing invaluable advice and editorial commentary on documents, protocols, and trainings.

Professor Siegler and students in the 2020–2021 FCJC cohort subsequently created and honed Verbatim Notes Forms for each of the 4 courtwatching districts.[521] They also created an online Qualtrics survey where courtwatchers answered a series of detailed questions in order to code various aspects of every Initial Appearance and Detention Hearing, including the result of each hearing. The Qualtrics surveys enabled us to transform the notes taken during court hearings into an analyzable spreadsheet format from which we generated the findings in this Report. FCJC student Desiree Mitchell, Professor Starr, Boston Site Manager Aliza Bloom, and Project Manager Noadia Steinmetz-Silber all made major contributions to these Qualtrics surveys.

With Professor Siegler's guidance, FCJC students also created court-watching manuals, spreadsheets where courtwatchers recorded hearings from the court calendar and indicated hearings that they watched, protocols to ensure the smooth transfer of the data gathered from each courtwatching site to a central repository, FAQs for the Qualtrics surveys, and other materials tailored to each courtwatching site. We then prepared and presented courtwatcher training sessions to standardize practices across all courtwatching sites.

During the 2020–2021 academic year, Professor Siegler launched the 4 courtwatching sites and ran them in collaboration and conjunction with faculty from other law schools. Boston Site Manager Aliza Bloom and Project Manager Noadia Steinmetz-Silber contributed immeasurably to the courtwatching phase of this project. (The student members of the courtwatching teams are listed in the Authors & Acknowledgments section.):

- We launched our first courtwatching site on September 8, 2020, in the District of Massachusetts, leading a team that included Chief Federal Public Defender Miriam Conrad; Professor Dehlia Umunna, Faculty Deputy Director of Harvard Law School's Criminal Justice Institute Clinic (CJI), Clinical Instructor and Managing Attorney of CJI Lia Monahon, and then-Clinical Instructor Sadiq Reza of CJI; and Professor David Rossman, the Director of Boston University School of Law's Criminal Law Clinical Programs (BU), as well as BU Professor Wendy Kaplan and BU Visiting Scholar Aliza Bloom. Law students from both Boston-based clinics served as courtwatchers. Professor Siegler conducted trainings for the Boston-based students before courtwatching began.

Bloom became the Boston Site Manager, supervising students as they monitored court dockets, engaged in courtwatching, and coded their results. Courtwatching in Boston ran for 5 months, ending on January 11, 2021, and netted a total of 37 relevant hearings in 29 cases.

- We launched our second courtwatching site on November 2, 2020, in the Southern District of Florida, with the help of Chief Federal Defender Michael Caruso. The FCJC's own clinic students served as courtwatchers under Professor Siegler's supervision. FCJC students Kate Harris and Sam Bonafede served as the Miami Site Managers and were joined in early 2021 by Project Manager Steinmetz-Silber. Courtwatching in Miami ran for 4 months, ending on March 11, 2021, and netted a total of 342 relevant hearings in 220 cases.

- We launched our third courtwatching site on January 11, 2021, in the District of Maryland, with the help of Chief Federal Defender James Wyda and Professor Maneka Sinha, the Director of the University of Maryland Carey School of Law's Criminal Defense Clinic. Mr. Wyda secured the agreement of U.S. Chief District Court Judge James Bredar of the District of Maryland to enable the project to proceed. Following those conversations, Professor Sinha served as the Baltimore Site Manager, recruiting her clinic students and additional volunteer students enrolled in criminal procedure courses separate from the clinic to ensure that the site would be adequately staffed. Courtwatching in the Northern Division of the District of Maryland (Baltimore) launched on January 11, 2021, and ran for 14 weeks until April 15, 2021. Thirteen students observed a total of 107 relevant hearings in 63 cases.

- We launched our fourth courtwatching site on January 11, 2021, in the District of Utah, with the help of First Assistant Federal Public Defender Robert Steele. Professor Jon Powell, the Director of Campbell Law School's Restorative Justice Clinic and Monica Veno of that clinic were the Utah Site Managers; their clinic students served as the courtwatchers. Courtwatching in Salt Lake City ran for 4 months, ending on March 11, 2021, and netted a total of 60 relevant hearings in 31 cases.

In each district, courtwatchers worked pre-scheduled shifts and were responsible for observing all hearings during their shift. This ensured that the data collected by the courtwatchers captured as many hearings as possible. The hearings covered a range of charges, with a variety of federal magistrate judges presiding. The professors responsible for each courtwatching site played an integral role by supervising their clinic students throughout the courtwatching and coding phases.

While observing remote hearings, courtwatchers used the Verbatim Notes Form templates for Initial Appearances and Detention Hearings. In Part 1 of the Verbatim Notes Form, courtwatchers recorded detailed information about the particular case they were watching, including the name of the arrestee, the names of every participant, the case number, and the charges; courtwatchers also answered questions about the presence or absence of counsel. In Part 2 of the Verbatim Notes Form, courtwatchers took word-for-word notes on their laptops, writing down everything said by every participant in the hearing. To ensure accuracy, FCJC students subsequently spot-checked Verbatim Notes Forms against transcripts in a subset of cases.

To obtain race data, courtwatchers recorded in the Verbatim Notes Form the demographics of everyone in the courtroom based on their observations of each person's physical appearance, noting the basis for that assumption in the form itself. Because demographic information such as race and gender were not available from the docket sheet or any other public source, we relied on courtwatchers' perceptions and judgments. We recognized that courtwatchers might be uncomfortable with being asked to record observable race, and we provided a space in the Verbatim Notes Form for courtwatchers to convey any such concerns.

Courtwatchers also recorded in the Verbatim Notes Form whether an arrestee was identified as a United States citizen during the hearing.[522] This information allowed us to code differential practices and outcomes between citizens and noncitizens in subsequent phases.

Prior to launching the Maryland and Utah courtwatching sites, Professors Siegler and Bloom, along with FCJC students Bonafede and Harris, trained volunteers on both substantive law and courtwatching procedures. To complete their training, student observers spent a week observing hearings informally before the official site launch.

Due to the dedication of our faculty partners and student courtwatchers, our study ultimately gathered information from over 600 federal bond hearings. Because we were interested in observing the entire pretrial detention and release process in every case, we eliminated cases where courtwatchers had not observed the Initial Appearance. This narrowed our dataset to the 343 relevant cases discussed in this Report. In each of those cases, we observed the Initial Appearance as well as the subsequent Detention Hearing, if one was held, for a total of 536 hearings.

# B Phase 2: Data Coding and Analysis

The data coding and analysis phase of this study ran from spring 2021 through summer 2022. The project's Technical Advisor, Professor Starr, played a pivotal role in the data coding and analysis phase. In 2021, Data Managers Morgen Miller and Dylan Baker of the Coase-Sandor Institute of Law and Economics[523] joined this project and made many notable contributions.

Upon finishing the courtwatching phase of the project in spring 2021, courtwatchers completed an online Qualtrics survey for each hearing that they had observed, drawing on the information in their Verbatim Notes Forms. These surveys focused on many substantive issues, including those that we discuss in this Report: the prosecutor's stated bases for requesting detention at both hearings, the judge's bases for detaining or releasing at both hearings, whether and at which point in the hearing the arrestee was represented by counsel, whether and what financial conditions were imposed on released individuals, and the results of the hearings. Professor Siegler, the FCJC student team, Bloom, and Steinmetz-Silber created a coding protocol and fielded courtwatchers' questions in real time to troubleshoot problems and ensure accuracy. They also spot-checked cases and re-coded as necessary.

During summer 2021, we obtained additional information for each observed case by downloading case documents from the federal court's Public Access to Court Electronic Records (PACER) docketing system. Michael Jeung served as the Project Manager in June and July 2021, training a group of undergraduate interns how to use PACER and input case data into Excel. Project Manager Jeung supervised the interns as they gathered and coded data into Excel from the Docket Sheet, Complaint, Indictment, Case Summary, and the relevant Detention or Release Order in each of the observed cases. Project Manager Jeung and undergraduate intern Jacqueline Lewittes checked all Excel sheets and ensured all relevant PACER documents were retrieved and properly entered for every case in our dataset.

FCJC student Krysta Kilinski took over as Project Manager in August 2021, overseeing interns as they continued to clean and validate our dataset. In fall 2021, Project Manager Kilinski created Qualtrics surveys to code the results of the PACER research,

created a coding protocol, conducted a training on that protocol, and supervised interns as they coded the data. These Qualtrics surveys allowed us to track certain outcomes of interest across cases, including whether the arrestee was detained or released, whether the prosecutor cited a valid § 3142(f) factor when requesting detention, and the type of conditions of release imposed.

For cases where a courtwatcher observed the Initial Appearance but not the subsequent Detention Hearing, we ordered Detention Hearing transcripts. During summer 2021, undergraduate interns reviewed PACER dockets and flagged all "unobserved hearings" to determine all cases that required a Detention Hearing transcript.[524] This list was subsequently validated by Baker and Project Manager Jacqueline Lewittes. Using the validated list, Lewittes also engaged in the laborious process of ordering transcripts from the 4 courtwatched districts, which FCJC students then coded into additional Qualtrics surveys.

To analyze the data gathered through courtwatching, FCJC students worked closely with Professor Starr, Coase-Sandor's Baker, and Technical Research Assistants Jacob Jameson and Dhruv Sinha. First, the Qualtrics survey response spreadsheets were cleaned. This process consisted of removing duplicates, correcting typos, generating new variables, and standardizing identifier variables, such as arrestee name, case number, and city. Next, the spreadsheets were merged by matching the identifier variables, creating a master spreadsheet that tracked all data for each case from both the Initial Appearance and the Detention Hearing—if one was held. Most of the data analysis was then completed using R, a widely used statistical programming language.

Additionally, some manual calculations were performed by reviewing the full data spreadsheet and Qualtrics response spreadsheets in Excel. Professor Starr and FCJC students also coded every type of crime charged in our data set. This, in turn, illuminated which cases were technically eligible for detention at the Initial Appearance under § 3142(f), as well as which cases qualified for a presumption of detention at the Detention Hearing.

Our study's methodology was limited in a couple of important ways. First, given the relatively small size of our dataset, our Report relies on summary statistics, rather than regression analyses. This was a limitation created by the number of hearings that occurred during our courtwatching schedule and the limitations the academic calendar placed on the number of weeks during which students were available to courtwatch. Second, because Pretrial Service Reports are not made public, we lacked verifiable information regarding arrestees' criminal history.

Throughout the 2021–2022 academic year, FCJC students Clare Downing and Stephen Ferro served as the Project Managers, while FCJC student Angela Chang served as a Data Manager.[525] In the fall of 2021, Downing, Ferro, Chang, and Kilinski conducted and led an entirely new phase of data coding and analysis that yielded far more nuanced results. Chang's role included incorporating into our data analysis the results of these supplemental Qualtrics surveys, which recorded additional information and corrected errors. Chang also engaged in data reconciliation and cleanup, determined the appropriate variables to be used in calculating each metric, and manually reviewed data spreadsheets to calculate the more complex metrics. In addition, from 2021–2022, Baker, Jameson, and Dhruv Sinha spent countless hours writing code in R and STATA to clean, merge, and analyze our data set.

# C Phase 3: Qualitative Interviews

To understand and elucidate the national scope of the bail crisis unfolding in federal courts throughout the country, we supplemented our quantitative courtwatching data with qualitative interviews of stakeholders in many districts beyond the 4 districts where we had courtwatched. We interviewed 48 federal magistrate judges and federal public defenders from 36 federal courts across 11 federal circuits.[526]

The goal of our interviewing project was to determine whether the problems revealed by our courtwatching study were occurring nationwide. Through these interviews, we confirmed that the federal bail crisis was truly national in scope, and we learned more about the freewheeling and varied nature of pretrial bail proceedings in federal courts. Excerpts from these interviews appear throughout the Report as supplemental findings to our quantitative results. To ensure candor, we promised interviewees that we would de-identify them, would not list their names in this Report, and would not attribute quotes to them directly.

The interviewing project began in fall 2021. Led by Interview Team Leaders Krysta Kilinski and Ale Clark-Ansani, FCJC students first selected a geographically diverse pool of federal district courts that included rural, urban, suburban, and border districts. We included the 4 districts where we had courtwatched, then added districts that had particularly high rates of detention, as well as some districts with average or particularly low rates of detention. Our aim was to identify and understand any problems that were leading to high detention rates, as well as best practices that mitigated the culture of detention. FCJC students compiled a spreadsheet of stakeholders to contact and developed interview questions. Professor Siegler then recruited the interviewees.

In spring 2022, Kilinski, Clark-Ansani, and Professor Siegler interviewed 26 judges and federal defenders (mostly Chief Federal Public Defenders or their second-in-command) who practiced in 13 federal district courts. With the interviewees' approval, we recorded interviews via Zoom and uploaded them to Box. In the few instances where interviewees asked not to be recorded, we took detailed notes to shore up our recollection.

We asked a standard set of questions of each interviewee, with different question sets for magistrate judges and federal defenders. As the interviewing process progressed, we added new questions sparked by our prior interviews. When interviewing stakeholders from our 4 courtwatching districts, we added unique questions related to our courtwatching data and observations. Project Manager Jacqueline Lewittes then transcribed all of the interviews and analyzed them according to key themes, including changes observed during the COVID-19 pandemic, adherence to the legal standard during Initial Appearances, practices relating to counsel at Initial Appearances, adherence to the legal standard in presumption-of-detention cases, and the use of financial conditions of release. Kilinski worked with Lewittes to identify salient vignettes to highlight in the Report.

We were able to interview a federal magistrate judge and the Chief Federal Public Defender in 3 of the 4 courtwatching districts (Maryland, Massachusetts, and the Southern District of Florida). In the fourth district—the District of Utah—we interviewed a defender, but the federal magistrate judges we contacted in Salt Lake City did not consent to be interviewed.

In August 2022, Professor Siegler conducted interviews of 17 additional Chief Federal Defenders and 5 Assistant Federal Defenders to determine specifically how access to counsel at the Initial Appearance operated in numerous federal districts. These interviews provided a much more comprehensive and complex picture of the national access-to-counsel crisis described in this Report.

D

# Phase 4: Creating this Report

During the 2020–2021 academic year, FCJC student Report Team Leaders and Primary Authors Kate Harris and Sam Bonafede led the research and writing of a first draft of this Report. During the 2021–2022 academic year, FCJC student Report Team Leaders and Primary Authors Clare Downing and Stephen Ferro led the research and writing of subsequent drafts. During summer 2022, Project Manager Lewittes led the writing and editing of the final Report draft, with essential contributions by FCJC students Emma Stapleton and Sebastian Torrero, as well as intern Ethan Ostrow. In August 2022, FCJC students Jaden Lessnick and Clare Downing spearheaded the final phase of the writing and editing process.

In the spring and summer of 2022, we partnered with Voilà:, an information design company. Professor Siegler, Data Manager Chang, and Project Manager Lewittes identified and revalidated key data points, which Voilà: visualized and integrated into the Report design. Additionally, Project Manager Lewittes oversaw communications between the FCJC and Voilà: teams, including preparing full annotated drafts, communicating revised datapoints and new visualization requests, and relaying design feedback to Voilà:.



# APPENDIX B: DISTRICT-SPECIFIC DATA COMPARISONS

# 1 Detention Rates

**Figure 28 shows that detention rates varied at the Initial Appearance, at the Detention Hearing, and overall, across the districts where we courtwatched. Across all 3 metrics, Salt Lake City had the highest detention rates and Baltimore had the lowest.**

"Overall" numbers depict what happened across the entire bond phase, during the Initial Appearance and during any Detention Hearing. Specifically, the cases categorized as detained "overall" are cases where the arrestee was detained at the Initial Appearance and no Detention Hearing was held, as well as cases where the arrestee was detained at the Initial Appearance and remained detained after the Detention Hearing.

**Figure 28:** Detention Rates




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| At Initial Appearance | 63% | 76% | 78% | 97% |
| At Detention Hearing | 75% | 78% | 76% | 83% |
| **Overall** | **54%** | **62%** | **66%** | **81%** |

# 2 Types of Cases by District

**Figure 29:** Proportion of Non-(f)(1) Cases, Presumption Cases, and Drug Cases in Each District



# 3 Race

## A Race of Arrestees in Each District[527]

Figure 30 shows how the racial composition of arrestees varied across districts. Baltimore had the highest proportion of Black arrestees, while Miami and Salt Lake City had the highest proportion of Latino arrestees. In all districts, people of color comprised a large majority of arrestees.

**Figure 30:** Race of Arrestees in Each District[528]




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Black | 76% | 34% | 34% | 6%** |
| Latino | 3%** | 24%* | 58% | 52% |
| Other | 2%** | - | <1%** | 3%** |
| White | 19% | 34%* | 6% | 32% |
| Unknown | - | 7%** | 1%** | 6%** |

# B Detention Rates by Race

Looking across both hearings and all 4 districts, the overall detention rate data did not show notable racial disparities.[529] There are two likely underlying reasons. First, most of the people federal prosecutors charge with crimes are people of color: people of color made up 81% of those charged in federal court in 2019.[530] The vast majority of arrestees in our data set—87%—were likewise people of color. *See* Figure 3. Accordingly, there were very few white arrestees in our study. Second, the small sample size of some racial groups, particularly white arrestees, means that our results may not be representative of the total cases involving white arrestees in a given district.

Despite the data limitations identified above, Figure 31 shows that detention rates at the Initial Appearance were higher for arrestees of color than for white arrestees in all 4 districts we observed. Figures 32 and 33 show that trends in detention rates by race varied for the Detention Hearing and overall. Notably, in Boston, the detention rate for arrestees of color was consistently higher than that of white arrestees across all 3 metrics.

