**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **Plaintiff,** | § | |
| **V.** | § | **CAUSE NO.  5:25-cr-04750-MIS** |
| | § | |
| **MAXWELL JENSEN** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE SIXTH AMENDMENT RIGHT TO COUNSEL

Defendant Maxwell Sterling Jensen ("Mr. Jensen"), by and through counsel, moves to suppress statements and derivative evidence obtained after the return of the Texas indictments - Apr. 17, 2025; superseding May 22, 2025 - through the Government's knowing use of a Source of Information ("SOI") to deliberately elicit uncounseled incriminating statements and investigative leads. The motion is grounded in the Sixth Amendment and the *Massiah* line of cases. Moreover, as the Defendant is still waiting on Government information as ordered by the Court, the Defendant will be asking for leave to supplement this Motion dependent on the information that will hopefully subsequently be received from the Government.

### I.  STATEMENT OF RELEVANT FACTS AND TIMELINE

#### A.  TEXAS CHARGES

**April 17, 2025:** Grand jury returns Texas indictment, sealed, in the Southern District of Texas, Brownsville Division, Case 1:25-cr-00257. Counts include 18 U.S.C. § 1956(a)(1)(B)(i) & (h) (money laundering conspiracy), 18 U.S.C. § 545 & 2 (smuggling), 18 U.S.C. § 542 & 2 (false entry), and money-laundering spending under 18 U.S.C. § 1957.

**May 22, 2025:** Texas superseding indictment returned; includes, among other counts, an additional conspiracy count under 18 U.S.C. § 2339B (material support to designated foreign terrorist organization).

**October 28, 2025:** Texas second superseding indictment returned.  The indictment expands the time period for the alleged violations and includes, among other counts, additional and broader money laundering counts, and an additional count under 18 U.S.C. § 2314 and 2 (interstate transportation of stolen property).

### B.  SOI INTRODUCTION / POST-ATTACHMENT CONTACTS

**June 11, 2025:** FBI SA Nathan Jeronimus receives a forwarded call from an individual later used as the SOI; caller says they were hired to break a lock and remove property and, critically, had searched the hiring party's name and found the person "*had previously been indicted by the Federal Government.*"  **Ex. "A" - Tr. 13:20 – 14:9**.

**June 11, 2025:** At that time, the caller was not working for the FBI. **Ex. "A" - Tr. 14:10–12**.

**June 18, 2025:** An in-person meeting with the SOI occurs; the agent testifies the in-person interview in which he was involved occurred on June 18, 2025.  **Ex. "A" - Tr. 31:8–16**.

**June 18, 2025:** New Mexico complaint affidavit states that on June 18, 2025, an FBI agent in Midland was "notified by a confidential source" that Jensen was orchestrating a scheme involving stolen crude oil to be stored at 4154 7 Rivers Highway, Carlsbad, New Mexico, with daily quantities and value estimates. Doc. 1; see affidavit ¶ 4.

**August 21, 2025:** The New Mexico criminal complaint is filed charging 18 U.S.C. § 2314. See Doc. 1. The hearing transcript also references an "August 21st instance" where the SOI wore a device/wire. **Ex. "A" - Tr. 41:25–42:1; 46:8–17**.

**C. SPECIFIC FACTS FROM THE FEB. 18, 2026 HEARING TRANSCRIPT**

**The June 11, 2025 call shows law enforcement knowledge of Texas indictments:**

i.     SA Jeronimus testifies he was working on June 11, 2025 and received a forwarded phone call. **Ex. "A" - Tr. 13:20–23**.

ii.     The caller described being hired to break a lock and remove property and stated he searched the hiring person's name and found the person "*had previously been indicted by the Federal Government.*" **Ex. "A" - Tr. 14:4–9**.

iii.     Jeronimus confirms the caller was not working for the FBI at the time of that June 11 contact. **Ex. "A" - Tr. 14:10–12**.

**SOI later becomes official, incentivized, and controlled:**

i.     Jeronimus testifies that later the source "did work in an official capacity…for another agency," and he understood that was when the source was "recording phone calls and providing them." **Ex. "A" - Tr. 15:11–14**.

ii.     On the SOI's "benefit," Jeronimus testifies the SOI was not promised anything but "would accept payment" and "would accept having a criminal history expunged." **Ex. "A" - Tr. 31:24–32:3**.

