**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
                vs.             )   NO: 25-CR-4750 MIS
                                )
MAXWELL STERLING JENSEN,        )
                                )
                Defendant.      )


TRANSCRIPT OF PROCEEDINGS
MOTION HEARING
BEFORE THE HONORABLE MARGARET I. STRICKLAND
UNITED STATES DISTRICT JUDGE
WEDNESDAY, FEBRUARY 18, 2026
1:39 P.M.
LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO


(Proceedings recorded by machine shorthand and transcript produced by Computer-Aided Transcription.)

REPORTED BY:      VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
                  Federal Official Court Reporter
                  100 N. Church Street
                  Las Cruces, NM  88001
                  Phone:  (575) 528-1430
                  Email:  Vanessa_Alyce@nmd.uscourts.gov


UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

<u>**EXHIBIT "A"**</u>

2

Appearances of Counsel:


FOR THE UNITED STATES:

                UNITED STATES ATTORNEY'S OFFICE
                District of New Mexico
                200 N. Church St.
                Las Cruces, NM  88001
                BY:  ALYSON HEHR, ESQ.
                     JAMES DICKENS, ESQ.


FOR THE DEFENDANT:

                BENJAMIN LAW OFFICE
                1013 E. San Antonio
                El Paso, TX 79901
                BY:  BROCK BENJAMIN, ESQ.

                and

                MARTINEZ/TIJERINA, PLLC
                1201 E. Van Buren
                Brownsville, TX 78520
                BY:   BENIGNO MARTINEZ, ESQ.

                and

                LAW OFFICE OF ROBERT GUERRA, PLLC
                1201 E. Van Buren St.
                Brownsville, TX 78520
                BY:   ROBERT L. GUERRA JR., ESQ.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

(In Open Court at 1:39 P.M.)

THE COURT: All right. The next case is *United States versus Jensen*.

May I have entries of appearances, please?

MS. HEHR: Good afternoon. Alyson Hehr on behalf of the United States.

THE COURT: Good afternoon, Counsel.

MR. BENJAMIN: Good afternoon, Your Honor. Brock Benjamin on behalf of Mr. Jensen.

MR. MARTINEZ: Trey Martinez on behalf of Mr. Jensen as well.

MR. GUERRA: And Robert Guerra on behalf of Mr. Jensen as well.

THE COURT: Good afternoon to you. We are here on the motion to suppress evidence. I got the motion to continue. I've reviewed that, so -- but -- so Mr. Benjamin, the Government's position is there's not a search in this case. So if I decide this motion based on whether or not there was a search, do you need extra time for discovery to determine whether this person was working as a Government agent?

MR. BENJAMIN: Your Honor, if the Court's inclined -- you're inclined to grant the suppression today, no, I don't.

THE COURT: No, no, I understand that. If I'm

**EXHIBIT "A"**

going to determine today -- if I'm going to decide this issue based solely on whether or not this was a search at all, then do you need time for extra discovery?

MR. BENJAMIN:  Your Honor, based upon the statements last night and the conversation I just had in the hallway with the United States, yes.  Because my gut is a hundred percent accurate that there is other information out there.  And the document dump we got last night is what confirms that.  And so a very specific piece of information that I would like to have before I cross-examine the agent on whether or not there was a search is a call log from June of 2025 from the agent and the confidential informant.  And that's just one -- one issue that I think will lock the Government in, and that hasn't been disclosed.  And I'm --

THE COURT:  Let me just say you filed this motion to suppress before there was even a scheduling order, so I don't understand all the complaints now about how discovery is coming out.  Discovery is not concluded till March.

MR. BENJAMIN:  Well, but, Your Honor, the issue is my client's detained in green (indicating), and there's not a case here, is the concern.  And so the problem that I have is that -- and the Government's position is, "We're going to give you what we give you when we give it to you," but they have -- and they haven't produced information regarding an individual who has been identified through

discovery, Carlos Contreras, who is the brother of the codefendant, Christian Contreras. They produced, last night, rap sheets for three individuals that kind of seemingly are co-located. But what they're doing is they're holding very tight all the cards regarding Mr. Jensen, who is, I think, even under their theory now that seems to be coming out tangentially, related under some tangential theory, I mean --

THE COURT: Well, I'm sure you want all the information, regardless of whether it's, you know, potentially going to be admitted at trial or not, right?

MR. BENJAMIN: I do, but what I want, Your Honor, is I want the information that is -- directly shows that the complainant in this case -- excuse, me the CI -- "C" words are confusing me this afternoon --

THE COURT: Yeah, yeah, yeah.

MR. BENJAMIN: -- that the confidential informant in this case is, one, not credible; two, is searching -- is working as a direct individual -- agent of the United States; and then, three, then we can move on and deal with the case. But I can't do that because my email from January 23rd was filed after those conversations. And, yesterday, I get materials that I was specifically told did not exist when I made those conversations in that email.

And so -- and to reasonably prepare for today's

<u>**EXHIBIT "A"**</u>

6

hearing:  Was the CI paid?  I don't know, and that hasn't been disclosed prior to today's hearing.

THE COURT:  Well, does it matter -- does it matter whether the CI was paid or how often the CI talked to the agent or any of those things if it wasn't a search?  Because that's the Government's position, is it's not a search.

MR. BENJAMIN:  Your Honor, I don't even -- based upon the exhibit and the -- what's going to be the exhibit -- and the reason I cut and pasted the August 14th recording in there is that is a federal agent telling the confidential informant how he's going to set up my client -- or actually, not my client.  Mr. Rees.

THE COURT:  Right.

MR. BENJAMIN:  I don't know how there can't be Government acts.  And it's not a search.  It's whether or not they were directing, encouraging, and the test out of -- *Poe*, the two-factor test, whether they were encouraging, directing, and engaging the individual, and whether they had a personal interest or a pecuniary interest to do it.

And *Poe* is the -- I want to say *"banditos,"* but it's the bounty hunters case where the bounty hunters turned in an individual who was having drug deals in their house. And the Court found that the bounty hunters didn't have any benefit -- they were doing it all for their own benefit,

**EXHIBIT "A"**

because they were going to collect the benefit of the individual with the outstanding warrant --

THE COURT:  Okay.

MR. BENJAMIN:  -- it wasn't to benefit the United States.

Here, the August 14th call specifically shows this is only being done to benefit the United States.  And my concern here is without the -- and I'll go back to my first request, which I think is Number 13 in that motion -- without those call logs, I can't show what -- there was a month before the recordings in this case start.  During that month, my gut, which was right on January 23rd and is right today, I believe, tells me that he was -- there was communications -- and I'm going to get Mr. Guerra, because he's the one that memorized those things -- tell me about when these ROIs that haven't been produced cover and document, in my experience, the conversations between the FBI and the confidential informant.  And so there's a lot of things missing.

And so if last night's document dump had had the information, and they were just providing that in a Jencks manner, which I complain about all the time, but would have been sufficient --

THE COURT:  Yeah.

MR. BENJAMIN:  -- yes.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

8

THE COURT:  Okay.

MR. BENJAMIN:  So it's not a search, Your Honor. And I think the Government flat-out just generally missed the mark in their response.  The issue is the two tests in *Poe*, which I think is on page 2 of my motion, which is whether the Government was encouraging or directing them, and whether the individual, the agent, had a personal benefit out of it or the Government was getting a benefit. And both of those questions are answered in the affirmative as far as the Government.

THE COURT:  Okay.  But that is about a search. *Poe* is about a search.  So okay.

MR. BENJAMIN:  It's a Fourth Amendment violation, yes.

THE COURT:  Yeah, a Fourth Amendment violation that is a search.

MR. BENJAMIN:  Because the Government is directing how and who to conduct that search.

THE COURT:  Okay.  So we're back to search.

So I'm going to find out what exactly the Government got from the SOI.  And then we will see about -- if I can rule on this, on whether it's a search or not, I might just do that.  Obviously, if there's -- if it is a search, you need additional information about -- showing that the SOI was acting on behalf of the Government or,

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

like, as an agent, then I'll probably just continue it so you can look through whatever it is you need to look through.

So from the Government, what all did you get from the source of information, just, like, in categories?  So I know you got screenshots of text messages.  You got recorded phone calls.  What else did you get?

MS. HEHR:  Your Honor, to the best of my recollection --

THE COURT:  No, no.  You don't know everything you got from the thing we're here about?  Do you have an agent who can tell us what all was gotten?

MS. HEHR:  Your Honor, we did get the screenshots and the recordings, but the --

THE COURT:  What else did you get?

MS. HEHR:  That's it so far.

THE COURT:  Are you sure?  Do you have your agent here?

MS. HEHR:  We do have our agent here, yes.

THE COURT:  Go ask, make sure, and verify with your agent that that's what you got:  Screenshots of text messages and recorded phone calls.

(Discussion off the record.)

MS. HEHR:  Your Honor, there were no --

THE COURT:  I'm sorry, so sorry.  One second.

<u>**EXHIBIT "A"**</u>

(Discussion off the record.)

THE COURT:  All right.  Go ahead, Counsel.

MS. HEHR:  Yes, Your Honor.  There were no additional screenshots or -- I'm sorry.  We got the screenshots and the recordings.  And my agent did remind me that we did have the recording from the takedown when we arrested Thomas Rees, Christopher Ortega at the location, and that has all --

THE COURT:  Okay.  I'm asking about things that the source of information gave.

MS. HEHR:  Yeah, that was it.

THE COURT:  Okay.  Do you want to put the agent on to verify that that's all the agent got, Counsel?  Or do you want to accept that proffer from the Government?  Because you said he got other stuff in your motion.

MR. MARTINEZ:  Trey Martinez on behalf of the defendant.  If I may?

THE COURT:  Uh-huh, sure.

MR. MARTINEZ:  And if I can give you a little bit of context, Judge, Mr. Guerra and I represent Mr. Jensen down in the Texas case.

THE COURT:  Okay.

MR. MARTINEZ:  Okay.  That was a case that was filed back in April of 2025.  And then he was released on bond in May of 2025.  Since that time, while he was indicted

**EXHIBIT "A"**

and while he was represented, there's been an issue in regards to maybe potentially not just a Fourth Amendment violation, but there's an even bigger issue in regards to a Sixth Amendment violation.

THE COURT:  Okay.

MR. MARTINEZ:  Okay?  And so these are the issues that we need to discuss and some of the things that we need to discover, which is part and parcel of the list that we're requesting from the Court in regards to conversations that were had, at the time that Mr. Jensen was represented and already indicted, by agents of the Government with anybody else in the Southern District of Texas or within the Western District of Texas and New Mexico, and how this conversation came to be; how they approached the SOI.

