IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>**MAXWELL STERLING JENSEN, et al.,**<br><br>Defendants. | No. 5:25-CR-04750-MIS |

**UNITED STATES' WRITTEN CLOSING ARGUMENT
AS TO DEFENDANT CHRISTOPHER ORTEGA**

Pursuant to the Court's direction at the close of the evidence, the United States submits this written closing argument as to Defendant, Christopher Ortega, together with its Proposed Findings of Fact and Conclusions of Law.

## I. INTRODUCTION

The Government's case reduces to a single sentence: Christopher Ortega knew that the oil moving through the Seven Rivers yard was stolen, and wherever his knowledge stopped, it stopped only because he took intentional and deliberate steps to keep it from ever becoming certain.

Indeed, Ortega's own statements frame the issue: he told the agents that he asked Tom Rees, the owner of the Seven Rivers yard, where the oil came from. Gov. Ex. 44a at 23. Moreover, he told law enforcement of the supply crew in the vacuum truck, noting *"I don't feel good about these guys"* Gov. Ex. 44a at 6, and Ortega even told them that he was going to follow the trucks to see for himself. Yet Ortega, despite all these suspicions about the oil's legitimacy, never did. Gov. Ex. 44a at 24. A man with truly no suspicions would have no questions to swallow. Instead, Ortega had the questions, and he made the conscious choice to keep writing tickets instead.

As such, the Court may reach the knowledge element by either of two roads. If the Court finds that Ortega actually knew (and his own words, his coaching on the August 21 recording, and

his pumper's command of oil prices show that he did) then the element is met directly. However, if the Court instead finds that he saw the high probability and deliberately shut his eyes to it, the law treats deliberate ignorance precisely the same as knowledge. Tenth Cir. Pattern Jury Instr. Crim. 1.37 (2021 ed.). Accordingly, either road reaches the same verdict: guilty on Counts 1, 5, and 9.

## II. STANDARD OF REVIEW

The Government must prove each element of each count beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). Count 1 of the superseding indictment charges conspiracy under 18 U.S.C. § 371 and requires (1) an agreement with at least one other person to violate the law; (2) at least one overt act in furtherance; (3) that Ortega knew the essential objective; (4) that he knowingly and voluntarily participated; and (5) interdependence among the members. Tenth Cir. Pattern Jury Instr. Crim. 2.19. Moreover, Counts 5 and 9 charge interstate transportation of stolen goods, 18 U.S.C. §§ 2314 and 2, on or about July 30 and August 21, 2025, and require that stolen crude oil was transported in interstate commerce; that Ortega, as principal or aider and abettor, knew at the time that it was stolen; and that the oil was worth $5,000 or more. Tenth Cir. Pattern Jury Instr. Crim. 2.82, 2.06.

In addition, three settled principles frame the disputed mens rea element which was the primary focus at trial. First, "value" means market value, and the aggregate value of the goods referred to in a single indictment constitutes the value thereof. 18 U.S.C. § 2311. Second, knowledge may be inferred from unexplained possession of recently stolen property. *Barnes v. United States*, 412 U.S. 837, 843 (1973). Third, deliberate ignorance is knowledge: it suffices that the defendant subjectively believed there was a high probability the goods were stolen and took deliberate actions to avoid learning that fact. Furthermore, proof of a date reasonably near the date

charged satisfies an "on or about" allegation. Tenth Cir. Pattern Jury Instr. Crim. 1.18. Accordingly, the argument below walks the trial record against these standards, element by element and count by count.

## III. THE OIL WAS STOLEN

### A. The Court watched the theft happen.

First, this Court does not need to infer that the theft of oil occurred because the Court watched it happen. On July 30, 2025—the very day charged in Count 5—two law-enforcement drones filmed the operation. Over the Plains All American pipeline, Sergeant Investigator Kye Harris's fixed-wing drone aircraft captured the white vacuum truck backed to the pigging riser with the white Plains-marked pickup truck alongside, a hose ran directly into the pipeline infrastructure, three men worked the operation: one on the catwalk gauging the fill while the others manipulated the station valves. The Court witnessed the arm signal to cut the flow by one of the man, the hose drained into the overspill container, and, when the work was finished, the crew high-fiving each other, job complete, mission complete. Tr. of Trial – 1, pp. 71–82; Gov. Exs. 70–75; see also Gov. Ex. 4 (still photograph of the same conduct; Tr. of Trial – 1, pp. 59–61; Tr. of Trial – 2, p. 66).