**Figure 31:** Detention Rates Overall, by Race



| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Black | 67% | 100% | 82% | 100%** |
| Latino | 50%** | 86%** | 77% | 100% |
| Other | 100%** | - | 100%** | 100%** |
| White | 50%* | 50%* | 71% | 90% |

**Figure 32:** Detention Rates at Detention Hearing, by Race




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Black | 71% | 71%* | 75% | 100%** |
| Latino | - | 100%* | 75% | 80% |
| Other | 100%** | - | 100%** | 100%** |
| White | 100%** | 50%** | 100%* | 89%* |

**Figure 33:** Detention Rates Overall, by Race




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Black | 54% | 80% | 68% | 100%** |
| Latino | 50%** | 86%* | 66% | 81% |
| Other | 100%** | - | 100%** | 100%** |
| White | 50%* | 30%** | 71% | 80% |

# 4 Prosecutors' Detention Requests

**Figure 34 compares the percentage of cases in which prosecutors requested detention in each district.**

These numbers include cases where the prosecutor did not explicitly request detention during the hearing, but based on context, appeared to be seeking detention. Salt Lake City had the highest rate of prosecutorial detention requests across all 3 metrics. In Miami, the rate of prosecutorial detention requests was artificially low because of the high number of cases involving corporate surety bonds (CSBs). In those cases, the prosecutor did not formally seek detention; however, arrestees were seldom able to meet the CSB condition and obtain release. Seeking a CSB thus effectively amounts to a detention request, a fact that was confirmed by a judge during one hearing: "[N]obody ever meets this bond and they remain detained."[531]

**Figure 34:** Rate of Prosecutors Seeking Detention




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami)[532] | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| At Initial Appearance | 63% | 76% | 64% | 97% |
| At Detention Hearing | 88% | 78% | 61% | 100% |
| **Overall** | **60%** | **62%** | **45%** | **97%** |

# 5 Defense Behavior

## A Defense Waiver

Figure 35 shows the rate at which defense counsel in each district waived the right to seek release, submitted to detention, stipulated to detention, agreed to detention without prejudice, waived the Detention Hearing, or otherwise did not contest detention at each stage, as well as overall (at any point pretrial). Baltimore—which had the lowest rate of overall pretrial detention—had the lowest overall rate of defense waiver. *See* Figure 28.

**Figure 35:** Rate of Defense Waiver




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| At Initial Appearance | 19% | 14%** | 21% | 3%** |
| Between IA and DH | 13%** | - | - | - |
| At Detention Hearing | 4%** | 56% | 44% | 48% |
| **Overall** | **25%** | **48%** | **45%** | **48%** |

# B | Defense Argument for Release

Figure 36 shows the rate at which defense counsel in each district made affirmative arguments for release at each hearing. Again, Baltimore—the district with the lowest detention rate among the districts we observed—had the highest rate of defense counsel arguing for release at the Detention Hearing.

**Figure 36:** Rate of Defense Argument for Release at Initial Appearance vs Detention Hearing




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| At Initial Appearance | 6%** | 3%** | 7% | 6%** |
| At Detention Hearing | 92% | 33%* | 39% | 45% |

# 6 Initial Appearance

## A Prosecutors' Bases for Requesting Detention at the Initial Appearance

Figure 37 shows the percentage of cases where the prosecutor cited various grounds when requesting detention at the Initial Appearance. Some of these grounds were legal bases for detention contained in § 3142(f), while others were not. Prosecutors in Boston and Salt Lake City cited to the BRA when requesting detention at the Initial Appearance at far higher rates than prosecutors in Baltimore and Miami.

**Figure 37:** Grounds Cited by Prosecutors When Seeking Detention at the Initial Appearance



| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Factor listed in 3142(f) | 10%** | 77% | 2%** | 67% |
| Danger, ordinary risk of flight | 28% | 18%** | 45% | 0% |
| Noncitizen client, criminal history, etc. | 10%** | 5%** | 2%** | 7%** |
| No specific grounds stated | 53% | 0% | 51% | 27%* |

B

# Cases Charging Offenses Not Listed in § 3142(f)(1) (Non-(f)(1) Cases)

Figure 38 shows, using publicly available federal sentencing data, the percentage of cases in each district where there is no § 3142(f)(1) factor present.

**Figure 38:** **Proportion of Non-(f)(1) Cases in Each District**[533]




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| % of sentenced cases where no (f)(1) factor is present | 29% | 43% | 53% | 43% |

Figure 39 shows, using data from our study, the rate at which prosecutors sought detention in cases where, by law, no § 3142(f)(1) factor applied.

**Figure 39: Rate of Prosecutors Seeking Detention in Non-(f)(1) Cases**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City)[534] |
|---|---|---|---|---|
| Rate of detention requests | 50%* | 43%** | 35% | - |

# C | Unlawful Detention at Initial Appearances

Figure 40 shows detention outcomes at the Initial Appearance in cases where prosecutors sought detention, including the rate at which arrestees were detained unlawfully at the Initial Appearance.

**Figure 40:** **Detention Outcomes at the Initial Appearance, When Prosecutor Sought Detention**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City)[535] |
|---|---|---|---|---|
| Detained | 82.5% | 91% | 87% | 100% |
| **Detained Unlawfully** | **15%*** | **9%**** | **13%** | **-** |
| Released | 2.5%** | 0% | 0% | 0% |

# 7 Counsel at the Initial Appearance

**Figure 41 shows that only Miami held the Initial Appearances where some arrestees were not represented by counsel.**

In Miami, 11% of the arrestees we observed were unrepresented during the Initial Appearance; 100% of those arrestees were detained at the Initial Appearance, and 76% were detained for the duration of the case. *See* Figure 17. Figure 41 shows a correlation between detention rates and the extent to which the arrestee was represented by counsel at the Initial Appearance, with detention rates increasing as representation by counsel decreases.

**Figure 41:** Detention Rates at the Initial Appearance, by Representation




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City)[536] |
|---|---|---|---|---|
| Full Representation | 62% | 73% | 59% | 97% |
| Partial Representation[537] | 73%* | 75%** | 92% | 100%** |
| Unrepresented | - | - | 100% | - |

# 8 Cases Involving the Presumption of Detention in § 3142(e)(3)

## A Application of the Presumption of Detention

The presumption of detention applied in 67% of Baltimore cases, 52% of Boston cases, 56% of Miami cases, and 55% of Salt Lake City cases.

Figure 42 compares the proportion of arrestees of color in presumption cases versus non-presumption cases. In every district, there was a greater proportion of arrestees of color among the presumption cases than in non-presumption cases.

**Figure 42:** Proportion of Cases Involving Arrestees of Color




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Presumption Cases | 83% | 67% | 96% | 71% |
| Non-Presumption Cases | 76% | 64% | 91% | 64% |

Figure 43 shows the categories of presumption cases we observed in each district. Across all districts, the vast majority of presumption cases were drug cases.

**Figure 43:** **Types of Presumption Cases Observed**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Drug Cases | 69% | 100% | 92% | 82% |
| Gun Cases (924(c)) | 26% | - | 7%* | 12%** |
| Trafficking | 2%** | - | 2%** | - |
| Terrorism | - | - | - | - |
| Minor Victim | 17% | - | 3%** | 24% |

# B | Detention Rates in Presumption Cases

Figure 44 shows detention rates in presumption cases compared to non-presumption cases in each district. Surprisingly, in Baltimore, the detention rate in non-presumption cases was higher than in presumption cases. In Miami, the detention rate for presumption cases was far higher than the detention rate in non-presumption cases.

**Figure 44:** Detention Rates in **Presumption Cases** vs **Non-Presumption Cases**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Presumption Cases | 48% | 67% | 79% | 88% |
| Non-Presumption Cases | 67% | 57%* | 50% | 71% |

Figure 45 shows detention outcomes, by race, when the prosecutor invoked the presumption at the Detention Hearing. Out of the 113 Detention Hearings in presumption cases, the prosecutor explicitly invoked the presumption in only 35. Of those 35 hearings, only one involved a white arrestee.

**Figure 45: Detention Rates When Prosecutor Invoked Presumption at Detention Hearing, By Race**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Black | 73%* | 100%** | 71%* | - |
| Latino | - | 100%** | 100%* | 100%** |
| Other | 100%** | - | - | - |
| White | - | - | - | 100%** |

C

# Judges' Treatment of the Presumption at Detention Hearings

In most presumption cases, either no Detention Hearing was held, or the judge did not explicitly mention the presumption during the hearing. Detention rates were generally high in presumption cases, but they were even higher at Detention Hearings where a judge found that the presumption applied and did not find the presumption rebutted or did not discuss rebuttal. In 6 cases, however, the presumption was found to be rebutted (5% of our sample: 6/113 Detention Hearings in presumption cases). Judges released the arrestee in all of those cases.

**Figure 46:** **Detention Outcomes, By Judges' Treatment of the Presumption at the Detention Hearing in Cases Where Presumption Applied by Law**




| | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|
| Judge found presumption applied and arrestee failed to rebut | 100%* | - | 100%* | 100%* |
| Judge found presumption applied and did not further discuss rebuttal | 100%** | 100%** | 100%** | 100%** |
| Judge found presumption applied but found presumption rebutted | - | - | - | - |
| Judge did not mention presumption | 50%** | 70%* | 75% | 100%** |

# 9 Financial Conditions

**In Baltimore and Salt Lake City, no financial conditions of release were imposed. In Boston, 100% of arrestees were able to meet the financial conditions and were released. In Miami, however, 40% of arrestees were *unable* to meet the financial conditions and were ultimately detained pretrial. *See* Figure 25. We identified these cases by checking PACER docket reports for any release orders following the entry of a financial condition in the case. If we found no release order, we categorized the individual as detained rather than released.**

Of the districts we observed, corporate surety bonds (CSBs) were only used in Miami. We observed 48 cases in Miami where CSBs were imposed, representing 22% of the 220 cases we observed in that district overall. The detention rate in cases where CSBs were imposed was 92%, meaning 92% of arrestees were unable to satisfy the CSB required for their release and were thus detained pretrial. Every arrestee in those cases was a person of color. *See* Figure 24.

# 10 Noncitizen Cases

**Figure 47 shows the detention rate at the Initial Appearance, at the Detention Hearing, and overall, for identified noncitizens.**

The overall detention rate for noncitizens was higher than for citizens in each district we observed.

**Figure 47:** Detention Rates for Noncitizens vs. Citizens




| | | D. Md (Baltimore) | D. Ma (Boston) | S.D. Fl (Miami) | D. Utah (Salt Lake City) |
|---|---|---|---|---|---|
| **At IA** | Noncitizens | 100%** | 100%** | 97% | 100%** |
| | Citizens | 62% | 72% | 75% | 96% |
| **At DH** | Noncitizens | - | 75%** | 73% | 100%** |
| | Citizens | 75% | 79% | 77% | 81% |
| **Overall** | Noncitizens | 100%** | 75%** | 77% | 100%** |
| | Citizens | 52% | 60% | 65% | 79% |

# ENDNOTES

1 United States v. Salerno, 481 U.S. 739, 755 (1987).

2 The terms "jailing" and "detention" are used interchangeably in this Report to refer to the process by which an arrestee is detained in jail pending trial. The terms "bond" and "bail" are used interchangeably as a shorthand for the pretrial detention and release process more generally. We refer to the monetary aspects of pretrial release as "financial conditions" generally, or name the specific type of monetary requirement imposed.

3 We have de-identified our interview subjects throughout this Report to ensure their anonymity, and therefore will not be providing citations for interview quotes. To promote candor, we promised interviewees that we would de-identify them, would not list their names in this Report, and would not attribute quotes to them directly. The identity of the individual federal magistrate judge and Federal Defender who made each statement quoted in this Report is on file with the authors.

4 Alison Siegler & Erica Zunkel, *Rethinking Federal Bail Advocacy to Change the Culture of Detention*, The Champion 46, 46 (July 2020), https://perma.cc/GA48-BY6Z.

5 18 U.S.C. § 3141 *et seq*.

6 The courtwatching component of our research was conducted and co-supervised by faculty and students at the University of Maryland Law School's Criminal Defense Clinic, Harvard Law School's Criminal Justice Institute, Boston University School of Law's Criminal Law Clinical Program, and Campbell Law School's Restorative Justice Clinic.

7 We interviewed stakeholders from the following 11 federal courts of appeals: The First Circuit, Second Circuit, Third Circuit, Fourth Circuit, Fifth Circuit, Sixth Circuit, Seventh Circuit, Eighth Circuit, Ninth Circuit, Tenth Circuit, and Eleventh Circuit. Those stakeholders were located in the following 36 federal districts: the District of Arizona, the Northern District of California, the Southern District of California, the District of Colorado, the District of Delaware, the Southern District of Florida, the Central District of Illinois, the Northern District of Illinois, the District of Maryland, the District of Massachusetts, the Eastern District of Michigan, the Northern District of Mississippi, the Southern District of Mississippi, the Western District of Missouri, the Southern District of New York, The Eastern District of New York, the District of New Mexico, the Eastern District of North Carolina, the Western District of North Carolina, the District of North Dakota, the Northern District of Ohio, the Southern District of Ohio, the Eastern District of Pennsylvania, the District of South Carolina, the District of South Dakota, the Eastern District of Tennessee, the Western District of Texas, the Southern District of Texas, the District of Utah, the District of the Virgin Islands, the Western District of Virginia, the Eastern District of Virginia, the Western District of Washington, the Western District of Wisconsin, the Eastern District of Wisconsin, and the District of Wyoming.

8 *See* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 46 (coining the term "federal bail crisis").

9 *The Administration of Bail by State and Federal Courts: A Call for Reform, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 116th Cong. 3 (Nov. 14, 2019) (written statement of Alison Siegler, Dir. Federal Criminal Justice Clinic, University of Chicago Law School), https://www.congress.gov/116/meeting/house/110194/witnesses/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf [hereinafter Siegler Bail Hearing written statement].

10 The data underlying this Report is on file with the authors. Given the relatively small size of our dataset, our Report relies on summary statistics, rather than regression analyses. The arrestees in our study were overwhelmingly people of color: Black individuals constituted 39% of our sample, Latino individuals 45%; courtwatchers coded 2% of our sample "race unknown" (we assume, given the high percentage of people of color in our sample overall, that these arrestees were most likely people of color of ambiguous ethnicity), and 1% "other." Accordingly, our ability to estimate differences in the treatment of white arrestees versus nonwhite arrestees is naturally somewhat limited from a statistical perspective. Moreover, our data do not allow us to identify whether racial discrimination, in the purposeful sense that constitutional law focuses on, played a role in outcomes. However, we can say with certainty that the vast majority of those bearing the brunt of the federal bail crisis are Black and Latino. Some of the phenomena we documented were inflicted against only people of color—for example, every single individual locked up for their inability to pay was Black or Latino. People of color experienced other improper practices at higher rates than their representation in our sample.

11 Admin. Off. of U.S. Courts, *Caseload Statistics Data Tables*, https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables [https://perma.cc/FXS5-U8CY].

12 None of the AO's publicly available H-Tables provides race information.

13 AO Table H-9. This annually updated table is not publicly available and can only be seen by insiders granted access to the federal judiciary's intranet system (the "J-Net").

14 AO Table H-15. This annually updated table is not publicly available and can only be seen by insiders granted access to the J-Net.

15 *See, e.g.*, AO Table H-14, H-14A, H-3, H-3A.

16 18 U.S.C. §§ 3142(b)–(c) (mandating that the court "*shall order* . . . pretrial release . . . on personal recognizance, or upon execution of an *unsecured* appearance bond . . . *unless* . . . such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," in which case the court "*shall order* . . . pretrial release . . . subject to the least restrictive . . . condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of . . . the community" (emphasis added)); *see also* United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986) (finding the Bail Reform Act of 1984 "codified . . . the traditional presumption favoring pretrial release 'for the majority of Federal defendants'" (quoting S. Rep. No. 98-225, at 6–7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189))); United States v. Orta, 760 F.2d 887, 890 (8th Cir. 1985) ("[T]he statutory scheme of 18 U.S.C. § 3142 continues to favor release over pretrial detention.").

17 18 U.S.C. § 3142(j).

18 481 U.S. 739 (1987).

19 *Id.* at 755.

20 United States v. Stone, 608 F.3d 939, 940 (6th Cir. 2010); *see also* United States v. Santos-Flores, 794 F.3d 1088, 1090 (9th Cir. 2015) ("Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant."); United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007) ("[T]he law thus generally favors bail release."); United States v. Byrd, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention."); United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991) (deeming pretrial detention "an exceptional step").

21 *Pretrial Release and Detention: The Bail Reform Act of 1984*, Bureau of Just. Stat. Special Rep., at 1 (Feb. 1988), https://perma.cc/7A6U-S5XV [hereinafter BJS 1988 Report].

22 *Id.* ("The percent of defendants held on pretrial detention, that is, without bail, increased from less than 2% before the Act to 19% after."); *see also id.* at 2 tbl.1 & tbl.2 (10% of arrestees failed to meet bail conditions and were held until trial).

23 *See* AO Table H-14 (2019); *see also* Alison Siegler & Kate M. Harris, *How Did the 'Worst of the Worst' Become 3 out of 4?*, N.Y. Times (Feb. 24, 2021), https://www.nytimes.com/2021/02/24/opinion/merrick-garland-bail-reform.html [https://perma.cc/JN6N-LKVL]. We take the 2019 rate as our reference point because it represents the state of the system before the COVID-19 pandemic hit.

24 AO Table H-14 (2020, 2021).

25 *See infra* Contextualizing the Culture of Detention—A Judge's Decision to Jail Someone Pretrial Has Damaging and Enduring Effects. Myriad studies demonstrate the devastating and long-lasting consequences of pretrial detention. Pretrial detention adversely affects an individual's physical and mental wellbeing, an individual's case outcome, and their economic stability, among other factors. *See, e.g.*, *Corruption, Abuse, and Misconduct at U.S. Penitentiary Atlanta: Hearing Before the Homeland Sec. and Governmental Affairs Comm. Permanent Subcomm. on Investigations*, 117th Cong. 3–5 (July 26, 2022) (testimony of Rebecca Shepard, Assistant Federal Public Defender, Northern District of Georgia), https://www.hsgac.senate.gov/subcommittees/investigations/hearings/corruption-abuse-and-misconduct-at-us-penitentiary-atlanta [https://perma.cc/6KSB-93B2] [hereinafter Shepard testimony] (listing unacceptable food and hygiene conditions and denials of mental health treatment); Samuel R. Wiseman, *Bail and Mass Incarceration*, 53 Ga. L. Rev. 235, 250 ("A group of studies published in the past five years shows a compelling empirical connection between bail and convictions and bail and guilty pleas, specifically."); *id.* at 251–52 ("All of these studies controlled for factors not associated with bail that could affect the likelihood of conviction and release, including, for example, race, age, gender, prior offenses, and number of charged offenses . . . . [Pretrial detention is] a factor driving the higher conviction rates for pretrial detainees."); Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effect of Pretrial Detention on Self-Reported Outcomes*, 82 Fed. Prob. 39, 40–41 (2018), https://www.uscourts.gov/sites/default/files/fedprobation-sept2018_0.pdf [https://perma.cc/2DZJ-Q6BE] (finding adverse and prolonged effects on detainees' economic and housing stability, as well as intergenerational effects for detainees who have dependent children at the time of their jailing).