**Recorded calls flowed through DPS / interagency control:**

i.     Jeronimus testifies Texas law enforcement officers Special Agent Orr and Special Agent Brown received recorded calls. **Ex. "A" - Tr. 28:7–9**.

ii.     He explains the SOI would record calls on one phone while speaking on another. **Ex. "A" - Tr. 28:17–19**.

iii.     The Court questions whether the Government has all calls; Jeronimus states he would be aware because he was told by Texas DPS that DPS had sent "all the calls," and he

identifies that DPS sent them directly or "through" "the Bureau of Land Management." **Ex. "A" - Tr. 43:12–22**.

**Government proffered intended trial use:**

i.      The AUSA states recorded calls are "incriminating" in the Government's view and the Government wants to "use those recorded calls at trial." **Ex. "A" - Tr. 58:8–11**.

ii.     The AUSA further points to text messages and communications as evidence of knowledge and investigative leads. **Ex. "A" - Tr. 58:13–23**.

**Government control/direction admissions:**

i.      On cross, Jeronimus testifies the agency "in control" of the SOI was the Texas Department of Public Safety; the agent was Special Agent Brown; and Brown was "communicating, directing, and leading the source," "in most cases." **Ex. "A" - Tr. 40:11–19**.

ii.     Jeronimus acknowledges he is only aware of his own in-person meeting; he did not ask DPS how many times DPS met with the SOI. **Ex. "A" - Tr. 41:1–7**.

**Device/wire provided by law enforcement**

i.      The Court asks if the SOI wore a wire; Jeronimus testifies there was "one instance" and that it was "a device provided by law enforcement to the source." **Ex. "A" - Tr. 46:8–17.**

ii.     Jeronimus testifies that what was recorded "by the wire," the SOI was involved in the conversations. **Ex. "A" - Tr. 46:19–25**.

**D.  SOI USED IN COORDINATION WITH THE SOUTHERN DISTRICT OF TEXAS**

The hearing record raises substantial concerns as to whether the SOI was being used to obtain information from Mr. Jensen after indictment in connection with the already-pending Southern District of Texas prosecution.

Agent Jeronimus' testimony then supplied a factual basis for that concern. He testified that, on June 11, 2025, the caller told him he had searched Mr. Jensen's name and found that Mr. Jensen "had previously been indicted by the Federal Government," and that the caller was concerned he was being involved in a criminal case. **Ex. "A" - Tr. 14:6-13**. Thus, from the outset, law enforcement knew the person they were dealing with had already been indicted elsewhere.

The record also shows that the SOI was not operating in a vacuum or solely with New Mexico agents. Agent Jeronimus testified "that source did work in an official capacity, later on, for another agency." **Ex. "A" - Tr. 15:10-15**.  He further testified that Special Agent Orr and Special Agent Brown—"Texas law enforcement officers, Texas State law enforcement officers"—received the recorded calls directly from the SOI. **Ex. "A" - Tr. 28:5-19**. That testimony places Texas personnel at the center of the post-indictment source activity.

Most importantly, defense counsel directly asked Agent Jeronimus: "At any point prior to that meeting, sir, did you have any conversations with the U.S. Attorney in the Southern District of Texas regarding his case down there?" **Ex. "A" - Tr. 70:8-11**. Agent Jeronimus did not deny all such communications. Instead, he answered: "Not directly with the U.S. Attorney for the Southern District of Texas, no, sir." **Ex. "A" - Tr. 70:12-13**. When counsel immediately followed up—"But with whom?"—the Government objected before the witness answered.  **Ex. "A" - Tr. 70:14-18**. The Court then stated: "Yeah, it's not relevant. It might be relevant to a Sixth Amendment issue . . . ." **Ex. "A" - Tr. 70:19-20**. That exchange is critical. It suggests that there were, in fact, conversations with someone connected to the Southern District of Texas matter, even if not

"directly" with the U.S. Attorney himself, and the Court expressly recognized that the unanswered question bore on the Sixth Amendment analysis.