So all of these are very relevant not just in regards to the Fourth Amendment issue, Judge, but also in regards to the bigger issue of whether somebody who was already represented and already indicted in another case and an SOI was approached after all this knowledge was known. So we're asking for that discovery so that we can make sure that we have all that before we move forward.

THE COURT:  Okay.  That's fine.  We're here on a Fourth Amendment motion to suppress.

MR. MARTINEZ:  Understood.

THE COURT:  Is the Sixth Amendment even mentioned

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

12

in the motion to suppress?

MR. BENJAMIN:  No, it's not.

THE COURT:  Okay.  I was just looking to see.

MR. MARTINEZ:  It's not, Judge.

THE COURT:  It's interesting.  Do you want me to put the agent on the stand to see if he has anything other than screenshots of text messages and phone calls?

MR. BENJAMIN:  Yes, Your Honor.

THE COURT:  Call your agent.

MS. HEHR:  The United States calls Special Agent Nathaniel Jeronimus.

(Whereupon the witness was duly sworn under oath.)

THE COURT:  Go ahead, Counsel.

MS. HEHR:  Your Honor, just for clarification, is this just related to what we were discussing or the entire Fourth Amendment?

THE COURT:  No, no, just the -- I'm trying to determine whether there was a search or not.

MS. HEHR:  Okay.

THE COURT:  Okay.  So ask him for absolutely all the information he got from the source of information that would either be used -- well, let's just do absolutely all the information he got from the source of information.  Go ahead, Counsel.

**NATHAN JERONIMUS**,

<u>EXHIBIT "A"</u>

13

After having been first duly sworn, did make the following answers:

### DIRECT EXAMINATION

Q.  (BY MS. HEHR):  Can you please state and spell your name for the record.

A.    My name is Nathan Jeronimus.  Last name is J-E-R-O-N-I-M-U-S.

Q.    And where are you employed?

A.    I'm employed at the Federal Bureau of Investigation.

Q.    What is your job with the FBI?

A.    I am a special agent.

Q.    And how long have you been a special agent with the FBI?

A.    Since 2023.

Q.    Where is your duty station?

A.    It is in Midland, Texas.

Q.    And what are your duties as an FBI special agent?

A.    I investigate allegations of crimes, primarily in major theft.

Q.    And were you working on June 11, 2025?

A.    I was.

Q.    Did you receive a phone call that day?

A.    I did.

Q.    Can you briefly explain that phone call?

A.    A phone call was forwarded to me from the FBI office

**EXHIBIT "A"**

regarding a person who had reached out to the FBI because they were concerned that they were being involved in potentially some criminal conduct.  So this person reached out, and I spoke with them.  And they described being hired by an individual who needed them to go and break a lock and remove property from a location.  And they had searched this person's name and found that this person had previously been indicted by the Federal Government, and they were concerned that they were being involved in a criminal case.

Q.   And was this person working for the FBI when you received that call?

A.   No.

Q.   Was he working --

THE COURT:  So we're not talking about whether he was working for the FBI or if he was an agent of the FBI or any of that.

MS. HEHR:  Okay.

THE COURT:  I want to know absolutely all the information the source of information gave your agent during the course of the investigation.

Go ahead.

Q.   (BY MS. HEHR):  Did the source do anything to corroborate the information that he gave to you over the phone?

A.   Yes, the source did basically record phone calls,

**EXHIBIT "A"**

15

later on, for another agency, and also provided screenshots to myself that corroborated the information that we discussed in that phone call.

Q.   And other than those phone calls that he recorded and the screenshots of the text messages, did he send you any other documents?

A.   Not to my knowledge.  He did provide information over phone calls and in an in-person interview at a later date.

Q.   But no documents, nothing additional that he sent you?

A.   Apart from the documents and screenshots that were documented, correct.  At a later date, that source did work in an official capacity, later on, for another agency, but -- so, you know, I think that's when that source was recording phone calls and providing them.

MS. HEHR:  No further questions, Your Honor.

THE COURT:  All right.  Agent, so when he -- when the source of information gave you screenshots, the person who made the phone call that had you received June 11, 2025, what were the screenshots of?

THE WITNESS:  The screenshots that came possibly a later date from June -- there was a period of time covering a month -- they were of conversations with Maxwell Jensen and, additionally, screenshots of individuals that were coming to Mr. Jensen's properties to conduct business; screenshots of -- screenshots of his phone, including, you

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

know, documents; one of them, some banking details.

THE COURT: Okay. And did you understand where those came -- the pictures of the people coming from the property -- coming to the property to conduct business, where that came from?

THE WITNESS: From the SOI, was my understanding.

THE COURT: Okay. And the screenshots of the banking documents, did you say?

THE WITNESS: Yes.

THE COURT: Did you understand where he got those from?

THE WITNESS: That they were received from Mr. Jensen to the -- that were sent to the SOI.

THE COURT: From Mr. Jensen.

So the source of information didn't go get the documents from somewhere, that was something Mr. Jensen had sent him?

THE WITNESS: That --

THE COURT: And the source of information sent that information to you?

THE WITNESS: That's my understanding.

THE COURT: Okay. And then what about the people coming to the property? Like, was that, like, outside the property, was that inside the building? Where was, physically, those photos taken?

THE WITNESS:  It was a yard located in Odessa, Texas, from my understanding, looking into purchasing crude oil stored at the property.

(Simultaneous discussion off the record.)

THE COURT:  I'm sorry, say that one more time.

THE WITNESS:  These individuals were looking into purchasing crude oil stored in sort of a fenced property in Odessa, Texas.

THE COURT:  And the picture of these people is outside the yard or inside the yard?

THE WITNESS:  I think he -- he obtained a license plate number and passed that license plate number on.  But I don't know if that was inside the yard or outside the yard when they were leaving.

THE COURT:  Okay.  Let me just write that down. So he -- the picture of the yard in Odessa, people coming to visit to maybe buy the oil, is literally just a picture of the license plate?

THE WITNESS:  Yes, I believe so.

THE COURT:  Oh, okay.  And then you said he gave you some more information in a call and then later in an in-person interview -- or it sounds like an in-person interview; is that right?

THE WITNESS:  Yes, at a later date.

THE COURT:  Okay.  And that information that he

gave you in a call and interview, did any of it come from him looking through any of Mr. Jensen's property, looking -- things that he would have seen while he was on Mr. Jensen's property?

THE WITNESS:  Not to my knowledge.  From my understanding, they were things that Mr. Jensen told him that he relayed to us.

THE COURT:  Okay.  So just things he was told, nothing he saw?  Is that right?

THE WITNESS:  As far as I can recall, yes.

THE COURT:  Do you have a copy of your report?

THE WITNESS:  Not here with me today, but --

THE COURT:  Do you have a copy of his report?

MS. HEHR:  Not printed, Your Honor.

THE COURT:  You don't have a copy of the agent's report that you were calling to have testify?

MS. HEHR:  Not -- not printed out, Your Honor.  I have them --

THE COURT:  Does the defense have a copy of the agent's report?

MR. BENJAMIN:  We have one that was produced this morning, Your Honor.  I think that's what the Court's referring to.

THE COURT:  I don't know.

How many reports did you write?

**EXHIBIT "A"**

19

THE WITNESS:  Regarding reports from the source of information?

THE COURT:  Uh-huh.

THE WITNESS:  Five reports.

THE COURT:  Okay.  Do you have all those reports?

MR. BENJAMIN:  I have one, specifically, that we were planning on using, Your Honor, but I have all the other reports if he's referring to them that have been produced. I do have some questions about -- if he says five reports, I think -- anyway, I don't want to guess, but, I mean, I can show him documents that have been produced, Your Honor, that have his name on them, yes.

THE COURT:  Okay.  I'm just concerned, because I want to make sure -- the Government's position is that there was no search.  I want to make sure that that's accurate, that all the information that the agent was given was Mr. Jensen -- excuse me, the source of information telling him things that he heard directly from Mr. Jensen and potentially a license plate -- which, I mean, I guess I can go back and look, but I'm pretty sure you don't have a privacy interest in your license plate -- so that's what I'm trying to figure out.  So I wanted him to see his report since he says "to the best of his recollection."  I don't want problems later.

So do you want email my chambers a copy of the

**EXHIBIT "A"**

reports?

MS. HEHR:  Sorry, Your Honor.  Can you repeat that?

THE COURT:  I want all of his reports so we don't have these problems I'm talking about.

MS. HEHR:  Yes, Your Honor.

THE COURT:  Do you want to email my chambers a copy of all the reports?

MS. HEHR:  Yes, Your Honor.

THE COURT:  Okay.

Jess, can we print those when we get them?

COURT CLERK:  Yes, ma'am.

THE COURT:  All right.  Go ahead with the cross-exam.

MR. BENJAMIN:  And, Your Honor, I'm going to start with what the Court zeroed in on, because my concern is that it's not -- my concern is that the search doesn't occur if it's simply information that was handed over or was -- that was browsed; it's how the source of information got the information, and the Government knew of or acquiesced in the party's intrusive conduct, which is --

THE COURT:  I agree the information -- how the source of information got the information is, right.  Was the source of information even conducting a search or not?  So...

MR. BENJAMIN:  I think his entire employment is the search, Your Honor, is the issue.  And if -- and I can articulate that or can I do it asking --

THE COURT:  No.  Explain to me what you mean, just so I understand where we're going.

MR. BENJAMIN:  Your Honor, the agent just testified.

THE COURT:  Right.

MR. BENJAMIN:  And taking him at face value that the SOI calls the FBI and says, "I was asked to commit an offense" --

THE COURT:  Right.

MR. BENJAMIN:  -- because that's what's in the ROI, "and I'm concerned about that," that's a citizen calling in and reporting a crime.  And the citizen's able to do that.

THE COURT:  Right.

MR. BENJAMIN:  The next statement that I believe the agents made to him over the course of 30 days is, "You told us that Max Jensen was indicted," which is what I believe he just testified --

THE COURT:  Right.

MR. BENJAMIN:  -- that the SOI calls and says, "I'm concerned about working for this guy."  And that statement's not in the report, Your Honor, that the SOI ran

the report and found out -- or ran him on Google and found out that he was indicted.

THE COURT:  Okay.

MR. BENJAMIN:  But -- so that triggered the FBI's interest in my client.  And they said, "Can you record stuff?  Can you share stuff?  Can you provide us this?"  And the text messages that the agent is calling a "license plate" is on June 18th, was in the United States' motion for bond --

THE COURT:  Okay.