### B. The insiders admitted the theft occurred.

Moreover, the men on the inside admitted to the scheme. Obed Lopez, a Plains operations supervisor, testified that he was recruited to "pull oil" from the pipeline and was paid $720 in cash per load. Half of the money would be for him and half for the field employee facilitating the theft, and that the thefts ran from March or April 2025, multiple times a week, sometimes multiple times a day. Plains operation sites located in New Mexico at were chosen because "the security threshold was not as tight." Tr. of Trial – 1, pp. 47–53. Furthermore, German Ortiz, the Plains field

employee, corroborated Lopez's testimony: Ortiz opened the way for "[t]he people that arrive in the vac truck," moved the lock, and kept watch "for people not to notice," four or five times a week, for $360 in cash, and "every time," the same vacuum truck left "filled with pure oil from the line." Tr. of Trial – 1, pp. 53, 62–65.

In addition, the August 13 trial camera ties the two cells of the conspiracy together: Ortiz's Plains pickup—identified by Lopez and by Ortiz himself from the Zia emblem—at the theft site at 4:50 p.m., and the same white "MIS, LLC" vacuum truck four minutes behind it. Tr. of Trial – 1, pp. 51–52, 58–59; Tr. of Trial – 2, pp. 64–65, 78–79; Gov. Exs. 35–37. Indeed, the court-authorized trackers completed the loop: the truck ran to approximately five different Plains riser locations, stopped about thirty minutes at each, "and then would return straight back to the Seven Rivers yard" making numerous trips to deliver stolen oil taken from Plains All American Pipeline. Tr. of Trial – 2, pp. 74–77.

**C. The volumes and the purity exclude every innocent account.**

Even if the films and the confessions were set aside, the volumes and the purity would exclude every innocent account on their own. The Court heard the legitimate baseline from a stipulated expert. Pigging a line yields "maybe five to ten barrels" of oil max; a reclamation yard recovers perhaps "two, three barrels" of oil from a hundred barrels of slop. Tr. of Trial – 1, pp. 31, 37–38 (Putnam). Mr. Ortiz put the field figure of pigging operations at Plain's pipelines as lower still: "[a]t the most, five barrels." Tr. of Trial – 1, p. 61. Indeed, the Court heard testimony that vacuum trucks themselves are not placarded and may not lawfully haul large quantities of pure crude oil at all pursuant to the regulations. Tr. of Trial – 1, pp. 28, 43; Tr. of Trial – 2, p. 67.

Against that backdrop the Court can juxtapose the Seven Rivers yard's own records and the contrast is stark: more than four dozen Hound Dog load tickets from Ortega's phone totaling

approximately 5,839 barrels, roughly 93 percent attributed to "Carlos" or "MIS, LLC," virtually every ticket certifying 0.1 percent BS&W. In other words, "[p]erfect oil" in essentially every single load. Tr. of Trial – 2, pp. 83, 121–124; Gov. Exs. 45, 46, 49. As such, the operation at Seven Rivers was essentially Putnam's described reclamation yard in reverse: thousands of barrels of pure, pipeline oil coming in, thousands of barrels of that same pure oil being then sold to a buyer in Texas, and all of this preformed with no processing equipment at all. Tr. of Trial – 3, pp. 78–79. While fractions of a barrel might have been legitimate, five thousand eight hundred barrels of what was essentially pipeline-purity crude oil is not a cleanup operation. It is a theft operation, and its intake paperwork, ticket after ticket, was created by Ortega in his hand.

Accordingly, the first fact of this case—that the oil was stolen—is established many times over.

## IV. ACROSS THE STATE LINE, ABOVE THE THRESHOLD

Nor is there any doubt about where the stolen oil went, because Ortega answered the question himself: *"Most of the time it's Andrews, sometimes it's, uh, town called Tarzan."* Gov. Ex. 44a at 14; *accord* Tr. of Trial – 2, p. 102. Both delivery sites are in Texas. Moreover, the Court saw the oil hauler loading at the Seven Rivers tanks with the hose connected to the red frac tank at one end and the hauler at the other. Tr. of Trial – 1, pp. 96–99 (Hewitt); Gov. Exs. 7–8. Furthermore, the 9G tickets recovered from Ortega's own vehicle carry the Seven Rivers yard's Eddy County coordinates and Texas drop-offs; the pickup account is Caribou Energy, whose owners and address are the same as 9G's. Tr. of Trial – 2, pp. 83–85, 118–119; Gov. Ex. 50.