26 Thomas H. Cohen & Amaryllis Austin, *Examining Federal Pretrial Release Trends over the Last Decade*, 82(2) Fed. Prob. 3, 10 (2018), https://www.uscourts.gov/sites/default/files/82_2_1_0.pdf [https://perma.cc/2SVY-A9TA]; *see also id.* at 6 (finding that among those not charged with immigration-related offenses, "the percentage of defendants released pretrial has declined to a greater extent among defendants with less severe criminal profiles than among defendants with more substantial criminal histories").

27 Roughly 2% of federal cases involve violent offenses, as opposed to 25% of state felony cases. *Compare* U.S. Dep't of Just. Bureau of Just. Stat., *Federal Justice Statistics 2015–2016*, at 3, 11 (Jan. 2019), https://www.bjs.gov/content/pub/pdf/fjs1516.pdf [https://perma.cc/X95K-QZT6], *with* U.S. Dep't of Just. Bureau of Just. Stat., *Felony Defendants in Large Urban Counties, 2009*, at 2 (Dec. 2013), https://www.bjs.gov/content/pub/pdf/fdluc09.pdf [https://perma.cc/DJQ2-H6Y8].

28 In large urban counties, state systems only detained 38% of individuals charged with felonies in 2009. *See Felony Defendants in Large Urban Counties, 2009*, *supra* note 27, at 15. The detention rate for *violent* state felonies in 2009 was only 45%. Unfortunately, 2009 is the most recent year for which such nationwide state-level pretrial detention data is available, preventing an exactly parallel comparison between the state and federal numbers.

29 *See* BJS 1988 Report, *supra* note 21, at 5 tbl.10; AO Table H-9A (1997–2021).

30 AO Table H-9A (2021).

31 BJS 1988 Report, *supra* note 21, at 5 tbl.10 (showing an average of 53 days of pretrial detention in 1985).

32 *See* Memorandum, *Costs of Community Supervision, Detention, and Imprisonment*, Admin. Off. of U.S. Courts (Aug. 2021) (finding that the daily cost of supervision is $12, compared to $98 for pretrial detention). The cost of incarceration rises annually. *See, e.g.*, *Incarceration Costs Significantly More than Supervision*, Admin. Off. of U.S. Courts (Aug. 17, 2017) https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision [https://perma.cc/Y4VU-8ZE9] (showing that in 2017, the cost was $31,842 for detention and $4,026 for supervision).

33 *See* AO Table H-9, for the 12-Month Period Ending December 31, 2021 (2021) (showing that at the start of 2021, there were 31,763 individuals detained pretrial, and by the end of the year, 32,004 individuals were jailed, for an average of 31,884 individuals detained pretrial). At an average of $35,758 annually per person, federal pretrial detention costs taxpayers upwards of $1.14 billion each year.

34 U.S. Dep't of Just., FY 2021 Budget Request at a Glance 3 (2021) https://www.justice.gov/doj/page/file/1246841/download [https://perma.cc/E89P-JNY4] (showing costs of $9.2 billion in FY2021 towards "Prisons and Detention." This funding comprised nearly 30% of the Department of Justice's (DOJ) discretionary budget in FY2021).

35 Mark Motivans, *Federal Justice Statistics, 2019*, U.S. Dep't of Just. Bureau of Just. Stat. Special Rep. at 8 tbl.5 (Oct. 2021), https://bjs.ojp.gov/content/pub/pdf/fjs19.pdf [https://perma.cc/J66J-6CV4] [hereinafter BJS 2019 Report].

36 *See, e.g.*, Sonja B. Starr & M. Marit Rehavi, *Racial Disparity in Federal Criminal Charging and Its Sentencing Consequences*, 122 J. Pol. Econ 1320, 1349 (Dec. 2014) ("[B]lack male federal arrestees ultimately face longer prison terms that whites arrested for the same offenses with the same prior records."); *id.* at 1350 ("In the federal system, more than half of the black-white sentence disparity that is unexplained by the arrest offense and offenders' prior traits can be explained by initial charge decisions, particularly the prosecutors' decision to file charges that carry 'mandatory minimum' sentences. Ceteris paribus, they do so 65 percent more often against black defendants.").

37 *See* Ad Hoc Comm. to Review the Criminal Justice Act, 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act at xiv (2018), https://www.uscourts.gov/sites/default/files/2017_report_of_the_ad_hoc_committee_to_review_the_criminal_justice_act-revised_2811.9.17.29_0.pdf [https://perma.cc/FM2Z-8GW3] [hereinafter The Cardone Report] (finding that "90 percent of defendants in federal court cannot afford to hire their own attorney").

38 *See, e.g.*, 18 U.S.C. § 3142(b), (c), (e), (g) (repeatedly highlighting that the goals of the BRA are to reasonably assure "the appearance of the person as required" and "the safety of the community"); Guide to Judiciary Policy, Vol. 8B, "Alternatives to Detention and Conditions of Release" (Monograph 110) at § 150 (finding that "by imposing conditions of release and alternatives to detention, judicial officers are able to promote the responsible use of public funding to protect the rights of defendants and to reasonably assure the appearance of the defendant and the safety of the community as required").

39 AO Table H-15 (2007–21). These tables show that federal failure-to-appear and rearrest rates have remained consistently low over the past fifteen years, regardless of the detention rate. Although AO data regarding failure-to-appear and rearrest rates are unavailable prior to 2007, some annual compendia from the Bureau of Justice Statistics include these data. *See, e.g.*, Laura Winterfield et al., *Compendium of Federal Justice Statistics, 2004*, U.S. Bureau of Just. Stat. at 53 tbl.3.8 (Dec. 2006), https://bjs.ojp.gov/library/publications/compendium-federal-justice-statistics-2004 [https://perma.cc/4GN9-UHVF].

40 *See* AO Table H-15 (2007–21).

41 *Id.*; *see also* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 47 & fig.1.

42 While release rates increased from 25% in 2019 to 29% in 2020 to 36% in 2021, the rates at which people on pretrial release failed to appear in court or were rearrested remained extremely low. *See* AO Table H-14 (2019–21); *see also* AO Table H-15 (2019) (showing a failure-to-appear rate of 1.16% and a rearrest rate of 1.83%); AO Table H-15 (2020) (showing a failure-to-appear rate of 1.17% and a rearrest rate of 1.94%); AO Table H-15 (2021) (showing a failure-to-appear rate of 1.32% and a rearrest rate of 2.25%). The federal Probation and Pretrial Services Office recently emphasized that the slight increase in release rates during the pandemic was not accompanied by any rise in the perennially low failure-to-appear and rearrest rates. *See* William E. Hicks et al., *Pretrial Work in a COVID-19 Environment*, 85 Fed. Prob. 24, 29–30 (June 2021), https://www.uscourts.gov/sites/default/files/usct10024-fedprobation-june2021_508.pdf [https://perma.cc/3YK9-NA4E] (noting that "for the 12-month period ending in March of 2021, national failure rates remained low as follows: failure to appear (1.7 percent), new criminal arrests (2.3 percent), and technical violations (4.1 percent)," and that the increase in pretrial release rates during the COVID-19 pandemic came "without adverse effects on pretrial supervision outcomes").

43 *See* AO Table H-15 (2007–21) (listing "rearrest violations" for "felony," "misdemeanor," and "other").

44 *See, e.g.*, BJS 2019 Report, *supra* note 35, at 3 tbl.3, 6 tbl.10 (showing that there were fewer than half as many federal convictions as arrests in 2019, at 78,254 and 206,630, respectively).

45 Paul Heaton, *The Effects of Misdemeanor Bail Reform*, Quattrone Ctr. (Aug. 16, 2022), https://www.law.upenn.edu/institutes/quattronecenter/reports/bailreform/#/lessons/298QqaqdYgFhhsKx7ei9zGKvT8ILGEVt [https://perma.cc/BWK5-NRNQ].

46 D.C. Pretrial Services Agency, Congressional Budget Justification and Performance Budget Request 41 (Mar. 24, 2022), https://www.psa.gov/sites/default/files/FY%202023%20PSA%20CBJ.pdf [https://perma.cc/X8R2-DLNM].

47 *Id.* at 39.

48 *Id.* at 39, 41.

49 Heaton, *supra* note 45.

50 *Id.*

51 *See* John Pfaff, *Op-Ed: The Never-Ending "Willie Horton Effect" Is Keeping Prisons Too Full for America's Good*, L.A. Times (May 14, 2017), https://www.latimes.com/opinion/op-ed/la-oe-pfaff-why-prison-reform-isnt-working-20170514-story.html [https://perma.cc/ZCZ9-JY6K] ("No matter how successful an 'early release' prison program is, one single failure can impose huge political costs . . . [i]t didn't matter that overall the reforms appeared to be safely addressing the state's mass incarceration problem; one murder derailed the effort."); *cf.* Note, *Bail Reform and Risk Assessment: The Cautionary Tale of Federal Sentencing*, 131 Harv. L. Rev. 1125, 1140 (2018) ("Even after pretrial reforms, judges and prosecutors retain the incentive to be too cautious releasing people pretrial because some released people will commit new crimes that will bring public scrutiny upon the judge or district attorney . . . it's a 'covering your ass' problem.").

52 U.S. Const. art. I; *see also About Federal Judges*, Admin. Off. of U.S. Courts, https://www.uscourts.gov/judges-judgeships/about-federal-judges [https://perma.cc/86QT-EWJG] ("Magistrate judges are judicial officers of the U.S. district court appointed by the district judges of the court.").

53 Erica Zunkel & Alison Siegler, *The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction*, 18 Ohio St. J. Crim. 283, 306 (2020) (quoting Christopher L. Lowenkamp et al., *The Hidden Costs of Pretrial Detention*, Arnold Found. 19 (2013), https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_hidden-costs_FNL.pdf [https://perma.cc/FE39-BR7E]).

54 Judge James G. Carr, *Why Pretrial Release Really Matters*, 29 Fed. Sent'g Rep. 217, 220 (2017).

55 *See, e.g.*, Holsinger & Holsinger, *supra* note 25, at 40–41.

56 Ellen A. Donnelly & John M. MacDonald, *The Downstream Effects of Bail and Pretrial Detention on Racial Disparities in Incarceration*, 108 J. Crim. L. & Criminology 775, 805 (2019).

57 Christopher Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Nat'l Instit. of Corr. 3 (Nov. 2013) ("Compared to defendants released at some point pending trial, defendants detained for the entire pretrial period are more likely to be sentenced to jail or prison – and for longer periods of time.").

58 Rachel E. Barkow, *Categorical Mistakes: The Flawed Framework of the Armed Career Criminal Act and Mandatory Minimum Sentencing*, 133 Harv. L. Rev. 200, 221 (2019), https://harvardlawreview.org/wp-content/uploads/2019/11/200-240_Online.pdf [https://perma.cc/Y3BS-M6A5].

59 Bush v. Gore, 531 U.S. 98, 106 (2000) (Stevens, J., dissenting).

60 The District of Massachusetts in the First Circuit, the District of Maryland in the Fourth Circuit, the District of Utah in the Tenth Circuit, and the Southern District of Florida in the Eleventh Circuit.

61 We interviewed Chief Federal Public Defenders in all 4 of the districts where we courtwatched, yet we were able to interview federal judges in only 3 of those districts (Baltimore, Boston, and Miami).

62 The detention eligibility net is a set of offenses and factors for which the BRA authorizes pretrial detention. Timothy R. Schnacke, "Model" Bail Laws: Re-Drawing the Line Between Pretrial Release and Detention 78–80 (2017), https://perma.cc/8V4M-S9TF. This eligibility net "limits the type of federal criminal cases that are eligible for pretrial detention." Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48. The BRA's detention eligibility net is defined in § 3142(f). In *Salerno*, the Court emphasized that the BRA's detention eligibility net is quite narrow, and "carefully limits the circumstances under which detention may be sought to the most serious of crimes." 481 U.S. at 747; *see also Bail*, 50 Geo. L.J. Ann. Rev. Crim. Proc. 394, 397–98 (2021) ("If at the Initial Appearance the government requests that the defendant be detained, the judge is *only* authorized to hold a detention hearing and detain the defendant if one of the factors in § 3142(f) is satisfied. If none of the § 3142(f) factors are satisfied, however, the judicial officer is prohibited from holding a detention hearing or detaining the defendant pending trial." (citing cases) (footnotes omitted)).

63 United States v. Ploof, 851 F.2d 7, 11 (1st Cir. 1988) ("Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists.").

64 18 U.S.C. § 3142(f)(1).

65 18 U.S.C. § 3142(f)(2).

66 We interviewed and surveyed stakeholders in 36 districts; 26 of those districts exhibited an access-to-counsel problem at the Initial Appearance.

67 *See* The Cardone Report, *supra* note 37, at xiv.

68 18 U.S.C. § 3006A(c); *see also* Fed. R. Crim. P. 44(a).

69 *See* 18 U.S.C. § 3142(e)(3) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.").

70 Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 Fed. Prob. 52, 55 (2017), https://www.uscourts.gov/sites/default/files/81_2_7_0.pdf [https://perma.cc/BL9D-D7LC].

71 *See e.g.*, United States v. Wilks, 15 F.4th 842, 846 (7th Cir. 2021) (holding that the defense bears only a "light burden of production" to rebut the presumption); United States v. Jessup, 757 F.2d 378, 380–84 (1st Cir. 1985) (same); United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986) (same); United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985) (same); *see also Bail*, *supra* note 62, at 404 (2021) (collecting cases).

72 Siegler & Harris, *supra* note 23 (quoting Austin, *supra* note 70, at 61).

73 This analytic step was noted by the enacting Congress, which observed that all § 3142(g) factors must be considered. *See* S. Rep. No. 98-225, at 24–25, *as reprinted in* 1984 U.S.C.C.A.N. at 3208–09 ("[A] court is expected to weigh all the factors in the case before making its decision as to risk of flight and danger to the community.").

74 18 U.S.C. § 3142(c)(2).

75 S. Rep. No. 98-225, at 9, *as reprinted in* 1984 U.S.C.C.A.N. at 3192.

76 *See* 18 U.S.C. § 3142(c)(1)(B)(xii).

77 *Salerno*, 481 U.S. at 750.

78 *Dominguez*, 783 F.2d at 707 (emphasis added); *see also supra* note 71 and accompanying text.

79 *See infra* note 418 and accompanying text.

80 481 U.S. at 755.

81 Admin. Off. of U.S. Courts, *Caseload Statistics Data Tables*, https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables [https://perma.cc/FXS5-U8CY].

82 AO Table H-9A. After 2005, this annually updated table is not publicly available and can only be seen by insiders granted access to the J-Net. Only data for the years 1997 through 2005 are publicly available.

83 AO Table H-14, H-14A, H-3, H-3A.

84 *See* 18 U.S.C. § 3142(f)(1).

85 *See* 18 U.S.C. § 3142(f)(2).

86 *See* 18 U.S.C. § 3142(e)(3). The BJS reports never provide any information about charging rates or detention rates for the second-largest category of offenses that qualify for the presumption of detention: firearms offenses charged under 18 U.S.C. § 924(c).

87 *See, e.g.*, George E. Browne & Suzanne M. Strong, *Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011–2018*, Bureau of Just. Stat. at 1 (Mar. 2022), https://bjs.ojp.gov/content/pub/pdf/prmfdcfy1118.pdf [https://perma.cc/C7CP-LYAN] [hereinafter BJS 2011–2018 Report] (combining 8 years of release rate statistics into a single data point).

88 For example, the latest BJS report focusing on federal pretrial detention was published in March of 2022, *see generally id.*, and another report was published in October of 2021, *see generally* BJS 2019 Report, *supra* note 35. But before that, the most recent BJS report on federal pretrial detention we could find was published in 2012.

*See generally* Thomas H. Cohen, *Pretrial Release and Misconduct in Federal District Courts, 2008–2010*, Bureau of Just. Stat. (2012), https://www.bjs.gov/content/pub/pdf/prmfdc0810.pdf [https://perma.cc/3G9K-GLEF] [hereinafter BJS 2008–2010 Report].

**89** The annual BJS Federal Justice Statistics reports do not provide any information about detention outcomes by race or detention outcomes by type of offense. *See generally, e.g.*, BJS 2019 Report, *supra* note 35; Mark Motivans, *Federal Justice Statistics, 2017–2018*, Bureau of Just. Stat. (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/fjs1718.pdf [https://perma.cc/68BM-F4AF] [hereinafter BJS 2017–2018 Report]. The *Compendium of Federal Justice Statistics* that BJS published annually through 2005 included detention outcomes by race and detention outcomes by type of offense, but did not combine those datapoints to provide a picture of the rate at which people of different races were detained pretrial, by type of offense.

**90** BJS 2011–2018 Report, *supra* note 87, at 3 tbl.2.

**91** BJS likewise does not disaggregate Latino and white arrestees in its earlier *Pretrial Release and Misconduct in Federal District Court* reports (with the exception of the 2008–2010 report) or in its annual BJS *Compendium of Federal Justice Statistics* (1992–2005).