In short, the hearing record supports the inference that the SOI was being used, at least in part, in coordination with the Texas case after Mr. Jensen's right to counsel had attached there. The transcript shows: (1) law enforcement knew at the outset that Mr. Jensen had already been indicted; (2) Texas officers were receiving the calls; (3) the SOI later worked in an "official capacity" for another agency; (4) there were at least some communications with someone tied to the Southern District of Texas case; and (5) the defense did not receive a complete, unredacted account of those communications.

On this record, the Government cannot credibly maintain that the SOI was used only for an unrelated New Mexico purpose. The more reasonable inference is that the SOI was being used to gather post-indictment information from an already-indicted and represented defendant, and the Government has not fully disclosed the communications showing how that occurred.

## II.   ARGUMENT

### A.  GOVERNING SIXTH AMENDMENT FRAMEWORK

The Sixth Amendment guarantees the accused the right to assistance of counsel in "all criminal prosecutions." Once adversary judicial proceedings begin, the Government may not "deliberately elicit" incriminating statements from the accused in the absence of counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964) (post-indictment use of codefendant with transmitter; statements "deliberately elicited" and inadmissible).

The Supreme Court has extended *Massiah* to settings where the Government uses an informant to create or exploit an opportunity to obtain statements outside counsel's presence. *United States v. Henry*, 447 U.S. 264, 274 (1980) (*Massiah* violation where Government

"intentionally creat[ed] a situation likely to induce" incriminating statements).  *Maine v. Moulton*, 474 U.S. 159, 176–80 (1985) (affirmative obligation not to circumvent counsel; incriminating statements about pending charges inadmissible even if police also investigate other crimes).

In the Fifth Circuit, a *Massiah* claim is typically analyzed as requiring: (1) attachment, (2) government agent, (3) deliberate elicitation. *See, e.g., United States v. Bates*, 850 F.3d 807, 809–10 (5th Cir. 2017) (three-part framing); *United States v. Age*, 136 F.4th 193 (5th Cir. 2025) (same; plus jailhouse-informant agency test).

In the Tenth Circuit, the court held that "Massiah and Henry condemn deliberate efforts by the government to create situations in which indicted defendants are likely to make incriminating statements to seemingly independent others in the absence of counsel." *U.S. v. Geittmann*, 733 F.2d 1419 (10th Cir. 1984).  Building on this foundation, the Tenth Circuit in *U.S. v. Taylor*, 800 F.2d 1012 (10th Cir. 1986), articulated the specific test that courts must apply: "in order to find a violation of a defendant's Sixth Amendment right to counsel, a court must find that defendant's statements (1) were made to a Government agent, and (2) were deliberately elicited." *U.S. v. Taylor*, 800 F.2d 1012 (10th Cir. 1986). This two-pronged test has become the standard framework for analyzing *Massiah* claims in the circuit.

### B. ATTACHMENT

The Sixth Amendment right to counsel "attaches" at or after the initiation of adversary judicial proceedings, including by formal charge, preliminary hearing, indictment, information, or arraignment.  *See Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (initial appearance where charge is read and liberty restricted triggers attachment).

Here, the Texas indictments were returned on **April 17, 2025**, superseded **May 22, 2025,** and second superseded **October 28, 2025**. That fact alone establishes attachment as to those Texas offenses from the date of indictment, as well as the Government's ongoing investigation.

Critically, the hearing transcript shows that by **June 11, 2025**, the SOI told the FBI agent he searched Jensen's name and found Jensen "had previously been indicted by the Federal Government." **Ex. "A" - Tr. 14:6–9**. Thus, when the Government later received recorded calls, texts, and other materials from that SOI, law enforcement was on notice that adversary proceedings were already underway. **Ex. "A" - Tr. 14:6–9**.

### C. GOVERNMENT AGENCY / STATE ACTION

*Massiah* applies when the person eliciting statements is a government agent. *Moulton* describes the State's "affirmative obligation not to act in a manner that circumvents" the right to counsel. *Maine v. Moulton*, 474 U.S. 159, 176–80 (1985). *Henry* emphasizes paid/incentivized informant use and government creation of an inducive situation. *United States v. Henry*, 447 U.S. 264, 274 (1980).