MR. BENJAMIN:  -- or challenging the bond, that is a request for the yard -- or for the location where the oil is being picked up.  It's not a license plate.  It's what they're calling the "locus of the crime."

THE COURT:  Okay.

MR. BENJAMIN:  So I believe the agent -- and we don't have recorded calls on June 18th.  We simply have to go with -- I believe we're going to have messages from the SOI and the agent saying, "When he tells you where the oil is coming from, share that with us."  That's because that's -- they're knowing it and they're telling him to do it.  And then he doesn't have a financial benefit, like the bounty hunters, in providing that information because it doesn't benefit him, it's going to benefit the United States.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

23

THE COURT:  Okay.

MR. BENJAMIN:  That's the search.  And that's one of the searches, in a nutshell.

THE COURT:  A search has to be something -- has to be the Government looking into something that people have a reasonable expectation of privacy in.  How does he have a reasonable expectation of privacy in his text messages he's sending somebody else, or phone calls?

MR. BENJAMIN:  Because I have a reasonable expectation of privacy when I communicate with my employee --

THE COURT:  Okay.  Taking attorney-client privilege out of it -- you --

MR. BENJAMIN:  No --

THE COURT:  -- he didn't have that.

MR. BENJAMIN:  -- no, but when my client communicates with his employee information that is not publicly available -- that I have a reasonable expectation of privacy in, which is not publicly available information, it's not information that's posted on the wall or anything else, and so the information is given to that employee, if that employee chooses to share that information -- "My boss is driving drunk tonight; he just left a bar," that's a public service.

THE COURT:  Right.

24

MR. BENJAMIN:  But if it's being asked in order to investigate information that the FBI does not have access to and can only get by directing, encouraging, knowing, and acquiescing to, under Pope [sic], and the person providing that private information does not have a financial benefit -- and the one financial benefit that I'm really interested in is if they're paying him --

THE COURT:  Right.

MR. BENJAMIN:   -- but does not benefit him, like the bounty hunters, he's searching and providing information for the benefit of the United States, at the direction of the United States, then the United States is getting the benefit and invading his Fourth Amendment right to be free from unreasonable searches and seizures.

THE COURT:  Okay.  What's the search, though? What's the --

MR. BENJAMIN:  The information that's being provided.

THE COURT:  But you think that Mr. Jensen had a reasonable expectation of privacy in text messages he was just sending to somebody else and phone calls he was just making to somebody else?

MR. BENJAMIN:  It was his employee.  And the issue here is that --

THE COURT:  Okay.  What -- I mean, I've never

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

25

heard of that before.  So do you have some case or something that says you have a reasonable expectation, under the Fourth Amendment, for something you say to an employee, that --

MR. BENJAMIN:  *Smith*, Your Honor (reading), The Government must affirmative -- and I missed a "not" -- must not affirmatively engage, initiate, or instigate private action.

Here --

THE COURT:  Of a search.

MR. BENJAMIN:  There -- correct, Your Honor.

THE COURT:  Yes.

MR. BENJAMIN:  And the search is my client's company information.  Because, as Special Agent Orr, in interviewing Tom Rees, says, "We know that you're doing this."  And one of the things that is interesting on all these audio calls -- and Your Honor, there are 30 days of audio calls.  So the 30 days of audio calls is the SOI constantly bringing up what he's going to be able -- what do you think we can do for this?  How much can we get this oil for?  How much can we get it below?  And he never provides anything of benefit to anybody except for the Federal Government.  His employment is solely for the benefit of United States.  There has been many times during the course of his employment when my client offers him a contingency,

a -- what do I want to call a fee that's based upon something?

THE COURT:  Yeah.

MR. BENJAMIN:  The SOI never bites on any of that, Your Honor.  The only reason he is with Big Striker or Mr. Jensen is to provide and be a funnel to receive information that was -- this is not information that Max was sharing with the world.  "I'm willing to pay $50 for a barrel of oil" on a billboard.

THE COURT:  Yeah.

MR. BENJAMIN:  This is information that he says, "If you think you can get this, let's do this."  And then he funnels that directly back at the direction of the agents, to the FBI.

THE COURT:  All right.  You can ask the agent questions about what all the agent received from the SOI.

Go ahead.

MR. BENJAMIN:  Thank you.

**CROSS-EXAMINATION**

Q.  (BY MR. BENJAMIN):  And Agent, you received -- or, specifically, Special Agent Orr -- you're familiar with who he is, correct?

A.  Yes, sir.

Q.  He received what the source of information passed on, what my client was willing to provide for oil, correct?

<u>**EXHIBIT "A"**</u>

27

A.    I believe so, yes.

Q.    The ticket -- "yes" or "no"?

A.    Sorry, could you rephrase your question, sir?

Q.    You received, during the recorded calls, what my client was willing to pay individuals for oil, correct?

A.    I did not receive that.  Special Agent Orr received that.  He's with another agency, yes, sir.

Q.    Have you listened to the calls in this matter?

A.    I've listened to a number of calls in this matter.

Q.    How many calls in this matter?

A.    I could not say off the top of my head, but probably at least 15.

Q.    Fifteen?  And there's 30 days' worth, right?

A.    To the best -- if you say so, sir, yes, sir.

Q.    Who was --

MR. BENJAMIN:  Your Honor, I'm going to outside the scope, but based upon the agent's answers, I would like to ask him who was controlling this -- who was having communication after June 11th with this individual.

THE COURT:  Why?

MR. BENJAMIN:  Because the agent just appears to have been brought here because he doesn't have knowledge of what the intimate facts are here, is my concern.  What I got out of the exchange, Your Honor, is:  "I briefly have listened to 15 calls, maybe 15 calls," and I don't think he

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

28

has --

THE COURT:  If you think another person received information from the source of information, you can ask the agent if he knows who that was.

Q.   (BY MR. BENJAMIN):  Do you need me to repeat it or can you answer the Court's question?

A.   So, yes, Special Agent Orr and Special Agent Brown with -- who are Texas law enforcement officers, Texas State law enforcement officers, received those recorded calls.

Q.   Okay.  And they were the ones -- were they monitoring the recorded calls real time?

A.   No.

Q.   In what kind of frequency?  Daily?

A.   I'm not sure how often they received the updated calls to my understanding.

Q.   How did they receive the calls?

A.   They received the calls directly from the SOI, who would record the calls on one phone while speaking on another phone.

Q.   Okay.  And then did he -- and then how did we get the audios?  Did he send those -- did he text or email those audios or were those downloaded?

A.   I'm not sure exactly what medium he provided the recorded calls to Special Agents Orr and Brown.

Q.   Are you familiar with a call -- are you familiar with

**EXHIBIT "A"**

a call on July 28th that was 48 minutes long that involved the SOI and his wife and there was directions going on from an agent to move the phone so that they could hear what was occurring on the phone better?

A.   I'm not aware of that call, no, sir.

Q.   Okay.  Are you aware of a call on August 14th --

MR. BENJAMIN:  May I play a call, Your Honor?  This is a call that I put in the motion to continue.

THE COURT:  Okay.

MR. BENJAMIN:  I was going to play it just through the --

THE COURT:  Actually, you can't play it because we don't -- our audio is not working, but proffer to me what's in the call.

MR. BENJAMIN:  This is the call that's the transcript there, Your Honor.  If I do it the old-fashioned way and just put the speaker next to the microphone, I think the agent will hear it.

THE COURT:  What do you -- what's the deal with the call?  What do you -- what's going on?

MR. BENJAMIN:  This is the call that I was going to ask him which agent was directing the SOI in how to interact that day and what to tell Mr. Rees and how to tell them that the oil was stolen.

THE COURT:  We're just talking about the actual

materials the source of information gave to law enforcement, so I don't see the relevance of that.

Q.   (BY MR. BENJAMIN):  Did you receive --

MR. BENJAMIN:  May I approach, Your Honor?

THE COURT:  Show it to the Government first.

MR. BENJAMIN:  I did, Your Honor.

THE COURT:  Okay.

Q.   (BY MR. BENJAMIN):  Are you familiar with this text message (indicating)?

A.   I'm not familiar with that text message.  I believe that was provided to SAs Orr and Brown.  But I'm familiar with the content of the text messages.

Q.   Would it surprise you if the Government thought this text message was important enough to use in a motion?

A.   I'm sorry, sir?

Q.   This text message provides the location of the yard, correct?

A.   Yes.  I believe that would probably be the second time the source provided that address.

Q.   And special agents asked the source of information to find out where this yard was, right?

A.   I'm not aware of that.  In fact, we were provided that address, I believe, on June 18th --

Q.   Okay.

A.   -- in an in-person interview.

Q.   Okay.

A.   And the source provided that address during that interview.

Q.   Do you remember, on direct, saying the only time you'd had an in-person interview was after these calls had ended?

A.   After my personal phone calls with the source.  Yes, sir.

Q.   When were in-person interviews conducted with the source of information?

A.   The one in which I was involved occurred on June 18th of 2025.

Q.   On June 18th, the source of information texted you -- or texted the Federal Government this message about the yard location, right?

A.   I believe the address was provided in person, to my recollection, during an in-person interview.

Q.   Okay.  And he came in at your -- at the agents' request, right?

A.   He had offered to meet with us, yes, sir.

Q.   Is that like offering to provide a voluntary statement, Agent?

A.   Him approaching us is, yeah.  His participation in this was voluntary.

Q.   What was his benefit in this participation?

A.   Well, he wasn't promised anything.  He was told

**EXHIBIT "A"**

that -- he, one, wanted to do the right thing; and, two, he would accept payment; and also he would accept having a criminal history expunged.

THE COURT:  Okay.  So we're talking about what exactly was given to the law enforcement by the source of information.

Go ahead.

Q.  (BY MR. BENJAMIN):  And was -- and the source of information provided oil prices.  We've covered that, correct?

A.  Yes, I believe they were text messages -- the screenshots of text messages with Mr. Jensen in which he described how much he would pay pumpers for oil.

MR. BENJAMIN:  May I approach, Your Honor?

THE COURT:  Show it to the Government first.

MR. BENJAMIN:  I did, Your Honor.

THE COURT:  Okay.

Q.  (BY MR. BENJAMIN):  Are you familiar with what that is, Agent?

A.  I believe that's a load ticket.

Q.  Okay.

THE COURT:  It's a what?

MR. BENJAMIN:  Load ticket, Your Honor.

THE COURT:  All right.  Sorry.