Indeed, on July 25, 2025, officers followed two 9G haulers from the yard south on Highway 285 to just north of Pecos, Texas, and east to a LACT station, where they hooked up and unloaded the oil from the truck. This Court heard testimony that this LACT station, like every LACT, accepts

only pipeline grade crude oil. Tr. of Trial – 2, pp. 4–10, 70–72; Tr. of Trial – 1, pp. 34–36; Gov. Exs. 41–42.

As for value, the element of the $5,000 threshold is met many times over. The Court heard testimony that market price of low-BS&W crude in the summer of 2025 was approximately $67 to $68 per barrel. Tr. of Trial – 1, pp. 37–38. Furthermore, Ortega himself was able to recite similar market prices on the spot. Indeed, at that price the $5,000 statutory threshold is roughly seventy-five barrels and each load Ortega accepted and documented on the charged dates cleared that threshold standing alone: 131, 139, and 141 barrels on July 30 (approximately $8,777, $9,313, and $9,447, respectively), and 138 and 143 barrels on August 21 (approximately $9,246 and $9,581). Gov. Ex. 49 at 5–7, 40–41. Virtually every load on the 9G tickets, moreover, ran 130 to 196 barrels. Gov. Ex. 50. Moreover, the money confirms it: six Caribou/9G deposits between June 24 and July 31 totaling $192,660, and $362,873 across the life of the yard. Tr. of Trial – 3, pp. 14–20; Gov. Exs. 57, 76. Value aggregates across the goods referred to in the indictment in any event. 18 U.S.C. § 2311. Accordingly, the interstate-transportation and value elements are satisfied as to every charged transaction several times over.

## V. ORTEGA WAS THE CONSPIRACY'S INTAKE AND HE WAS PAID ACCORDINGLY.

So who was Christopher Ortega within this operation? Ortega's own words described that his job was to keep the yard secured, gauge the tanks, write the tickets, find more oil for commission, and send everything to Tom Rees, the owner of the yard according to LLC and bank records for Hound Dog Energy LLC. Gov. Ex. 44a at 2. Indeed, Ortega was the yard's sole employee. Tr. of Trial – 3, p. 75. His weekly report, from his phone provided Tom Rees with updates: *"Last week 2518 bbls brought in carlos 2413 levi 105. Sold 2246 bbls. We have 438 bbls on location."* He even provided his own assessment of the operation, *"Dam good week."* Gov. Ex.

48 at 6; Tr. of Trial – 2, pp. 134–135. He also sent words of encouragement to vacuum-truck crew: *"Yall are doing a badass job. We making that money."* Gov. Ex. 47 at 5; Tr. of Trial – 2, p. 128.

Moreover, he wrote the business records which, in his view, served to attempt to legitimize what was known to be stolen oil. The tickets he signed certified 0.1 percent sediment and water, load after load — even though the yard could not test oil at all: *"Tom always just told me, just put 0.1 until we get it tested out. ... Point one every time. Yeah."* Gov. Ex. 44a at 47–48; Gov. Ex. 45; Tr. of Trial – 3, p. 39. And to Ortega's credit, no testing was ever needed because that vacuum truck would always bring in perfect oil. Such consistency is yet another factor which would make it blatantly clear that the incoming oil was not from waste but was coming directly out of a pipeline.

Ortega had other responsibilities at the yard as he was paid five dollars a barrel to recruit more supply of clean pipeline-grade oil. Gov. Ex. 44a at 46. Indeed, as discussed below, Ortega told Dollar of his efforts to attempt to recruit such oil without being caught by law enforcement.