**92** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 47 & fig.2 (compiling studies before 2019).

**93** Matthew G. Rowland, *The Rising Federal Pretrial Detention Rate, in Context*, Admin. Off. of the U.S. Courts 14 fig.2 (Sept. 2018), https://www.uscourts.gov/sites/default/files/82_2_2_0.pdf [https://perma.cc/CPQ4-5GJR].

**94** Stephanie Holmes Didwania, *Discretion and Disparity in Federal Detention*, 115 Nw. U. L. Rev. 1261, 1265 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss5/1/ [https://perma.cc/3E3R-N4VN]; *see also id.* at 1291 & fig.1 (finding in the raw data that a Black male arrestee was 20 percentage points more likely to be detained than a white male arrestee, while a Latino male arrestee was almost 15 percentage points more likely to be detained).

**95** To obtain race data, courtwatchers recorded the demographics of everyone in the courtroom based on their observations of each person's physical appearance, and also recorded the basis for that assumption. Because demographic information such as race and gender were not available from the docket sheet or any other public source, we relied on courtwatchers' perceptions and judgments.

**96** In the Qualtrics survey where courtwatchers coded their results, we asked 3 questions about citizenship in an effort to determine which arrestees in the study were not U.S. citizens: (1) "Was the client's citizenship mentioned in court or on the docket?" with answer choices Y/N; (2) "Is the client a citizen of the United States?," with answer choices reading "Y/N/Unsure (please explain your confusion)"; and (3) "What country is the client a citizen of?," with a blank for the courtwatcher to fill in.

**97** The rate at which individuals were detained pretrial fell somewhat in 2020 and again in 2021. *See* AO Table H-14 (2020, 2021). However, there is no evidence that the pandemic is to thank for that drop. It is entirely possible that the critiques we and others began to levy against high federal pretrial detention rates starting in 2018 contributed to declining detention rates in the ensuing years. At the time of this Report's publication, the AO's most recent public data ended in September 2021. *See supra* note 11.

**98** AO Table H-9A (2019, 2021).

**99** In that one case, however, defense counsel did not specifically argue that the arrestee was particularly vulnerable to COVID-19. This arrestee was released at the Initial Appearance.

**100** Nationwide, the rate at which prosecutors requested detention in pretrial hearings dropped by approximately 1% between 2019 and 2020 and by approximately 6% between 2020 and 2021. However, these changes were

not uniform across all federal courts. In fact, in Utah—one of the districts where we courtwatched—the prosecutors' detention request rate actually *increased* between 2019 and 2021 (from 93.3% to 94.5%). *See* AO Table H-3 (2019, 2020, 2021).

**101** Some studies about the consequences of pretrial detention were conducted in state systems rather than in the federal system. Other studies use data which include both state and federal systems. Studies that are not exclusively federal are nevertheless relevant to an understanding of the consequences of federal pretrial detention; jail is jail, whether run by a state or the federal government. We expressly identify all federal and joint federal/state studies discussed below; when a study is not so identified, it relied on state-level data only.

**102** *See, e.g.*, Charles E. Loeffler & Daniel S. Nagin, *The Impact of Incarceration on Recidivism*, 5 Ann. Rev. Criminology 133, 143 (2021) (reviewing federal and state cases, researchers found, "[w]ith the combination of disruption from temporary detention and the absence of programming or reentry resources, pretrial detention appears unfavorable compared to less restrictive pretrial monitoring alternatives"); *id.* at 149 ("[T]he findings of studies of pretrial incarceration are consistent—most find a deleterious effect on postrelease reoffending. This finding adds to the growing literature on the disruptions that pretrial detentions have on the lives of those detained even as many are not convicted or are convicted of minor offenses." (citations omitted)); *see also* Lowenkamp et al., supra note 57, at 19 ("Defendants detained pretrial were 1.3 times more likely to recidivate compared to defendants who were released at some point pending trial."); Austin, *supra* note 70, at 53 (citing Lowenkamp's 2013 study for the proposition that "low-risk defendants who were held pretrial for two to three days were almost 40 percent more likely to recidivate before trial compared to similarly situated low-risk defendants who were detained for 24 hours or less," those detained for 8 to 14 days "were 51 percent more likely to recidivate within two years of their cases' resolution, and when held for 30 or more days, defendants were 1.74 times more likely to commit a new criminal offense").

**103** Diana D'Abruzzo, *The Harmful Ripples of Pretrial Detention*, Arnold Ventures (Mar. 24, 2022), https://www.arnoldventures.org/stories/the-harmful-ripples-of-pretrial-detention [https://perma.cc/G5DM-5VEK] (citation omitted).

**104** Crystal S. Yang, *Toward an Optimal Bail System*, 92 N.Y.U. L. Rev. 1399, 1426 (2017).

**105** D'Abruzzo, *supra* note 103; *see also generally* Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & Econ. 529 (2017) (revealing that pretrial jailing increases recidivism).

**106** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 46 & n.3; *see also supra* note 27 and accompanying text.

**107** Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 Am. Econ. Rev. 201, 234–35 (2018).

**108** *Salerno*, 481 U.S. at 747.

**109** Gabriel A. Fuentes, *Federal Detention and "Wild Facts" During the COVID-19 Pandemic*, 110 J. Crim. L. & Criminology 441, 448 (2020) (citing Hardeman v. Curran, 933 F.3d 816, 822–23 (7th Cir. 2019); Darnell v. Pineiro, 849 F.3d 17, 34–35 (2d Cir. 2017); Mays v. Dart, No. 20-C-2134, 456 F. Supp. 3d 966, 1002–03 (N.D. Ill. 2020)).

**110** Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011–12*, U.S. Bureau of Just. Stat. at 11 (Oct. 2016), https://bjs.ojp.gov/content/pub/pdf/mpsfpji1112.pdf [https://perma.cc/JM2E-EV8Z].

**111** *Id.*

112 *Id.*

113 Michael Balsamo & Michael R. Sisak, *The Jail Where Jeffrey Epstein Killed Himself is Crumbling*, AP News (Sept. 23, 2021), https://apnews.com/article/health-prisons-new-york-manhattan-coronavirus-pandemic-5113a1e33a0c3967787e04c0523e406b [https://perma.cc/2R4X-MHKS] (New York MCC); Alec Hamilton, *Sentenced to Prison, But Trapped in Jail*, WNYC News (Nov. 22, 2016), https://www.wnyc.org/story/sentenced-prison-trapped-jail/ [https://perma.cc/XG45-V282] (Brooklyn MDC); Annie Sweeney, *MCC Can't Escape Bad Reputation*, Chi. Trib. (Dec. 26, 2012), https://www.chicagotribune.com/news/ct-xpm-2012-12-26-ct-met-prison-escape-security-1223-20121226-story.html (Chicago MCC); Nick Chrastil, *A Puerto Rican Federal Inmate's Horrifying Account of What the Prison Did After Hurricane Maria*, Think Progress (Apr. 26, 2018), https://thinkprogress.org/puerto-rico-federal-detention-center-allegedly-abused-inmates-hurricane-maria-494c2a8306e8/ [https://perma.cc/KQK7-3GM2] (Puerto Rico MCC).

114 *Oversight Hearing on The Federal Bureau of Prisons and Implementation of the First Step Act of the House Subcomm. on Crime, Terrorism, and Homeland Security*, 116th Cong. 1 (Oct. 17, 2019) (statement of David E. Patton, Exec. Dir., Federal Defenders of New York), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-PattonD-20191017.pdf [https://perma.cc/6LDQ-G7J6] [hereinafter Patton testimony].

115 Aviva Stahl, *Prisoners Endure a Nightmare 'Gulag' in Lower Manhattan, Hidden in Plain Sight*, The Gothamist (June 19, 2018), https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight; *see also* Alexander Nazaryan, *Manhattan Jail Where Jeffrey Epstein Died Has Long History of Suicide, Neglect*, Yahoo (Aug. 14, 2019), https://news.yahoo.com/manhattan-prison-where-jeffrey-epstein-died-has-long-history-of-suicide-neglect-172413714.html [https://perma.cc/5Z8V-SC5R].

116 Stahl, *supra* note 115.

117 T.A. DeFeo, *Georgia's Ossoff Says Atlanta Federal Prison Was 'Extremely Dangerous and Insecure,'* Ctr. Square (July 27, 2022), https://www.thecentersquare.com/georgia/georgias-ossoff-says-atlanta-federal-prison-was-extremely-dangerous-and-insecure/article_f7045686-0db7-11ed-aaa0-2795af30132a.html [https://perma.cc/8E85-8XE5].

118 Shepard testimony, *supra* note 25, at 3.

119 Joshua Ceballos & Alex Deluca, *Employees at Understaffed Miami Prison Say Inmates, Guards, and Public Are at Risk*, Mia. New Times (May 24, 2022), https://www.miaminewtimes.com/news/fdc-miami-staffing-shortage-spurs-complaints-from-inmates-and-prison-guards-14521728 [https://perma.cc/E4MY-YCTM].

120 Shepard testimony, *supra* note 25, at 1, 9–11.

121 *Id.* at 2–5.

122 *Id.* at 1, 9–11.

123 *See, e.g.*, *id.* at 5 ("Individuals [detained at USP Atlanta] are denied their right to effective assistance of counsel. . . . The inevitable result of inadequate access to counsel is ineffective representation, and in some cases, wrongful conviction."); Patton testimony, *supra* note 114, at 5 ("[MCC Manhattan] was originally built without rooms for attorney visitation even though it is a pretrial detention facility. The limited number of attorney visitation rooms create expensive and aggravating delays.").

124 Shepard testimony, *supra* note 25, at 5–9.

125 *Id.* at 4.

126 *Sexual Victimization Reported by Adult Correctional Authorities, 2016–2018*, Bureau of Just. Stat. at 1 (June 2021), https://bjs.ojp.gov/content/pub/pdf/svraca1618.pdf [https://perma.cc/R64X-TLYL] [hereinafter BJS 2016–2018 Report]. The last year for which such statistics are available is 2018.

127 *Id.* at 5 tbl.2.

128 *Id.* at 1.

129 *Id.* at 23 app. tbl.6.

130 *Id.*

131 Emily Widra, *No Escape: The Trauma of Witnessing Violence in Prison*, Prison Pol'y Inst. (Dec. 2, 2020), https://www.prisonpolicy.org/blog/2020/12/02/witnessing-prison-violence/ [https://perma.cc/839X-SAVV]. While Widra discusses both state and federal incarceration interchangeably, the statistics referenced here appear to use exclusively federal data.

132 *Id.*

133 John Broman, *What I Learned from 13 Years of Witnessing Violence in Federal Prisons*, Vice (Sept. 25, 2015), https://www.vice.com/en/article/nn9qeq/what-i-learned-from-13-years-of-witnessing-violence-in-federal-prisons-925.

134 Brandon L. Garrett & Lee Kovarsky, *Viral Injustice*, 110 Cal. L. Rev. 117, 124 (2022).

135 *Id.*

136 Brandon Saloner et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, 324 J. Am. Med. Ass'n 602, 602–03 (2020).

137 Jon Seidel, *COVID-19 Outbreak Among Inmates at MCC in Chicago Among Largest Across the System*, Chi. Sun Times (May 10, 2020), https://chicago.suntimes.com/2020/5/10/21252571/covid-19-outbreak-inmates-mcc-chicago-among-largest-in-nation [https://perma.cc/6AHM-L7UG]. Given inadequate testing, the actual rate of infection at federal detention centers is likely higher. *See, e.g.*, Nick Pinto, *Detainees at a Federal Jail Said Their Coronavirus Symptoms Were Ignored. The Government is Fighting to Keep the Records Secret*, The Intercept (May 15, 2020), https://theintercept.com/2020/05/15/mdc-brooklyn-coronavirus-hearing/ [https://perma.cc/WC9V-4U97] (finding that by May 2020, only 15 people in the entire Brooklyn Metropolitan Detention Center had been tested for COVID-19 despite many more complaining about symptoms).

138 Alison Siegler & Erica Zunkel, *Commentary: Don't Let Chicago's Federal Jail Become the next Coronavirus Hot Spot*, Chi. Trib. (Apr. 24, 2020), https://www.chicagotribune.com/opinion/commentary/ct-opinion-coronavirus-jail-cook-county-mcc-20200424-zagv2nvjyzcrvknxbfasusx63a-story.html.

139 Kelly Davis, *Coronavirus in Jails and Prisons*, The Appeal (Sept. 30, 2020), https://theappeal.org/coronavirus-in-jails-and-prisons-61/ [https://perma.cc/3K5K-5PQ7].

140 *COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ [https://perma.cc/X87V-CZMQ].

141 *Hearing on Oversight of the Federal Bureau of Prisons: Hearing Before the Senate Judiciary Committee*, 117th Cong. 8–9 (Apr. 15, 2021) (written testimony of Anita Aboagye-Agyeman, Assistant Federal Public Defender, District of New Jersey & Alison K. Guernsey, Clinical Associate Professor, University of Iowa College of Law), https://law.uiowa.edu/sites/law.uiowa.edu/files/2021-04/Congressional%20Testimony%20-%204-13-21-%20Final.pdf [https://perma.cc/L66J-XV7C].

142 *Compassionate Release*, Univ. of Iowa Coll. of Law, Fed. Crim. Def. Clinic, https://law.uiowa.edu/compassionate-release [https://perma.cc/J9XQ-YLPP] (finding that 302 people detained at BOP-managed or private prisons with federal contracts had died from COVID-19 as of January 31, 2022).

143 Ayyab Rahim Abdullah, *COVID-19 Experience at a Federal Detention Center*, Prison Journalism Project (Mar. 25, 2021), https://prisonjournalismproject.org/2021/03/25/covid19-exerience-at-a-federal-detention-center/ [https://perma.cc/469H-L79C].

144 Robert Barton, *Frequent Prison Lockdowns Backfire. I Know From Experience*, Politico (Feb. 2, 2022), https://www.politico.com/news/agenda/2022/02/10/frequent-prison-lockdowns-backfire-00007797 [https://perma.cc/3PVK-S63W].

145 *How it Spreads*, Ctr. for Disease Control (July 2022), https://www.cdc.gov/poxvirus/monkeypox/transmission.html [https://perma.cc/77RU-A28A].

146 Homer Venters, *CDC Must Act to Prevent Monkeypox Explosion in Prisons*, The Hill (July 2022), https://thehill.com/opinion/healthcare/3576465-cdc-must-act-to-prevent-monkeypox-explosion-in-prisons/ [https://perma.cc/77RU-A28A].

147 Blair Paddock, *As Monkeypox Spreads, Attention Turns Toward Jails*, WTTW News (Aug. 2022), https://news.wttw.com/2022/08/02/monkeypox-spreads-attention-turns-toward-jails?mkt_tok=MjUwLUNRSC05MzYAAAGGCIZqRQhZ8PD-R4nkUCkKWw4XH-P7wR_MXvLBlZmGqvYUn18k02V9NUcb4_0rVluSQuH3zjIAi9Rk3eBz9ztSIFUTEKfPLWR77xx2U-f9kqrP [https://perma.cc/8545-W3W9].

148 Jed S. Rakoff, *Why the Innocent Plead Guilty and the Guilty Go Free* 23–24 (2021).

149 Donnelly & MacDonald, *supra* note 56, at 805.

150 *Id.* at 804; *see also* Wiseman, *supra* note 25, at 251–52 ("All of these studies controlled for factors not associated with bail that could affect the likelihood of conviction and release, including, for example, race, age, gender, prior offenses, and number of charged offenses . . . . [Pretrial detention is] a factor driving the higher conviction rates for pretrial detainees.").

151 Dobbie et al., *supra* note 107, at 225.

152 Stephanie Holmes Didwania, *The Immediate Effects of Pretrial Detention*, 22 Am. L. & Econ. Rev. 24, 26 (2020); *see also* James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2017) (finding "being released on pretrial services supervision was associated with a decrease in the likelihood of being sentenced to prison, and a decrease in sentence length"); Lowenkamp et al., *supra* note 57, at 4:

> Defendants who are detained for the entire pretrial period are much more likely to be sentenced to jail and prison. Low-risk defendants who are detained for the entire pretrial period are 5.41 times more likely to be sentenced to jail and 3.76 times more likely to be sentenced to prison when compared to low-risk defendants who are released at some point before trial or case disposition. Moderate and high-risk defendants who are detained for the entire pretrial period are approximately 3 times more likely to be incarcerated than similar defendants who are released at some point.

153 Didwania, *Immediate Effects of Pretrial Detention*, *supra* note 152, at 26 ("Pretrial release appears to decrease sentence length, increase the probability of receiving a below-Guidelines sentence, and decrease the probability of receiving a mandatory minimum.").

**154** *Id.*

**155** Carr, *supra* note 54, at 218.

**156** In our study, 89% of those detained at their Initial Appearance hearing were people of color.

**157** Dobbie et al., *supra* note 107, at 204.

**158** *Id.* at 227.

**159** Holsinger & Holsinger, *supra* note 25, at 40.

**160** *Id.* at 41.

**161** *Id.* at 40.

**162** While there are some differences between the state and federal systems, there is no reason to believe that people detained federally would experience more salubrious long-term outcomes than their peers in the state system.

**163** Terry-Ann Craigie et al., *Conviction, Imprisonment, and Lost Earnings*, Brennan Ctr. for Just. 6 (Sept. 15, 2020), https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal [https://perma.cc/36AD-XARQ]. This study considered individuals who were imprisoned post-conviction, rather than jailed pending trial. As the researchers explain, "[r]eliable information on the jail population is hard to find, but the jail system's sprawling size makes the issue an important area for future research." *Id.* at 7.

**164** *Id.*; *see also id*. at 19 fig.4, 20 fig.5 (finding that, on an annual basis, Black people without *any* criminal record earn less than socioeconomically similar white people *with* a criminal record).

**165** Holsinger & Holsinger, *supra* note 25, at 40.

**166** *Id.*

**167** *Id.* (emphasis added).

**168** *See, e.g.*, Mark Halsey & Melissa de Vel-Palumbo, Generations Through Prison: Experiences of Intergenerational Incarceration (Jan. 2020) (finding that approximately one in five incarcerated individuals had a parent who was or is currently incarcerated).