The Fifth Circuit agency analysis for informants commonly asks whether the informant (1) was promised/led to believe/received a benefit and (2) acted under government instruction or control. *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998) (two-prong agency test).

The hearing transcript contains multiple government-agency admissions. First, the SOI evolved beyond "private citizen" status. Special Agent Jeronimus testified the SOI later worked "in an official capacity…for another agency" and that this was the period in which the SOI was "recording phone calls and providing them." **Ex. "A" - Tr. 15:11–14**.

Second, the SOI had an incentive structure consistent with agency. Jeronimus testified the SOI would accept "payment" and would accept having his "criminal history expunged." **Ex. "A"**

**- Tr. 32:1–3**. Under *Henry* and *Creel/Age*, such expected benefits strongly support government-agent status.

Third, the SOI operated under interagency control, including Texas DPS direction. Jeronimus testified Texas DPS was "in control" of the SOI; Special Agent Brown was the controlling official; Brown was "communicating, directing, and leading" the SOI "in most cases." **Ex. "A" - Tr. 40:11–19**.

Fourth, the SOI operated within an interagency pipeline for recordings and evidence. Jeronimus testified Texas DPS agents Orr and Brown received recorded calls from the SOI. **Ex. "A" - Tr. 28:7–9**. The Court further elicited that DPS told Jeronimus it had sent "all the calls," and that DPS sent calls directly or "through" the Bureau of Land Management. **Ex. "A" - Tr. 43:14–22**. That is state action.

Fifth, the SOI used law-enforcement equipment. Jeronimus testified at least one wire/device was "provided by law enforcement to the source." **Ex. "A" - Tr. 46:13–17**. Provision of the recording equipment and coordination for its use are classic markers of an agency relationship under *Massiah/Moulton/Henry*.

### D.  DELIBERATE ELICITATION AND ITS APPLICATION

"Deliberate elicitation" under *Massiah* is not limited to formal "interrogation." It covers indirect and surreptitious efforts by government agents, including informants, to produce incriminating statements once the right has attached. *Massiah v. United States*, 377 U.S. 201 (1964). *Henry* finds deliberate elicitation where the Government intentionally creates a situation likely to induce incriminating statements. *United States v. Henry*, 447 U.S. 264 (1980). *Moulton* finds a violation where officers knowingly exploit an opportunity to confront the accused through

an agent, and it rejects a defense that the accused "initiated" the contact. *Maine v. Moulton*, 474 U.S. 159 (1985).

On this record, the SOI did not merely overhear conversations. The Court asked whether the calls were between the SOI and Mr. Jensen; the agent testified that in every instance he knew, the SOI was "having" the conversation with Mr. Jensen. **Ex. "A" - Tr. 41:21–23**. That is active participation, not passive listening. The SOI recorded calls and supplied them to DPS agents. **Ex. "A" - Tr. 28:7–9, 28:17–19**. At least one operational episode involved a "wire" or device "provided by law enforcement." **Ex. "A" - Tr. 46:13–17**. The Government has already articulated an intent to use the recorded calls at trial because multiple calls are "incriminating" in the Government's view. **Ex. "A" - Tr. 58:8–11**. Texas DPS controlled the SOI, and Brown was "communicating, directing, and leading" him "in most cases." **Ex. "A" - Tr. 40:11–19**.

Taken together, the facts support the conclusion that law enforcement created and managed a relationship designed to produce recorded admissions and incriminating communications after attachment, which is precisely what *Massiah* forbids.