MR. BENJAMIN:  It's okay, Your Honor.  I had down

"load ticket" earlier and was corrected by an individual earlier that it was a "run ticket."

THE COURT:  Okay.

Q.  (BY MR. BENJAMIN):  So, Agent, that was provided to you by the source of information, correct?

A.   It's possible.  These tickets all look very similar. For me to know if that's, like, the exact ticket or the exact date of a screenshot I was provided, I'd have to confirm.

Q.   Well, that screenshot -- and I'll represent -- I'll supplement the record that's exhibit -- I'm going to mark that as "six underscore run ticket."  That's a screenshot of somebody taking a picture of a load ticket on their leg; is that fair?

A.   I'll accept that description.  I didn't look at the context of the photo, but okay.

MR. BENJAMIN:  May I approach, Your Honor?

THE COURT:  Sure.

Q.  (BY MR. BENJAMIN):  (Indicating.)

A.   Yeah, it looks like a photo somebody snapped of a ticket.

Q.   And that came from the source of information, right?

A.   I do recall receiving photos of tickets from the SOI. Yes.

Q.    And so that I can lay a background why this is important --

A.    Okay.

Q.    -- why is it -- what does a load ticket tell us for oil?

A.    Typically, a load ticket is going to describe whenever a trucking service picks up a load of oil in an oil hauler. And they test the oil and they look at its quality and temperature and they accept it and they list the latitude and longitude of wherever they received it from.

Q.    And, more importantly, the load ticket doesn't have it, but you can infer value from what the quality of that oil that was on the load ticket, right?

MS. HEHR:  Your Honor, I would object that this is getting out of the relevance again.

THE COURT:  Yeah, it's not relevant.

Agent, where did the source of information get this ticket?

THE WITNESS:  I think it was through the course of their activities that they were being directed to conduct.

THE COURT:  So what does that mean?

THE WITNESS:  I guess, essentially, through their work under -- under Mr. Jensen.

THE COURT:  So he got the -- the source of

information got this ticket from Mr. Jensen?  Or did the source of information go through Mr. Jensen's things in order to find this ticket?

THE WITNESS:  No, my understanding, if I remember correctly, was they were attempting to sell oil from a site in Texas -- and Counsel, maybe you can remind me from the context -- but I believe that this was a truck that came to pick up a load of oil, and that's the ticket that the SOI received in performing those activities.

THE COURT:  Okay.  The answer to that is important.  So we're going to have your agent look at his documents, his reports, and then I'm going to -- you'll do a redirect.  But do you understand why I want to know where all the information came from?

MS. HEHR:  Yes, Your Honor.

THE COURT:  All right.  Go ahead, Counsel.

Q.  (BY MR. BENJAMIN):  That was during the course and scope of his employment, right?

A.  Yes, sir.

Q.  And one of the things they talked about on the information on the calls was how they were going to buy oil cheaper than other individuals, right?

A.  I couldn't say off the top of my head if that was a conversation -- are you referring to the call between a special agent and -- or between the source and Mr. Jensen?

**EXHIBIT "A"**

36

Q.   (BY MR. BENJAMIN):   Between my client and the source of information, multiple calls, not -- majority of the calls talk about how they can find a source -- a lower price of oil, right?

A.   Yeah, I think, in most calls, they're trying to locate people who are selling crude oil.

Q.   And are you familiar with the chart that was provided that the source of information gave to the Federal Government that showed what Mr. Jensen was willing to pay based upon the BS&W which is on the run ticket, right?

A.   I believe I heard a chart discussed --

Q.   Okay.

A.   -- with law enforcement officers, but yeah.

Q.   And that chart's important because that chart showed what my client was commercially reasonably willing to pay, and his employee knew that, right?

A.   I -- I can't say from my personal knowledge, but, yeah, I would assume, yes, the chart is Mr. Jensen's slide scale of oil quality and prices he's willing to pay.

Q.   And was that information that Mr. Jensen was willing to let out in the wild or publish?

A.   To be honest, I've seen schemes in which people do advertise the prices that they pay for crude oil of varying quality.

Q.   But that's a choice that that employer or the company

makes, right?

A.   Yeah, employer or they -- however it's just informal knowledge that this group accepts this price for oil and this group accepts that price.

Q.   And as you listen to the calls, Mr. Jensen, multiple times, can be heard discussing with the source of information that he doesn't want -- that he wants to figure out how to find a lower price.  He's not advertising that he wants to find a lower -- the information is the request to find a lower price, right?

MS. HEHR:  Objection, Your Honor.  This is again getting outside of the relevance.

THE COURT:  Yeah, that's not relevant.

Go ahead, Counsel.

MR. BENJAMIN:  Your Honor, it's the -- and I'm going to use the term "private commercially protected information" that is the substance --

THE COURT:  Yeah, do you have a case or something that says that you have a Fourth Amendment right to expectation of privacy in that kind of situation?

MR. BENJAMIN:  Your Honor, I will because I believe I've seen it.

THE COURT:  All right.

MR. BENJAMIN:  Because it comes into play in other types of white-collar cases.

THE COURT:  You have two lawyers sitting there. See if they can find it for you.  Because I've never heard of a Fourth Amendment protection in that situation.  I'm going to have my clerk look for it too.  If I find it, then I guess we can go back through this, but I don't think that's something.

MR. BENJAMIN:  Okay.

Q.  (BY MR. BENJAMIN):  You were also provided context out of the phone messages by the source of information from my client; is that fair?

A.  I think, in some instances, they provided context to the screenshots.

Q.  And just so we're not differentiating, when you say "screenshots," that's just because that was the source of information taking screenshots, and that's how he decided to send them to them, to the agents, right?

A.  Yeah.  I think, in some instances, he would take screenshots.

Q.  And the source was in daily communication with these agents?

A.  I'm not sure how often he was in communication with those agents.

Q.  Regularly, though, right?

A.  To my understanding.

Q.  I mean, if you were running somebody, you would be in

**EXHIBIT "A"**

39

daily communication or regular communication with them, right?

A. Not all the time. Some cases span years.

Q. I'm sorry?

A. No, I would not. It depends on the case.

Q. Would you let this individual use his own judgment?

A. No. I think, in some cases, you have sources that run for years, and you can't feasibly speak to your source every single day for the length of the case.

MR. BENJAMIN: Your Honor, may I have a second?

THE COURT: Sure.

(Discussion off the record.)

Q. (BY MR. BENJAMIN): And, Agent, I'm going to take a stab at this one. The information that was provided, the contacts were requested by the source from Mr. Jensen by [sic] not given by Mr. Jensen voluntarily in all cases; is that fair?

A. I'm sorry, I don't under- -- I don't follow the question.

Q. Did the source say, "Do you have a contact for" -- one of the contacts, so that we're talking, not in generalities, in specifics -- is Reidco. Are you familiar with that screenshot?

A. A Reidco screenshot?

Q. Yes.

**EXHIBIT "A"**

40

A.    Yes.

Q.    Yes.  And that's a company that was in the Midland area that was buying oil and everything else; am I right?

A.    To my understanding, yes.

Q.    Can you testify that the source did not ask Mr. Jensen for that material and/or that Mr. Jensen provided that material voluntarily to the source?

A.    I don't know how the source -- I don't know.

Q.    Because there was communication -- and which -- which agency was super -- I think I asked you this and I didn't get a good answer, I apologize.  Who was in control of the source of information?

A.    That was -- that would be Texas Department of Public Safety.

Q.    Okay.  And that was agent who?

A.    That would have been Special Agent Brown.

Q.    Okay.  And he was the individual who was communicating, directing, and leading the source, correct?

A.    I think, yes, in most cases.

Q.    Okay.  And have you reviewed -- is he the person who set up the June 18th meeting?

A.    No.  I believe, in that case, that was -- that was myself and Special Agent Orr who did that.

Q.    Okay.  Who brought in the source that day?

A.    Yes.

Q.   How many other in-person meetings were there?

A.   I'm only aware of my in-person meeting with the source.  I'm not sure how many meetings DPS had with the source of information.

Q.   In preparation for today's hearing, did you ask?

A.   I did not ask them how many times they met in person with the source.

MR. BENJAMIN:  Your Honor, I'm going to check with counsel as to whether or not he's found the reason --

THE COURT:  Sure.  Oh, okay.  Or any time during the hearing, you can let me know if you find it.

(Discussion off the record.)

MR. BENJAMIN:  Pass the witness, Your Honor.

THE COURT:  All right.  Let me ask some questions.

So, Agent, when you talk about the phone calls that you got from the source of information, were all of the phone calls between the source of information and other people, or were any of the phone calls between two other people and the source of information was just listening?

THE WITNESS:  I think, in every instance that I know of, it was a conversation that the source of information was having with Mr. Jensen.

THE COURT:  All right.  Go ahead.

THE WITNESS:  There was the August 21st

instance, in which the source did wear a device.

THE COURT: Okay. We're just talking about phone calls for now, though.

THE WITNESS: Right, yeah, but he was involved in those conversations.

THE COURT: So for all the phone calls, the source of information was involved in the conversation?

THE WITNESS: To my understanding, yes.

THE COURT: Is that right, from the Government?

MS. HEHR: Yes, Your Honor.

THE COURT: All right. So were any of them --

MR. BENJAMIN: Your Honor?

THE COURT: Uh-huh.

MR. BENJAMIN: I don't know if this is relevant to the Court or not, but on June 28th, there's a 48-minute phone call, and I believe the source disappears. It's his wife -- and I'm a little confused, because it's the wife; she ends up talking to the agent. And then the -- this is the call where they have a call with my client on another phone, and they tell the client to move the phone closer. It's a little chaotic and 48 minutes, Your Honor, but I mean, there's -- I don't know that they're all -- I don't know that we have all the calls, is the bigger question.

THE COURT: That what?

MR. BENJAMIN: I don't know that we have all the

**EXHIBIT "A"**

calls.

THE COURT:  Does the defense have all the calls?

MS. HEHR:  All of the calls the Government has received, yes.

THE COURT:  Okay.  Are there any calls you haven't received, you think?

MS. HEHR:  Not that we're aware of.  But we are --

THE COURT:  Are there any calls that the Government hasn't received?

THE WITNESS:  Not that I'm aware of.

THE COURT:  How would you be aware of all the calls?

THE WITNESS:  Because I was told by DPS that they had sent all the calls.

THE COURT:  And then you sent all of those to the Government?

THE WITNESS:  DPS, I believe, sent them directly -- or through BLM, so --

THE COURT:  Through who?