Furthermore, Ortega involved himself in the conspiracy not only as a man taking deliveries but as the bookkeeper of the operation. On August 7, Ortega messaged Carlos, the operator of the white M.I.S. LLC vacuum truck: *"Your boy did good i told tom he said hell yea so ill get the money from him and get us all paid."* Gov. Ex. 47 at 2. The next morning, however, Rees answered Ortega with a division of proceeds stated in advance: *"Carlos check is for 14,040 and your guy gets 3,850 and you get 550 with that total check as 4,400 just don't cash that one until my wire comes in."* Gov. Ex. 48 at 4; Tr. of Trial – 3, p. 38. The business financial records received in the investigation show that this instruction was carried out to the exact dollar: first there was an August 8 check to Carlos Contreras for $14,040, Tr. of Trial – 3, p. 24, Gov. Exs. 55, 77; then there was a wire from the oil buyer — $93,213 into Hound Dog LLC bank account on August 11, Gov. Ex. 76; and finally, $550 was paid to Chris Ortega by Cash App on August 11, the day the wire landed. Tr. of

Trial – 3, pp. 25–26; Gov. Ex. 77. Indeed, the operation was executed like clockwork to ensure the operations of Hound Dog LLC were carried out with zero discrepancies. It is difficult to imagine clearer proof of an agreement than one conspirator announcing the split and the ledger executing it on schedule.

Ultimately, Chris Ortega's actions of gauging, ticketing, logging, recruiting, reporting, and celebrating the take are not representative of someone who was in close proximity to a conspiracy. Chris Ortega was a critical part of the conspiracy serving as the intake function of the operation. In exchange for his work managing the site and serving as the bookkeeper by drafting the load tickets, he was paid weekly and was offered career advancement by expanding the oil theft ring by recruiting additional sources of supply. Accordingly, the participation, overt-act, and interdependence elements are proved out of the conspiracy's own records.

**VI. ORTEGA KNEW THE OIL WAS STOLEN**

During the trial, knowledge is the only element that is genuinely contested; however, the proof of it is Ortega's own voice in his post-arrest statement on the night of his arrest, and on a recording made when he had no idea law enforcement was listening.

(1) **First, Ortega noted that he questioned the source from the start.** *"I asked him one time where he was getting it … I told Tom this, I was like, I don't feel good about these guys. … You gotta prove where this oil's coming from."* Gov. Ex. 44a at 6. He worked the scenarios — a frac job, a well watcher diverting tanks — and told Rees, *"dude, we need to … watch what we're doing here."* Gov. Ex. 44a at 24. Ortega then states he decided to press on because of Rees's answer, every time: *"just write the tickets." Id.*; Tr. of Trial – 2, p. 106; Tr. of Trial – 3, pp. 85–86.

(2) **Ortega then identified the oil as non-waste.** *"I told him that, you know, this shit don't just come out of … waste."* Gov. Ex. 44a at 23. On cross-examination Ortega doubled down and confirmed: *"even in your interview, you repeatedly told the agents, 'This ain't from slop.'"* — "I know that." Tr. of Trial – 3, p. 88.

(3) **Next Ortega admitted he knew exactly what the tickets were for.** Ortega recounted Rees's instruction: *"just keep writing the tickets that saves our ass."* Gov. Ex. 44a at 23. Furthermore, Ortega gave the same coaching, unprompted, to the man he believed was a new supplier working for Max Jensen: *"Always make them sign your tickets. … That covers your ass. … saying, nah, dude, I buy waste oil. Like, here's the ticket. That's what I bought."* Gov. Ex. 34a at 9.

(4) **Ortega specifically knew of and articulated several red flags indicating that the oil was stolen.** Ortega recounted that the vacuum truck ran with an armed escort — "So it's like an armed guard when they go out and get oil?" — *"Yeah, I know."* Gov. Ex. 44a at 26; Tr. of Trial – 2, p. 107; Tr. of Trial – 3, p. 80. Loads arrived at night, sight unseen: *"Just put it in the red tank both loads … I'll make tickets in the morning."* Gov. Ex. 47 at 4; *see also* Tr. of Trial – 1, pp. 94–95 (night drone footage); Gov. Ex. 12. Indeed, when a law-enforcement tracker turned up on Carlos's truck, and Ortega's reaction was concealment: *"And after that I told Tom, we need to cover our butts."* Gov. Ex. 44a at 7. No innocent yard hand needs to cover if the operation is legitimate.