**169** Holsinger & Holsinger, *supra* note 25, 40–41.

**170** *Id.*

**171** Charles Colson Task Force on Fed. Corr., Transforming Prisons, Restoring Lives 15 (Jan. 2016).

**172** Scott Hechinger, *We Must Follow Facts, Not Fear: Bail Reform Not the Reason for Rise in Some Crimes in NYC*, Daily News (Mar. 6, 2022), https://www.nydailynews.com/opinion/ny-oped-nyc-follow-facts-not-fear-20220306-e56f7dyxx5frzia5tdsrugaoiu-story.html [https://perma.cc/QZC8-F9YE].

**173** Lauren Jones et al., *The Cost of Incarceration in New York State* at 15, Vera Inst. of Just. (Jan. 2021), https://www.vera.org/publications/the-cost-of-incarceration-in-new-york-state [https://perma.cc/EU36-9Y8W].

**174** Ames Grawert & Noah Kim, *The Facts on Bail Reform and Crime Rates in New York State*, Brennan Ctr. for Just. (Mar. 22, 2022), https://www.brennancenter.org/our-work/research-reports/facts-bail-reform-and-crime-rates-new-york-state [https://perma.cc/FP5J-WC29]; *see also* Hechinger, *supra* note 172; Michael R. Sisak, *Don't Blame*

*Bail Reform for Higher Crime, NYC Watchdog Says*, AP NEWS (Mar. 22, 2022), https://apnews.com/article/kathy-hochul-covid-health-new-york-violence-aa42caf25b4fc333e4c864346f28d42c [https://perma.cc/9XBC-FR4L].

**175** Heaton, *supra* note 45.

**176** S. REP. NO. 98-225, at 6, *as reprinted in* 1984 U.S.C.C.A.N. at 3188.

**177** *Id.* at 7, *as reprinted in* 1984 U.S.C.C.A.N. at 3189.

**178** *Id.* at 8–10, *as reprinted in* 1984 U.S.C.C.A.N. at 3190–93.

**179** *Salerno*, 481 U.S. at 750.

**180** *Id.* at 747.

**181** *Id.* at 752.

**182** *See supra* note 16 and accompanying text.

**183** The legal standard that applies at the Initial Appearance is found in 18 U.S.C. § 3142(f).

**184** 18 U.S.C. § 3142(e).

**185** 18 U.S.C. § 3142(c)(2).

**186** *See* 18 U.S.C. § 3142(f)(1)–(2). The factors listed in § 3142(f)(1) are offense-specific (such as many drug and gun crimes or crimes involving a minor victim). The § 3142(f)(2) factors are subjective and allow a judge to schedule a Detention Hearing in a case involving "a *serious* risk that [the] person will flee" (18 U.S.C. § 3142(f)(2)(A) (emphasis added)) or "a serious risk that such person will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2)(B).

**187** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 49; Siegler Bail hearing written statement, *supra* note 9, at 5 ("Caselaw furthers supports § 3142(f)'s role as a gatekeeper. . . . [E]very court of appeals to address the issue agrees that it is illegal to detain someone—or even hold a Detention Hearing—unless the government affirmative invokes one of the § 3142(f) factors."); *see also id.* at 5 n.10 (collecting cases).

**188** *Bail*, *supra* note 62, at 400 ("If there is no legal basis for detention at the Initial Appearance, [a judge] may release a defendant on personal recognizance, on unsecured appearance bond, or subject to conditions.").

**189** *See* SCHNACKE, *supra* note 62, at 78–80 (discussing the federal detention eligibility net); *see also Pretrial Release: Detention*, NAT'L CONF. OF STATE LEGISLATURES (June 20, 2022), https://www.ncsl.org/research/civil-and-criminal-justice/pretrial-detention.aspx [https://perma.cc/67L2-7WS2] (defining the "detention eligibility net" as "the charges and circumstances that make a defendant eligible for detention").

**190** 18 U.S.C. § 3142(f)(1).

**191** 18 U.S.C. § 3142(f)(2)(A).

**192** 18 U.S.C. § 3142(f)(2)(B).

**193** 18 U.S.C. § 3142(e)(3).

**194** *See* 18 U.S.C. § 3142(e)(3) (no mention of crimes of violence or gun possession offenses under 18 U.S.C. § 922(g)). It is irrelevant that some of the offenses listed in § 3142(f)(1) also qualify for a presumption of detention during the Detention Hearing (such as drug offenses and § 924(c) gun offenses). Even in such cases, the presumption of detention does not kick in until the Detention Hearing.

**195** 18 U.S.C. § 3006A (emphasis added).

**196** S. Rep. No. 91-790, at 4 (1970); H.R. Rep. No. 91-1546, at 7 (1970) (emphasis added); *see also* Fed. R. Crim. P. 44 advisory committee's note to 1966 amendment ("The phrase 'from his initial appearance before the commissioner or court' is intended to require the assignment of counsel as promptly as possible after it appears that the defendant is unable to obtain counsel."); Fed. R. Crim. P. 5(d)(2) (stating that "[t]he judge must allow the defendant reasonable opportunity to consult with counsel" during the Initial Appearance).

**197** United States v. Barber, 291 F. Supp. 38, 42 (D. Neb. 1968).

**198** 18 U.S.C. § 3142(f).

**199** 18 U.S.C. § 3142(f).

**200** 18 U.S.C. § 3142(f).

**201** *Compare* 18 U.S.C. § 3142(b) ("The judicial officer *shall order the pretrial release* of the person . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." (emphasis added)), *with* 18 U.S.C. § 3142(e)(3) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."); *see also Bail*, *supra* note 62, at 403.

**202** *See Bail*, *supra* note 62, at 404 (citing 18 U.S.C. § 3142(e)(1), (f)) ("Even when a presumption of detention applies, the government continues to bear the ultimate burden of proving that no conditions of release will reasonably assure the defendant's appearance and the safety of the community.").

**203** 18 U.S.C. § 3142(e)(3) (a rebuttable presumption of detention applies at the Detention Hearing when the charged offense is: (A) a drug crime carrying a maximum penalty of 10 or more years; (B) a crime listed in 18 U.S.C. § 924(c), § 956(a), or § 2332b; (C) a crime listed in 18 U.S.C. § 2332b(g)(5)(B) carrying a maximum penalty of 10 years or more; (D) a crime listed in Title 18, Chapter 77, carrying a maximum penalty of 20 years or more; or (E) a crime involving a minor victim).

**204** 18 U.S.C. § 3142(e)(2).

**205** *See, e.g.*, *Dominguez*, 783 F.2d at 707; *see also Bail*, *supra* note 62, at 404.

**206** *See, e.g.*, *Dominguez*, 783 F.2d at 707; *Jessup*, 757 F.2d at 384 (holding that a rebutted presumption is "but one factor among many" and that a judge "is free to . . . release the defendant" in a presumption case).

**207** *See infra* note 418 and accompanying text.

**208** *Wilks*, 15 F.4th at 847.

**209** 18 U.S.C. § 3142(b).

**210** 18 U.S.C. § 3142(c)(1).

**211** 18 U.S.C. § 3142(c)(1).

**212** 18 U.S.C. § 3142(c)(1)(B)(i).

**213** 18 U.S.C. § 3142(c)(1)(B)(xiv) (allowing a judge to impose "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community").

**214** 18 U.S.C. § 3142(c)(2) (emphasis added).

**215** As evinced by our courtwatching data, federal prosecutors often request detention for reasons that Congress has deemed inappropriate or otherwise impermissible under the BRA. And because judges often do little to curb these illegal requests, defense attorneys are reticent to push back—as their efforts would be futile.

**216** *See* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48 ("Prosecutors only provided a valid basis for detention in 5 percent of cases and provided evidence to support the request in one case [among those watched by the FCJC in Chicago."); *id.* ("[I]n nearly 10 percent of the Phase 1 cases, there was no statutory basis for detention whatsoever, rendering [the judge's order of] detention illegal.").

**217** *See id.* at 46–47 (highlighting that "[t]he BRA was supposed to authorize detention for a narrow set of people: those who are highly dangerous or pose a high risk of absconding").

**218** *Bail*, *supra* note 62, at 400; *see also supra* note 16 and accompanying text.

**219** 18 U.S.C. § 3142(b); 18 U.S.C. § 3142(c)(1).

**220** 18 U.S.C. § 3142(f).

**221** *Bail*, *supra* note 62, at 398.

**222** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 49.

**223** *Salerno*, 481 U.S. at 747.

**224** Siegler Bail Hearing written statement, *supra* note 9, at 5 ("A key reason the Supreme Court upheld the Bail Reform Act as constitutional in *United States v. Salerno* was because the statute only authorizes detention at the Initial Appearance under certain limited circumstances.").

**225** *Salerno*, 481 U.S. at 747 (emphasis added); *see also* S. Rep. No. 98-225, at 20, *as reprinted in* 1984 U.S.C.C.A.N. at 3204 ("Because detention may be ordered under section 3142(e) only after a detention hearing pursuant to subsection (f), the requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial."); United States v. Watkins, 940 F.3d 152, 158 (2d Cir. 2019) ("Section 3142(f)(1) thus performs a gate-keeping function by 'limit[ing] the circumstances under which [pretrial] detention may be sought to the most serious of crimes.'" (citing *Salerno*, 481 U.S. at 747)).

**226** *See* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 49 ("When no § 3142(f) factor is met, the judge is flatly prohibited from holding a Detention Hearing; the [arrestee] must be released."); Siegler Bail Hearing written statement, *supra* note 9, at 5 ("Caselaw furthers supports § 3142(f)'s role as a gatekeeper. . . . [E]very court of appeals to address the issue agrees that it is illegal to detain someone—or even hold a Detention Hearing—unless the government affirmative invokes one of the § 3142(f) factors."); *Ploof*, 851 F.2d at 11 ("Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists."); United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988); United States v. Himler, 797 F.2d 156, 160 (3d Cir. 1986); *Byrd*, 969 F.2d at 109; United States v. Twine, 344 F.3d 987, 987 (9th Cir. 2003); United States v. Singleton, 182 F.3d 7, 9 (D.C. Cir. 1999) ("First, a [judge] must find one of [seven] circumstances triggering a detention hearing . . . [under] § 3142(f). Absent one of these circumstances, detention is not an option.").

**227** *Watkins*, 940 F.3d at 158 (2d Cir. 2019).

**228** *Ploof*, 851 F.2d at 11.

**229** U.S. Dep't of Just., Just. Manual § 26 (Title 9-6100), https://www.justice.gov/archives/jm/criminal-resource-manual-26-release-and-detention-pending-judicial-proceedings-18-usc-3141-et [https://perma.cc/7R8V-YUXY] (citations omitted) (enumerating 6 (f) factors by counting § 3142(f)(2)(A) and (B) as a single ground for detention).

**230** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48–49.

**231** *See* 18 U.S.C. § 3142(f)(1)(A)–(E) ("The judicial officer shall hold a [detention] hearing . . . *upon motion of the attorney for the Government*, in a case that involves" one of five categories of offenses (emphasis added)).

**232** Section 3142(f)(1) does not authorize the judge to hold a Detention Hearing on their own motion. *Compare* 18 U.S.C. § 3142(f)(1) ("upon motion of the attorney for the Government") *with* 18 U.S.C. § 3142(f)(2) ("upon motion of the attorney for the Government or upon the judicial officer's own motion").

**233** *See* 18 U.S.C. § 3142(f) ("During a continuance, such person shall be detained.").

**234** Siegler Bail Hearing written statement, *supra* note 9, at 3.

**235** *See* Starr & Rehavi, *supra* note 36, at 48.

**236** Barkow, *supra* note 58, at 210 ("In the Bail Reform Act, one part of the [Comprehensive Crime Control Act], Congress expanded the availability of pretrial detention."); *see also Statement of Sakira Cook on the Civil Rights Implications of Cash Bail*, Leadership Conf. on Civ. & Hum. Rts. (Feb. 22, 2021), https://civilrights.org/resource/statement-of-sakira-cook-senior-director-justice-reform-program-the-leadership-conference-on-civil-and-human-rights-u-s-commission-on-civil-rights-hearing-on-the-civil-rights-implications/# [https://perma.cc/ME94-X29S] [hereinafter Cook statement].

**237** *See* Cook statement, *supra* note 236.

**238** BJS 2019 Report, *supra* note 35, at 15 fig.7 (showing that the racial composition of people sentenced in drug, gun, and crime of violence cases where the § 3142(f)(1) factors applied was 41% Black, 31% Hispanic, 4% other, and 24% white). In our dataset, people of color comprised approximately 88% of those who qualified for automatic detention at the Initiation Appearance. The racial breakdown was: 41% Black, 44% Latino, 12% white, 1% other, and 2% unknown.

**239** *See generally* Austin, *supra* note 70.

**240** *Id.* at 52.

**241** Lauryn P. Gouldin, *Defining Flight Risk*, 85 U. Chi. L. Rev. 677, 705 (2018).

**242** *Id.*

**243** *See, e.g.*, *Friedman*, 837 F.2d at 49 (holding that a judge "must first determine by a preponderance of the evidence" that § 3142(f)(1) or (2) is met); *Himler*, 797 F.2d at 160 (holding that an arrestee "may be detained [at the Initial Appearance] only if *the record supports a finding* that he presents a *serious* risk of flight" under § 3142(f)(2)(A) (emphasis added)). In addition, "there is a constitutional argument that the standard for flight risk should be clear and convincing evidence" because "the Constitution requires a higher standard of proof than preponderance of the evidence for deprivations of liberty." Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 51 n.102; *see also generally* Jaden M. Lessnick, Comment, *Pretrial Detention by a Preponderance: The Constitutional and Interpretive Shortcomings of the Flight Risk Standard*, 89 U. Chi. L. Rev. 1245 (2022) (contending that using a preponderance of the evidence standard to jail someone as a flight risk violates Due Process and misinterprets the BRA).

**244** 18 U.S.C. § 3142(f)(2)(B) (on motion of the government or on the judge's own motion).

**245** *Ploof*, 851 F.2d at 11; *see also* United States v. Dillard, 214 F.3d 88, 96 (2d Cir. 2000) ("The question whether the defendant poses a danger to the safety of the community . . . cannot be considered unless the defendant is found to be eligible for detention under subsection 3142(f). *A defendant who is not eligible must be released, notwithstanding alleged dangerousness*." (emphasis added)); *Friedman*, 837 F.2d at 49 ("[T]he [BRA] does not permit detention on the basis of dangerousness."); *Byrd*, 969 F.2d at 110 ("[A] defendant who clearly may pose a danger to society cannot be detained on that basis alone."); *Himler*, 797 F.2d at 160 (detention at the Initial Appearance is not authorized "upon proof of danger to the community other than from those offenses which will support a motion for detention" under § 3142(f)(1)).

**246** *Twine*, 344 F.3d at 987.

**247** *Bail*, *supra* note 62, at 398.

**248** *Id.* at 400.

**249** *Id.* at 399.

**250** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48 ("[T]he statute and case law make clear that neither 'danger to the community' nor ordinary 'risk of flight' [as opposed to *serious* risk of flight] is a legitimate basis for detention at the Initial Appearance Hearing.").

**251** *Bail*, *supra* note 62, at 398–99; *see also* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 50.

**252** *Himler*, 797 F.2d at 160 (emphasis added).

**253** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 50.

**254** None of these offenses is listed under § 3142(f)(1).

**255** *See, e.g.*, United States v. Taylor, 142 S. Ct. 2015 (2022) (holding that attempted Hobbs Act robbery does not qualify as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A) because no element of the offense requires proof that the defendant used, attempted to use, or threatened to use force).

**256** BJS 2011–2018 Report, *supra* note 87, at 2 tbl.1. Specifically, nearly 60% of federal cases charged from 2011–18 involved fraud, public order, or immigration offenses (as opposed to weapons offenses, drug offenses, or property offenses that did not involve fraud). The detention rates at Initial Appearances for non-(f)(1) offenses are surprisingly high: 37% for fraud arrestees, 57% for public order arrestees, and 91% for immigration arrestees. *See id.*

**257** *See, e.g.*, United States v. Gibson, 384 F. Supp. 3d 955, 963 (N.D. Ind. 2019) (releasing defendant in a fraud case and holding, "Any reading of the [BRA] that allows danger to the community as the sole ground for detaining a defendant where detention was moved for only under (f)(2)(A) runs the risk of undercutting one of the rationales that led the Salerno Court to uphold the statute as constitutional"); United States v. Morgan, No. 14-CR-10043, 2014 WL 3375028, at *1–6 (C.D. Ill. July 9, 2014) (concluding that financial dangerousness is not a legitimate ground for detention at the Initial Appearance and denying the prosecutor's detention request in an access device fraud case).

**258** BJS 2011–2018 Report, *supra* note 87, at 2 tbl.1.

**259** Verbatim Notes Form, United States v. Dupin, No. 21-MJ-2225 (S.D. Fla. Feb. 5, 2021) (on file with the FCJC). The 3-day detention in this particular case was not itself unlawful, as there was a legitimate statutory basis for holding a Detention Hearing under § 3142(f)(1). But when no one in the courtroom mentions the BRA, a problematic feedback loop develops that fuels unlawful detentions.

**260** BJS 2011–2018 Report, *supra* note 87, at 2 (showing a 22% release rate at Initial Appearances nationwide).

**261** The results of our 2019 Chicago pilot study were even more striking: the prosecutor cited an improper statutory basis in 95% of the cases that we observed, citing danger to the community in 56% of cases and *ordinary* risk of flight in 60% of cases. *See* Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48.

**262** BJS 2011–2018 Report, *supra* note 87, at 2 tbl.1.

**263** Verbatim Notes Form of Initial Appearance, United States v. Watson, No. 21-MJ-02322 (S.D. Fla. Feb. 19, 2021) (on file with the FCJC).

**264** *Id.*

**265** Verbatim Notes Form of Detention Hearing, United States v. Watson, No. 21-MJ-02322 (S.D. Fla. Feb. 24, 2021) (on file with the FCJC).

**266** Verbatim Notes Form of Detention Hearing, United States v. Muniz, No. 21-MJ-02279 (S.D. Fla. Feb. 17, 2021) (on file with the FCJC).