### E. *CASES ARISE FROM SAME CORE THEORY*

After the Texas indictment was returned, the Government remained free to investigate. It was not free, however, to use a cooperating source to circumvent counsel and deliberately obtain statements from Mr. Jensen about the same underlying criminal enterprise for which his right to counsel had already attached. *Massiah v. United States*, 377 U.S. 201, 206 (1964); *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Under *Blockburger v. United States*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test … is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304 (1932). The Supreme Court has reaffirmed

the same-elements inquiry in later double-jeopardy cases, explaining that the test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' … and double jeopardy bars … successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993).  In *Texas v. Cobb*, the Court held there is no "factually related" exception; <u>the Sixth Amendment extends to the charged offense and any uncharged offense that would be the same offense under *Blockburger*. *Cobb*, 532 U.S. 162 at 173 (2001)</u>.  Under *Blockburger*, offenses are not the same if each requires proof of a fact the other does not.  284 U.S. 299 (1932).  The Tenth Circuit strictly applies the *Blockburger* test following *Texas v. Cobb*, rejecting any "factually related" or "inextricably intertwined" exceptions that might extend Sixth Amendment protections beyond charged offenses.  *U.S. v. Mullins*, 613 F.3d 1273 (10th Cir. 2010). In *United States v. Mullins*, the court emphasized that Sixth Amendment protections are "offense specific" and attach only to charged offenses or those that would be considered the same offense under *Blockburger*. *Id*.

The Supreme Court also makes clear that greater/lesser-included offenses are treated as the "same" under Blockburger because the lesser offense "requires no proof beyond that which is required for conviction of the greater." *Brown v. Ohio*, 432 U.S. 161, 168 (1977).

Critically for Fifth Circuit practice, *Blockburger* is an elements inquiry. The Fifth Circuit explains that *Blockburger* requires courts to "compare the two statutes at issue" and that "[t]he *Blockburger* inquiry focuses on the statutory elements of the offenses, not on their application to the facts of the specific case before the court." *United States v. Singleton*, 16 F.3d 1419, 1424 (5th Cir. 1994).

The Government may try to frame the New Mexico investigation as merely "related" to, but legally distinct from, the already-pending Texas prosecution. *Texas v. Cobb* forecloses that

shorthand. *Cobb* holds that the Sixth Amendment right to counsel is offense-specific, but it also makes clear that the right extends to offenses that are the same offense under the *Blockburger* test. *Cobb*, 532 U.S. 162 (2001).  *Blockburger* asks a straightforward question: whether each offense requires proof of a fact that the other does not. Thus, the relevant inquiry is not simply whether the two cases arise from the same factual narrative, but whether the Government, after attachment, used the SOI to deliberately elicit statements about an offense that was already charged or that would qualify as the same offense under *Cobb/Blockburger*.

That distinction matters here because this is not merely a "same core theory" case. It is also a same charged statute case. The Texas second supeseding indictment expressly charges Maxwell Sterling Jensen in Count Eight with violating 18 U.S.C. § 2314, alleging that from January 2018 through April 2025 he knowingly transported, transmitted, and transferred crude oil in interstate and foreign commerce, valued at $5,000 or more, knowing the oil had been stolen, converted, and taken by fraud.  The New Mexico indictment likewise charges Jensen in Count Two with violating 18 U.S.C. § 2314, alleging that on or about June 18, 2025, he transported stolen crude oil in interstate commerce, valued at $5,000 or more, knowing it had been stolen, converted, and taken by fraud, while on release in the Texas case.

The core elements of a § 2314 charge, as pleaded in both indictments, are materially the same:

(1) transportation, transmission, or transfer in interstate commerce;

(2) goods, wares, or merchandise—here, crude oil;

(3) value of $5,000 or more; and

(4) knowledge that the property was stolen, converted, or taken by fraud.

In the New Mexico indictment, the § 3147 allegation adds a while-on-release enhancement, but that enhancement does not alter the underlying fact that both indictments charge Jensen with the same substantive federal offense under § 2314.

That is the key point under *Cobb*. The defense position is not merely that the two indictments involve overlapping facts, overlapping actors, or the same general crude-oil enterprise. The point is narrower and stronger: before the Government used the SOI to obtain post-attachment statements and investigative leads, Jensen had already been indicted in Texas and subsequently charged with the same substantive statute—18 U.S.C. § 2314—that later appeared again in the New Mexico case. Under *Cobb*, the Sixth Amendment does not turn on whether prosecutors later package the conduct in a new indictment, pair it with additional counts, or describe it as part of a different investigation. *Cobb*, 532 U.S. 162 (2001).  It turns on whether the later-elicited statements concerned the same offense, as measured by *Blockburger*.  *Id*.