THE WITNESS:  Through the Bureau of Land Management.  Apologies, Your Honor.

THE COURT:  So the BLM -- the Department of Public Safety said they sent all their calls to BLM.  And BLM sent those calls to the Government.  Is that right?

**EXHIBIT "A"**

44

THE WITNESS:  Yes.  Ultimately, they provided all --

THE COURT:  Okay.  Have you confirmed with BLM that they gave you all the phone calls?

MS. HEHR:  Yes, we --

THE COURT:  All right.  So what about the June 28th call?  What do you know about that, the one defense counsel's talking about?

THE WITNESS:  I'm not familiar with that phone call, Your Honor.

THE COURT:  What do you all know about the June -- from prosecution, what do you all know about the June 28th call?

(Discussion off the record.)

MS. HEHR:  Your Honor, if I may have one moment?

THE COURT:  Sure.

MR. BENJAMIN:  And, Your Honor, if I said "June," I meant "July."  It's July 28th.

THE COURT:  I'm sorry.  Maybe I got it wrong. It's July 28th.  Do you know July 28th, either, agent?

MR. BENJAMIN:  And, Your Honor, I'm going to make a specific request because I deal with DPS, and because Texas DPS has had issues.  What I heard occur is that the agent affirmed that the BLM agent gave all the calls to the Federal Government.

THE COURT:  Yes.

MR. BENJAMIN:  But what I didn't hear affirmed under oath is that DPS has been asked to provide all the evidence they have.

THE COURT:  Yes.

MR. BENJAMIN:  And I make that specific request based upon DPS -- based upon being a Texas attorney, Your Honor.

THE COURT:  Okay.

MS. HEHR:  Your Honor, from our understanding of that June 28th call, the wife was holding the phone that was recording the conversation with the source and the defendant.  And we are not aware -- or that the source left that conversation, but the source's wife was also involved in there.  And so there would have at least been one other person involved in that conversation.

THE COURT:  The source of information's wife was also in on that call, and the people on the call knew that the wife was on the call?

(Discussion off the record.)

MR. BENJAMIN:  (Indicating.)

THE COURT:  Let me let them answer first from the Government.

(Discussion off the record.)

THE COURT:  And, Counsel, I don't know if you

heard this, but we corrected the date to July 28th, if you're looking for something.

MS. HEHR: Yes, Your Honor. I'm looking for the transcript of that call.

THE COURT: Well, I'll put a pin in that while y'all are -- or Mr. Dickens is looking for it, but let me ask the agent:

So, in addition to the calls, there were instances where the source of information wore a wire; is that correct?

THE WITNESS: There is one instance that I'm aware of -- sorry. Go ahead.

THE COURT: Okay. Was it a wire that you-all set up, or did he just personally record it with a device somehow?

THE WITNESS: In that instance, I think that was a device provided by law enforcement to the source.

THE COURT: Okay. And recorded on -- recorded by that wire -- well, on all the things recorded by the wire, was the source of information involved in the conversation or was he ever, like, you know, I don't know, hiding behind a wall or something and just recording a conversation between two other people?

THE WITNESS: No, Your Honor. He was involved in the conversations he recorded that day.

THE COURT:  Okay.  And then, in the in-person interview where the source tells you about the location of the yard, how did the source know the location of the yard?  Was it, like, documents that he saw?  Was he -- had he been to the yard personally?  How did he know the location?

THE WITNESS:  I don't believe he'd been to the yard personally at that point yet.  I'm not sure in what context Mr. Jensen would have provided him the address of the Carlsbad --

THE COURT:  Okay.

THE WITNESS:  -- address.

THE COURT:  But do you know that Mr. Jensen provided the address, or is it possible that the source of information looked through Mr. Jensen's things to get the address?  Do you know what I'm saying?

THE WITNESS:  I understand.  My personal understanding was that Mr. Jensen was providing him --

THE COURT:  Okay.

THE WITNESS:  -- the information that he was providing us.

THE COURT:  And when you say "my personal understanding," like, where do you get that personal understanding from?

THE WITNESS:  Essentially because most of the information he was providing was through conversations with

48

Mr. Jensen.

THE COURT:  Okay.  All right.  And then the -- oh, I've talked to you about the load ticket.  How many load tickets were you-all given by the source of information?  At least, roundabout, how many?

THE WITNESS:  To myself?

THE COURT:  Well, to law enforcement in this case.

THE WITNESS:  I couldn't speak for DPS overall, but I don't believe there was much activity conducted --

THE COURT:  Okay.

THE WITNESS:  -- in Texas.  I don't know that there was a lot of activity happening in the Texas locations; whereas, Mr. Jensen had reported to the source that there was a lot more oil moving in the Carlsbad location.

THE COURT:  Okay.

THE WITNESS:  So I think there were, to myself at least, no more than five or ten tickets --

THE COURT:  Okay.

THE WITNESS:  -- that would have been provided.

THE COURT:  All right.  And then you said that, you know, the source of information gave you a bunch of screenshots.  Were those screenshots taken on the source of information's phone?

THE WITNESS:  In terms of screenshots, yes, to my understanding, those were screenshots from their personal phone.  And anything else was information that they -- like, the license plate or a Google search that they performed and took a screenshot of what came back in the Google search --

THE COURT:  Okay.

THE WITNESS:  -- things like that.

THE COURT:  Okay.

THE WITNESS:  And I think there was one instance where the source did obtain some bank account details --

THE COURT:  Uh-huh.

THE WITNESS:  -- and provided those.

THE COURT:  And how did the source get the bank account details?

THE WITNESS:  I cannot recall, off the top of my head --

THE COURT:  Okay.

THE WITNESS:  -- but I believe it was something Mr. Jensen had provided the source.

THE COURT:  Okay.

All right.  Did the Government figure out about the June -- excuse me, July 28th call?

(Discussion off the record.)

THE WITNESS:  Sorry.  Did the government provide --

**EXHIBIT "A"**

50

THE COURT:  Sorry.  I'm going back to the prosecution.

THE WITNESS:  Okay.

THE COURT:  Did you-all find the July 28th call?

(Discussion off the record.)

MS. HEHR:  Your Honor, looking through the transcript we have for the call, there's no indication that there was anyone involved in this call other than Max Jensen and the source.

THE COURT:  Okay.  I just wanted to see -- I mean, it's your position that there was no search.  So if the source or, I guess, the source's wife was on the call, I'm inclined to find that's not a search, so that's why I was asking.

MS. HEHR:  I would agree, Your Honor.  It appears that the source was there throughout the call.

THE COURT:  Okay.  All right.  Okay.  How did you -- how did the Government use all of this information -- so I'll just go through the -- you used the information -- what information did you use to get the warrant?

MS. HEHR:  Your Honor, the information given by the source led to physical surveillance.

THE COURT:  Right.

MS. HEHR:  And that physical surveillance is

primarily what led to the warrant because the agent himself physically saw --

THE COURT:  That's fine.

MS. HEHR:  -- the vacuum truck stealing the oil.

THE COURT:  That's primarily what led to the warrant.  Did anything else lead to the warrant from the source of information?

MS. HEHR:  Your Honor, just the location of the yard.

THE COURT:  Location...not the -- okay.  I'm just writing this down -- of the yard.  Not the phone calls?

MS. HEHR:  The phone calls and the text messages helped provide the location of yard, but the surveillance of the yard began before the source started recording those phone calls, from my understanding.

THE COURT:  Who wrote the warrant?

MS. HEHR:  Special Agent Trent Boone.

THE COURT:  Did the Government do the warrant or somebody else did the warrant?

MS. HEHR:  Yes.

THE COURT:  You guys did the warrant?

MS. HEHR:  Yes, Your Honor.

THE COURT:  So is anything about the calls in the warrant?

MS. HEHR:  Let me double-check real quick, Your

**EXHIBIT "A"**

52

Honor --

THE COURT:  All right.

MS. HEHR:  -- but I don't believe so.

(Discussion off the record.)

MS. HEHR:  Your Honor, I apologize.  If you'll give me one second, I think my agent was able to find it faster than we did.

THE COURT:  That what?

MS. HEHR:  I think my agent was able to find it faster than --

THE COURT:  That's fine.  So here's my -- you know, so I -- some of these things, it's not clear completely to me whether it was actually a result of a search or it wasn't a result of a search.  So I'm just trying to find out, if it was a search, whether it was used in some way in the warrant or to be used in the case-in-chief.  And if it's not, then I have to even decide on it; like, if there's a fruit-of-the-poisonous-tree issue or not.

So I just want to know about the load tickets, especially, where he got those; the bank account details, where he got those; I guess the location of the yard, where the source of information got that.  So I'm trying to figure out whether the call -- whether that stuff was used or not, so whether it's important as to whether it was a search or

<u>**EXHIBIT "A"**</u>

53

not.  So, yes, go ask the agent and see, but I want to know all that.

From defense?

MR. MARTINEZ:  If I may?

THE COURT:  Sure.

MR. MARTINEZ:  Trey Martinez on behalf of Mr. Jensen.  And I know that I just appeared on behalf of Mr. Jensen today.

THE COURT:  That's fine.

MR. MARTINEZ:  In looking at the case and trying to answer the Court's question into whether or not there's a reasonable expectation of privacy.

THE COURT:  Yeah.

MR. MARTINEZ:  Whether a company has a reasonable expectation of privacy and whether that expectation is, in fact, reasonable.

THE COURT:  Yeah.

MR. MARTINEZ:  And to my understanding, at least in the Fifth Circuit, as well as in the Tenth Circuit -- and I think the Tenth Circuit case falls under *Mimics, Incorporated versus Village of Angel Fire* --

THE COURT:  Give me the cite.

MR. MARTINEZ:  394 F.3d 836.  And while those deal with different issues, Judge, it really sets out the basis for that reasonable expectation of privacy.  And this

**EXHIBIT "A"**

54

information that was handed over by the SOI to the agents is based upon Mr. Jensen's reasonable expectation of privacy for that information for his company for everything that he was doing.

The bigger issue that I have, Judge, other than the Fourth Amendment issue, and as this agent testified to, is that on the day that he was allegedly contacted by this SOI, that SOI informed him that Mr. Jensen had been indicted already in the Southern District of Texas.

THE COURT:  Right.

MR. MARTINEZ:  And at that point in time, what is the duty of the agent under the Sixth Amendment in order to make sure that Mr. Jensen's rights are not violated? Because if he's charged in another case and they're collecting statements from him, that's going to be a bigger issue, which is why we led to these questions that were presented to the Court, which I understand you said, "Give them what they want."