(5) **Indeed, Ortega knew that the purchase price of the oil itself said it was stolen.** Ortega pumped for Cimarex for three to four years, Gov. Ex. 44a at 19; Tr. of Trial – 3, pp. 53–54, and he priced crude oil from memory on the recording at seventy-five dollars a barrel. Gov. Ex. 34a at 4. His yard paid thirty-five which is "not" the market

value of clean oil, Tr. of Trial – 2, p. 99 and he knew 9G paid fifty-five. Tr. of Trial – 3, p. 79. His own recruits understood the thirty-five-dollar price "instantly … I mean instantly." Gov. Ex. 34a at 6. Thirty-five dollars a barrel said everything to those who were in the oil industry.

(6) **Finally, the August 21 recording explains Ortega's methods of avoiding detection or interference by law enforcement.** Ortega lauded the yard on its low profile and lack of interference by law enforcement: *"We're quiet out here. Nobody fucks with us . . . It's quiet, quiet. We don't get no, no problems, no."* Gov. Ex. 34a at 3. Ortega warned that the FBI ran stings in the field, he gave advise on how to avoid being caught by explaining a recruiting rule: deal with "independents"—counterparties selected precisely because they would not ask questions and would not report. Gov. Ex. 34 at 14:30–16:29; Gov. Ex. 34a at 5–6. When discussing purchasing skimmed oil, Ortega explained that he worried about exactly one thing: *"what if the oil company gets on to it? Then we lose our oil buyer."* Gov. Ex. 34a at 6. A man buying lawful waste oil would never have an oil company to fear. His standing pitch was aimed at oil with no lawful home — find someone who *"don't know what to do with that oil ... that they get,"* and steer it away from the disposal wells to his yard. *Id.* And finally, when explaining that 'one word' that no one at that yard would say, Ortega explained: *"It's pretty simple, man. Like the guys that are trying to bring you stolen shit. They'll, they'll let you know. ... Yeah, we don't use that word."* Gov. Ex. 34a at 10. A legitimate oil business does not have a forbidden word. The forbidden word here was "stolen." That is not caution; that is concealment, practiced as a business method.

(7) **Ultimately, Ortega admitted the knowledge element on cross-examination.** Confronted on cross-examination with the August 11–13 window (eight loads from Carlos in the M.I.S. LLC vacuum truck, roughly a thousand barrels in three days) Ortega admitted "a knowledge of a high probability that this is probably illegally or illicit oil," and that he continued to process the oil anyway: "With my concerns, yes." Tr. of Trial – 3, pp. 87–88. His suspicion began far earlier: he conceded he became suspicious on July 22–24, three consecutive days of 130-plus-barrel loads, Tr. of Trial – 3, p. 84, and his own wife dated his worry to "the end of July, roughly." Tr. of Trial – 3, p. 95. Accordingly, the record establishes actual knowledge.

## VII. IF ANY DOUBT SURVIVES, DELIBERATE IGNORANCE CLOSES IT

However, even if the Court has reservations that Ortega had actual knowledge, the doctrine of deliberate ignorance closes it. Willful blindness requires two things: a subjective belief in a high probability that the fact exists, and deliberate action to avoid learning it. Instr. 1.37. Ortega admitted the first prong outright on cross-examination, Tr. of Trial – 3, pp. 87–88, and the record supplies its foundation three ways besides: he recognized that the M.I.S LLC vacuum truck consistently delivered unusually large volumes of unusually pure oil; he knew that Seven Rivers performed no purification of any kind; and he acknowledged that the prices paid and charged were inconsistent with lawful market rates. Gov. Ex. 44a at 6, 23; Tr. of Trial – 3, pp. 78–80; Tr. of Trial – 2, p. 99. He narrated the second prong himself: *"I told Tom I was gonna follow 'em."* Rees: *"do it."* Ortega: *"And I just never did."* Gov. Ex. 44a at 24. *"I never asked. I didn't ask. And that's my mistake, should have asked."* Gov. Ex. 44a at 40. *"My old lifestyle just made me not ask questions."* Gov. Ex. 44a at 45. And on cross examination: "You decide, again, just better not to ask questions, right?" — "Yes." Tr. of Trial – 3, p. 89. He stood at the one door that would have

told him, 'where do hundreds of barrels of perfect oil come from' and deliberately chose not to open it.

Moreover, the instruction's caveat does Ortega no good: nothing in this record supports an actual belief that the oil was lawful. A man who actually believes his oil is legitimate does not need to "cover our butts" when a tracker appears, does not banish the word "stolen," and does not recruit counterparties for their silence. Accordingly, whichever road the Court takes (actual knowledge or deliberate ignorance) the destination is the same.