**267** *Id.*

**268** *Id.*

**269** *Id.*

**270** Verbatim Notes Form of Initial Appearance, United States v. Sterling, No. 19-CR-20736 (S.D. Fla. Mar. 2, 2021) (on file with the FCJC).

**271** Verbatim Notes Form of Initial Appearance, United States v. Patino, No. 11-CR-20409 (S.D. Fla. Feb. 19, 2021) (on file with the FCJC).

**272** Transcript of Initial Appearance at 8, United States v. Cedric Desmond Smith, Jr., No. 21-MJ-02264 (S.D. Fla. Feb. 10, 2021) (on file with the FCJC).

**273** *Id.*

**274** Transcript of Initial Appearance at 5, United States v. Oviedo, No. 20-CR-20033 (S.D. Fla. Nov. 16, 2020), ECF No. 43.

**275** *Salerno*, 481 U.S. at 747.

**276** BJS 2011–2018 Report, *supra* note 87, at 2 tbl.1.

**277** We use the language "agreed to detention" to mean that the defense attorney submitted to detention, waived the right to seek release, agreed to detention without prejudice, waived the Detention Hearing, or otherwise did not contest detention at a given hearing.

**278** *See supra* note 96.

**279** 18 U.S.C. § 3142(d).

**280** *See, e.g.*, United States v. Ailon-Ailon, 875 F.3d 1334, 1338 (10th Cir. 2017) ("[A] risk of involuntary removal does not establish a serious risk that [the defendant] will flee."); *Santos-Flores*, 794 F.3d at 1091 ("[T]he risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition."); United States v. Villatoro-Ventura, 330 F. Supp. 3d 1118, 1135–36 (N.D. Iowa 2018); United States v. Suastegui, No. 3:18-MJ-00018, 2018 WL 3715765, at *4 (W.D. Va. Aug. 3, 2018); United States v. Marinez-Patino, 2011 WL 902466 (N.D. Ill. Mar. 14, 2011).

**281** BJS 2008–2010 Report, *supra* note 88, at 15 tbl.13.

**282** *See id.*

**283** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 50.

**284** *Himler*, 797 F.2d at 160.

**285** Zunkel & Siegler, *The Federal Judiciary's Role in Drug Law Reform*, *supra* note 53, at 314–15.

**286** *See id.* at 315.

**287** *Salerno*, 481 U.S. at 755.

**288** We interviewed and surveyed stakeholders in 36 districts; 26 of those districts exhibited an access-to-counsel problem at the Initial Appearance.

**289** *See* BJS 2011–2018 Report, *supra* note 87, at 2 tbl.1 (documenting the high rate of detention at the Initial Appearance).

**290** *See generally* Danielle Soto & Mark Lipkin, *Representation at Arraignment: The Impact of "Smart Defense" on Due Process and Justice in Alameda County*, Impact Just. (Dec. 2018), https://impactjustice.org/wp-content/uploads/Smart-Defense-Report-2019.pdf [https://perma.cc/G82D-KT82]; *Access to Counsel at First Appearance: A Key Component of Pretrial Justice*, Nat'l Legal Aid and Def. Ass'n (Feb. 2020), https://www.nlada.org/sites/default/files/NLADA%20CAFA.pdf [https://perma.cc/TU4G-NNEH].

**291** *See* The Cardone Report, *supra* note 37, at xiv.

**292** We use the term "indigent arrestee" as a shorthand for people who are unable to afford counsel to represent them in federal court, while recognizing that someone does not need to be living in poverty to qualify for appointed counsel under the Criminal Justice Act of 1964 (CJA), 18 U.S.C. § 3006A. The purpose and legislative history of the CJA shows that Congress intended federal judges to appoint counsel for every arrestee unable to afford one, not just poor arrestees. *See Statement by Attorney General Robert F. Kennedy Before S. Comm. on the Judiciary Regarding S. 1057, the Proposed Criminal Justice Act*, 88th Cong. 7 (1963) (written statement of Robert F. Kennedy, Attorney General of the United States) [hereinafter Kennedy CJA Testimony].

**293** Fed. R. Crim. P. 44 ("A defendant who is unable to obtain counsel is entitled to have counsel appointed to represent the defendant at every stage of the proceeding *from initial appearance through appeal*, unless the defendant waives this right." (emphasis added)); *see also* 18 U.S.C. § 3006A(c) ("A person for whom counsel is appointed *shall be represented* at every stage of the proceedings *from his initial appearance* before the United States magistrate judge or the court through appeal." (emphasis added)).

**294** *See* United States v. Williams, 411 F. Supp. 854, 856 (S.D.N.Y. 1976) ("The federal courts have the duty to implement the policies embodied in the Criminal Justice Act, as well as to ensure the general fairness of a criminal proceeding. This duty extends beyond the standards required by the constitution and must prevent even the possibility of unfairness.").

**295** 18 U.S.C. § 3006A(c).

**296** *See From*, n.2(a), Oxford Eng. Dictionary Online (Dec. 2021) ("Indicating the starting-point or the first considered of two boundaries adopted in defining a given extent in space."); Union P. R. Co. v. Hall, 91 U.S. 343, 348 (1875) ("The words '*from*,' '*to*,' and '*at*,' are taken inclusively, according to the subject-matter.").

**297** *See* Charlie Gerstein, Note, *Plea Bargaining and the Right to Counsel at Bail Hearings*, 111 Mich. L. Rev. 1513, 1516 (2013) ("The right to the presence of counsel [at a bail hearing] and the right to her effective assistance are coterminous—if you get one, you get the other.").

**298** S. Rep. No. 88-346, at 12–13 (1963); H.R. Rep. No. 88-864, at 7 (1963).

**299** S. Rep. No. 91-790, at 4; H.R. Rep. No. 91-1546, at 7.

**300** *Barber*, 291 F. Supp. at 42.

**301** *See* Kennedy CJA Testimony, *supra* note 292, at 1 ("[The CJA] seeks to guarantee competent legal representation and services to every accused person whose lack of funds prevents him from providing for his own defense.").

**302** *Id.* at 7.

**303** Guide to Judiciary Policy, Vol. 7A, Ch. 2, Appx. 2A: *Model Plan for Implementation and Administration of the Criminal Justice Act* 10, https://www.uscourts.gov/sites/default/files/vol07a-ch02-appx2a.pdf [https://perma.cc/E6AY-YPYJ] [hereinafter Model Plan].

**304** Fed. R. Crim. P. 44 (emphasis added).

**305** *See* Fed. R. Crim. P. 44 advisory committee's note to 1966 amendment.

**306** Fed. R. Crim. P. 5(d)(2).

**307** *See supra* The Law: The Bail Reform Act Carefully Limits the Cases Eligible for Detention.

**308** This problem is not limited to judges at the trial court level. Many appellate judges also fail to appreciate the important liberty interest at stake during the Initial Appearance. Laboring under this misconception, these judges write opinions that undercut the rights of arrestees and contribute to the culture of detention. *See, e.g.*, United States v. Perez, 776 F.2d 797, 800 (9th Cir. 1985) (characterizing an Initial Appearance as a benign proceeding "at which the indictment is read, the name of the defendant asked, the defendant is apprised of his *Miranda* rights, and counsel is appointed," omitting entirely that the hearing also involves a pretrial detention determination); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1473 (11th Cir. 1992) (calling the Initial Appearance "largely administrative" and trivializing the detention determination as "not a trial on the merits").

**309** *See* Gideon v. Wainwright, 372 U.S. 335, 344 (1963) (Not only . . . precedent[] but also reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court who is too poor for a lawyer, cannot be assured a fair trial unless counsel is provided for him.").

**310** *See supra* Findings & Recommendations—The Practice: At the Initial Appearance Hearing, Federal Judges Jail People Unlawfully.

**311** Johnson v. Zerbst, 304 U.S. 458, 462–63 (1938) (emphasis added).

**312** 372 U.S. 335 (1963).

**313** *See id.* at 339–45.

**314** 554 U.S. 191 (2008).

**315** *Id.* at 212; Brewer v. Williams, 430 U.S. 387, 398 (1977) ("[A] person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him – 'whether by way of *formal charge*, preliminary hearing, indictment, information, or arraignment.'" (emphasis added) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972))).

**316** *See, e.g.*, United States v. Wade, 388 U.S. 218, 224 (1967); *Rothgery*, 554 U.S. at 212 ("Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the postattachment proceedings.").

**317** In *Rothgery*, the Court did not decide whether the Initial Appearance in Texas state court constitutes a "critical stage," holding only that the right to counsel "attaches" at such a hearing. 554 U.S. at 212; *see also id.* at 216 ("[The critical stage analysis] lies beyond our reach, petitioner having never sought our review of it." (Alito, J., concurring)).

**318** *Id.* at 198 (quoting *Kirby*, 406 U.S. at 689).

**319** Bell v. Cone, 535 U.S. 685, 696 (2002) (defining "critical stage"); *see also* Hamilton v. State of Ala., 368 U.S. 52, 54 (1961) (holding arraignments in Alabama to be critical stages because what happens there affects the whole trial, including the loss of certain defenses); Coleman v. Alabama, 399 U.S. 1, 7 (1970) (noting that pretrial stages "where certain rights may be sacrificed or lost" have been held to be critical stages entitling someone to a right to counsel).

**320** *Rothgery*, 544 U.S. at 212.

**321** *Id.* at 212 n.16 (quoting United States v. Ash, 413 U.S. 300, 312–13 (1973)).

**322** *Id.* (quoting *Wade*, 388 U.S. at 226).

**323** *Wade*, 388 U.S. at 227; *see also* United States v. Leonti, 326 F.3d 1111, 1117 (9th Cir. 2003) ("[T]he essence of a 'critical stage' is not its formal resemblance to a trial, but the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel.").

**324** *See, e.g.*, *Salerno*, 481 U.S. at 759.

**325** *See, e.g.*, Ditch v. Grace, 479 F.3d 249, 253 (3d Cir. 2007); Hurrell-Harring v. State, 930 N.E.2d 217, 223 (N.Y. 2010); Gonzalez v. Comm'r of Corr., 68 A.3d 624, 641–43 (Conn. 2013) (Palmer, J., concurring), *cert. denied* 134 S. Ct. 639 (2013); Booth v. Galveston Cnty., 2019 WL 3714455, at *11–15 (S.D. Tex. Aug. 7, 2019); *see also* Paul S. Heaton, *Enhanced Public Defense Improves Pretrial Outcomes and Reduces Racial Disparities*, 96 Ind. L.J. 701, 741 (2021) ("The results here provide clear support for the notion that the early bail settings should be considered a critical stage, and therefore fall under the Sixth Amendment's ambit.").

**326** In Philadelphia, for example, the likelihood of conviction increased by 13% when an arrestee was detained pretrial, while in New York, conviction rates jumped from nearly half of all non-felony cases to 92%, and from 59% to 85% in felony cases, when individuals were subject to pretrial detention. *See* Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. Econ. & Org. 511, 512 (2018); Mary T. Phillips, A Decade of Bail Research in New York City 116 (2012).

**327** *See* Didwania, *Immediate Effects of Pretrial Detention*, *supra* note 152, at 26, 44–46 & tbl.4.

**328** Ian A. Mance, *Covid-19 Jail Restrictions and Access to Counsel*, Admin. of Just. Bull., Univ. of N.C. Sch. of Gov't (Oct. 2020); *see also* United States v. Davis, 449 F. Supp. 3d 532 (D. Md. 2020) (ordering a federal arrestee released pretrial because COVID-19 restrictions at the jail would impede their access to counsel); State v. Hill, 277 N.C. 547, 552 (1971) (holding that the "right to communicate with counsel . . . necessarily includes the right of access to them"); Geders v. United States, 425 U.S. 80, 91 (1976) (holding Sixth Amendment implicated where accused was prevented "from consulting with his attorney . . . when an accused would normally confer with counsel"); Maine v. Moulton, 474 U.S. 159, 170 (1985) ("[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."); Heaton, *supra* note 325, at 705 ("[T]he quality of representation provided at the preliminary arraignment directly affects the outcome of the case and the defendants' likelihood of future involvement in the criminal justice system.").

**329** *See supra* Contextualizing the Culture of Detention—A Judge's Decision to Jail Someone Pretrial Has Damaging and Enduring Effects (illuminating the many pernicious consequences that accrue from pretrial detention); *see also* State v. Fann, 239 N.J. Super. 507, 519 (Law. Div. 1990) ("The effect on family relationships and reputation is extremely damaging. Failure of pretrial release causes serious financial hardship in most cases. Jobs and therefore income are lost. The immediate consequence of the absence of bail or the inability to make bail-deprivation of freedom-standing alone, is critically consequential.").

**330** *Ash*, 413 U.S. at 307 ("A concern of more lasting importance was the recognition and awareness that an unaided layman had little skill in arguing the law or in coping with an intricate procedural system.").

**331** *Id.*; *see also Booth*, 2019 WL 3714455, at *11 ("Unrepresented defendants . . . are in no position at an initial bail hearing to present the best, most persuasive case on why they should be released pending trial.").

**332** 776 F.2d 797 (9th Cir. 1985).

**333** *Id.* at 800.

**334** *Id.*

**335** *See supra* Contextualizing the Culture of Detention—Federal Pretrial Detention Leads to Longer Sentences ("Strikingly, one study of federal and state arrestees found that '[p]retrial detention increases a defendant's likelihood of conviction by 55%,' even when controlling for confounding factors." (citations omitted)).

**336** 963 F.2d 1467 (11th Cir. 1992).

**337** *Id.* at 1473.

**338** *See* Gov't of Canal Zone v. Peach, 602 F.2d 101, 104 (5th Cir. 1979); *Ditch*, 479 F.3d at 253; United States v. Cookston, 379 F. Supp. 487, 487 n.1 (W.D. Tex. 1974); Caliste v. Cantrell, 329 F. Supp. 3d 296, 313–14 (E.D. La. 2018), *aff'd*, 937 F.3d 525 (5th Cir. 2019); *Booth*, 2019 WL 3714455, at *16.

**339** Swarthout v. Cooke, 562 U.S. 216, 219 (2011); *see also* Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976).

**340** *See Caliste*, 329 F. Supp. 3d at 312; Schultz v. State, 330 F. Supp. 3d 1344, 1374 (N.D. Ala. 2018). *But see Booth*, 2019 WL 3714455, at *8–9 (holding that a failure to provide counsel at a state Initial Appearance violates the Sixth Amendment but not the Fifth Amendment).

**341** The "duty attorney" is the appointed lawyer responsible for handling new arrests on a given day and may be an Assistant Federal Public Defender who works for the federal defender's office, or a Criminal Justice Act Panel Attorney (CJA attorney) who is appointed by the court to represent indigent arrestees but is not employed by the federal defender's office.

**342** Fed. R. Crim. P. 44 advisory committee's note to 1979 amendment.

**343** The Defender elaborated: "[T]here was a point system where, if you declined a case, you dropped to the bottom of the list." "Now, they wouldn't wait for people to call them back. If they called and they got voicemail or whatever, they just keep going down the list until they find a CJA lawyer able to take the case."

**344** Specifically, we recorded an individual as "partially represented by counsel" or "represented during part of the Initial Appearance" if they received representation after substantive questioning by a judge, e.g., about his financial conditions or other elements of his case. In contrast, we recorded an individual as "fully represented" or "represented during the entire Initial Appearance" only if a defense attorney was present for the entire hearing and appeared to be representing the arrestee from the beginning of the hearing. We tracked this distinction because of the potential for arrestees to inadvertently incriminate themselves before they receive appointed counsel—a potential that was realized in multiple cases that we observed.

345 In addition, information about the presence or absence of an attorney at the Initial Appearance was missing from 3% of our data set.

346 Verbatim Notes Form of Initial Appearance, United States v. Vallejo, No. 18-CR-20796 (S.D. Fla. Feb. 22, 2021) (on file with the FCJC). While the deprivation of counsel violated the law, the 3-day detention in this particular case was not itself unlawful, as there was a legitimate statutory basis for holding a Detention Hearing under § 3142(f)(1). However, when there is no valid statutory basis for holding a Detention Hearing or detaining an arrestee at the Initial Appearance under § 3142(f), an unrepresented arrestee has no chance of vindicating their rights or opposing a prosecutor's detention request.

347 Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act 18 U.S.C. § 3006A, *V: Timely Appointment of Counsel* 11, https://www.flsd.uscourts.gov/sites/flsd/files/CJA%20Plan%202021.pdf [https://perma.cc/967T-PHLK].

348 There are 94 federal judicial districts. *See* 28 U.S.C. § 81–132; Admin Off. of the U.S. Courts., *Court Role and Structure*, https://www.uscourts.gov/about-federal-courts/court-role-and-structure [https://perma.cc/WX74-S4YM]. The denial of counsel at the Initial Appearance is a confirmed problem in at least one division of at least 16 of those districts: the Southern District of Florida, and the 15 additional named districts confirmed in our research and named below. These 16 districts account for 17% of the federal district courts. As discussed, the problem may also exist in 10 additional districts, bringing the total to 26. These 26 districts account for 28% (over one-quarter) of the federal district courts.

349 The 16 named districts alone span the Third Circuit, Fourth Circuit, Fifth Circuit, Sixth Circuit, Seventh Circuit, Eighth Circuit, Ninth Circuit, Tenth Circuit, and Eleventh Circuit.

350 In at least one division of every district named here, *some arrestees* are not represented by appointed counsel during the Initial Appearance. The many permutations of the problem are described in more detail below.

351 The information about these 10 additional unnamed districts was obtained from interviews and surveys conducted across the country. We conducted some of these surveys in 2020–2021 and others in 2022. If a district recently altered its representation practices, our survey results may not capture those changes.