The New Mexico indictment and the Texas second superseding indictment are both built around the same commodity, the same defendant, and the same alleged illegal oil-trafficking enterprise.  The Government's theory in both districts depends on the same underlying premise: the crude oil was illicitly obtained, moved through commerce, and monetized through concealment and false documentation.

Once the Texas case was indicted, the Government could not avoid the Sixth Amendment by treating post-indictment source activity as though it concerned some wholly separate matter when, in reality, the source was being used to gather statements about the same crude-oil enterprise. If the Government's proof is that the oil in both cases was stolen or otherwise illicitly obtained and then moved, concealed, sold, and monetized through the same general scheme, then post-

indictment questioning through a directed source implicated the very subject matter for which counsel had already attached. *Moulton*, 474 U.S. at 176, 180.

Accordingly, the Court should suppress statements deliberately elicited through the source after attachment of the Sixth Amendment right to counsel, as well as evidence derived from those statements. To the extent the Government contends the New Mexico and Texas prosecutions are materially distinct, that contention only underscores the need for an evidentiary hearing and for production of the recordings, communications, and agent instructions showing what the source was directed to obtain from Mr. Jensen after indictment.

### F. FRUITS AND DERIVATIVE EVIDENCE

Courts recognize that exclusion can extend beyond the recorded statements themselves to evidence derived from the constitutional violation, "fruit of the poisonous tree", and that this doctrine applies to Sixth Amendment violations as well. *United States v. Terzado-Madruga*, 897 F.2d 1099 (11th Cir. 1990) (*Massiah* violation for post-indictment recorded informant conversations despite asserted "other crime" purpose; discusses suppression for indicted-case use and fruit analysis).

The SOI's communications led to investigative leads and law enforcement actions. The Government attributes surveillance and knowledge development to text messages and communications with the defendant. **Ex. "A" - Tr. 58:13–23**. The New Mexico criminal complaint affidavit attributes probable-cause development to the SOI tip (June 18, 2025) describing the scheme and identifying the Carlsbad "Target Location." See Doc. 1 at affidavit ¶ 4.

### III. REQUESTED RELIEF

Accordingly, Defendant seeks suppression of:

a. All SOI-recorded calls, wire recordings, texts, screenshots, and related statements, to the extent they incriminate the Texas or New Mexico indicted offenses and were obtained after April 17, 2025 without counsel present, through deliberate elicitation by a government agent; and

b. All derivative evidence obtained as a direct product of those violations, including warrants, subpoenas, surveillance targets, and witness identifications traceable to the impermissible elicitation, unless the Government proves independent source, inevitable discovery, or attenuation.

## IV.   PRAYER

Defendant respectfully requests that the Court: 1) Grant this motion and suppress all post-attachment recordings, calls, texts, screenshots, and related statements obtained through the SOI as a government agent in the absence of counsel; 2) Suppress all fruits/derivative evidence traceable to those violations absent a Government showing of independent source, inevitable discovery, or attenuation; and 3) Any further relief to which this Defendant may show himself to be justly entitled.

Respectfully Submitted,

/s/ Benigno (Trey) Martinez
BENIGNO (TREY) MARTINEZ
State Bar No.  00797011
Federal ID No. 23945
MARTINEZ / TIJERINA, PLLC
1201 E. Van Buren
Brownsville, Texas 78520
Tel:  956-550-4868
Fax:  956-621-0135
E-mail: trey@mbmtlawfirm.com

Robert Guerra, Lead Counsel
Federal ID No. 570991
State Bar No. 24036694

1201 E. Van Buren St.
Brownsville, Texas 78520
Ph. (956) 254-0694
E-mail: rguerra@rguerralaw.com

Benjamin Brock
New Mexico Bar No. 141535
1013 E. San Antonio Ave.
El Paso, Texas 79901
Tel: 915-412-5858
Fax: 915-503-2224
E-Mail:  brock@brockmorganbenjamin.com
***Attorneys for Defendant***
***Maxwell Sterling Jensen***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 23rd day of March, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and service to all CM/ECF registrants.

/s/ Benigno (Trey) Martinez
BENIGNO (TREY) MARTINEZ