THE COURT:  Yeah.

MR. MARTINEZ:  And so we still need to do that. And it seems to me, just from my 10,000-foot view, that we still have a lot of questions that need to be answered.  And I'm happy to provide very specific questions to the United States so that we can get those questions answered and then come back to this Court, so we can make sure we're not going

<u>**EXHIBIT "A"**</u>

55

back and forth and trying to get answers on the fly.

THE COURT:  Okay.  That sounds good.  I mean, I have to go back and look at the Sixth Amendment jurisprudence on this to see whether the Sixth Amendment -- whether a person who is counseled and accused of a crime can be spoken to on a new crime.  I just don't remember the answer to that, but I'm sure there is an answer.  So if you file something, we'll figure it out.

MR. MARTINEZ:  We'll get it done, Judge.  And it's, essentially, the Massiah doctrine that we're basing that on.  I'm sure you've heard that before.  But there's other case law that we're going to go ahead and brief for this Court in regard to that.  And in reading some of the conversations that had been produced by the agent, there's a number of conversations in which there's discussion regarding the case in the Southern District of Texas.

THE COURT:  Okay.

MR. MARTINEZ:  Okay?  And so we'll go ahead and brief that for the Court.

THE COURT:  Okay.

MR. MARTINEZ:  But we need some of those questions answered and those documents provided to by all the law enforcement agencies before we do that, Judge.

THE COURT:  Just while we're here and we're waiting for the answers about the warrant and stuff, what

questions do you want answered by the Government regarding your Sixth Amendment concerns?

(Discussion off the record.)

MR. MARTINEZ:  Judge, in our motion for continuance -- I don't know if you have that in front of you.

THE COURT:  I do.

MR. MARTINEZ:  Okay.  Starting on paragraph 4 in regards to discovery requests.

THE COURT:  Paragraph...

MR. MARTINEZ:  It's on -- it's on -- it doesn't have -- it should be...

THE COURT:  Section 4?

MR. MARTINEZ:  Section 4, excuse me.

THE COURT:  Okay.  That's fine.

MR. MARTINEZ:  And we have a number of very specific discovery requests pertaining to documents that should be contained within law enforcement agencies' -- both the DPS, Bureau of Land Management, FBI -- that should be answerable, and those documents should be produced.  And so we have provided this very specific request for documentation regarding this.

THE COURT:  Okay.  I'll ask the Government about this at the end, but the -- I mean, all this is new.  This was filed today.

**EXHIBIT "A"**

57

MR. MARTINEZ:  I understand, Judge.

THE COURT:  Okay.  All right.  That's fine.  I'll ask them about it.

Does the Government have an answer about how all this information was used in the investigation and the warrant and then, potentially, how you want to use it at trial?

MS. HEHR:  Yes, Your Honor.  There was a -- there was a call referenced in the warrant.

THE COURT:  Okay.

MS. HEHR:  But that was after we had done periodic surveillance and --

THE COURT:  The call was done after surveillance?

MS. HEHR:  The call was recorded, yes, Your Honor, after we had already done surveillance.

THE COURT:  Okay.  What else?

MS. HEHR:  I'm sorry, Your Honor.  Can you repeat your question?

THE COURT:  Sure, yeah, yeah.  What else was used in the warrant -- you know, all these things that we've been talking about today that the source of information gave -- what else that the source of information gave was used in the warrant?

MS. HEHR:  Like I said, Your Honor, there was a call and then the source of information provided us the

location of the site.

THE COURT: Anything else?

MS. HEHR: I believe that was it.

THE COURT: Okay. And how would you want to use these things in your case-in-chief? Or, I guess, in any way in your case; in your case-in-chief or maybe, like, rebuttal, I don't know.

MS. HEHR: Yes, Your Honor. I mean, the recorded calls, some -- several of them are incriminating in the Government's eyes, so we would like to use those recorded calls at trial.

THE COURT: All right. What else?

MS. HEHR: Additionally, Your Honor, the text messages that provide the location and lead to all of the surveillance that we conducted.

THE COURT: The text messages that provide location?

MS. HEHR: Yes, Your Honor.

THE COURT: Okay. What else?

MS. HEHR: The text messages, in general, again, Your Honor, that lead to knowledge of the scheme. I mean, Your Honor, I think all of the communications with the defendant go to his knowledge of the scheme, and so we would be asking to be able to use --

THE COURT: Well, I'm not saying they're not

relevant --

MS. HEHR:  Yes.

THE COURT:  -- I'm just trying to figure out if I need to make a decision on some of these that we don't exactly know the source of, so...

(Discussion off the record.)

MS. HEHR:  Yes, Your Honor.  We did collect the load tickets from the property with -- that were provided --

THE COURT:  Pursuant to the warrant?

MS. HEHR:  Well, no, Your Honor.  We went to the property to arrest individuals.  And the individuals at that property consented to a search of the truck that lead to load tickets being received on the property.

THE COURT:  Okay.  So you don't want to use the load tickets you got from the source of information?

MS. HEHR:  No, Your Honor.

THE COURT:  Okay.  What about the screenshots of the contacts?

MS. HEHR:  Your Honor, right now, I don't foresee a need for those, but I can't say if we would need them in the future or not, given what would come out, for rebuttal.

THE COURT:  Okay.  I'm just looking at what else I had.  What about the bank account -- the bank account details?

MS. HEHR:  Your Honor, we would be using the bank

**EXHIBIT "A"**

60

account details.  We were able to subpoena those bank accounts.

THE COURT:  Okay.  So had you got it from a different source, I'm not concerned about it, but what about the bank account details that were provided by the source of information?

MS. HEHR:  Your Honor, I think we would only need those, again, if it goes to trial for the pretrial --

THE COURT:  I'm talking about trial.

MS. HEHR:  Yes.

THE COURT:  So do you want to use the bank account details that were given by the source of information in trial in any way?

MS. HEHR:  Only to establish how we received the information to subpoena the grand jury.

THE COURT:  So you used the data on the -- you used, like, the account number from the bank account details given to you by the source of information to subpoena the bank?

MS. HEHR:  Yes, Your Honor.

THE COURT:  Okay.  I see.  All right.  Okay.  Thanks.

We got a copy of the reports.  So have you had a chance to look at them?

MS. HEHR:  Yes, Your Honor.

**EXHIBIT "A"**

61

THE COURT:  Do you want to give them to your witness or, actually, I have a copy, too, if you want to give these to your witness.

MS. HEHR:  Yes, Your Honor.  And I also have a couple copies.

THE COURT:  Okay.

MS. HEHR:  May I approach?

THE COURT:  Sure.

Do you have a copy that you can use, though, Counsel?

MS. HEHR:  Yes, Your Honor.

THE COURT:  Okay.  All right.

So, Agent, we want to just clarify, if you remember or this refreshes your memory, from your report, where the source of information got the bank account details.  If the -- if they were given to him by Mr. Jensen or somebody else with access to them, or whether the source of information had to go looking through things to find them.  Same thing with the load tickets.  How did he -- how did the source of information come into possession of these load tickets?

THE WITNESS:  Yes, Your Honor.  Here in this report, it says (reading), On July 8th, 2025, SOI received wiring instructions for two bank accounts provided by Maxwell Jensen so that Jensen could receive payments.  And

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

then it lists the bank account information.

THE COURT:  Okay.  So Mr. Jensen gave the source of information the bank account stuff in order that he could get paid?  Mr. Jensen get paid.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  And then what about the -- I'm sorry -- the load tickets?  And then I forgot to say earlier, I think, the location of the yard.

THE WITNESS:  As to the location of the yard, I believe that would be referenced on June 18th, 2025.  Let me confirm really quick, Your Honor.

THE COURT:  Sure, of course.  That's why we gave you the reports.  Go ahead and look.

(Discussion off the record.)

THE WITNESS:  Okay.  That would be in a June 18th, 2025, meeting.

THE COURT:  Meeting?

THE WITNESS:  Yes.  In-person meeting with the SOI and DPS Special Agent Orr, in which the SOI provided that address.  And here, it states (reading), Jensen's Carlsbad, New Mexico, yard is located at 4154 7-Rivers Highway, Carlsbad, New Mexico.  Contact for that yard is Tom Last Name Unknown, and provides a phone number.

THE COURT:  So did the source of information explain how he came to know the information of the location

**EXHIBIT "A"**

63

of the yard and the contact person?

THE WITNESS:  It doesn't list that in this report, and I can't say off the top of my head.

THE COURT:  Okay.

MR. BENJAMIN:  Your Honor, can I ask a question on that point?

THE COURT:  About the location of the yard?

MR. BENJAMIN:  About how he came into that information.

THE COURT:  Oh, okay, uh-huh.

MR. BENJAMIN:  Specifically, with regard to the -- actually, I'm sorry, it's on the bank account, not the location of the yard.

THE COURT:  All right.  Go ahead.

Q.  (BY MR. BENJAMIN):  The bank account, the source of information proposed that he had a buyer for the oil, correct?  Your report -- Agent, are there other ROIs out there?  Because that report doesn't detail the communication that day, it just kind of generally covers it; is that fair?

A.  Sir, it reports the information we received from the source.

Q.  Would you disagree with me that, normally, there's more reports that detail the actual conversation?

A.  No, sir.  You report the intelligence that you gather.

**<u>EXHIBIT "A"</u>**

64

And it depends on -- sometimes some sources are more specific than others as to how they obtain the information.

Q.   Did the source of information represent to Mr. Jensen that he had a buyer and needed the bank account information in order to get the funds transferred?

A.   I don't know.

Q.   Okay.  Can you say he did not?

A.   I can't say that he did not.

Q.   Okay.  And did the source of information ever provide a buyer and transferring in funds?

A.   Not that I know of.

Q.   Can I proffer "no"?  I mean, I haven't seen --

THE COURT:  You can proffer stuff to me if you want to or you can put somebody on to testify to it.

MR. BENJAMIN:  Your Honor, there's been nothing produced that shows any money coming in, is the issue.

THE COURT:  Well, why does that matter, Counsel?

MR. BENJAMIN:  Because, Your Honor, the source of information was asked by the DPS agent to get a bank account so they could subpoena the bank account records to find out what the bank account was.  And he did it under false premises that there was a buyer of this oil.

THE COURT:  And that makes a search?

THE WITNESS:  If I'm...

Q.   (BY MR. BENJAMIN):  Yes.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

A.    I don't believe --

THE COURT:  I was asking the attorney questions.

How does that make it a search?