## VIII. THE COUNTS

The application of § 2314 and § 2 to Ortega's conduct deserves to be stated plainly at the outset. By accepting and gauging the stolen loads, documenting them on tickets he wrote and signed, meeting the 9G haulers at every pickup and signing their outgoing tickets, and maintaining the yard's operational readiness as its sole employee, Ortega performed acts that were a substantial factor in causing the stolen oil to be transported from New Mexico to Texas. Such conduct satisfies the "caused to be transported" element directly. Tr. of Trial – 3, pp. 61, 75–77, 87; Tr. of Trial – 2, pp. 102–103, 118–119; Gov. Exs. 49–50. Moreover, Ortega's knowledge that the oil was stolen, coupled with his repeated assistance in receiving, staging, and releasing it for interstate sale, shows that he intentionally associated himself with the unlawful venture and sought by his actions to make it succeed; indeed, Ortega's continued participation despite acknowledging that the oil was too pure, too consistent, and too voluminous to be waste, demonstrates the required intent. Instr. 2.06; Gov. Ex. 44a at 23; Tr. of Trial – 3, pp. 87–88.

### A. Count 5, July 30, 2025.

As set forth above, the Court watched the July 30 theft on the drone footage, Gov. Exs. 70–75, watched the same truck deliver to the Seven Rivers tanks while Ortega gauged them, Gov. Exs.

9–10; Tr. of Trial – 2, p. 74, and can read the day's intake in Ortega's hand: three tickets, 411 barrels, 0.1 BS&W. Gov. Ex. 49 at 5–7. The interstate shipments bracket the charged date: 172.84 barrels to Andrews on July 29 and four loads totaling 575.8 barrels on July 31. Doing some quick math, such loads would be worth approximately $11,580 and $38,578 at the Court-confirmed market price. Gov. Ex. 50. Moreover, proof of a date reasonably near the date alleged satisfies the indictment, Instr. 1.18, and knowledge as of that date follows from Parts VI and VII: his suspicion was fixed by July 22–24, and his deliberate refusal to learn more supplies the rest. Accordingly, Count 5 is proved beyond a reasonable doubt.

**B. Count 9, August 21, 2025.**

The Court inquired at the directed-verdict stage what evidence shows the movement of stolen oil on the day of the arrests. Tr. of Trial – 3, p. 97. Importantly, the record answers that question four ways. First, 9G load tickets dated August 21 document pickups from the yard that day. Second, that morning's stolen inventory is documented in Ortega's hand and falsified in real time: tickets 183 and 184, 281 barrels at 0.1 BS&W, with the red tank's gauge written up from 97 to 99. Such oil was held for Seven River's only sales channel, 9G/Caribou, under a business model that turned every barrel around within hours or days. Gov. Ex. 49 at 40–41; Gov. Ex. 47 at 6; Tr. of Trial – 3, pp. 78–79. Third, the "on or about" allegation of Count 9 also reaches the August 19 shipments—120 barrels to Andrews, more than $8,000 at market—and value of such loads aggregates across the goods referred to in the indictment. *See* Gov. Ex. 50; Instr. 1.18; 18 U.S.C. § 2311. Fourth, the offense is a continuing one that began in New Mexico. 18 U.S.C. § 3237(a). As such, Ortega's acts that morning of accepting shipments of oil, gauging tanks, ticketing, and falsifying the records by changing the gauge readings — were a substantial factor in the

transportation that followed and are precisely the intentional association and participation that aiding-and-abetting liability requires. Instr. 2.06. Accordingly, Count 9 is proved.

**C. Count 1, the Conspiracy.**

Finally, for the conspiracy count, the United States proved an agreement, tacit or express, among Ortega, Contreras, Rees, and Jensen to receive stolen crude oil at the Seven Rivers yard, consolidate it, and sell it to 9G Energy for interstate transport; such an agreement may be inferred from coordinated action, shared economic interest, and the participants' own words, and this record supplies all three. The agreement is proved the way agreements are always proved: by performance of the parties. Rees announced and directed payment splits in advance; the books executed it to the dollar; Ortega collected his share on the schedule the wire allowed. Gov. Exs. 47–48, 55, 76–77; Tr. of Trial – 3, pp. 24–26. Indeed, the repeated deliveries, the consistent below-market pricing, and the continuous interstate sales demonstrate concerted activity that only an agreement explains.