352 This Report's authors have closely reviewed the CJA Plans for each of the 26 districts. To the degree that those plans differ from the Model Plan, none authorizes courts to wait until *after* the Initial Appearance hearing to provide counsel—with one notable exception. The Central District of Illinois's CJA Plan removes the language that counsel must be appointed "as soon as feasible in the following circumstances, whichever occurs earliest." By deleting that clause, the Plan leaves the timing of appointment of counsel entirely to the judge's discretion, does not require appointment of counsel "when [the person] first appear[s]" in court, and enables the judge to delay appointing counsel until such time as the "judicial officer otherwise considers appointment of counsel appropriate under the CJA and related statutes." *See Criminal Justice Act Plan*, U.S. Dist. Ct. Cent. Dist. Ill. 2–6 (Nov. 2019), https://www.ilcd.uscourts.gov/sites/ilcd/files/general-ordes/Nov.%202019%20REVISED%20CJA%20PLAN%20Final.pdf [https://perma.cc/U928-JMC3].

353 In the District of New Mexico, for example, there is universal representation during the Initial Appearance in Albuquerque and Las Cruces, but there is a remote magistrate court in Farmington where they are still in the process of assuring representation at the Initial Appearance.

354 These districts changed their practices regarding representation by counsel at the Initial Appearance within the last decade. In some of these districts, the change occurred in the last one to three years.

355 This 33% figure was reached by adding the 5 districts discussed here to the 26 districts discussed above (31 districts) and dividing by the 94 total districts.

356 *See supra* Findings & Recommendations—The Practice: At the Initial Appearance Hearing, Federal Judges Jail People Unlawfully.

357 Two of these arrestees were unlawfully detained, as there was no statutory basis under § 3142(f)(1) for a Detention Hearing.

358 Transcript of Initial Appearance at 6, United States v. Kramer, No. 21-CR-20069 (S.D. Fla. Feb. 11, 2021), ECF No. 12.

359 Transcript of Initial Appearance at 4–5, *Oviedo*, No. 20-CR-20033, ECF No. 43; *see also id.* at 2, 6 (showing the only 4 sentences spoken by the prosecutor during the hearing).

360 Black and Latino arrestees made up 87% of our sample in total.

361 Among the 134 Black arrestees in our study, 46 were not provided lawyers until partway through their Initial Appearance; 49 of the 153 Latino arrestees in our study likewise were not represented until partway through their Initial Appearance.

362 Transcript of Record at 4, United States v. Lampe, No. 21-MJ-02111 (S.D. Fla. Jan. 22, 2021), ECF No. 3.

363 *See* Kennedy CJA Testimony, *supra* note 292, at 1.

364 Model Rules of Pro. Conduct R. 3.8 (Am. Bar Ass'n, Comment 2020), https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_3_8_special_responsibilities_of_a_prosecutor/comment_on_rule_3_8/ [https://perma.cc/7R8V-YUXY].

365 The promise of innocent until proven guilty is even codified in the BRA itself. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

366 Didwania, *Discretion and Disparity*, *supra* note 94, at 1278.

367 18 U.S.C. § 3142(e)(3). There is a second presumption in 18 U.S.C. § 3142(e)(2), but it is very narrow and rarely applies. "Note that [under § 3142(e)(2)] there is a separate presumption of detention if the person is charged with a detention eligible crime under § 3142(f), has been convicted of a similar offense, was on release when the prior offense was committed, and not more than five years have elapsed since conviction or release for that prior offense. . . . This § 3142(e)(2) presumption is extraordinarily rare." Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 58 n.81.

368 Siegler & Harris, *supra* note 23.

369 Zunkel & Siegler, *Federal Judiciary's Role in Drug Law Reform*, *supra* note 53, at 292.

370 Austin, *supra* note 70, at 55.

371 Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 50.

372 Siegler & Harris, *supra* note 23.

373 *Id.*

374 18 U.S.C. § 3142(e)(3). At the Initial Appearance, individuals charged in presumption-of-detention cases are subject to automatic temporary detention until a Detention Hearing takes place. *See* 18 U.S.C. § 3142(f)(1). Importantly, the § 3142(f)(1) factors and the presumption are not coextensive. But while (f)(1) is more expansive, the crimes captured by the presumption are also included in the (f)(1) factors.

375 The presumption for drug and gun cases applies in approximately 45% of all federal cases, while the presumption for drug cases in particular applies in 93% of all federal drug cases. *See* Austin, *supra* note 70, at 55.

376 Siegler & Harris, *supra* note 23.

377 Zunkel & Siegler, *Federal Judiciary's Role in Drug Law Reform*, *supra* note 53, at 293 (quotation marks omitted).

378 *See id.* at 283, 290. The original presumption did not include terrorism or crimes involving minor victims. These crimes were added under the presumption in later iterations of the BRA. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132 (1996); Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub L. No. 108-21 (2003); *see also* Barkow, *supra* note 58, at 210.

379 *See generally* Mark W. Bennett, *A Slow Motion Lynching? The War on Drugs, Mass Incarceration, Doing* Kimbrough *Justice, and a Response to Two Third Circuit Judges*, 66 Rutgers L. Rev. 873 (2014) (showing how the "War on Drugs" and associated criminal laws disproportionately affect people of color).

380 Zunkel & Siegler, *Federal Judiciary's Role in Drug Law Reform*, *supra* note 53, at 292.

381 *Id.* at 293.

382 *Id.* at 294 (quotation marks omitted).

383 *Id.*

384 *Federal Judicial Caseload Statistics 2020*, Admin. Off. of the U.S. Courts (2021), https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2020 [https://perma.cc/AZX3-LCNT].

385 John Scalia, *Federal Drug Offenders, 1999 with Trends 1984–99*, Bureau of Just. Stat. at 1 (Aug. 2001), https://www.csdp.org/research/fdo99.pdf [https://perma.cc/47FY-FZZ6] [hereinafter BJS 1984–1999 Report].

386 Didwania, *Discretion and Disparity*, *supra* note 94, at 1322 (comparing presumption cases with non-presumption cases).

387 *Id.* at 1306 (ultimately concluding that the presumption "does not appear to explain race-based disparity in detention").

388 For example, in 2019, 75% of people sentenced for drug trafficking—the most common presumption offense—were people of color. *See* U.S. Sent'g Comm'n, 2019 Annual Report and Sourcebook of Federal Sentencing Statistics 48 tbl.5, 110 tbl.D-2 (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report-and-Sourcebook.pdf [https://perma.cc/XMX7-JDYF] [hereinafter Sent'g Comm'n 2019 Report]. Assuming that sentencing data roughly tracks with charging data, people of color are disproportionately subject to the presumption of detention. Federal Bureau of Prisons data points to the same conclusion: 76% of people incarcerated for federal drug offenses in 2019 were people of color. *See* Mark Motivans, *Federal Justice Statistics, 2015–2016*, Bureau of Just. Stat. at 15 fig.7 (Jan. 2019), https://www.bjs.gov/content/pub/pdf/fjs1516.pdf [https://perma.cc/XVP8-VA6W] [hereinafter BJS 2015–2016 Report].

389 Jud. Conf. of the U.S., Report of the Proceedings of the Judicial Conference of the United States 10–11 (2017), https://www.uscourts.gov/sites/default/files/17-sep_final_0.pdf [https://perma.cc/2GFW-LZUA].

390 Austin, *supra* note 70, at 57.

391 *Id.* at 53.

392 *Id.* at 60. "High-risk . . . cases" involve arrestees who fall in Pretrial Risk Assessment (PTRA) categories 4 and 5, the highest categories in the system. *Id.* at 57. But arrestees in presumption cases had similar—if not lower—rearrest and failure-to-appear (FTA) rates as arrestees in non-presumption cases across every PTRA category. *See id.* at 56 tbl.2.

**393** *See id.* (showing lower failure-to-appear rates in presumption cases across 3 of the 5 PTRA categories).

**394** For a comprehensive discussion of the operation of the presumption as a matter of law, see Alison Siegler, *Guest Posts on Big Seventh Circuit* Wilks *Decision on Bail Reform Act's "Presumption of Detention,"* Sent'g L. & Pol'y (Jan. 19, 2022), https://sentencing.typepad.com/sentencing_law_and_policy/2022/01/guest-posts-on-big-seventh-circuit-wilks-decision-on-bail-reform-acts-presumption-of-detention.html [https://perma.cc/4M7T-YCWV].

**395** *See* United States v. Moore, 607 F. Supp. 489, 499 (N.D. Cal. 1985):

> In sum, the court finds that the rebuttable presumption of the BRA places only a burden of production on defendant and requires the government to rebut it with clear and convincing evidence. The government may not rely on the presumption alone to satisfy the clear and convincing evidence standard. This construction affords the defendant an opportunity to show that the presumption does not apply to him so as to avoid any Eighth Amendment or Fifth Amendment problems stemming from "conclusive" presumptions.

**396** Foucha v. Louisiana, 504 U.S. 71, 80 (1992).

**397** Reno v. Flores, 507 U.S. 292, 302 (1993) (citing *Salerno*, 481 U.S. at 746).

**398** United States v. Scott, 450 F.3d 863, 874 (9th Cir. 2006); *see also* Lopez-Valenzuela v. Arpaio, 770 F.3d 772, 791 (9th Cir. 2014) ("[T]he individualized determination of flight risk or dangerousness . . . [was something] *Salerno* deemed essential" in upholding the BRA's constitutionality.).

**399** *Lopez-Valenzuela*, 770 F.3d at 791.

**400** *Id.*

**401** *Wilks*, 15 F.4th at 846; *see also Stone*, 608 F.3d at 945; United States v. Stricklin, 932 F.2d 1353, 1354–55 (10th Cir. 1991); United States v. Moss, 887 F.2d 333, 338 (1st Cir. 1989); United States v. Hare, 873 F.2d 796, 798 (5th Cir. 1989); United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986); United States v. Perry, 788 F.2d 100, 115 (3d Cir. 1986); *Alatishe*, 768 F.2d at 371 n.14; United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985); United States v. Hurtado, 779 F.2d 1467, 1470 n.4 (11th Cir. 1985); *Orta*, 760 F.2d at 891 n.17.

**402** *Dominguez*, 783 F.2d at 707 (emphasis added); *see also Bail*, *supra* note 62, at 404 ("Once defendants '[come] forward with some evidence that [they] will not flee or endanger the community if released,' the presumption of flight risk and dangerousness is rebutted." (quoting *Dominguez*, 783 F.2d at 707)); *Jessup*, 757 F.2d at 380–84; *Alatishe*, 768 F.2d at 371.

**403** *Dominguez*, 783 F.2d at 707 ("Any evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of one or both of the presumptions, including evidence of their marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3).").

**404** *Id.*

**405** United States v. Jackson, 845 F.2d 1262, 1266 (5th Cir. 1988) (emphasis added).

**406** *Wilks*, 15 F.4th at 844.

**407** *Id.*

**408** *Id.* at 847; *see also* Siegler, *supra* note 394 ("Even if the defense does not carry its light burden of production . . . [, under *Wilks*,] *that lack of rebuttal does not, standing alone, authorize detention in a presumption case.*");

State v. Mascareno-Haidle, 2022 WL 2351632, at *8 (N.M. June 30, 2022) ("[P]retrial detention or release decisions cannot be made to turn on any single factor, be it the nature and circumstances of the charged offense(s) or otherwise.").

**409** *See Wilks*, 15 F.4th at 847; *Jackson*, 845 F.2d at 1266.

**410** *Jackson*, 845 F.2d at 1266 (quoting 18 U.S.C. § 3142(g)(2)).

**411** *Wilks*, 15 F.4th at 847; *see also* S. Rep. No. 98-225, at 23, *as reprinted in* 1984 U.S.C.C.A.N. at 3206:

> Subsection (g) enumerates the factors that are to be considered by the judicial officer in determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of any other person and the community. Since this determination is made *whenever a person is to be released or detained under this chapter*, consideration of these factors is required . . . [and] a court is expected to weigh all the factors in the case before making its decision as to risk of flight and danger to the community. (emphasis added).

**412** *Wilks*, 15 F.4th at 846–47 (emphasizing that the burden of persuasion never shifts to the defense); *Bail*, *supra* note 62, at 404 ("Even when a presumption of detention applies, the government continues to bear the ultimate burden of proving that no conditions of release will reasonably assure the defendant's appearance and the safety of the community.").

**413** *See, e.g.*, *Orta*, 760 F.2d at 891 n.17 ("In this case, the district court erred in interpreting the 'reasonably assure' standard set forth in the statute as a requirement that release conditions 'guarantee' community safety and the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act.").

**414** 18 U.S.C. § 3142(f), (e)(1).

**415** *Salerno*, 481 U.S. at 751 (emphasis added); *see also* United States v. Munchel, 991 F.3d 1273, 1280 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021) (citing this passage in reversing district court's detention order). The New Mexico Supreme Court recently reflected as follows on the clear and convincing evidence standard in the pretrial detention context:

> In keeping with the presumption of innocence that attaches to all defendants prior to conviction . . . [,] [p]roof by clear and convincing evidence represents that standard, one satisfied only by evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.

*Mascareno-Haidle*, 2022 WL 2351632, at *6 (citations and internal quotation marks omitted).

**416** *Dominguez*, 783 F.2d at 706.

**417** *See, e.g.*, *Bail*, *supra* note 62, at 404 (quoting *Dominguez*, 783 F.2d at 707).

**418** Courts generally treat even a rebutted presumption as relevant to a detention determination. *See Dominguez*, 783 F.2d at 707 (holding that a rebutted presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with the other evidence relevant to factors in § 3142(g)"); United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008); United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); *Hare*, 873 F.2d at 788–89; *Jessup*, 757 F.2d at 384; United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991); *Martir*, 782 F.2d at 1144. These cases are incorrect and should be reversed or limited. The non-bursting bubble presumption is likely unconstitutional and is a creation of the courts—not Congress. The BRA offers no textual support for the proposition that a judge can lawfully consider a *rebutted* presumption of detention in determining

whether detention is warranted. The statute does not say that a rebutted presumption remains relevant, and the presumption is not among the factors in § 3142(g). The presumption is likely unconstitutional since it impermissibly lowers the prosecution's evidentiary burden and substitutes for specific evidence of an individual arrestee's dangerousness and flight risk.

**419** 18 U.S.C. § 3142(e)(1); *Salerno*, 481 U.S. at 751.

**420** *See supra* note 418 and accompanying text.

**421** *See supra* note 386 and accompanying text.

**422** The team searched for all the written pretrial release decisions available on LexisNexis, filtered the decisions for those involving the presumption, and catalogued whether the decision ordered detention or release.

**423** It should be noted that this research does not capture all of the pretrial Detention Hearings in the First Circuit. It captures only written opinions that appear on LexisNexis, which may differ from the totality of bail decisions in unknown ways. The written opinions likely understate the detention rate in presumption cases, as they do not capture any of the cases in which an arrestee stipulated to detention. Regardless, the statistics remain illustrative and striking.

**424** For example, a recent article made multiple misstatements about the legal standard in presumption cases, erroneously claiming (1) that the defense bears the burden of persuasion, and (2) that the arrestee must affirmatively and definitively prove the absence of danger and flight risk. *See* Christine S. Scott-Hayward & Connie Ireland, *Reducing the Federal Prison Population: The Role of Pretrial Community Supervision*, 34 Fed. Sent'g Rep. 327, 327 (2022) ("[T]he statute sets out two situations where the presumption [of release] is reversed and, instead, *defendants* must demonstrate that they pose no risk to public safety and are not at risk of failing to appear." (emphasis added)).

**425** *See, e.g.*, *Jessup*, 757 F.2d at 380–84; *Dominguez*, 783 F.2d at 707; *Alatishe*, 768 F.2d at 371; *see also Bail*, *supra* note 62, at 404 (collecting cases).

**426** *Dominguez*, 783 F.2d at 707.

**427** The FCJC's legal research found similar results. Looking at the set of written detention opinions from the First Circuit referenced above, judges found the presumption rebutted in only 12% of presumption cases. They either found that the presumption was not rebutted or made no finding in the remaining 88% of cases.

**428** Verbatim Notes Form, United States v. Ernesto Morales Bacallao, No. 21-MJ-02179, (S.D. Fla. Feb. 4, 2021) (on file with the FCJC).

**429** In approximately 75% of the Detention Hearings where judges did not affirmatively find the presumption of detention rebutted, defense attorneys contested detention—they did not waive the Detention Hearing or otherwise agree to detention.

**430** Prosecutors erroneously invoked the presumption of detention at the Detention Hearing in two cases, one of which the judge affirmed at the hearing. Judges misapplied the presumption at detention at another two Detention Hearings.

**431** *See supra* note 52 and accompanying text.

**432** Note, *supra* note 51, at 1140; *see also id.* ("Judges can be expected to take advantage of loopholes in pretrial procedures.").

**433** 18 U.S.C. § 3142(e)(3)(A).

**434** Zunkel & Siegler, *Federal Judiciary's Role in Drug Law Reform*, *supra* note 53, at 291.

**435** At the Initial Appearance, the median bond imposed for presumption and non-presumption cases was $250,000 and $100,000, respectively.

**436** See *supra* note 388 and accompanying text.

**437** Of the 198 presumption cases we observed, 176 individuals were people of color. This is a slightly higher percentage of people of color than in the broader dataset.

**438** Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 50.

**439** *Id.*

**440** For example, Senator Durbin recently introduced the Smarter Pretrial Detention for Drug Charges Act, which eliminates the presumption of detention in drug cases. Smarter Pretrial Detention for Drug Charges Act of 2021, S. 309, 117th Cong. (2021), https://www.congress.gov/bill/117th-congress/senate-bill/309/text [https://perma.cc/B9C3-X6LL]. The bill has bipartisan sponsorship—in addition to Senator Durbin, Senators Coons, Lee, and Wicker cosponsor the legislation. Although broader reform to the presumption is needed, this bill takes a significant step in the right direction by addressing perhaps the most deleterious aspect of the presumption as it currently exists.

**441** *Wilks*, 15 F.4th at 844.

**442** *See, e.g.*, *Bail*, *supra* note 62, at 404 (quoting *Dominguez*, 783 F.2d at 707).

**443** *See supra* note 418 and accompanying text.

**444** 18 U.S.C. § 3142(c)(2).

**445** 18 U.S.C. § 3142(c).

**446** *See, e.g.*, United States v. Price, 773 F.2d 1526, 1528 (11th Cir. 1985) ("The policy of [the BRA] is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant.").