MR. BENJAMIN:  Your Honor, because he -- because, under Pope [sic], he did it for the Government's benefit, and the Government knew or, in this case, I believe, directed him to do it.

THE COURT:  Okay.

MR. BENJAMIN:  And that is the -- Your Honor, I apologize --

THE COURT:  Well, get the answer, but I don't think it's a search.

But go ahead and answer the question, Agent.

THE WITNESS:  I don't recall requesting the source to provide -- to obtain bank account details.

THE COURT:  Okay.  So -- okay.  So Counsel, so we were -- we were asking -- I was asking you about -- you just asked the question about the location of the yard.  What about the load tickets?  Did you find out, from your report, how the source of information became -- took into his possession the load tickets?  Or they were also being called the "run tickets."

THE WITNESS:  Right.  Can I locate that report?

THE COURT:  Of course.  Yeah, yeah, yeah.

(Discussion off the record.)

MR. GUERRA:  Your Honor, good afternoon. Attorney Robert Guerra here, one of the attorneys for Mr. Jensen.

With the Court's permission, may I ask the agent a question with regards to the June 18th report?

THE COURT:  Yeah.  Let's look up the question that I asked first, and then I'll let the Government go first because it's their turn, but then I'll let you ask as well.

MR. GUERRA:  Without a doubt, Your Honor.

THE COURT:  Okay.

MR. GUERRA:  Thank you.

(Discussion off the record.)

THE WITNESS:  Okay.  I have this report here.

THE COURT:  Go ahead, Agent.

THE WITNESS:  So it essentially lists, over the course of several days, the SOI providing images of load tickets and describing, more or less, the volume of oil being sold in those loads, and then also the basic sediment and water, or BS&W of that content.

THE COURT:  Okay.

THE WITNESS:  And saying that that oil was then sold to a company, and which company transported the oil as well.

So my understanding was that the source was

**EXHIBIT "A"**

67

working for Mr. Jensen at his location and overseeing the sale of that oil.

THE COURT:  Okay.  And so he got -- so the source of information got that information from Mr. Jensen -- sorry, the load ticket or run ticket information and the actual tickets, and, I guess, now we are talking about the volume being sold -- he got that information through his work for Mr. Jensen?

THE WITNESS:  Yes, Your Honor.

THE COURT:  He didn't search for it in some way?

THE WITNESS:  No, it was -- realistically, I think he would be at the site working and overseeing the sale.  And once the truck runs the test and loads the oil, they provide the person on site with the run ticket, is my understanding of how that industry is run.

THE COURT:  "How the industry is run," okay.

All right.  What was the one question that the defense wanted to ask about the June 28th call -- or July 28th?

MR. BENJAMIN:  There was a June 18th meeting.

MR. GUERRA:  I was asking about the June 18th meeting.

THE COURT:  Oh, the meeting, the in-person --

MR. GUERRA:  Yes.

THE COURT:  What did you want to ask?

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**<u>EXHIBIT "A"</u>**

68

MR. GUERRA:  Well, I just wanted to ask the special agent, Your Honor, if I could:  How long was that meeting in person with Mr.- -- well, I'm sorry, with the SOI?

THE COURT:  I'm not sure that's relevant, but go ahead and answer.

THE WITNESS:  Just relatively quick, from my recollection.

MR. GUERRA:  How many minutes?

THE WITNESS:  It might have been under an hour.

MR. GUERRA:  Okay.  Well, given -- let's just assume it was under an hour.  What other information were you provided by the SOI, other than what you included in the 302s?

THE WITNESS:  Everything of substance that I was provided by the SOI, to my knowledge, is recorded in these 302s.

MR. GUERRA:  Okay.  So, in the 302s -- we have reports across two 302s that mention this meeting in basically two paragraphs; is that fair to say?

THE WITNESS:  Sorry.  Two paragraphs in which report?

MR. GUERRA:  Two paragraphs in two reports.  I believe there was one that you issued on July 29th, 2025, that referred to the June 18th, 2025, meeting; is that

**EXHIBIT "A"**

69

correct?

THE WITNESS:  I'm sorry, which serial number is this?

MR. GUERRA:  I apologize, I don't have that in front of me.  One moment.

Agent, with regards to that meeting on Serial Number 4, you said that you met with the SOI for about an hour, a little under an hour.  There's only two paragraphs included on that report; is that correct?

THE WITNESS:  In Serial 4?

MR. GUERRA:  Yes, Your Honor -- yes, sir.  I apologize.  Dated June 27, 2025?

THE WITNESS:  Correct.  So this is a report that, more or less, summarizes information being sent by the SOI --

MR. GUERRA:  Okay.

THE WITNESS:  -- which could include -- which includes the same day which we met; whereas the in-person meeting is summarized in Serial 7.

MR. GUERRA:  And in Serial 7, what information was provided by the SOI during that meeting?

THE WITNESS:  That information summarized in this was the number that Jensen was currently using, because he had switched his number three times over the course of the communications; it provided the information that Jensen had

**EXHIBIT "A"**

70

approximately 15,000 barrels stored at his location in Odessa, Texas; the address of Mr. Jensen's operation in Carlsbad, New Mexico; and the point of contact working that location in Carlsbad, New Mexico, being Tom Last Name Unknown and Tom's phone number; and that Jensen was still seeking a vacuum truck driver who could pick up oil from third-party locations to bring to their yard.

MR. GUERRA:  At any point prior to that meeting, sir, did you have any conversations with the U.S. Attorney in the Southern District of Texas regarding his case down there?

THE WITNESS:  Not directly with the U.S. Attorney for the Southern District of Texas, no, sir.

MR. GUERRA:  But with whom?

THE WITNESS:  I'm sorry?

MR. GUERRA:  With whom?

MS. HEHR:  Your Honor, I'm going to object.  I don't think this is relevant.

THE COURT:  Yeah, it's not relevant.  It might be relevant to a Sixth Amendment issue, but it's not --

MR. GUERRA:  Thank you, Your Honor.

One last question, Special Agent:  With regards to the information you seized, would you consider that to be a seizure of that information on behalf of Mr. Jensen -- or excuse me, against Mr. Jensen?

**EXHIBIT "A"**

MS. HEHR:  Objection, Your Honor, I think that's question of law not a question for a fact witness.

THE COURT:  I do think that's a question for the Court, but what are you getting at?

MR. GUERRA:  Well, Your Honor, I believe, again, when we're talking about Fourth Amendment, it's not necessarily limited to a search, it's also a search and/or a seizure.  So I know the Court's been inquiring with regard to a search.  Our position on the defense is, yes, it is a search, but if it's also a seizure, then they were taking this documentation.  And, of course, I would adopt the arguments being made by my co-counsel --

THE COURT:  Yeah.

MR. GUERRA:  -- as well, but I would argue that it wouldn't be just limited to a search, it would also be part of a seizure by a Government agent; in this case, the SOI working on behalf of the Government.

THE COURT:  Okay.  All right.  Well, I still think it's a question of law for the Court.  I guess I always thought of search and seizure as, like, search of stuff and seizure of person, but I guess I'll look at it.

MR. GUERRA:  Thank you, Your Honor.

THE COURT:  Okay.

MR. GUERRA:  That's all I have.  Thank you.

THE COURT:  Thanks.

**EXHIBIT "A"**

72

Does the Government have any redirect for their agent?

MS. HEHR:  Just very briefly, Your Honor.

#### REDIRECT EXAMINATION

Q.   (BY MS. HEHR):  Special Agent Jeronimus, did the source consent to meeting with the defendant in these recordings?

A.   Yes, I believe -- or at least with contacts of the defendant, and proposed meetings at a later date with the defendant himself.

Q.   And were the recordings consensual?

A.   Yes.

Q.   And did the source consensually send you the text messages?

A.   Yes.

MS. HEHR:  One moment, Your Honor.

THE COURT:  Uh-huh.

MS. HEHR:  No further questions.

THE COURT:  All right.  Do you want some redirect [sic] on any of this based on the Government's questions or my questions?

MR. BENJAMIN:  I just have argument, Your Honor.

THE COURT:  I guess my concern is this:  From the Government -- if the Government's position is this wasn't a search, I think it's un- -- so that your source of

**EXHIBIT "A"**

73

information did not search anything, I think it's unclear regarding the load tickets -- I mean, I understand the agent's testimony, but that's just about how this industry works generally -- and the location of the yard. I mean, I can definitely see how both of those things came into the source of information's possession through something other than a search, but I don't think we have any testimony on it. I'm a little concerned about the bank account; although, I probably have enough about how that was gotten, but it's just -- it's not completely clear. And then also the phone call -- the June -- the July 28th call, exactly what was going on there.

So, you know, I thought what maybe we could do today is just make a determination about whether or not these things were searches so we wouldn't have to make a determination -- I wouldn't have to make a determination on whether the source of information was acting as an agent of the Government; especially since the defense wants a bunch more information to determine whether or not -- or to argue whether or not the agent [sic] was working on behalf of the Government.

So without that additional information, I think I'll continue it so that we can -- the Government can get more information on exactly how all of these things came into the source of information's possession; especially the

**EXHIBIT "A"**

74

things I went over, but, I mean, more information on all of it would be helpful.  And then, if it looks like it was a search, then we're going to have to continue this so the Government -- the defense can look at all the information it wants, and we can have a hearing about the things that were searches and whether or not the source of information was acting as an agent during those searches.

I'll also just say, if there were things that, after you look into these things, that were searches by the source of information, I mean, the remedy is suppression, including fruit of the poisonous tree, right?  So if any of it was in the warrant, you would take it out of the warrant and do the probable cause analysis without that information and see whether there would have been enough, and then we would suppress that evidence -- I mean, potentially, right?  And we would do sort of the fruit-of-the-poisonous-tree analysis on the information.

So that's my inclination, is just to continue it, look into those things, and then we'll have to have another hearing on it to determine whether any of these things were searches.  And if I determine they were, we'll decide whether they were actually searches of the Government and not an independent actor.  And then if they were searches of the Government, I mean, I guess we could discuss whether there was an exception -- nobody has made an argument about

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

an exception to the warrant requirement, but I guess we could argue about that, and then we could determine a remedy.

Does that make sense to the Government?

MS. HEHR:  Yes, Your Honor.

THE COURT:  And to the defense?

MR. MARTINEZ:  It does, Judge.  And if I may, I think what we can do is provide a very pointed list of documents or information that we need to receive --

THE COURT:  Yeah.