Moreover, multiple overt acts were committed in furtherance of that agreement. For example, there are Contreras's repeated thefts using the M.I.S. vacuum truck, Ortega's repeated acceptance and documentation of the stolen loads, and the 9G haulers' interstate transport and sale of the oil and any one of them satisfies § 371's overt-act requirement. Tr. of Trial – 2, p. 76; Gov. Exs. 46, 49–50.

Furthermore, Ortega knew the conspiracy's essential objective: obtaining stolen crude oil and profiting from its interstate sale. His recognition of Max Jensen's prior arrest for oil theft, his own statements about the oil's purity, and his continued acceptance of loads after acknowledging the high likelihood of theft each demonstrate knowledge of that unlawful goal. Tr. of Trial – 2, pp. 52–53, 55; Gov. Ex. 44a at 23; Tr. of Trial – 3, pp. 87–90. In addition, he knew the enterprise

above him: that Rees "does everything that Max tells him to do," that Jensen monitored the yard's volume and ordered the numbers up on a three-way call, and that Jensen was taking proceeds. Tr. of Trial – 2, pp. 100–102, 112; Tr. of Trial – 3, pp. 89–91.

Ortega's participation, moreover, was voluntary and anything but incidental: he continued to operate the yard, accept the stolen oil, write and sign the tickets, and facilitate the sales to 9G, and that conduct was integral to the conspiracy's overall success and without its sole intake employee, the Seven Rivers yard did not function at all. Tr. of Trial – 3, pp. 75–77.

Finally, the conspiracy was marked by clear interdependence amongst its members, and the record maps each dependency: Contreras depended on Ortega and the yard to receive, store, and pay for the oil; Ortega depended on Contreras for supply and on 9G for the interstate buyer; Jensen and Rees depended on Ortega to maintain the yard's operations and generate its revenue. Indeed, Jensen personally called to order the numbers up; and the haulers depended on Ortega's signed documentation to move the oil to Texas under cover of apparent legitimacy. Each participant's actions were mutually reinforcing and directed toward the shared illicit objective: $284,155 to Contreras, $11,500 to Ortega, none of it payable until the 9G wire for the sale of the stolen oil to Texas landed. Tr. of Trial – 3, pp. 24–29, 91; Tr. of Trial – 2, pp. 100–102, 133; Gov. Ex. 34a at 9. Notably, the conspiracy was compartmentalized into multiple smaller divisions. But the fact that the pipeline cell with and the Seven Rivers yard cell never met, Tr. of Trial – 1, pp. 53–54, 63, changes nothing, because each link moved the same oil toward the same Texas sale. Each smaller compartment and division worked because it was orchestrated by Max Jensen and his underlings. Accordingly, each element of Count 1 is satisfied.

## IX. CONCLUSION

In the end, the Court need only lay the record against the elements. The oil was stolen: the Court watched the theft on video, heard it from the Plains insiders who committed it, and counted it across the tickets that Chris Ortega wrote. Moreover, oil moved in interstate commerce, from Eddy County to Andrews and Martin Counties, and every charged transaction cleared $5,000 several times over. Furthermore, Ortega participated—he gauged, ticketed, logged, recruited, reported, and was paid $11,500 for it. Ultimately, Ortega knew the business he was in, and he told the agents his suspicions in his own voice, he coached a stranger that the tickets exist to cover it, and where his knowledge fell short of certainty, it was because he stood at the one door that would have confirmed it and chose not to open it.

Taken together, the coordinated thefts, Ortega's knowledge and active participation, the interstate movement of stolen oil whose value cleared the statutory threshold on every charged date, and the participants' interdependence demonstrated satisfies every element of Counts 1, 5, and 9 beyond a reasonable doubt.

Accordingly, the United States respectfully asks the Court to find Christopher Ortega guilty of Counts 1, 5, and 9.

Respectfully submitted,

TODD BLANCHE
Attorney General
RYAN ELLISON
First Assistant United States Attorney

***/s/ Electronically filed on 8/28/2026***
JAMES DICKENS
BENJAMIN SUSLAVICH
Assistant United States Attorney
200 N. Church Street
Las Cruces, New Mexico 88011
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record.

***/s/ Electronically filed on 8/28/2026***
JAMES DICKENS
Assistant United States Attorney