**447** United States v. Fidler, 419 F.3d 1026, 1028 (9th Cir. 2005).

**448** 18 U.S.C. § 3142(c)(1)(B)(xii).

**449** *See, e.g.*, S. Rep. No. 98-225, at 11, *as reprinted in* 1984 U.S.C.C.A.N. 3194 (acknowledging that financial conditions such as bail bonds and solvent surety requirements pose "the potential for . . . abuse"); *id.* at 9, *as reprinted in* 1984 U.S.C.C.A.N. at 3191–92 (stating that financial conditions of release are appropriate in a narrower subclass of cases than other conditions of release).

**450** Siegler Bail Hearing written statement, *supra* note 9, at 10–11.

**451** *See, e.g.*, S. Rep. No. 98-225, at 16, *as reprinted in* 1984 U.S.C.C.A.N. at 3199 ("The purpose of this provision is to preclude the *sub rosa* use of money bond to detain dangerous defendants.").

**452** *Id.* at 5, *as reprinted in* 1984 U.S.C.C.A.N. at 3187–88.

**453** *Id.* at 9, *as reprinted in* 1984 U.S.C.C.A.N. at 3191–92.

**454** *Id.* at 9, *as reprinted in* 1984 U.S.C.C.A.N. at 3192; *see also* Siegler Bail Hearing written statement, *supra* note 9, at 10–11.

**455** S. Rep. No. 98-225, at 10, *as reprinted in* 1984 U.S.C.C.A.N. at 3193. The 1966 Act did not attempt "to deal with evaluating defendants' dangerousness during the bail inquiry." Mani S. Walia, *Putting the Mandatory Back in the Mandatory Detention Act*, 85 St. John's L. Rev. 177, 192 (2011); *see also* H.R. Rep. No. 89-1541, at 3 (1966), *as reprinted*

*in* 1966 U.S.C.C.A.N. 2293, 2296 ("[P]retrial bail may not be used as a device to protect society from the possible commission of additional crimes by the accused.").

**456** S. Rep. No. 98-225, at 11, *as reprinted in* 1984 U.S.C.C.A.N. at 3194.

**457** *Id.*

**458** *Orta*, 760 F.2d at 890.

**459** *See, e.g.*, United States v. Edwards, 960 F.2d 278, 283 (2d Cir. 1992) ("We also note that the [BRA's provisions] primarily were drafted to deemphasize the use of money bonds as a condition of bail, while simultaneously permitting a court to consider the likelihood of flight and community safety in setting release conditions" (citations omitted)); United States v. Holloway, 781 F.2d 124, 127 (8th Cir. 1986) ("[B]ail is not to be set at a level that the defendant cannot make, so as to result in detention.").

**460** *Holloway*, 781 F.2d at 127.

**461** *See, e.g.*, *Resolution: NAACP Calls for Major Improvements to Bail Bonds*, NAACP (2016), https://naacp.org/resources/naacp-calls-major-improvements-bail-bonds [https://perma.cc/5JRG-BKS4] ("[T]he [NAACP] urges each state and municipality to adopt the Federal Bail System, to include various pretrial services . . . in lieu of money bail."); Ames Grawert, *Expert Brief: How to Fix the Federal Criminal Justice System (in Part)*, Brennan Ctr. for Just. (Jan. 2, 2020), https://www.brennancenter.org/our-work/research-reports/how-fix-federal-criminal-justice-system-part [https://perma.cc/H6DH-Z8ZZ] ("Federal pretrial release isn't perfect, but it's well ahead of where many of the states are today. It also offers ongoing proof that cash bail isn't necessary to preserve public safety."); Data for Progress & Just. Collaborative, The End Money Bail Act 5 (2020), https://www.filesforprogress.org/memos/money-bail-memo.pdf [https://perma.cc/SBD9-VQAF] (comparing "enormously successful" state reforms to the federal system, which does not "allow a person to be held based only on an inability to pay money bail").

**462** 342 U.S. 1 (1951).

**463** *Id.* at 5.

**464** 481 U.S. at 754.

**465** Some circuits, however, have disagreed, finding that "when faced with a risk of flight, [a] judge is entitled to set bail at a level he finds reasonably necessary; if defendant cannot afford bail, and must be detained pending trial, it is not because he cannot raise the money, but because without the money the risk of flight is too great." United States v. Mantecon-Zayas, 949 F.2d 548, 550 (1st Cir. 1991) (quotation marks omitted) (quoting *Jessup*, 757 F.2d at 388–89); *see also* United States v. McConnell, 842 F.2d 105, 108–10 (5th Cir. 1988); United States v. Wong-Alvarez, 779 F.2d 583, 584 (11th Cir. 1985). This flawed reasoning demonstrates that courts are circumventing the BRA's protections against excessive financial conditions. If a considerable amount of money is required to reasonably assure a person's appearance at trial, perhaps conditions of release are insufficient to secure their appearance and detention would be appropriate.

**466** Courts are ill-equipped to distinguish between honestly imposed bonds and *sub rosa* detention orders. Allowing financial conditions that result in pretrial detention, as some courts do, permits judges to bypass the many procedural requirements of a Detention Hearing, including the right to cross examine witnesses, testify, and present information by proffer. *See* 18 U.S.C. § 3142(f).

**467** 18 U.S.C. § 3142(b).

**468** 18 U.S.C. § 3142(c)(1)(B).

**469** 18 U.S.C. § 3142(c)(1)(B)(xi)–(xii).

**470** *See, e.g.*, 18 U.S.C. § 3142(c)(B)(i)–(xiv) (allowing judges to impose, *inter alia*, curfew, employment requirements, and electronic monitoring); *Holloway*, 781 F.2d at 125:

> The statute, § 3142(a), provides the judicial officer with a broad range of pre-trial release options. These options are to be considered sequentially, in order of severity, and the judicial officer is directed to select the option which is the least restrictive of the defendant but which will adequately assure his appearance for further judicial proceedings and will also protect the safety of the community.

**471** Siegler Bail Hearing written statement, *supra* note 9, at 10.

**472** S. Rep. No. 98-225, at 13–14, *as reprinted in* 1984 U.S.C.C.A.N. at 3196–97.

**473** United States v. Spiltoro, 786 F.2d 808, 816 (8th Cir. 1986); *see also* United States v. Irizarry, No. 22-3028, 2022 WL 2284298, at *2 (D.C. Cir. June 24, 2022) (holding that a court erred in making "global judgments about all defendants charged with offenses related to January 6, rather than on an individualized assessment of safety concerns or flight risks"); United States v. Tortora, 922 F.2d 880, 888 (1st Cir. 1990) ("Detention determinations must be made individually and . . . must be based on the evidence which is before the court regarding the particular defendant.").

**474** John L. Weinberg & Evelyn J. Furse, Federal Bail and Detention Handbook 29–30, Practising L. Inst. (2021) ("Many courts have a 'standard set' of conditions which are part of every defendant's appearance bond. It seems likely these include some conditions which are not necessary for specific defendants."); *see also* Timothy P. Cadigan & Christopher T. Lowenkamp, *Implementing Risk Assessment in the Federal Pretrial Services System*, 75 Fed. Prob. 46, 47 (Sept. 2011), https://www.uscourts.gov/sites/default/files/75_2_5_0.pdf [https://perma.cc/2D9J-34EN] (finding that unless the imposition of further conditions can "be demonstrated to increase the likelihood that the defendant will appear in court as required and/or reduce new offenses committed . . . , then the significant investment of pretrial release agencies and courts in these conditions and their enforcement is ineffective and unwise."). The overuse of conditions can also have adverse effects, particularly among low-risk arrestees. *See, e.g.*, Lowenkamp et al., *The Development of a Pretrial Screening Tool*, 72 Fed. Prob. 2, 3 (Dec. 2008), https://www.uscourts.gov/sites/default/files/72_3_1_0.pdf [https://perma.cc/V5B7-PWSS] ("[P]roviding intensive services and supervision to low-risk offenders does little to change their likelihood of recidivism and, worse, occasionally increases it.").

**475** *See generally* Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pretrial Just. Inst. (2013), http://web.archive.org/web/20160204155044/http://www.pretrial.org/download/research/Unsecured Bonds, The As Effective and Most Efficient Pretrial Release Option - Jones 2013.pdf (finding that unsecured bonds are just as effective at achieving public safety and court appearance as secured bonds).

**476** In our study, "financial conditions" include both secured bonds and unsecured bonds.

**477** BJS 2008–2010 Report, *supra* note 88, at 5.

**478** *How Federal Bail Bonds Work in the United States*, How Bail Bonds Work (Nov. 13, 2021), https://howbailbondswork.com/how-federal-bail-bonds-work [https://perma.cc/VJJ6-GAGZ].

**479** *Id.*

**480** *Id.*

**481** Color of Change & ACLU's Campaign for Smart Just., Selling Off Our Freedom: How Insurance Corporation Have Taken Over Our Bail System 14 (May 2017), https://www.aclu.org/sites/default/files/field_document/059_bail_report_2_1.pdf [https://perma.cc/XJ9K-SN84].

**482** *Who Really Makes Money Off of Bail Bonds?*, The Atlantic (May 12, 2017), https://www.theatlantic.com/business/archive/2017/05/bail-bonds/526542/ [https://perma.cc/3V54-F46Q].

**483** Allie Preston et al., *Fact Sheet: Profit Over People: Inside the Commercial Bail Bond Industry Fueling America's Cash Bail Systems*, Ctr. for Am. Progress (Jul. 6, 2022), https://www.americanprogress.org/article/fact-sheet-profit-over-people/ [https://perma.cc/383U-RR74].

**484** *See, e.g.*, Joshua Page, *I Worked as a Bail Bond Agent. Here's What I Learned.*, The Appeal (Apr. 4, 2019), https://theappeal.org/i-worked-as-a-bail-bond-agent-heres-what-i-learned/ [https://perma.cc/9GD5-JKLT].

**485** United States v. Nebbia, 357 F.2d 303 (2d Cir. 1966).

**486** In this district, as well as in Miami, judges frequently used cash or corporate surety bonds in cases involving noncitizen arrestees. Bonds are set at rates that typically prevent arrestees from securing release, thus acting as de facto detention orders.

**487** This requirement prevents those who are self-employed from acting as solvent sureties.

**488** Ava Kofman, *Digital Jail: How Electronic Monitoring Drives Defendants into Debt*, ProPublica (July 3, 2019), https://www.propublica.org/article/digital-jail-how-electronic-monitoring-drives-defendants-into-debt [https://perma.cc/A6C7-8M5W].

**489** In our study, we were unable to determine how often judges required arrestees to cover the cost of their own electronic monitoring.

**490** *See, e.g.*, Angela Hanks et al., *Systemic Inequality: How America's Structural Racism Helped Create the Black-White Wealth Gap*, Ctr. for Am. Progress (Feb. 21, 2018), https://www.americanprogress.org/issues/race/reports/2018/02/21/447051/systematic-inequality/ [https://perma.cc/FHF7-AQSB].

**491** *See, e.g.*, *id.*

**492** *Id.*

**493** *Id.* tbl.5 (showing that Black and white households make nearly the same debt payments relative to their incomes).

**494** John H. Doyle et al., *Report of the Working Committees to the Second Circuit Task Force on Gender, Racial and Ethnic Fairness in the Courts*, 1997 Ann. Surv. Am. L. 117, 317–18 (1997).

**495** In the secured bond cases we observed, 24% of arrestees were Black, 68% were Latino, and only 5% were white. The arrestee's race was marked as unknown in 3% of secured bond cases; we assume, given the high percentage of people of color in our sample overall, that these arrestees were most likely people of color of ambiguous ethnicity.

**496** In the CSB cases we observed, 19% of arrestees were Black, and 79% were Latino. One arrestee's race was marked as unknown; we assume, given the high percentage of people of color in our sample overall, that this arrestee was most likely a person of color of ambiguous ethnicity.

**497** Transcript of Detention Hearing at 7–8, United States v. Ramos, No. 21-MJ-02141 (S.D. Fla. Feb. 11, 2021), ECF No. 21.

**498** 18 U.S.C. § 3142(c)(2).

**499** *Id.*

500 Transcript of Detention Hearing at 8, United States v. Ramos, No. 21-MJ-02141 (S.D. Fla. Feb. 11, 2021), ECF No. 21.

501 The Cardone Report, *supra* note 37, at xiv.

502 Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 48 (In Phase 1 of our Chicago pilot study, "[p]rosecutors only provided a valid basis for detention in 5 percent of [Initial Appearances] and only provided evidence to support the request in one case. . . . [D]uring Phase 2, prosecutors either explicitly cited the statute or used the words 'serious risk of flight' in 82 percent of the Initial Appearances in which clients were detained without conceding detention.").

503 *Id.* at 51 ("FCJC's courtwatching revealed that the defense waived Detention Hearings 35 percent of the time. But after FCJC held its training [for the defense bar], the defense waived the hearing just 22 percent of the time.").

504 Siegler & Zunkel, *Rethinking Federal Bail Advocacy*, *supra* note 4, at 46.

505 *Id.*

506 *Id.*

507 *Id.*

508 *Id.* at 47–48.

509 *Id.* at 48.

510 *Id.* at 47.

511 *Id.*

512 *The Administration of Bail by State and Federal Courts: A Call for Reform, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. On the Judiciary*, 116th Cong. 3 (Nov. 14, 2019) (testimony of Alison Siegler, Dir. Federal Criminal Justice Clinic, University of Chicago Law School).

513 *Id.*

514 Siegler Bail Hearing written statement, *supra* note 9.

515 *Salerno*, 481 U.S. at 755 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

516 Federal Bail Reform Act of 2020, H.R. 9065, 116th Cong. (2020).

517 Justice Roundtable, Transformative Justice: Justice Roundtable's Recommendations for the New Administration and 117th Congress 22–23 (2020), https://www.sentencingproject.org/wp-content/uploads/2020/11/Transformative-Justice.pdf [https://perma.cc/NF4F-C7TD].

518 Memorandum from Alison Siegler, Dir. Federal Criminal Justice Clinic, University of Chicago Law School, to the Biden-Harris Administration, *Federal Bail Priorities for the Biden-Harris Administration: Executive Branch Policies* (Dec. 7, 2020), https://perma.cc/UY3B-KEXY.

519 Siegler & Harris, *supra* note 23.

520 *Id.*

521 The students in the 2020–2021 FCJC cohort were Miami Courtwatching Site Managers Sam Bonafede, Kate Harris, and Stephen Ferro, as well as Michael Belko, Clare Downing, Mikaila Smith, and Adam (Psi) Simon.

522 *See supra* note 96.

523 Coase-Sandor is a research institute at the University of Chicago Law School that employs economic and quantitative approaches to the law.

524 Hearings were marked as unobserved if interns were unable to locate a courtwatcher Verbatim Notes Form for them. For the purposes of our project, we were most interested in the final Detention Hearing, as this allowed us to ascertain the ultimate determination over the course of the entire pretrial detention/release process.

525 The students in the 2021–2022 FCJC cohort were Team Leaders and Primary Authors Clare Downing, Stephen Ferro, Angela Chang, and Jaden Lessnick; Project Managers Krysta Kilinski and Jacqueline Lewittes; Interview Team Leaders Alessanrdo Clark-Ansani and Kilinski; and FCJC students Mikaila Smith and Paige Petrashko.

526 See *supra* Executive Summary for details. For a list of districts and circuits in which we conducted interviews, see *supra* note 7.

527 Percentages may not add up to 100% due to rounding.

528 * Indicates fewer than 10 cases observed in the category. ** Indicates fewer than 5 cases observed in the category.

529 *See supra* note 10 and accompanying text.

530 *See supra* note 35 and accompanying text. Racial disparities in law enforcement and prosecution may themselves be a result of conscious or unconscious bias. *See supra* note 36 and accompanying text.

531 Transcript of Detention Hearing at 7, United States v. Ramos, No. 21-MJ-02141 (S.D. Fla. Feb. 11, 2021), ECF No. 21.

532 When CSB cases are included in the rate of prosecutors' detention requests, the rate at Initial Appearance increases to 75%, the rate at Detention Hearing increases to 83%, and the overall percentage increases to 67%.

533 *2020 Federal Sentencing Statistics*, U.S. Sent'g Comm'n (May 2021), https://www.ussc.gov/research/data-reports/geography/2020-federal-sentencing-statistics [https://perma.cc/K4EU-3QDZ]. The percentages include 7 categories of cases: antitrust, bribery/corruption, forgery/counterfeit/copyright, fraud/theft/embezzlement, immigration, money laundering, and tax.

534 We did not observe any non-(f)(1) cases in Salt Lake City.

535 Because we did not observe any non-(f)(1) cases in Salt Lake City, there was a valid statutory basis for detention at the Initial Appearance in every case we observed in that district.

536 Because we did not observe any non-(f)(1) cases in Salt Lake City, there was a valid statutory basis for detention at the Initial Appearance in every case we observed in that district.

537 We recorded an individual as "partially represented by counsel" or "represented during part of the Initial Appearance" if they received representation after substantive questioning by a judge about financial conditions or other elements of their case. In contrast, we recorded an individual as "fully represented" or "represented during the entire Initial Appearance" only if a defense attorney was present for the entire hearing and appeared to be representing the arrestee from the beginning of the hearing. We tracked this distinction because of the potential for arrestees to inadvertently incriminate themselves before they receive appointed counsel—a potential that was realized in multiple cases that we observed.

This Report reveals a fractured and freewheeling federal pretrial detention system that has strayed far from the norm of pretrial liberty.

To begin to remedy the many harms of mass pretrial detention and support the positive outcomes of pretrial release, federal judges must shift the culture from one prioritizing pretrial detention to one prioritizing pretrial release.

It is incumbent upon judges to act boldly and to be guided by data, not institutional pressures. Ultimately, federal judges have the power to uphold the rule of law, to make detention prior to trial the rare exception, and to be champions of liberty.

THE UNIVERSITY OF CHICAGO
THE LAW SCHOOL
Federal Criminal Justice Clinic