MR. MARTINEZ:  -- from the Government that I think everybody is lacking, so that we can go ahead and properly address this with the Court and potentially in a brief in regards to searches and seizures and violations of the Fourth.  And then we can address these other issues we discussed with the Court.

THE COURT:  All right.  That sounds good.  And what I'd like from the defense and Government, but especially from the defense, is if your theory that Mr. Jensen had a recognizable privacy interest -- I mean, I know you gave me -- I know I gave you, like, four minutes to look for it, so that's not fair.  And also, I mean, you can cite Fifth Amendment -- I mean, Fifth Circuit stuff to me. I know all of you are from the Fifth Circuit, but we're in the Tenth Circuit.

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

76

MR. MARTINEZ:  I understand, Judge.

THE COURT:  Okay.

MR. MARTINEZ:  And we'll do that.  And I don't want the Court -- so I can make sure that -- be honest with the Court and in full candor to the Court, in looking at this Tenth Circuit case, I literally just looked at that right now, so I'd like a chance to fully brief all that.

THE COURT:  I want you to brief it for me, too, because I've never heard of it.  You know, I've been doing criminal defense for my entire career -- well, until I got this job, so I've never heard it.  I'm not saying it's not real, but give it to me.

MR. MARTINEZ:  I understand, Judge.

THE COURT:  I mean, you know, if somebody is sending text messages and phone calls to another person, we hear that information all the time in criminal cases --

MR. MARTINEZ:  I understand.

THE COURT:  -- so I need something saying that he has a right of privacy --

MR. MARTINEZ:  Understood.

THE COURT:  -- not just that they were in business together and there should -- and, you know, even if you want to make an argument that I should recognize a previously non-recognized right of privacy, you can pitch that to me, too, and we'll look at it.

**EXHIBIT "A"**

77

MR. MARTINEZ:  I understand.

THE COURT:  All right.  How long does the Government want to get that information together for me?

MS. HEHR:  Your Honor, given that our discovery deadline is March 8th, we would like -- or March 9th, I believe, we would like at least until March 9th to gather all the --

MR. MARTINEZ:  Sure.

MS. HEHR:  -- discovery the defense is asking for.

THE COURT:  Okay.

MS. HEHR:  And at least two weeks after that to write our motion or supplemental brief to the Court.

THE COURT:  Two weeks after March 9th to supplement?

MR. MARTINEZ:  And, Judge, I think, you know, by Monday, we can get the list of stuff that we're specifically requesting, if that's all right.

MS. HEHR:  Yes.

MR. MARTINEZ:  That would give us adequate time.

THE COURT:  All right.  That works for me.  How long do you-all want to supplement your brief?

MR. MARTINEZ:  I think, as soon as we get responses from the Government, one way or the other -- and I guess, the responses would be "here's documents" or "we

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

78

don't have those documents" -- once we get that, I think we'd probably need seven to ten days so that we can go ahead and get that briefed.

THE COURT:  Okay.  I'll give you -- so we'll do simultaneous briefing two weeks after March 9th, whatever that is -- I'll get an order that gives the exact date -- for both sides to supplement regarding whether or not there was an actual search; how the source of information got this information; whether there was a right of privacy to any of this, so that it was actually a search; and -- I mean, go ahead and brief how you think the source of information was an agent, and the Government can, you know, say how it wasn't an agent just in case we have to get to that question.  And then also, I guess, how all this information was used, and what would be the -- from each person's perspective, each side's perspective, what would be the fruit of the poisonous tree of it.

MR. MARTINEZ:  Understood, judge.

THE COURT:  Okay.  Anything else I can do for the Government?

MS. HEHR:  Your Honor, just to clarify, I know we'll have two weeks for each side to submit our supplemental brief, but would the Court prefer to hear from the Government first or the defense first?

THE COURT:  Well, it's simultaneous, so, I don't

**EXHIBIT "A"**

79

care, whoever wants to file it first can file it first.

MS. HEHR:  Okay.

MR. MARTINEZ:  And I guess, if we have a reply, maybe we can both get seven days after that?  Your just you want our initial briefs --

THE COURT:  Yeah, just --

MR. MARTINEZ:  -- and if you need some more information we can go from there?

THE COURT:  Yeah, exactly.  So just get it filed. Because I mean, this case -- when are we set for trial?

MR. BENJAMIN:  June 8th, Your Honor.

THE COURT:  I mean, especially suppression issues, I want to get it done.  And then if you file a Sixth or any kind of other, you know, dispositive or pretty dispositive, I guess I should say, motion, I mean, get it -- you know, you don't have -- you can file it with whatever our deadlines are.  But get it in quickly and, that way, you guys aren't having to go out from San Antonio -- you're from San Antonio, right?

MR. MARTINEZ:  Brownsville.

THE COURT:  Brownsville, so even further -- you know, back and forth a million times.  I'll try to set everything together for out-of-town counsel.

MR. MARTINEZ:  That would be great, Judge.  Thank you so much.

**EXHIBIT "A"**

THE COURT:  Absolutely.  Anything else?

MR. BENJAMIN:  Your Honor, I was going to ask the marshals a question, and then ask the Court for help on that question.

THE COURT:  All right.  Ask the marshals a question.

Anything else I can do for the Government?

MS. HEHR:  No, Your Honor.

THE COURT:  Okay.  And then, as far as discovery goes, you know, you have the deadline that you have, but get everything to defense counsel just as soon as possible because it just helps the case move so much faster.  And do double-check for me about whether -- I don't want problems later, especially at trial, that DPS has phone calls that weren't turned over.  You tell DPS to give you every single -- everything they have, their entire file, their shadow files, their whatever they call it, like, everything.

MS. HEHR:  Yes, Your Honor.

THE COURT:  Okay.  What's up?

MR. BENJAMIN:  Your Honor -- and this is not the United States Marshals, this is Otero.  And Otero has instituted a "no paper policy."

THE COURT:  What does that mean?

MR. BENJAMIN:  Well, I think it's because they don't want Suboxone on the back of paper or something.

**EXHIBIT "A"**

81

THE COURT:  No, I know that's why they don't want it.  But you can't give your clients paper?

MR. BENJAMIN:  Yes, Your Honor.  And so I'd also like to send -- my normal course has been to send my clients with stuff after a day's hearing to make notes, et cetera, et cetera.  I'm looking for guidance from the Court, Your Honor.  Because I don't want to pick a fight with Otero, because Elijah Minifee [phonetic] at Otero is very helpful, but I also want to have my client provide me the information that he's been shouting at me all throughout this hearing in writing so I can write it down and --

THE COURT:  Right, right, right.  Well, what can -- can you have a meeting -- like, can you send an investigator out there to sit with the client while they read paper discovery and then take it all back when --

MR. BENJAMIN:  Yes, Your Honor, I can do that.

THE COURT:  Okay.

MR. BENJAMIN:  The issue I haven't been able to figure out a bridge to cross is:  "When you're up at 2:30 A.M. tonight, write down those notes, and then give me those notes" problem.

THE COURT:  Oh, you mean he can't have -- he can't have, like, paper from commissary?

(Discussion off the record.)

MR. BENJAMIN:  I don't think so, Your Honor.  And

UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430

**EXHIBIT "A"**

82

this is the all -- Doña Ana has got its own issues.  Otero has got paper issues.  And I'm willing to take guidance from Marshal Reifenscheid and everything else, Your Honor, but I'm just -- I'm raising this because it's becoming an ongoing --

THE COURT:  I'll ask the marshals who is in charge of the --

MR. BENJAMIN:  Reifenscheid, Your Honor.

THE COURT:  Yeah, he's not here.

MR. BENJAMIN:  No.

THE COURT:  I don't see him.  So I will ask him about that.  And I'm surprised they're not selling some kind of paper in commissary because they're always selling, like, cards and stuff people can send whoever.  So let me ask about it.  As far as you giving paper, I'll ask about that, too, but that's been my experience, especially with voluminous discovery, which I'm sure there is in this case, I feel like that was -- that's what we used to do, is just go and sit with the client or -- well, have an investigator --

MR. BENJAMIN:  Your Honor, I will say things have changed dramatically in the last two years.  I mean, they have.  I mean, that's kind of the -- the paper issue has gone the way -- laptops are easier, but...

THE COURT:  Okay.  Well, I'll ask about it and

see what can maybe be done.  I'll have Rief- -- he's super helpful.  I'll have him contact you-all and talk about it, but, I mean, I'm not -- and maybe -- I mean, we can -- I don't know if he wants to move somewhere else, but, you know, if a different place has different policies.

MR. BENJAMIN:  It's running into most places, Your Honor.

THE COURT:  All the detention centers in the south won't allow any paper at all?

MR. BENJAMIN:  I can't say "all," Your Honor.

THE COURT:  He could go to Deming or something, if they do it --

MR. BENJAMIN:  I don't want him in Deming, Your Honor.

THE COURT:  I know, but I can look into that.  He doesn't probably want to be there either, but I can look into it and see what can be done.  But, you know, I mean, obviously, Suboxone in jails and prisons is a huge, huge issue.  And, obviously, every counsel here, I'm sure, is above reproach in that matter, but, you know, they set policies for everybody.

MR. BENJAMIN:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Thanks.

Anything else from the defense?

MR. GUERRA:  I just want to thank you for

**EXHIBIT "A"**

84

allowing Mr. Martinez and I to appear in your courtroom.

THE COURT:  Oh, if you're entered, then you're here.

MR. BENJAMIN:  My client's grandfather traveled down from Salt Lake, Your Honor.  Is there a way to ask the marshals for a visit with him?

THE COURT:  You can ask the marshals and they'll do whatever their policy is regarding visits.  But also the jail does allow visits, so I know he can go see him there.

Anything else from the Government?

MS. HEHR:  No, Your Honor.

THE COURT:  All right.  Thank you all.

(The proceedings concluded at 3:09 P.M.)

**EXHIBIT "A"**

UNITED STATES OF AMERICA

DISTRICT OF NEW MEXICO


CERTIFICATE OF OFFICIAL REPORTER

I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and Federal Official Court Reporter in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, that I did report in stenographic shorthand to the best of my skill and ability the foregoing pages 1-84 of the proceedings set forth herein, that the foregoing is a true and correct transcript of the stenographically recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 24th day of February 2026.


S/Electronically Filed
Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
Federal Official Court Reporter
100 N. Church Street
Las Cruces, NM 88001
Phone: (575) 528-1430
Email:  Vanessa_Alyce@nmd.uscourts.gov


UNITED STATES DISTRICT COURT
100 N. Church St., Las Cruces, NM  88001
(575) 528-1430